# Exhibit 13

**FOX ROTHSCHILD LLP**
*Formed in the Commonwealth of Pennsylvania*
BY:    Henry L. Kent-Smith, Esq.  (Atty. ID #034211988)
       Irina B. Elgart, Esq.  (Atty. ID #027311999)
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648-2311
(609) 896-3600
*Attorneys for Plaintiff, 615 River Road Partners, LLC*

| | |
|---|---|
| 615 RIVER ROAD PARTNERS, LLC, | SUPERIOR COURT OF NEW JERSEY |
| | LAW DIVISION: BERGEN COUNTY |
| Plaintiffs, | |
| | DOCKET NO.: BER-L- $3\,6\,3\,8\text{-}17$ |
| v. | |
| | CIVIL ACTION |
| BOROUGH OF EDGEWATER, iPARK | |
| EDGEWATER, LLC; iPARK EDGEWATER | ORDER TO SHOW CAUSE |
| HOLDINGS, LLC; iPARK EDGEWATER | |
| INVESTMENTS, INC.; NATIONAL | |
| RESOURCES ACQUISITIONS, LLC; | $FILED$ |
| NORTH BUILDING EDGEWATER, LLC; | |
| ONE MAIN STREET EDGEWATER, LLC; | MAY 3 0 2017 |
| FOUR MAIN STREET EDGEWATER, | |
| LLC; EDGEWATER LOFTS, LLC; | GREGG A. PADOVANO, J.S.C. |
| EDGEWATER GLASS HOUSE, LLC; | |
| DAIBES ENTERPRISES, LLC; DAIBES | |
| BROTHERS, INC.; DDD & ASSOCIATES, | |
| LLC; 2 PEMBROKE WAY ASSOCIATES, | |
| LLC; 4 PEMBROKE WAY ASSOCIATES, | |
| LLC; 45 RIVER ROAD ASSOCIATES, | |
| LLC; and XYZ CORPORATIONS 1-10, | |
| | |
| Defendants. | |

Plaintiff, 615 River Road Partners, LLC, a New Jersey limited liability company, by way

of Complaint in Lieu of Prerogative Writs against hereby states and avers as follows:

THIS MATTER having been brought before the Court by Fox Rothschild LLP, attorneys

for Plaintiff, 615 River Road Partners, LLC. ("Plaintiff"), seeking relief by way of temporary

restraints pursuant to R. 4:52, based upon the facts set forth in the Verified Complaint filed

herewith; and it appearing that Defendants, Borough of Edgewater; iPark Edgewater, LLC; iPark Edgewater Holdings; LLC, iPark Edgewater Investments, Inc:, National Resources Acquisitions, LLC; North Building Edgewater, LLC; One Main Street Edgewater, LLC; Four Main Street Edgewater, LLC: Edgewater Lofts, LLC; Edgewater Glass House, LLC; Daibes Enterprises, LLC; Daibes Brothers, Inc.; DDD & Associates, LLC; 2 Pembroke Way Associates, LLC; 4 Pembroke Way Associates, LLC; 45 River Road Associates, LLC; and XYZ Corporations 1-10 (collectively "Defendants"), have notice of this application, and for good cause shown:

It is on this 30TH day of *MAY*, 2017, *ORDERED* that Defendants shall appear and show cause before the Superior Court of New Jersey, Bergen County, 10 Main Street, Hackensack, New Jersey 07601, at $11:00$ o'clock in the *A.M.* ~~noon,~~ or as soon thereafter as counsel can be heard, on the 30TH day of *JUNE*, 2017 why an order should not be issued:

    a.    For the issuance of an Order declaring iPark Redevelopment Group and Daibes Redevelopment Group in violation of COAH regulations, N.J.A.C. 5:93-5.6(d) and N.J.A.C. 5:94-4.4(f), Ordinance 240-154D(2), the 2007 Agreement, the 2013 Amended Plan, and the 2015 Deed Restriction;

    b.    For the issuance of an Order of Mandamus compelling the Borough of Edgewater to enforce Ordinance 240-154D(2), the 2007 Agreement, and the 2013 Amended Plan by requiring Defendants to comply with COAH regulations N.J.A.C. 5:93-5.6(d) and N.J.A.C. 5:94-4.4(f) to construct (75) units of affordable housing prior to the issuance of any certificate of occupancy, either temporary, conditional or permanent, for any market rate residential unit on the iPark Property;

c. For the issuance of an Order enjoining the Borough of Edgewater from issuing any permits or approvals; including zoning permits, building/construction permits, and certificates of occupancy, either temporary, conditional or permanent; for any construction on the iPark Property until such time the Borough issues permanent certificates of occupancy for at least (75) affordable housing units;

d. For the issuance of an Order of Mandamus compelling the Borough to issue a notice of violation and stop work order to the Defendants to abate the violation to its approvals;

e. For the issuance of an order directing Defendants to immediately file for building permits to authorize the construction of seventy five (75) affordable housing units;

f. For the issuance of an equitable lien over sales and lease proceeds against the iPark Property and Defendants until the Borough issues permanent certificates of occupancy for seventy five (75) affordable housing units;

g. For an Order invalidating and striking the following language from the 2015 Deed Restriction: "without the express written consent of Grantor so long as Grantor, or any entity affiliated with Grantor owns any portion of the Unilever Redevelopment Area";

h. For the issuance of an Order revoking the Borough's immunity from builder's remedy litigation for failure to provide a realistic opportunity for affordable housing; and

i. For such other relief as may be deemed equitable and just, together with costs and counsel fees.

**IT IS FURTHER ORDERED** that, pending the return date hereof or such other and further Order of the Court, Defendants, be and the same hereby are, **TEMPORARILY RESTRAINED AND ENJOINED** as follows:

    a)    iPark Redevelopment Group and Daibes Redevelopment Group are temporarily restrained and enjoined from taking any further action with regard to the iPark Property and/or proceeding with any construction on the iPark Property other than actions and construction for the development of at least (75) affordable housing units;

    b)    The Borough of Edgewater is temporarily restrained and enjoined from issuing any permits or approvals; including zoning permits, building/construction permits, and certificates of occupancy, either temporary, conditional or permanent; for any construction on the iPark Property until such time the Borough issues permanent certificates of occupancy for at least (75) affordable housing units;

    c)    The Court imposes a temporary equitable lien over sales and lease proceeds against the iPark Property and Defendants pending the return date herein; and

    d)    For such other relief as may be deemed equitable and just, together with costs and counsel fees.

    IT IS FURTHER ORDERED, as follows

    1.    Defendants may move to dissolve or modify the temporary restraints herein contained on two (2) days' notice to Plaintiff's attorney.

    2.    A copy of this order to show cause, verified complaint, legal memorandum and any supporting affidavits or certifications submitted in support of this application shall be served upon

the Defendants personally within ____ days of the date hereof, in accordance with R. 4:4-3 and R. 4:4-4, this being original process.

3. The Plaintiff must file with the court its proof of service of the pleadings on the Defendants no later than three (3) days before the return date.

4. Defendants and any interested party shall file and serve a written response to this order to show cause and the request for entry of injunctive relief and proof of service by $\mathcal{J}\nu\mathcal{N}\mathcal{E}$ ___ 2017. The original documents must be filed with the Clerk of the Superior Court in the county listed above. You must send a copy of your opposition papers directly to Hon. *court room 335* **GREGG A. PADOVANO,** whose address is 10 Main Street, Hackensack, New Jersey 07601. You must also send a copy of your opposition papers to the Plaintiff's attorney whose name and address appears above. A telephone call will not protect your rights; you must file your opposition and pay the required fee and serve your opposition on your adversary, if you want the court to hear your opposition to the injunctive relief the Plaintiff is seeking.

5. The Plaintiff must file and serve any written reply to the Defendants' order to show cause opposition by $\mathcal{J}\nu\mathcal{N}\mathcal{E}$ ___ , 2017. The reply papers must be filed with the Clerk of the Superior Court in the county listed above and a copy of the reply papers must be sent directly to the chambers of the Judge listed above.

6. If the Defendants do not file and serve opposition to this order to show cause, the application will be decided on the papers on the return date and relief may be granted by default, provided that Plaintiff files a proof of service and a proposed form of order at least three days prior to the return date.

7.    If Plaintiff has not already done so, a proposed form of order addressing the relief sought on the return date (along with a self-addressed return envelope with return address and postage) must be submitted to the court no later than three (3) days before the return date.

8.    Defendants take notice that the Plaintiff has filed a lawsuit against you in the Superior Court of New Jersey. The Verified Complaint attached to this order to show cause states the basis of the lawsuit. If you dispute this Complaint, you, or your attorney, must file a written answer to the complaint and proof of service within 35 days from the date of service of this order to show cause; not counting the day you receive it.

These documents must be filed with the Clerk of the Superior Court in the county listed above, include a filing fee payable to the "Treasurer State of New Jersey." You must also send a copy of your Answer to the Plaintiff's attorney whose name and address appear above. A telephone call will not protect your rights; you must file and serve your Answer (with the fee) or judgment may be entered against you by default. Please note: Opposition to the order to show cause is not an Answer and you must file both. Please note further: if you do not file and serve an Answer within 35 days of this Order, the Court may enter default against you for the relief Plaintiff demands.

9.    If you cannot afford an attorney, you may call the Legal Services office in the county in which you live. If you do not have an attorney and are not eligible for free legal assistance you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory of these offices is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

10.   The Court will entertain argument, but not testimony, on the return date of the order

to show cause, unless the court and parties are advised to the contrary no later than ___3___ days

before the return date.

GREGG A. PADOVANO, J.S.C.

11.   DEFENDANT BOROUGH
OF EDGEWATER SHALL
PROVIDE THE COURT
WITH COPIES OF ANY
CERTIFICATE OF OCCUPANCY
(PERMANENT, TEMPORARY, CONDITIONAL, ETC.)
ISSOED FOR THE SUBJECT
PARK PROPERTY(IES) REFERENCED IN
THE VERIFIED COMPLAINT DURING
MAY 30, 2017 THROUGH AND INCLUDING
JUNE 30, 2017, AS STATED ON THE
RECORD.



## Fox Rothschild LLP
### ATTORNEYS AT LAW

Mail: P. O. Box 5231, Princeton, NJ 08543-5231
Princeton Pike Corporate Center
997 Lenox Drive
Building 3
Lawrenceville, NJ 08648-2311
Tel (609) 896-3600  Fax (609) 896-1469
www.foxrothschild.com

HENRY L. KENT-SMITH
Direct No: 609-896-4584
Email: hkent-smith@FoxRothschild.com

May 26, 2017

**VIA HAND DELIVERY**
Clerk, Law Division/Civil Part
Bergen County Justice Center
10 Main Street
Hackensack, New Jersey 07601

> **Re:** **615 River Road Partners, LLC v. Borough of Edgewater, et al**
> **Docket No. TBA**

Dear Sir/Madam:

This law firm represents plaintiff, in the above-referenced action. Enclosed for filing are the originals and three (3) copies of the following documents:

1. Order to Show Cause;

2. Verified Complaint in Lieu of Prerogative Writ;

3. Brief of Plaintiff in support of Application for Order to Show Cause;

4. Case Information Statement; and

5. Certification of Service.

Please file the originals and return a file-stamped copy to the undersigned. Please charge the filing fee to this Firm's Superior Court Account #31965. In addition, upon execution of the Order to Show Cause, please return a filed stamped copy of executed Order to Show Cause in the enclosed self-addressed, stamped envelope.

Very truly yours,

Henry L. Kent-Smith

HLKS:jfp
Enclosures
cc:    Service List

49316189.v1

**FOX ROTHSCHILD LLP**
*Formed in the Commonwealth of Pennsylvania*
BY:    Henry L. Kent-Smith, Esq. (Atty. ID #034211988)
         Irina B. Elgart, Esq. (Atty. ID #027311999)
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648-2311
(609) 896-3600
*Attorneys for Plaintiff, 615 River Road Partners, LLC*

| | |
|---|---|
| 615 RIVER ROAD PARTNERS, LLC, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION:  BERGEN COUNTY |
| Plaintiffs, | |
| | DOCKET NO.:  BER-L- |
| v. | |
| | CIVIL ACTION |
| BOROUGH OF EDGEWATER, iPARK EDGEWATER, LLC; iPARK EDGEWATER HOLDINGS, LLC; iPARK EDGEWATER INVESTMENTS, INC.; NATIONAL RESOURCES ACQUISITIONS, LLC; NORTH BUILDING EDGEWATER, LLC; ONE MAIN STREET EDGEWATER, LLC; FOUR MAIN STREET EDGEWATER, LLC; EDGEWATER LOFTS, LLC; EDGEWATER GLASS HOUSE, LLC; DAIBES ENTERPRISES, LLC; DAIBES BROTHERS, INC.; DDD & ASSOCIATES, LLC; 2 PEMBROKE WAY ASSOCIATES, LLC; 4 PEMBROKE WAY ASSOCIATES, LLC; 45 RIVER ROAD ASSOCIATES, LLC; and XYZ CORPORATIONS 1-10, | **ORDER TO SHOW CAUSE** |
| Defendants. | |

Plaintiff, 615 River Road Partners, LLC, a New Jersey limited liability company, by way of Complaint in Lieu of Prerogative Writs against hereby states and avers as follows:

THIS MATTER having been brought before the Court by Fox Rothschild LLP, attorneys for Plaintiff, 615 River Road Partners, LLC. ("Plaintiff"), seeking relief by way of temporary restraints pursuant to R. 4:52, based upon the facts set forth in the Verified Complaint filed

herewith; and it appearing that Defendants, Borough of Edgewater; iPark Edgewater, LLC; iPark Edgewater Holdings; LLC, iPark Edgewater Investments, Inc., National Resources Acquisitions, LLC; North Building Edgewater, LLC; One Main Street Edgewater, LLC; Four Main Street Edgewater, LLC: Edgewater Lofts, LLC; Edgewater Glass House, LLC; Daibes Enterprises, LLC; Daibes Brothers, Inc.; DDD & Associates, LLC; 2 Pembroke Way Associates, LLC; 4 Pembroke Way Associates, LLC; 45 River Road Associates, LLC; and XYZ Corporations 1-10 (collectively "Defendants"), have notice of this application, and for good cause shown:

It is on this _____ day of _____, 2017, *ORDERED* that Defendants shall appear and show cause before the Superior Court of New Jersey, Bergen County, 10 Main Street, Hackensack, New Jersey 07601, at _____ o'clock in the _____ noon, or as soon thereafter as counsel can be heard, on the _____ _____ day of _____, 2017 why an order should not be issued:

      a.    For the issuance of an Order declaring iPark Redevelopment Group and Daibes Redevelopment Group in violation of COAH regulations, N.J.A.C. 5:93-5.6(d) and N.J.A.C. 5:94-4.4(f), Ordinance 240-154D(2), the 2007 Agreement, the 2013 Amended Plan, and the 2015 Deed Restriction;

      b.    For the issuance of an Order of Mandamus compelling the Borough of Edgewater to enforce Ordinance 240-154D(2), the 2007 Agreement, and the 2013 Amended Plan by requiring Defendants to comply with COAH regulations N.J.A.C. 5:93-5.6(d) and N.J.A.C. 5:94-4.4(f) to construct (75) units of affordable housing prior to the issuance of any certificate of occupancy, either temporary, conditional or permanent, for any market rate residential unit on the iPark Property;

c.     For the issuance of an Order enjoining the Borough of Edgewater from issuing any permits or approvals; including zoning permits, building/construction permits, and certificates of occupancy, either temporary, conditional or permanent; for any construction on the iPark Property until such time the Borough issues permanent certificates of occupancy for at least (75) affordable housing units;

d.     For the issuance of an Order of Mandamus compelling the Borough to issue a notice of violation and stop work order to the Defendants to abate the violation to its approvals;

e.     For the issuance of an order directing Defendants to immediately file for building permits to authorize the construction of seventy five (75) affordable housing units;

f.     For the issuance of an equitable lien over sales and lease proceeds against the iPark Property and Defendants until the Borough issues permanent certificates of occupancy for seventy five (75) affordable housing units;

g.     For an Order invalidating and striking the following language from the 2015 Deed Restriction: **"without the express written consent of Grantor so long as Grantor, or any entity affiliated with Grantor owns any portion of the Unilever Redevelopment Area"**;

h.     For the issuance of an Order revoking the Borough's immunity from builder's remedy litigation for failure to provide a realistic opportunity for affordable housing; and

i.     For such other relief as may be deemed equitable and just, together with costs and counsel fees.

IT IS FURTHER ORDERED that, pending the return date hereof or such other and further Order of the Court, Defendants, be and the same hereby are, **TEMPORARILY RESTRAINED AND ENJOINED** as follows:

a)   iPark Redevelopment Group and Daibes Redevelopment Group are temporarily restrained and enjoined from taking any further action with regard to the iPark Property and/or proceeding with any construction on the iPark Property other than actions and construction for the development of at least (75) affordable housing units;

b)   The Borough of Edgewater is temporarily restrained and enjoined from issuing any permits or approvals; including zoning permits, building/construction permits, and certificates of occupancy, either temporary, conditional or permanent; for any construction on the iPark Property until such time the Borough issues permanent certificates of occupancy for at least (75) affordable housing units;

c)   The Court imposes a temporary equitable lien over sales and lease proceeds against the iPark Property and Defendants pending the return date herein; and

d)   For such other relief as may be deemed equitable and just, together with costs and counsel fees.

IT IS FURTHER ORDERED, as follows

1.   Defendants may move to dissolve or modify the temporary restraints herein contained on two (2) days' notice to Plaintiff's attorney.

2.   A copy of this order to show cause, verified complaint, legal memorandum and any supporting affidavits or certifications submitted in support of this application shall be served upon

the Defendants personally within _____ days of the date hereof, in accordance with R. 4:4-3 and R. 4:4-4, this being original process.

3.    The Plaintiff must file with the court its proof of service of the pleadings on the Defendants no later than three (3) days before the return date.

4.    Defendants and any interested party shall file and serve a written response to this order to show cause and the request for entry of injunctive relief and proof of service by _____, 2017. The original documents must be filed with the Clerk of the Superior Court in the county listed above. You must send a copy of your opposition papers directly to Hon. _____, whose address is 10 Main Street, Hackensack, New Jersey 07601. You must also send a copy of your opposition papers to the Plaintiff's attorney whose name and address appears above. A telephone call will not protect your rights; you must file your opposition and pay the required fee and serve your opposition on your adversary, if you want the court to hear your opposition to the injunctive relief the Plaintiff is seeking.

5.    The Plaintiff must file and serve any written reply to the Defendants' order to show cause opposition by_____, 2017. The reply papers must be filed with the Clerk of the Superior Court in the county listed above and a copy of the reply papers must be sent directly to the chambers of the Judge listed above.

6.    If the Defendants do not file and serve opposition to this order to show cause, the application will be decided on the papers on the return date and relief may be granted by default, provided that Plaintiff files a proof of service and a proposed form of order at least three days prior to the return date.

7.      If Plaintiff has not already done so, a proposed form of order addressing the relief sought on the return date (along with a self-addressed return envelope with return address and postage) must be submitted to the court no later than three (3) days before the return date.

8.      Defendants take notice that the Plaintiff has filed a lawsuit against you in the Superior Court of New Jersey. The Verified Complaint attached to this order to show cause states the basis of the lawsuit. If you dispute this Complaint, you, or your attorney, must file a written answer to the complaint and proof of service within 35 days from the date of service of this order to show cause; not counting the day you receive it.

These documents must be filed with the Clerk of the Superior Court in the county listed above, include a filing fee payable to the "Treasurer State of New Jersey." You must also send a copy of your Answer to the Plaintiff's attorney whose name and address appear above. A telephone call will not protect your rights; you must file and serve your Answer (with the fee) or judgment may be entered against you by default. Please note: Opposition to the order to show cause is not an Answer and you must file both. Please note further: if you do not file and serve an Answer within 35 days of this Order, the Court may enter default against you for the relief Plaintiff demands.

9.      If you cannot afford an attorney, you may call the Legal Services office in the county in which you live. If you do not have an attorney and are not eligible for free legal assistance you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory of these offices is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

10.    The Court will entertain argument, but not testimony, on the return date of the order
to show cause, unless the court and parties are advised to the contrary no later than _____ days
before the return date.

_____

J.S.C.

**FOX ROTHSCHILD LLP**
*Formed in the Commonwealth of Pennsylvania*
BY:   Henry L. Kent-Smith, Esq. (Atty. ID #034211988)
        Irina B. Elgart, Esq. (Atty. ID #027311999)
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648-2311
(609) 896-3600
*Attorneys for Plaintiff, 615 River Road Partners, LLC*

| | |
|---|---|
| 615 RIVER ROAD PARTNERS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>BOROUGH OF EDGEWATER, iPARK EDGEWATER, LLC; iPARK EDGEWATER HOLDINGS, LLC; iPARK EDGEWATER INVESTMENTS, INC.; NATIONAL RESOURCES ACQUISITIONS, LLC; NORTH BUILDING EDGEWATER, LLC; ONE MAIN STREET EDGEWATER, LLC; FOUR MAIN STREET EDGEWATER, LLC; EDGEWATER LOFTS, LLC; EDGEWATER GLASS HOUSE, LLC; DAIBES ENTERPRISES, LLC; DAIBES BROTHERS, INC.; DDD & ASSOCIATES, LLC; 2 PEMBROKE WAY ASSOCIATES, LLC; 4 PEMBROKE WAY ASSOCIATES, LLC; 45 RIVER ROAD ASSOCIATES, LLC; and XYZ CORPORATIONS 1-10,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: BERGEN COUNTY<br><br>DOCKET NO.: BER-L-<br><br>CIVIL ACTION<br><br>**VERIFIED COMPLAINT IN LIEU OF PREROGATIVE WRITS** |

Plaintiff, 615 River Road Partners, LLC, a New Jersey limited liability company, by way of Complaint in Lieu of Prerogative Writs against Defendants, Borough of Edgewater; iPark Edgewater, LLC; iPark Edgewater Holdings; LLC, iPark Edgewater Investments, Inc., National Resources Acquisitions, LLC; North Building Edgewater, LLC; One Main Street Edgewater, LLC; Four Main Street Edgewater, LLC: Edgewater Lofts, LLC; Edgewater Glass House, LLC; Daibes

Enterprises, LLC; Daibes Brothers, Inc.; DDD & Associates, LLC; 2 Pembroke Way Associates, LLC; 4 Pembroke Way Associates, LLC; 45 River Road Associates, LLC; and XYZ Corporations 1-10 (collectively "Defendants"), hereby states and avers as follows:

## THE PARTIES

1.      Plaintiff, 615 River Road Partners, LLC, ("**Plaintiff**" or "**615**") is a New Jersey limited liability company with offices at c/o The Maxal Group, Inc., 825 Third Avenue, 31st Floor, New York, New York 10022, and the fee simple owner of property identified as Block 76, Lots 1 and 5, and Block 77, Lot 1 on the Tax Map of the Borough of Edgewater, consisting of approximately 18.73 acres of vacant land along the Hudson River.

2.      Defendant, Borough of Edgewater, ("**Borough**") is a municipal corporation and corporate body politic located in Bergen County, with offices located at Edgewater Municipal Building, 55 River Road, Edgewater, New Jersey 07020. Defendant Borough is the owner of Block 99, Lot 1.09, where the new Borough Hall and Police Station are located.

3.      Defendants, iPark Edgewater, LLC, iPark Edgewater Holdings, LLC and iPark Edgewater Investments, Inc., Delaware limited liability companies, were and/or are the owners and developers of property identified as Block 99, Lots 1, 3, 4 and 5 on the Tax Map of the Borough of Edgewater located at 45 River Road (the "**Property**").

4.      Defendant, National Resources Acquisitions, LLC, a Delaware limited liability company, is an affiliate and/or parent entity of Defendants iPark Edgewater, LLC, iPark Edgewater Holdings, LLC, and iPark Edgewater Investments, Inc.

5.      Defendant, One Main Street Edgewater, LLC, a Delaware limited liability company, having an address at 485 West Putnam Avenue, Greenwich, Connecticut 06830, was

2

and/or is the owner and developer of a portion of the Property identified as Block 99, Lots 1.03, 1.05, 1.07 (the "**View Residences**").

6. Defendant, North Building Edgewater, LLC, a Delaware limited liability company, having an address at 485 West Putnam Avenue, Greenwich, Connecticut 06830, was and/or is the owner and developer of a portion of the Property identified as Block 99, Lot 1.04 (the "**Oyster**").

7. Defendant, Four Main Street Edgewater, LLC, a Delaware limited liability company, having an address at 485 West Putnam Avenue, Greenwich, Connecticut 06830, was and/or is the owner and developer of a portion of the Property identified as Block 99, Lot 1.07.

8. Defendant, Edgewater Lofts, LLC, a Delaware limited liability company, having an address at 485 West Putnam Avenue, Greenwich, Connecticut 06830, was and/or is the owner and developer of a portion of the Property identified as Block 99, Lot 1.14 (a/k/a "**The Pearl**").

9. Defendant, Edgewater Glass House, LLC, a Delaware limited liability company, having an address at 485 West Putnam Avenue, Greenwich, Connecticut 06830, was and/or is the owner and developer of a portion of the Property identified as Block 99, Lot 1.15 (the "**Glass House**").

10. Defendants iPark Edgewater, LLC, iPark Edgewater Holdings, LLC, iPark Edgewater Investments, Inc., National Resources Acquisitions, LLC, One Main Street Edgewater, LLC, Four Main Street Edgewater, LLC, Edgewater Lofts, LLC, and Edgewater Glass House, LLC are owned and operated by Joseph Cotter, and will be referred to herein as the "**iPark Redevelopment Group.**"

11. Defendants, Daibes Enterprises, LLC, a New Jersey limited liability company, and Daibes Brothers, Inc., a New Jersey corporation, both having an address at 1000 Portside Drive,

3

Edgewater, New Jersey 07020, were and/or are the owners and developers of portions of the Property.

12.     Defendants, DDD & Associates, LLC and 2 Pembroke Way Associates, LLC, both having an address at 1000 Portside Drive, Edgewater, New Jersey 07020, were and/or are the owners and developers of the portion of the property identified as Block 99, Lot 1.16 (the "**Daibes Bank**").

13.     ˙Defendants, DDD & Associates, LLC and 4 Pembroke Way Associates, LLC, both having an address at 1000 Portside Drive, Edgewater, New Jersey 07020, were and/or are the owners and developers of the portion of the property identified as Block 99, Lot 1.17 ("**Daibes Retail Space**").

14.     Defendant, 45 River Road Associates, LLC, having an address at 1000 Portside Drive, Edgewater, New Jersey 07020, was and/or is the owner and developer of the portion of the property identified as Block 99, Lot 1.19, which is the area designated for 75 affordable housing for low and moderate-income households.

15.     Defendants, Daibes Enterprises, LLC, Daibes Brothers, Inc., DDD & Associates, LLC, 2 Pembroke Way Associates, LLC, 4 Pembroke Way Associates, LLC, and 45 River Road Associates, LLC, are owned and operated by Fred A. Daibes and will be referred to herein as the "**Daibes Redevelopment Group**."

16.     Defendants, XYZ Corporations 1-10 are Corporations, Partnerships, and Limited Liability Companies affiliated with Daibes Enterprises, LLC, a New Jersey limited liability company, believed to have an interest in the Property and not yet identifiable at the time of the filing of this Verified Complaint.

## FACTUAL BACKGROUND

17.     On or about July 7, 2015, the Borough filed a Complaint for Declaratory Judgment seeking a judgment of compliance from the court to determine the Borough's affordable housing obligation and to render a revised Housing Element and Fair Share Plan constitutionally compliant. In the Matter of the Application of the Borough of Edgewater, Docket No. BER-L-6364-15 ("Declaratory Judgment Action").

18.     The Borough filed the Declaratory Judgment Action in accordance with the procedures set forth in In re Adoption of N.J.A.C. 5:96, 221 N.J. 1 (2015) ("Mount Laurel IV"). However, the court has not issued a judgment of compliance in that matter.

19.     Last year, 615 completed the environmental remediation of the former Hess site, and sought approval from the Borough to develop its property as a multi-family housing with a set aside for low and moderate income households in compliance with the Fair Housing Act, Council on Affordable Housing ("COAH") regulations, and the Mount Laurel Doctrine.

20.     However, despite filing its variance application, 615 was unable to obtain any hearings before the Borough. As a result of the Borough's inaction, Plaintiff was forced to file an action seeking a declaration for a statutory approval, which is currently pending in Bergen County, captioned 615 River Road Partners, LLC v. Edgewater Zoning Board of Adjustment, et al., Docket No. BER- L-2040-16.

21.     Subsequently, in accordance with the procedures set forth in Mount Laurel IV, 615's motion to intervene in the Borough's Declaratory Judgment Action was granted as an interested party to ensure that the Borough's proposed fair share plan would comport with the Mount Laurel Doctrine.

22.     As discussed in greater depth herein, the Borough has relied and continues to rely upon the iPark Project to generate affordable housing in compliance with the Borough's Mount Laurel obligation since at least 2004 ("the Statutory Approval Action").

23.     The iPark Property is a 48.68 acre parcel of land located along River Road in the Borough, containing approximately 23.1 acres of buildable upland, which was previously developed as a research facility occupied by Unilever Research.

24.     By Deed from Conopco, Inc., d/b/a Unilever Research and Development Edgewater ("Unilever"), dated August 30, 2004, recorded October 20, 2004 in Deed Book 8736, Page 290, Lots 1, 3, 4, and 5 were transferred to the iPark Redevelopment Group.

25.     By resolution dated September 19, 2004, the Borough identified the Property as an area in need of redevelopment pursuant to the Local Redevelopment and Housing Law ("LRHL"), N.J.S.A. 40A:12A-1-22, and directed the Borough of Edgewater Planning Board to undertake a redevelopment study for the Property in accordance with N.J.S.A. 40A:12A-7.

26.     The Borough's Planning Consultant, Burgis Associates, Inc., prepared a Redevelopment Plan dated July 15, 2005. The original concept plan depicts ten (10) residential and mixed-use retail/residential buildings throughout the site with other ancillary improvements and non-residential structures.

27.     The Borough's September 6, 2005 Housing Element & Fair Share Plan anticipated future multi-family development for the Property to include a minimum of 300 residential units subject to a mandatory twenty-percent (20%) set aside for affordable housing units, yielding a minimum of sixty (60) affordable units.

28.     The Borough Planning Board adopted the Redevelopment Plan on August 9, 2006, which imposed an affordable housing obligation of sixty (60) affordable units for the first 300

units on site, and one (1) additional affordable unit for every eight (8) market rate units thereafter, which is 12.5% set aside (the "2006 Redevelopment Plan").

     29.     The 2006 Redevelopment Plan recommended the rezoning of the Property to permit, among other uses, the development of a mid-rise multi-family residential buildings with approximately four hundred and twenty (420) market-rate units, and seventy-five (75) affordable housing units based on the formula in the Plan.

     30.     On November 5, 2007, the Borough and iPark entered into a Redevelopment Agreement for the Property (the "2007 Redevelopment Agreement"). A true copy of the Agreement is attached hereto as **Exhibit A**. The 2006 Redevelopment Plan is annexed as Exhibit B to the 2007 Redevelopment Agreement.

     31.     Pursuant to Section 2.08 of the 2007 Redevelopment Agreement, iPark is required to provide a minimum of seventy-five (75) affordable units in accordance with the construction phase-in schedule explicitly set forth in COAH's regulations, N.J.A.C. 5:93-5.6(d) and N.J.A.C. 5:94-4.4(f).

     32.     Specifically and in relevant part, Section 2.08 of the 2007 Redevelopment Agreement mandates the following:

> Section 2.08    Affordable Housing. The Redeveloper shall provide affordable housing units at the Project Premises in compliance with the Redevelopment Plan. The Redeveloper shall provide a **minimum of seventy-five (75) affordable housing units**, at least thirty-five (35) of which must be "for sale" units, as its entire contribution for affordable housing at the Project. **The construction phase-in and unit allocation as to the number of bedrooms** shall **be consistent with the rules of the New Jersey Council on Affordable Housing ("COAH"),** and the Borough acknowledges that the foregoing agreements of Redeveloper fully and completely satisfy Redeveloper's obligations for the Project under COAH now or as they may exist in the future.

**Exhibit A,** 2007 Redevelopment Agreement, § 2.08 (emphasis added).

7

33.    Moreover, the Borough's zoning ordinance requires that "**[a]ll affordable units shall comply with COAH's rules pertaining to the phasing of construction**, integration, split between low- and moderate-income units, controls on affordability, bedroom distribution, affirmative marketing, heating source, and administration of the affordable units, as set forth in N.J.A.C. 5:94 et seq., as amended, and elsewhere in the rules." Ordinance, § 240-154D(2) (emphasis added), attached hereto as **Exhibit B**.

34.    In its December 2008 Housing Element and Fair Share Plan, the Borough again relied on the iPark project to provide seventy-five (75) units of affordable housing and reiterating its requirement that the affordable units construction would be phased accordance with COAH regulations: "The COAH units.are part of an overall Redevelopment Plan for the area. The plan is scheduled to be implemented in phases. It is projected that the COAH units will be built within the next 5 years" i.e. 2013.

35.    The Borough adopted an Amended and Restated Redevelopment Plan on August, 2013 for the Unilever (iPark) redevelopment area (the "2013 Amended Plan"). The 2013 Amended Plan reiterated that "...the developer shall provide affordable units on site. The number of units shall be based upon the maximum number of units required under the applicable regulations in effect as of the date of the issuance of the last final certificate of occupancy for market units, but shall not exceed 75 affordable housing units." **Exhibit C,** 2013 Amended Plan, § D(2) "Affordable housing", p.7.

36.    The 2013 Amended Plan also provides that "[a]ll units set aside for low and moderate income households shall be in accordance with the provisions of this section and subject to the rules of the Council on Affordable Housing and the Borough of Edgewater Housing Element and Fair Share Plan." Id.

8

37.     Finally, the 2013 Amended Plan states that: "Nonresidential development in the redevelopment area shall not be subject to the payment of development fees." Id.

38.     The Borough granted iPark Redevelopment Group's application to subdivide the Property, and thereafter transferred the subdivided lots to other entities, some of which were to its own affiliates, Daibes Redevelopment Group, and others to third-parties that have, upon information and belief, completed the retail component.

39.     Lot 1.09 was subdivided for the new Borough Hall and Police Station. As part of the iPark approvals, the Borough mandated the iPark Redevelopment Group to construct the new Borough Hall and Police Station. Moreover, the Borough expressly and explicitly conditioned the approval on the completion of the Borough Hall and the Police Station building first before any CO's would be issued for any other structure on the Property. See **Exhibit A**, 2007 Redevelopment Agreement.

40.     Upon information and belief, the Borough paid iPark $3.7 million for the building and the land.

41.     Upon information and belief, the Police Station and Borough Hall were not subject to any bidding process, nor does the Zoning Ordinance authorize the Borough to mandate the construction as a development fee.

42.     The 2007 Redevelopment Agreement and 2013 Amended Plan establish that iPark is an "inclusionary development," as that term is defined in N.J.A.C. 5:93-1.3 and N.J.A.C. 5:93-5.6.

43.     An "inclusionary development" is a project providing both market rate and affordable residential units, where the market-rate residential development subsidizes the creation of affordable housing.

44.    Typically, a developer will receive either residential zoning or a residential density bonus, with a presumptive affordable housing "set aside" ratio of between 15% to 20% affordable units to market-rate units.

45.    Because the market-rate units subsidize the affordable housing, public subsidies such as from the NJHMFA and Low Income Tax Credits are not available for inclusionary developments, absent a showing of economic hardship and necessity.

46.    Because inclusionary developments fund the creation of affordable housing by the revenue generated by market-rate sales or leases, COAH promulgated rules establishing a construction schedule requiring that affordable housing units be bult contemporaneously with market rate units.  N.J.A.C. 5:93-5.6(d);  N.J.A.C. 5:94-4.4(f).  This regulation ensures that the developer actually builds the affordable housing component, to foreclose the opportunity for a developer to abandon a project once the market-rate units are complete without building the affordable housing units, and thereby, "abscond" with the subsidy generated to fund construction of the affordable units.

47.    COAH's Regulations provide that municipalities zoning for inclusionary development **shall** require low and moderate income housing units to be in accordance with the following schedule:

| Percentage of Market-rate Units Completed | Minimum Percentage of Low and Moderate Income Units Completed |
|---|---|
| 25 | 0 |
| 25 + 1 unit | 10 |
| 50 | 50 |
| 75 | 75 |
| 90 | 100 |

N.J.A.C. 5:93-5.6(d); N.J.A.C. 5:94-4.4(f); 25 N.J.R. 5774, comment 154. See also N.J.A.C. 5:93-5.6(e) ("[a] newly constructed unit is considered complete when the certificate of occupancy is issued.").

48.    COAH's schedule to phase-in the affordable housing allows 25% of the market-rate units to be constructed ahead of the affordable housing units in order to provide a funding source for the affordable units.   The construction schedule of the affordable housing units thereafter accelerates to ensure that the creation of the affordable units exceeds the pace of the market rate units so that the affordable housing units are complete ahead of the market-rate units.

49.    The Borough has expressly adopted COAH's construction schedule. Borough Ordinance § 240-154D(2)  The phase-in schedule therefore is mandatory and cannot be unilaterally modified by the Borough or Defendants.

50.    The Borough was aware of the iPark Redeveloper Group's position that it preferred to NOT build the affordable housing units as mandated by the 2007 Redevelopment Agreement and Borough's Ordinance § 240-154D(2) from meetings before Borough officials.

51.    Based on the Borough's meeting minutes in 2011, Joseph Cotter, the CEO of Defendant National Resources, advised he would prefer not to produce the affordable units.  He also was aware of COAH's regulations that the affordable housing units were required to be phased-in.

52.    Attached hereto as **Exhibit D** are the Borough's Planning Board meeting minutes from 2011 that address the subdivision approvals received by iPark and iPark's obligation to provide affordable housing.

53.    For example, at the August 22, 2011 Planning Board Meeting, Mr. Cotter testified he "doesn't want COAH if not required." **Exhibit D,** at 2011PBMIN at 18.

11

54.     When his proposition was rebuked, Mr. Cotter further testified "When half the units are complete [iPark] would then do half of the COAH units. The building would be done in 2 phases." Id. at 19.

55.     Subsequently, at the December 12, 2011 Planning Board Meeting, it is noted that: "[iPark Edgewater, LLC] acknowledged that once the applicant has completed 210 market rate residential units certificates of occupancy for additional market rate residential units would not be issue[d] until [the COAH units] were completed." **Exhibit D,** at 2011PBMIN at 9, ¶ 41.

56.     Some 18 months later, the Borough contacted Mr. Cotter by letter of July 17, 2013. Paragraph 3 of the letter states: "Affordable housing. The Borough wishes to remain proactive with the development's obligation of affordable housing would like details of how and when this component will be satisfied?". **Exhibit E,** July 17, 2013 Letter from Gregory Franz, Borough Administrator, to Joseph Cotter of National Resources.

57.     In response, the attorney for iPark advised that "i.Park has entered into a contract with an experienced affordable housing developer. We are informed that construction of the affordable housing buildings will commence within six (6) to eight (8) months and that this developer will be in contact with you promptly following site plan approval for the affordable housing building (which will probably follow adoption of the amended redevelopment plan) **Exhibit F,** July 22, 2013 Letter from Paul Kaufman to Gregory Franz, at 1.

58.     Upon information and belief, there has been no site plan application filed for the iPark affordable housing units, and there has been no amendment to the 2013 Plan related to the iPark affordable housing units.

59.     In February 2015, the iPark Redevelopment Group transferred three lots (Lots 1.16, 1.17 and 1.19) to the Daibes Redevelopment Group. Lot 1.19 is the location where the 75

affordable housing units are proposed to be constructed. Lot 1.16 and Lot 1.17 are planned for commercial development.

60. Specifically, by Deed dated February 10, 2015, recorded February 19, 2015, in Book 01822, pg. 0895, 45 River Road Associates, LLC acquired Lot 1.19 from iPark Edgewater, LLC. Attached as **Exhibit G** is a true copy of the Deed (the "**2015 Deed**").

61. In relevant part, Section IX. of the 2015 Deed provides as follows:

IX. The Amended and Restated Redevelopment Plan for the Unilever Redevelopment Area dated August 2013 adopted by the Borough of Edgewater by Ordinance 1503-2014 on April 21, 2014 (the "Amended Redevelopment Plan"). **Grantee shall not use the Property for any purpose other than the construction and development of 75 affordable housing units consistent with the Amended Redevelopment Plan, without the express written consent of Grantor so long as Grantor, or any entity affiliated with Grantor owns any portion of the Unilever Redevelopment Area.** . . . .

(emphasis provided) (the "**2015 Deed Restriction**").

62. To the extent that the 2015 Deed Restriction allows iPark Edgewater LLC to unilaterally modify the delivery of affordable housing units, that provision is in violation of COAH regulations, the 2007 Redevelopment Agreement, 2013 Plan, and Borough's Ordinance § 240-154D(2).

63. Attached hereto as **Exhibit H** is a true copy of the Site Plan of the iPark Redevelopment dated August 20, 2014 and as **Exhibit I** is a true copy of an illustration of the iPark Project Property layout from its website with the Lot numbers handwritten for ease of reference, http://edgewaterharbornj.com/waterfront_community.html.

64. The market-rate residential buildings are owned by the iPark Redevelopment Group and labeled as follows:

      (a)    **The Oyster** – 100 Market Rate Rental Residences located on Lot 1.04
      (b)    **The View Residences** – 262 Market Rental Residences located on Lots 1.03, 1.05, 1.07

    (c)   **The Pearl** – 115 Market Rate Condominium Homes located on Lot 1.14

    (d)   **The Glass House Homes** – website states "107 Condominiums; 15 Luxury Waterfront Residences; 92 Luxury Residences" which are located on Lot 1.15

**Exhibit I**, Illustration of iPark with hand-written lot numbers.

    65.    Pursuant to its website, http://edgewaterharbornj.com/waterfront_community.html, the iPark Project's market-rate yield has increased since the 2007 Redevelopment Agreement and 2013 Plan, to 584 market-rate units without any reciprocal increase in its affordable housing obligation. Therefore, iPark now has less than an 11% affordable housing set aside.

    66.    An aerial map from Google Maps of the iPark project downloaded on May 9, 2017 demonstrates that Lot 1.19 is occupied by trailers and other construction equipment, and that the Oyster, the View Residences and the Pearl buildings have been completed. A copy of the aerial map is attached hereto as **Exhibit J**.

    67.    The Oyster and the View Residences are rentals so public records do not disclose whether and which units are occupied.

    68.    However, it is clear that the Pearl is complete and the market-rate units are being sold. Attached hereto as **Exhibit K** is a copy of a Deed dated April 2017 transferring a unit in the Pearl for $1.6 million.

    69.    Based on public tax assessment records, over 147 market-rate units (i.e., 25% of 584) were complete by the end of 2014, and 477 market-rate units have been completed as of the date of this Complaint based on the completion of these buildings i.e., the Oyster, the View Residences, and the Pearl.

    70.    Therefore, the affordable housing units were required to be started no later than the end of 2014 or beginning of 2015, as per COAH regulations, Ordinance, § 240-154D(2) and the 2013 Plan.

71.     On information and belief, it appears that the only buildings that are not complete are the Glass House Homes (which total 107 market rate units on Lot 1.15), the 75 affordable units referred as "Apartments" on Lot 1.19, and the Daibes Bank and Retail on Lots 1.16 and 1.17. See **Exhibit I**, Illustration of iPark with hand-written lot numbers; **Exhibit J**, Google Aerial of iPark.

72.     In addition, iPark also has a non-residential component, which includes a the Borough Hall, CVS, HomeGoods, retail in the River Road Retail Mall, retail on the first floor of the View and the Marriott Courtyard hotel, all of which have been completed and are operating. See **Exhibit I**, Illustration of iPark with hand-written lot numbers.

73.     Pursuant to the 2007 Redevelopment Agreement and 2006 Plan, the non-residential components of iPark were obligated to contribute towards the Borough's affordable housing trust fund pursuant to the then existing contribution ordinances. See **Exhibit A**, 2007 Redevelopment Agreement, Exhibit B - Redevelopment Plan, § E(2)(a).

74.     However, the 2013 Amended Plan changed this requirement by exempting nonresidential development in the iPark edevelopment area from the payment of development fees. See **Exhibit C**, at 7

75.     In 2009, the Legislature adopted the Non Residential Development Fee Act, N.J.S.A. 40:55D-8.1 et seq. ("NRDFA") The NRDFA invalidates all municipal affordable housing fee ordinances associated with nonresidential development. N.J.S.A. 40:55D-8.7

76.     The 2013 Amended Plan illegally and improperly exempts the nonresidential component of the iPark Project from payment of the State mandated NRDFA.

77.     However, as provided in the 2007 Developers Agreement, the 2013 Amended Plan, Ordinance 240-154D(2) and COAH regulations, Defendants are responsible to create the 75 affordable housing units on Lot 1.19 before any further development is authorized at iPark,

15

because the Borough has issued more than 178 residential Certificates of Occupancy ("CO's") (25% of the 584 market units).

78.     In the Declaratory Judgment Action, the Borough submitted a draft affordable housing compliance plan that relied upon the iPark Project to provide for seventy-five (75) affordable housing units.

79.     The Borough continues to claim affordable housing credit for the iPark Project in the Declaratory Judgment Action stating that a realistic opportunity for the creation of affordable housing, notwithstanding the complete failure of the Borough to enforce the phasing schedule required by the 2007 Redevelopment Agreement 2013 Plan, and its own Zoning Ordinance § 240-154D(2).

80.     Kathryn Gregory, the Borough's Professional Planner, stated in the November 2015 Narrative Section of the Edgewater Fair Share Compliance Plan Summary that the affordable housing units would not be produced for at least another three (3) years. Ms. Gregory acknowledged that the iPark affordable units were to be implemented pursuant to a phasing schedule, notwithstanding that the market rate residential construction was continuing and the Borough was issuing CO's for the market units. See **Exhibit L**.

81.     On January 9, 2017, Mayor Michael J. McPartland, sent a letter to Joseph Cotter advising that iPark and National Resources were in default of their obligation to provide affordable housing, requesting the immediate submission of a construction schedule for the affordable units, and stating that no further certificates of occupancy would be issued for the Property. Attached hereto as **Exhibit M** is a copy of the letter from the Mayor to Joseph Cotter dated January 9, 2017.

82.     A day later, on January 10, 2017, the Daibes Redevelopment Group responded to the Borough's letter, which had been directed to Mr. Cotter. The letter was non-responsive to the

Borough's January 9, 2017 letter. It failed to provide a construction schedule and any assurances that the affordable housing will be created. Attached hereto as **Exhibit N** is a copy of the letter from Daibes Enterprises to the Borough dated January 10, 2017.

83.     In fact, the letter from the Daibes Redevelopment Group serves as confirmation that the iPark Redevelopment Group considers itself no longer liable for the affordable housing because the intent of the letter was to put the Borough on notice that a "Daibes entity" has assumed the affordable housing obligation.

84.     Further, the self-serving letter on "Daibes Enterprises" letterhead demonstrates the complete disregard for the affordable housing obligations by Daibes Redevelopment Group. The Daibes Redevelopment Group's letter stated that "as a result and the needs of the other remaining construction relative to the project, the subject 'area' [Lot 1.19] is needed for construction staging. We are in process of preparing required plans for the project and anticipate making application for Building Permits when completed." This representation by Daibes Enterprises is also an admission that it is directly violating the 2015 Deed Restriction on Lot 1.19. The fact that Lot 1.19 is being used for construction staging is confirmed by Google maps. See **Exhibit J**.

85.     More critical, the January 10, 2017 letter is an admission by the Daibes Redevelopment Group that the process of *designing* the affordable units has not even started, notwithstanding the fact that 477 market-rate units, well over 50%, have been constructed and occupied.

86.     iPark Redevelopment Group and the Daibes Redevelopment Group have neither planned, designed nor constructed the affordable housing.

87.     In a follow-on letter dated January 13, 2017, the Borough's Professional Planner, Kathryn Gregory, advised the Plaintiffs that "the [iPark] building has yet to be constructed"

17

therefore Certificates of Occupancy, deed restrictions, and an affirmative marketing plan are "obviously not available." Attached hereto as **Exhibit O** is a copy of the letter dated January 13, 2017.

88.     Despite the Mayor's January 10, 2017 letter, and Ms. Gregory's January 13, 2017 letter, the Borough continues to issue Temporary Certificates of Occupancy following the January 2017 letter exchange. Attached hereto as **Exhibit P** are copies of the Certificates of Occupancy dated February 22, 2017.

89.     Moreover, the iPark Redevelopment Group continues to sell and transfer the market-rate units. Attached hereto as **Exhibit K** is a copy of a Deed dated April 2017 transferring a unit in the Pearl for $1.6 million.

90.     On March 17, 2017, Plaintiff served an OPRA request on the Borough seeking information regarding iPark. By letter dated March 28, 2017, other than two CO's and a single indiscernible architectural drawing of iPark, the OPRA Custodian merely stated that the remaining documents were not being provided without any explanation, which explicitly violates the requirements under OPRA to provide a <u>reason</u> for denying access. The deficient OPRA response is the subject of a summary action pending before the Law Division in Bergen County, captioned <u>615 River Road Partners, LLC v. Borough of Edgewater and Custodian of Records</u>, Docket No. TBA. Attached hereto as **Exhibit Q** is a true copy of the OPRA Order to Show Cause and Complaint.

91.     In the Declaratory Judgment Action, the Borough filed a motion to extend its immunity, which is pending before the court. The parties in that action, including Plaintiff, filed a cross motions to revoke immunity because the Borough has not been effective in enforcing its ordinances and agreements relating to affordable housing, and another motion, for the court to

issue a scarce resource restraint to protect land that becomes available since vacant land is a scarce resource in the Borough based on a Vacant Land Inventory dated October 28, 2015, which is annexed to the Borough's November 2015 Fair Share Summary (**Exhibit L**)

92.     These motions, among others, have been pending before the court for the past six months, while construction at iPark has continued and the Borough continues to issue CO's for market-rate units within iPark.

93.     As of the filing of this Complaint, the Borough has failed to take any action against the iPark Redevelopment Group and the Daibes Redevelopment Group to enforce COAH regulations, Ordinance 240-154D(2), the 2015 Deed Restriction, the 2013 Plan, and the 2007 Agreement as it relates to the construction of affordable housing.

94.     N.J.A.C. 5:23-2.30 and N.J.A.C. 5:23-2.31 compels the issuance of a notice of violation and a stop work order until the violation is remedied.

95.     Therefore, Plaintiff brings this action for injunctive relief to ensure compliance with COAH's phasing schedule.

## COUNT I

### [Prerogative Writ of Mandamus]

96.     Plaintiff reincorporates the foregoing paragraphs as though fully stated herein.

97.     While the Borough and Daibes have made representations to the court that no CO's would issue for iPark until the affordable housing units in iPark were at least designed and a building permit filed, the Borough has issued CO's for at least two market rate units.

98.     The Borough has refused to issue stop work orders or take any other action to enforce the 2007 Agreement, Ordinance Section 240-154D(2) and COAH's phase-in schedule.

99.     The Borough lacks the discretion to waive any requirements of COAH regulations and no deviation has been permitted from Borough Ordinance 240-154D(2) in connection with the phase-in construction schedule of affordable units to market rate units.

100.     Ordinance Section 240-154D(2), the 2007 Agreement and the 2013 Amended Plan require that the construction of the 75 affordable housing units comply with COAH's construction phase-in schedule.

101.     The Borough is relying on the affordable housing generated by iPark to be constructed to meet its Third Round Affordable Housing obligation, yet has taken no action to compel the development of the affordable housing.

**WHEREFORE**, Plaintiff demands judgment against Defendants for the following relief:

a.     For the issuance of an Order of Mandamus compelling the Borough of Edgewater to enforce Ordinance Section 240-154D(2) the 2007 Agreement and the 2013 Amended Plan by requiring Defendants to construct at least (75) units of affordable housing prior to the issuance of any certificate of occupancy, either temporary, conditional or permanent, for any market rate residential unit on the iPark Property;

b.     For the issuance of an Order of Mandamus compelling the Borough to issue stop work orders to the Defendants until the Borough issues permanent certificates of occupancy for at least (75) affordable housing units;

c.     For the issuance of an order enjoining the Borough of Edgewater from issuing any permits or approvals; including zoning permits, building/construction permits, and certificates of occupancy; for any construction on the iPark Property until such time the Borough issues permanent certificates of occupancy for at least (75) affordable housing units;

d.      For the issuance of an order directing Defendants to immediately file for building permits to authorize the construction of seventy five (75) affordable housing units;

e.      For the issuance of an equitable lien over sales proceeds against the iPark Property and Defendants until the Borough issues permanent certificates of occupancy for seventy five (75) affordable housing units;

f.      For the issuance of an Order revoking the Borough's immunity from builder's remedy litigation for failure to provide a realistic opportunity for affordable housing; and

g.      For such other relief as may be deemed equitable and just, together with costs and counsel fees.

<div align="center">

**COUNT II**

**[Preliminary and Permanent Injunction]**

</div>

102.    Plaintiff reincorporates the foregoing paragraphs as though fully stated herein.

103.    Defendants' refusal to complete construction of the affordable units is an unreasonable interference with the provision of affordable housing in the Township.

104.    ·Despite building most of the residential market-rate housing, the Borough Hall and Police Station, and all of the commercial/residential, Defendants' refusal to complete the affordable housing causes irreparable harm to low and moderate income households by depriving them of an opportunity to enjoy affordable housing in the Borough.

105.    Pursuant to the 2015 Deed Restriction, the 2007 Agreement, the 2013 Amended Plan, Ordinance Section 240-154D(2) and COAH regulations, Defendants lack any authority or approval to modify the use of Lot 1.19 to a use that is not devoted to 75 affordable housing units.

**WHEREFORE**, Plaintiff demands judgment against Defendants for the following relief:

a. For the issuance of an Order compelling the Borough of Edgewater to enforce Ordinance Section 240-154D(2) and the 2007 Agreement by requiring Defendants to construct at least (75) units of affordable housing prior to the issuance of any Certificate of Occupancy, either temporary, conditional or permanent, for any market rate residential unit on the iPark Property;

b. For the issuance of an Order enjoining the issuance of any certificates of occupancy, either temporary, conditional or permanent, for any market rate units on the iPark Property to the Defendants until the Borough issues permanent certificates of occupancy for at least (75) affordable housing units;

c. For the issuance of an order enjoining the Borough of Edgewater from issuing any permits or approvals; including zoning permits, building/construction permits, and certificates of occupancy; for any construction on the iPark Property until such time the Borough issues permanent certificates of occupancy for at least (75) affordable housing units;

d. For the issuance of an order directing Defendants to immediately file for building permits to authorize the construction of seventy five (75) affordable housing units;

e. For the issuance of an equitable lien against the iPark Property and Defendants until the Borough issues permanent certificates of occupancy for seventy five (75) affordable housing units;

f. For an Order invalidating and striking the following language from the 2015 Deed Restriction: **"without the express written consent of Grantor so long as Grantor, or any entity affiliated with Grantor owns any portion of the Unilever Redevelopment Area"**

22

g.      For the issuance of an Order revoking the Borough's immunity from builder's remedy litigation for failure to provide a realistic opportunity for affordable housing; and

h.      For such other relief as may be deemed equitable and just, together with costs and counsel fees.

FOX ROTHSCHILD LLP
*Attorneys for Plaintiff, 615 River Road Partners, LLC*

BY: _____
        Henry Kent-Smith
        Irina B. Elgart

Dated:   May 26, 2017

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:5-1(c), Plaintiff, 615 River Road Partners, LLC, hereby designates Henry L. Kent-Smith, Esq. as trial counsel.

FOX ROTHSCHILD LLP
*Attorneys for Plaintiff, 615 River Road Partners, LLC*

BY: _____
        Henry Kent-Smith
        Irina B. Elgart

Dated:   May 26, 2017

## CERTIFICATION UNDER RULE 4:5-1

I hereby certify that the matter in controversy is not the subject of any other action pending in any court and is, likewise, not the subject of any pending arbitration proceeding. I further certify there is no action or arbitration proceeding which is contemplated regarding the subject of this action and that I am not aware of any other parties who should be joined in this action.

The following matters involve the same or similar parties relative to the Defendant, Borough of Edgewater's affordable housing obligation pursuant to the Mount Laurel Doctrine: (a) In the Matter of the Application of the Borough of Edgewater, Docket No. BER-L-6364-15; (b) 615 River Road Partners, LLC v. Edgewater Zoning Board of Adjustment, et al., Docket No. BER-L-2040-16; (c) FSHC v. Kray Plaza, LLC, et al., Docket No. BER-L-6431-16; (d) FSHC v. MB Edgewater, LLC, Docket No. BER-L-7687 -16; (e) 615 River Road Partners, LLC v. Borough of Edgewater, et al. Docket No. BER-L-0090-17; and (f) 615 River Road Partners, LLC v. Borough of Edgewater and Custodian of Records, Docket No. TBA.

FOX ROTHSCHILD LLP
*Attorneys for Plaintiff, 615 River Road Partners, LLC*

BY: _____
Henry Kent-Smith
Irina B. Elgart

Dated:  May 26, 2017

## VERIFICATION

I, Henry L. Kent-Smith, being of full age and duly sworn according to law upon my oath, depose and say:

1.     Fox Rothschild, LLP is counsel for 615 River Road Partners, LLC, the Plaintiff in the above matter.

2.     I have read the foregoing Verified Complaint and the information contained therein is true and accurate based upon my personal knowledge and information.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: May 26, 2017

_____
HENRY L. KENT-SMITH

# EXHIBIT A

REDEVELOPMENT AGREEMENT

BETWEEN

I. PARK EDGEWATER, LLC

AND

THE BOROUGH OF EDGEWATER

Prepared by:

Philip N. Boggia, Esq.
Durkin & Boggia
71 Mount Vernon Street
Ridgefield Park, New Jersey 07660

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ...................................................................................4

    Section 1.01       Defined Terms ...............................................................................4

ARTICLE II REDEVELOPER'S RESPONSIBILITIES ......................................8

    Section 2.01       Property Acquisition By Redeveloper. ....................................8
    Section 2.02       Project Costs and Expenses. ....................................................9
    Section 2.03       Environmental Compliance and Remediation. ......................9
    Section 2.04       Remediation of the Project Premises. ..................................10
    Section 2.05       Governmental Approval Process. ..........................................11
    Section 2.06       Covenant to Build. ..................................................................12
    Section 2.07       Improvements -- The Project. .................................................13
    Section 2.08       Affordable Housing. ...............................................................15
    Section 2.09       Disposition Agreement. ..........................................................15
    Section 2.10       First Phase of Project. ............................................................16
    Section 2.11       Report on Progress. ................................................................17
    Section 2.12       Insurance. ...............................................................................17
    Section 2.13       Certificates of Occupancy and Certificates of Completion. ......................20
    Section 2.14       Construction Phasing Schedule. ...........................................21
    Section 2.15       Dust and Nuisance. ................................................................22
    Section 2.16       Duty RE: Unsafe Conditions. .................................................22
    Section 2.17       County and State Requirements. ...........................................22
    Section 2.18       Settlement of Tax Appeal. .....................................................23
    Section 2.19       Performance Bond for Municipal Complex. ..........................23

ARTICLE III BOROUGH RESPONSIBILITIES ...............................................24

    Section 3.01       Intentionally Deleted. .............................................................24
    Section 3.02       Professional Services. ............................................................24
    Section 3.03       Cooperation. ............................................................................25
    Section 3.04       Borough Not Responsible to Third Parties. ..........................25
    Section 3.05       Municipal Officials, Etc. Not Liable on Contract. ..................25
    Section 3.06       Consent of the Borough .........................................................26

ARTICLE IV PROJECT FINANCING ...............................................................26

    Section 4.01       Financing and Equity Capital. ................................................26

ARTICLE V COVENANTS AND RESTRICTIONS ..........................................26

i

Section 5.01    Declaration of Covenants and Restrictions........................................26
Section 5.02    Description of Covenants............................................................27
Section 5.03    Effect and Term of Covenants. ....................................................27
Section 5.04    Enforcement by the Borough........................................................28
Section 5.05    Permitted Exceptions ..............................................................29

ARTICLE VI MUNICIPAL CONSENT FOR ASSIGNMENT OR SALE................................30

Section 6.01    Transfers and Assignments. ........................................................30
Section 6.02    Permitted Transfers................................................................31
Section 6.03    Prohibition Against Speculative Development........................................32

ARTICLE VII MORTGAGE FINANCING AND RIGHTS OF MORTGAGEE .......................32

Section 7.01    Notice to Borough...................................................................32
Section 7.02    Completion of Project. ..............................................................33
Section 7.03    Notice to Mortgagee or Ownership Interest Pledgee................................34
Section 7.04    Right to Cure Default and Assume Redeveloper's Obligations. ...............34
Section 7.05    Mortgagee's Option To Cure Redeveloper Default..................................35
Section 7.06    Borough's Option To Cure Mortgage Default........................................36

ARTICLE VIII DEFAULT / REMEDIES ........................................................36

Section 8.01    Default..............................................................................36
Section 8.02    Redeveloper Default. ...............................................................37
Section 8.03    Initial Remedy Upon Default........................................................39
Section 8.04    Remedies in the Event of Termination of this Agreement. .......................39
Section 8.05    Rights and Remedies Cumulative....................................................40

ARTICLE IX ADDITIONAL TERMINATION RIGHTS ..........................................41

Section 9.01    Additional Termination Rights of the Borough. ...................................41

ARTICLE X REPRESENTATIONS AND WARRANTIES................................................42

Section 10.01   Representations and Warranties by Redeveloper. ................................42
Section 10.02   Representations and Warranties by Borough.......................................44

ARTICLE XI [RESERVED] ...................................................................46

ARTICLE XII PREPARATION AND APPROVAL OF PLANS AND SPECIFICATIONS FOR
            DEVELOPMENT .................................................................46

Section 12.01   Borough Approval of Site Plan......................................................46

Section 12.02   Filing of Phase II Site Plan. .............................................................47
Section 12.03   Phase II Site Plan Approval .............................................................48
Section 12.04   Approval of Construction Plans. ......................................................49
Section 12.05   Other Plans to be Submitted. ...........................................................50
Section 12.06   Time for Submission of Corrected Construction Plans. ...................51
Section 12.07   Time for Borough Action in Change in Construction Plans. ...........51
Section 12.08   Final Site Plan Approval. .................................................................52
Section 12.09   Changes in Improvements to be Constructed. ..................................52

ARTICLE XIII NOTICES AND DEMANDS ..................................................................52

Section 13.01   Manner of Notice. ............................................................................52

ARTICLE XIV MISCELLANEOUS .................................................................................53

Section 14.01   Force Majeure. .................................................................................53
Section 14.02   Right of Entry For Utility Service. ...................................................54
Section 14.03   Redeveloper Not To Construct Over Utility Easements. ..................54
Section 14.04   Construction Sign. ............................................................................54
Section 14.05   Maintenance. .....................................................................................55
Section 14.06   Equal Employment Opportunity. ......................................................55
Section 14.07   Entire Agreement. .............................................................................56
Section 14.08   Titles of Articles and Sections/Headings. ........................................56
Section 14.09   Counterparts. .....................................................................................56
Section 14.10   Severability. ......................................................................................57
Section 14.11   Estoppels. ..........................................................................................57
Section 14.12   Conflicts. ...........................................................................................57
Section 14.13   Indemnification. ................................................................................57
Section 14.14   Borough's Professional Costs. ..........................................................58
Section 14.15   Dedication of Streets. .......................................................................59
Section 14.16   Dispute Resolution. ..........................................................................61
Section 14.17   Governing Law. ................................................................................61
Section 14.18   Performance Bond. ...........................................................................61
Section 14.19   No Third Party Beneficiaries ...........................................................62

EXHIBIT A   Description of Redevelopment Area
EXHIBIT B   Redevelopment Plan
EXHIBIT C   Construction Phasing Schedule
EXHIBIT D   Remediation Plan
EXHIBIT E   Unilever Tax Judgment

REDEVELOPMENT AGREEMENT

THIS AGREEMENT, entered into this 5ᵗʰ day of November, 2007 (hereinafter referred to as the "Agreement") between the **BOROUGH OF EDGEWATER**, a public body corporate (which, together with any successor public body or officer hereinafter designated by or pursuant to law, is hereinafter referred to as the "Borough"), having its offices at 916 River Road, Edgewater, New Jersey 07020, and **I. PARK EDGEWATER, LLC**, a New Jersey limited liability company with its principal office at c/o National ReSources, 485 West Putnam Avenue, Greenwich, Connecticut 06830 (hereinafter referred to as the "Redeveloper").

WITNESSETH:

**WHEREAS**, the Borough pursuant to the provisions of the Local Redevelopment and Housing Law, as amended and supplemented, N.J.S.A. 40A:12A-1 *et seq.* (the "Local Redevelopment and Housing Law") is charged with responsibility for implementing redevelopment plans and carrying out redevelopment projects in the Borough; and

**WHEREAS**, in accordance with the criteria set forth in the Local Redevelopment and Housing Law, the Borough established an area in need of redevelopment, designated as the Unilever Redevelopment Area, which includes Block 99, Lot(s) 1, 3, 4 and 5 as more particularly described on "Exhibit A" annexed hereto (the "Redevelopment Area"); and

**WHEREAS**, pursuant to the provisions of the Local Redevelopment and Housing Law, the Borough has undertaken efforts to develop a program for the redevelopment of the Redevelopment Area, including the adoption of a Redevelopment Plan, dated August 9, 2006 and prepared by Burgis Associates, Inc.; and

**WHEREAS**, the Local Redevelopment and Housing Law authorizes the Borough to designate a Redeveloper and to arrange or contract with said redeveloper for the planning,

construction or undertaking of any project or redevelopment work in the area designated in "Exhibit A" as an area in need of redevelopment; and

WHEREAS, the Redeveloper is the fee owner of the Redevelopment Area and has made application to the Borough to be designated as the redeveloper for the entire Redevelopment Area; and

WHEREAS, in furtherance of the objectives of the Borough, the Redeveloper has submitted a proposal to complete construction in the Redevelopment Area of a mixed-use project, including residential and retail uses, a waterfront esplanade, and the construction of a new building for use as a police station, courthouse and borough hall, together with related improvements and facilities as described in "Exhibit B" (collectively, the "Project") and all in accordance with the provisions of this Agreement and the Redevelopment Plan adopted; and

WHEREAS, the Borough has reviewed the proposal of the Redeveloper and the concept plans and related submissions and have determined that it is in the Borough's best interests to consider the Redeveloper as the designated redeveloper for the Project Premises;

WHEREAS, by Resolution no. 082707-01, dated August 27, 2007, the Borough has granted to the Redeveloper Preliminary Site Plan Approval for Phase I of the Project; and

WHEREAS, the Borough designated the Redeveloper as the redeveloper for the Project Premises for purposes of negotiating an agreement for the redevelopment of the Redevelopment Area, contingent upon the further approval and adoption of a Redevelopment Agreement and subject to the filing of a formal application for Site Plan Approval by the Redeveloper before the

2

Planning Board, and the review of and attendant number of public hearings to be held on the application by the Planning Board in accordance with Section 12.02 hereof; and,

**WHEREAS,** the Borough and the Redeveloper have engaged in such negotiations and the Borough has determined that in furtherance of the Borough's objectives it is in the Borough's best interests to enter into this Agreement with the Redeveloper for the construction of the Project, subject to such other contingencies contained herein; and

**WHEREAS,** Redeveloper acknowledges that all uses to which the Project Premises may be devoted are governed by the Redevelopment Plan and this Agreement, recognizing, however, that in the event of any conflict between this Agreement and the Redevelopment Plan, the Redevelopment Plan shall control; and

**WHEREAS,** the Borough and the Redeveloper desire to enter into this Agreement for the purpose of setting forth in greater detail their respective undertakings, rights and obligations in connection with the construction of the Project, all in accordance with applicable law and the terms and conditions of this Agreement hereinafter set forth.

**NOW, THEREFORE,** for and in consideration of the mutual promises, covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the parties, and for the benefit of the parties hereto and general public, and, further to implement the purposes of the Local Redevelopment and Housing Law and the Redevelopment Plan, the parties hereto agree as follows:

3

## ARTICLE I

## DEFINITIONS

Section 1.01    Defined Terms.  The parties hereto agree that, unless the context otherwise specifies or requires, the following terms shall have the meanings specified below, such definitions to be applicable equally to the singular and plural forms of such terms and to the use of the upper or lower case initial letter of each word contained in such terms.

Borough:  The Borough of Edgewater.

Agreement:    This Agreement between the Borough and the Redeveloper for the redevelopment of the Project Premises within the Borough of Edgewater, County of Bergen and State of New Jersey .

Certificate of Completion:    A certificate acknowledging that the Redeveloper has performed all of its duties and obligations pursuant to this Agreement.

Certificate of Occupancy:  As defined in the New Jersey Administrative Code.

Construction Plans:  All plans, drawings, specifications and related documents, including a construction progress schedule, in sufficient completeness and detail to obtain construction permits and to show that the Improvements to be constructed by Redeveloper upon the Project Premises and the construction thereof will be in accordance with this Agreement, the Redevelopment Plan and any amendments thereto, including such plans, drawings and specifications as are required under Article XII hereof.

Days:  Whenever the word "days" is used to denote time, it shall mean calendar days.

4

Disposition Agreement: The Development and Disposition Agreement entered into by and between Redeveloper and the Borough in connection with construction and conveyance to the Borough of a Municipal Complex as more fully described herein.

Effective Date: The date this Agreement is last executed by either the Mayor of the Borough or by the authorized representative of the Redeveloper.

Force Majeure: Acts of God, fire, earthquake, explosion, the elements, war, terrorism, riots, mob violence or civil disturbance, inability to procure or a general shortage of labor, equipment or facilities, energy, materials or supplies in the open market, failure of transportation, strikes, walkouts, actions of labor unions, court orders, laws, rules, regulations or orders of governmental or public agencies, bodies and authorities, or any other similar cause not within the control of the party, after all responsible steps to cure have been taken.

Governmental Approvals: Any approvals (including all subdivision approvals), authorizations, permits, licenses and certificates needed from governmental authorities having jurisdiction, whether federal, state, county or local, to the extent necessary to implement the Project in accordance with the Redevelopment Plan and this Agreement.

Impositions: All taxes, assessments (including, without limitation, all assessments for public improvements or benefits), water, sewer or other rents, rates and charges, license fees, permit fees, inspection fees and other authorization fees and charges, in each case, whether general or special, which are levied upon any portion of the Project Premises or on any of the improvements constructed thereon.

5

Improvements:   All new buildings, structures and appurtenances including, but not limited to, the commercial development and all other improvements constructed on or installed upon the Project Premises in accordance with the approved Construction Plans, including those facilities and amenities, infrastructures, roads, including the improvements for sidewalks and landscaping shown in such approved Construction Plans and the Site Plan approved by the Borough and the Planning Board as being on the Project Premises and used or to be used in connection with the buildings, including ancillary recreation facilities and neighborhood convenience shopping areas, if any. Improvements also comprise all facilities, amenities, on and off street parking, landscaping and fencing and enhancements required to be made to the Project Premises and the streets abutting and surrounding the Project Premises. Improvements include all infrastructures, utilities, catch basins, curbs, site lighting, street trees, roadways, traffic striping, signage and demarcations; fire hydrants, sidewalks, walkways, retaining walls and open space treatments as shall be shown on the Site Plan approved by the Planning Board and required pursuant to the Redevelopment Plan or this Agreement.

Insurance Requirements:   All requirements set forth in the terms of any insurance policy(ies) covering or applicable to all or any part of the Project Premises or applicable to any Improvements thereon, or with respect to any portion of the Project Premises, or any easement or license for the benefit of the Redeveloper granted by the Borough, all requirements of the issuer of any such policy, and all orders, rules, regulations and other requirements of the National Board of Fire Underwriters (or any other body exercising similar functions) applicable to or

6

affecting all or any portion of the Project Premises, the Improvements thereon or the use or condition thereof.

ISRA: Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq.

Local Redevelopment and Housing Law: N.J.S.A. 40A:12A-1, et seq., as the same may be amended from time to time.

Mortgagee: A holder of a mortgage on the Project Premises as collateral for the financing of the acquisition, development, construction and marketing of the Project.

Municipal Complex: The building(s) to be constructed by the Redeveloper as set forth more fully in the Disposition Agreement, to be used by the Borough as a Borough Hall, Police Station, Municipal Court, and Borough Administrative Offices.

NJDEP: The New Jersey Department of Environmental Protection.

Ownership Interest Pledgee: A lender to whom the owners of the ownership interest in the Redeveloper have pledged such ownership interests in the Redeveloper as collateral for any loan for the purposes of financing costs associated with the acquisition, development, construction and marketing of the Project.

Planning Board: The Borough of Edgewater Planning Board and any successor thereto exercising similar functions in accordance with the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq.

Project: The proposed improvements as set forth in the Redevelopment Plan annexed hereto as Exhibit "B".

7

Project Premises:   The entirety of the property known as the "Redevelopment Area" as defined more fully in Exhibit A, together with all Improvements located thereon.

Redeveloper:   I. Park Edgewater, LLC, and any permitted assignee in accordance with the provisions hereof.

Redevelopment Plan:   The Redevelopment Plan attached as "Exhibit B" and any amendments thereto.

Site Plan:   The plan submitted to and approved by the Planning Board for Preliminary and Final Site Plan Approval in accordance with the Redevelopment Plan, as same may be amended, and Article 12 of this Agreement.

Transfer: An y transaction by which a Transferee obtains an interest in the Project Premises, or in this Agreement by means of methods which include, but are not limited to, conveyance, transfer, lease, encumbrance, acquisition or assignment through sale, merger, consolidation, reorganization, foreclosure or otherwise, including the appointment of a trustee in bankruptcy or an assignment for the benefit of creditors.

Transferee:   Any party to whom an interest in the Project Premises, or rights in or under this Agreement is conveyed, transferred, leased, encumbered, acquired or assigned, by sale, merger, consolidation, reorganization, foreclosure or otherwise, including a trustee in bankruptcy or assignee for the benefit of creditors.

## ARTICLE II

## REDEVELOPER'S RESPONSIBILITIES

Section 2.01    Property Acquisition By Redeveloper.   The Redeveloper has acquired fee simple absolute title to the Project Premises. The Redeveloper represents that its title to the

8

Project Premises is good and marketable and insurable at regular rates without special premium by a title insurance company authorized to do business in the State of New Jersey (the "Title Insurer"), subject only to title exceptions which do not prevent the construction of the Project (the "Permitted Exceptions" as such term is further defined in Section 5.05 herein).

Section 2.02    Project Costs and Expenses. The Redeveloper shall be responsible for all costs and expenses incurred by the Redeveloper, its agents, employees, subcontractors and independent contractors in implementing the Project. The Borough shall, without cost to it, assist Redeveloper (i) to obtain all environmental approvals from the agencies with jurisdiction in accordance with all applicable environmental laws, (ii) to enter into whatever reasonable agreements are necessary to obtain such environmental approvals; and (iii) to conduct the environmental cleanup, remediation and mitigation of the Project Premises at the Redeveloper's sole cost and expense. Redeveloper agrees to reimburse Borough for any reasonable costs, fees (including attorneys' fees), and charges as may be incurred by the Borough in connection with rendering such assistance, within 15 days of receiving notice from the Borough that such costs have been incurred, together with copies of all invoices, certified by the Borough as true and correct.

Section 2.03    Environmental Compliance and Remediation. The Redeveloper shall comply with all requirements of ISRA and NJDEP. The Redeveloper further agrees that with respect to the Project Premises, the Redeveloper shall, pursuant to ISRA, at its sole cost and expense, conduct such soils analyses, site investigations and other environmental evaluations necessary to determine the condition of the soils and subsurface conditions and the presence of

9

hazardous wastes or substances (the "Environmental Due Diligence"). An investigation disclosed the existence of environmental conditions on the Project Premises which require remediation, and NJDEP, the governmental agency with jurisdiction over the Project Premises, requires mitigation and remediation as a condition to the development of the Project Premises. The Redeveloper shall provide the necessary remediation for the Project Premises at its sole cost and expense. The required remediation is set forth in Reports and Letters from NJDEP, copies of which are collectively attached hereto as "Exhibit D."

Section 2.04   Remediation of the Project Premises. The Redeveloper shall have the sole obligation of satisfying all legal requirements of any governmental entity having jurisdiction concerning remedial action on the Project Premises and of complying with all regulations and standards regarding the remediation of the Project Premises. Redeveloper, its agents, contractors or assignees shall perform the environmental cleanup, remediation and mitigation of the Project Premises, at Redeveloper's sole cost and expense. The Borough shall, without cost to it, assist Redeveloper to obtain all environmental approvals, including one or more "No Further Action" letter(s) from the NJDEP, from the agencies with jurisdiction in accordance with all applicable environmental laws, and at Redeveloper's sole discretion may enter into whatever agreements are necessary to obtain such environmental approvals. Notwithstanding the foregoing, nothing in this Section shall require the Redeveloper to obtain one or more "No Further Action" letters from NJDEP prior to commencement of the Project, nor relieve the Redeveloper of its ultimate obligation to obtain one or more "No Further Action" letters from the NJDEP as required under the terms of this Agreement. The Borough shall assist the Redeveloper to complete all necessary

10

environmental testing and submit to the New Jersey Department of Environmental Protection all necessary test results to support a proposed Remedial Action Work Plan, to be approved by the New Jersey Department of Environmental Protection.    Upon receipt of approval of a Remedial Action Work Plan by the New Jersey Department of Environmental Protection, Redeveloper shall proceed in a reasonable manner to complete such remediation and shall begin construction within the time frame set forth in this Agreement.

Section 2.05   Governmental Approval Process.  The Redeveloper at its sole cost and expense, has caused or will cause to be prepared such plans, drawings, documentation, presentations and applications (collectively, the "Governmental Applications") as may be necessary and appropriate for the purpose of obtaining any and all Governmental Approvals for the Improvements on the Project Premises and the construction of the Project; it being understood, however, that the Redeveloper shall pursue the subdivision of the portion of the Project Premises that is the subject of the Disposition Agreement in accordance with the Disposition Agreement and may pursue other subdivisions of the Project, as well. All of the Governmental Applications shall be in conformity with the Redevelopment Plan and this Agreement, and any and all federal, state, county, and municipal statutes, laws, ordinances, rules and regulations applicable thereto, except that subdivisions shall not require amendment of the Redevelopment Plan. Notwithstanding the foregoing, the Redeveloper hereby acknowledges that the approval of the Borough of Edgewater Planning Board is required for any and all subdivisions of the Project Premises.  The receipt of the Governmental Approvals by the Redeveloper shall be achieved in sufficient time and manner so as to enable the Redeveloper to

11

conform to the relevant provisions of this Agreement. Unless otherwise provided in the Disposition Agreement or extended as provided for in this Agreement, the Redeveloper shall submit applications and shall obtain all Governmental Approvals needed for construction of all Improvements on the Project Premises within one (1) year after receiving Site Plan Approval (as hereinafter defined). In the event Redeveloper is denied any of the Governmental Approvals required to commence construction of the Improvements for which it has applied in good faith and with all diligence, upon written request by the Redeveloper, the Borough shall consent to an extension of the time frame up to an additional one (1) year. If the Redeveloper has been denied a necessary Governmental Approval and an appeal is filed relative to the approval of that Government Application by the Redeveloper, the Borough shall extend the dates for performance by the Redeveloper for a reasonable period up until all appeals are fully and finally resolved. If the Redeveloper has gained approval and an appeal of that of that approval is filed by a third party, then the Borough shall extend the time for performance by Redeveloper until the said appeal is definitively resolved.

Section 2.06 Covenant to Build. Redeveloper covenants, warrants, represents, and agrees to construct the Improvements on the Project Premises, together with all ancillary uses as indicated in and on the Governmental Approvals, the Site Plan and the Construction Plans. All Improvements must be constructed in accordance with all restrictions and controls contained in the Redevelopment Plan. All infrastructure (sidewalks, utilities and site lighting, off street parking, roadways, pilings, foundations, footings, open space, walkways, street trees, landscaping) and any and all other construction identified in the definition of Improvements, on

12

and serving the Project Premises shall be installed by the Redeveloper, at its sole cost and expense as the various stages of construction of the project require.

Section 2.07   Improvements – The Project.

(a)   The Redeveloper agrees, at its expense, to furnish, provide and supply all materials, labor, equipment, tools and appliances necessary to complete the proposed redevelopment including on-site and off-site improvements, if any, and landscaping as set forth on the Site Plan as approved by the Planning Board. Such Site Plan shall be modified only to the extent as required in the Resolution, with no further modifications permitted except as approved by the Planning Board on further application in accordance with the Land Use Procedures for the Borough.

Such Improvements shall be installed in strict compliance with the requirements and specifications of the Borough and other applicable laws and regulations including the Redevelopment Plan. Except as otherwise provided by this Agreement and the Disposition Agreement, any improvements to be ultimately dedicated to the Borough shall be completed to the satisfaction and approval of the Borough Engineer within a period of 24 months from the date of issuance of building permits, subject to Force Majeure. The Borough Council, upon recommendation of the Borough Planning Board, shall grant extensions of ninety (90) days upon demonstration by the Developer that reasonable progress has been made and/or delays have resulted from conditions beyond the reasonable control of the Redeveloper. In addition, the Redeveloper agrees to be responsible for damage to existing streets and public property caused by its operations or by the delivery of materials to the site and/or operation of the equipment, and

13

further agrees to restore streets and/or property so damaged to their/its condition as it existed at the commencement of construction.

The aforesaid work shall be done in a good and workmanlike manner, and shall not materially deviate either in specification or course, from the plans, profiles and documents described herein. To the extent that any design standard does not substantially meet the minimum requirements as set forth in the ordinances of the Borough of Edgewater, where no variance or waiver has been granted, the Redeveloper shall be required to comply with the appropriate standards as stated in the ordinance. The work shall not be deemed complete unless all improvements are installed in accordance with this Agreement, and all rubbish, debris, construction equipment, tools and surplus materials have been removed from the site, and the site left in a clean and neat appearing condition.

(b)     The Planning Board's Resolution, all exhibits accepted by the Planning Board during the Public Hearings, together with the recommendations of the Borough Engineer and Planning Board (insofar as the recommendations have not been modified or superseded by the Planning Board during the course of the hearings, the Resolution, or this Agreement) and not specifically included in this Agreement or mentioned herein shall nevertheless be considered a part of this Agreement, said resolutions, maps and plans being made a part hereof by reference.

(c)     Each of the provisions hereof shall have the same force and effect as if set forth at length as conditions of the grant of the Site Plan Approval.

(d)     The Redeveloper agrees that if, during the course of construction and installation of the Project, it shall be determined by the Borough Engineer, either on his own or

14

at Redeveloper's request, that revision of the plan is necessary with regard to the health, welfare and safety of the residents of the Borough (the "Public Interest"), or represents a more environmentally practicable alternative to the methodologies employed in the approved plans in furtherance of the Public Interest, it will undertake at its own expense, up to a maximum of fifty-thousand dollars ($50,000), such design and construction changes as may be indicated by the Borough Engineer. This paragraph is meant to apply to changes more commonly referred to as "field changes" which shall be of a minor and technical nature. Nothing contained herein shall be construed to allow the Redeveloper to relocate any improvements or landscaping on the approved plans, nor allow the Borough to direct any changes thereto, without prior approval of the Planning Board.

Section 2.08    Affordable Housing. The Redeveloper shall provide affordable housing units at the Project Premises in compliance with the Redevelopment Plan. The Redeveloper shall provide a minimum of seventy-five (75) affordable housing units, at least thirty-five (35) of which must be "for sale" units, as its entire contribution for affordable housing at the Project. The construction phase-in and unit allocation as to the number of bedrooms shall be consistent with the rules of the New Jersey Council on Affordable Housing ("COAH"), and the Borough acknowledges that the foregoing agreements of Redeveloper fully and completely satisfy Redeveloper's obligations for the Project under COAH now or as they may exist in the future.

Section 2.09    Disposition Agreement.    The Redeveloper and the Borough are simultaneously with the execution of this Agreement executing and delivering the Disposition Agreement, which shall govern the construction and conveyance to the Borough of the Municipal Complex as more particularly described therein.

15

Section 2.10 First Phase of Project. The Borough hereby acknowledges and agrees that Redeveloper may desire to implement the Redevelopment Plan in multiple phases. The Borough also acknowledges that the Redeveloper shall develop as Phase I of the Redevelopment Plan, the portion of the Project that is to be developed pursuant to the Disposition Agreement as a Municipal Complex and the conversion of Buildings identified as "B" and "C" on the Redevelopment Plan to loft apartments and the renovation of Building "K" (collectively, "Phase I"). The Borough hereby agrees that notwithstanding anything to the contrary in this Agreement, Redeveloper may apply for Governmental Approvals and Site Plan Approval for Phase I and proceed with the construction of Phase I prior to making application for or obtaining any required approvals for the other phases of the Project. The Redeveloper agrees that that part of Phase I of the Project involving the construction of the new Municipal Complex shall be completed within the time period set forth in Article IX after the satisfaction of each of the conditions enumerated in Section 2.2 of the Development and Disposition Agreement or any successor agreement. Redeveloper shall construct the Municipal Complex at the same time as it is constructing the other portions of Phase I. Borough shall cooperate and provide timely responses to inquiries and questions raised by Redeveloper and its contractors during construction. In addition, in no event shall the Borough issue a Certificate of Occupancy or Certificate of Completion for the entire Project until such time as a Certificate of Completion has been issued for Phase I of the Project.

It is the intention of the parties that the Municipal Complex be the first building completed and ready for occupancy, the completion of which is subject to a Construction Schedule. However, the Borough shall issue Certificates of Occupancy for other portions of Phase I,

16

provided Developer is in compliance with the Construction Schedule for the Municipal Complex. The Redeveloper hereby agrees, upon satisfaction of the requirements set forth in the Disposition Agreement, to convey to the Borough, and the Borough hereby agrees to purchase, the Municipal Complex and the property on which it is located as more fully described therein.

Section 2.11    Report on Progress. The Redeveloper shall produce, on the first day of each month after construction has commenced, a report in writing concerning the actual progress of the Redeveloper with respect to such construction. The work and construction activities of the Redeveloper shall be subject to inspection by the Borough provided Borough submits to Redeveloper written notice no less than five (5) days prior to such inspection. Notwithstanding the foregoing, the Redeveloper shall comply with all reporting and inspection requirements in the Disposition Agreement related to Phase I of the Project, as more fully set forth therein.

Section 2.12   Insurance. At all times during construction of the Project, and until the Project is available for its intended use and a Certificate of Completion is issued in accordance with the provisions of Section 2.13, the Redeveloper shall maintain or cause to be maintained at its own cost and expense, with responsible insurers, the following kinds and the following amounts of insurance with respect to the Project, with such variations as shall be reasonably required to conform to customary insurance practice:

(a)    Builder's Risk insurance during the term of construction which will protect against loss or damage resulting from fire and lightning, the standard extended coverage perils, and vandalism and malicious mischief. The limits of liability will be equal to 100% of the insurable value of the Project, including items of labor and materials in connection therewith,

17

whether in or adjacent to the structures insured, and material in place or to be used as part of the permanent construction;

(b) Comprehensive General Liability insurance against claims for bodily injury, death or property damage occurring on, in or about the Project Premises and the adjoining streets, sidewalks and passageways, in amounts not less than $5,000,000 for each claim with respect to any bodily injury or death, $5,000,000 for any one occurrence and $5,000,000 with respect to all claims for property damage relating to any one occurrence. This policy shall name the "Borough of Edgewater, its officers, employees and agents," as additional insureds. This insurance policy shall include but not be limited to, Personal Injury, Broad Form Property Damage, Contractual Liability including, where applicable, the deletion of the coverage restriction relating to work conducted within fifty (50) feet of a railroad, Products/Completed Operations, and Independent Contractors coverages. The Policy shall remain in force for a period of two (2) years following the completion and/or termination of this Agreement;

(c) Business Automobile Liability Insurance. The Business Automobile Liability policy shall cover owned, non-owned and hired vehicles with minimum limits as follows: Combined Single Annual Limit of Liability for Bodily Injury and/or Property Damage any one accident: $5,000,000. This policy shall name the "Borough of Edgewater, its officers, employee and agents" as additional insureds;

(d) Workers' Compensation and Employers' Liability Insurance. Workers' Compensation Insurance shall be provided in accordance with the requirements of the laws of the State of New Jersey, and shall include an all-states endorsement to extend coverage to any state

18

which may be interpreted to have legal jurisdiction. Employers' Liability Insurance shall be provided with a limit of liability of $1,000,000 for each accident. Such policies shall include endorsements to ensure coverage under the U.S. Longshore's and Harborworkers' Compensation Act and Maritime Death Act (Death on the High Seas Act) where required;

(e) Architects and Engineers or Miscellaneous Professional Errors and Omissions Liability Insurance. Redeveloper shall provide its own Architects and Engineers Errors and Omissions Insurance with a minimum limit of liability of $2,000,000 per claim and in the aggregate exclusive of the amount required for Commercial General Liability Insurance. The $2,000,000 limit of liability is to be renewed annually for the duration of the project and for a period of two (2) years following the termination of the Order for Professional Services. This coverage shall not contain any environmental restriction or exclusion;

(f) Contractor Pollution Liability Insurance. Minimum annual limits of liability of $5,000,000 for each occurrence with an annual aggregate of $5,000,000.   This policy shall be renewed annually for the duration of the work and for a period of two (2) years following termination of this Agreement or the completion of the environmental investigation, or include two (2) years completed operations coverage. This policy shall name the "Borough of Edgewater, its officers, employees and agents" as additional insureds; and

(g) Certificate and Endorsement Requirements. The Certificates of Insurance shall state that each of the above-required policies has been amended to include the following endorsements:

19

i. Thirty (30) days notice of cancellation or any restriction in coverage by mail to the Borough of Edgewater.

ii. All policies, except Workers' Compensation, shall contain a waiver of subrogation clause in favor of the Borough of Edgewater.

iii. With respect to all policies, except Workers' Compensation, Architects and Engineers or Miscellaneous Professional Errors and Omissions Liability Insurance, the other insurance clause under each policy shall be amended to read as follows: "This policy will act as primary insurance and not contribute with policies issued to the Borough of Edgewater.".

Section 2.13   Certificates of Occupancy and Certificates of Completion.

Upon completion of the construction of the Project or portions thereof in accordance with the Governmental Approvals, and upon submission of a completed AIA Form G704 "Certificate of Substantial Completion" for the Project or portion thereof, the Redeveloper shall, at its sole cost and expense, obtain a Certificate of Occupancy for such Improvements. Each Certificate of Occupancy, when issued, shall constitute evidence that the Redeveloper has fully performed its obligations to construct that portion of the Project set forth in the Certificate of Occupancy. In addition, upon completion of the Project and for purposes of releasing the restrictions referenced in this Agreement, the Borough agrees to issue a Certificate of Completion, whose issuance shall not be unreasonably withheld, in proper form for recording, which shall acknowledge that the Redeveloper has performed all of its duties and obligations under this Agreement and has

20

completed construction of the Project in accordance with the requirements of this Agreement. The Certificate of Completion shall constitute a recordable conclusive determination of the satisfaction and termination of the agreements and covenants in this Agreement and in the Redevelopment Plan with respect to the Redeveloper's obligation to construct the Project within the dates for the commencement and completion of same. Upon issuance of a Certificate of Completion, the conditions determined to exist at the time the Project Premises was determined to be in need of redevelopment shall be deemed to no longer exist, and the land and improvements constituting the Project and the Project Premises shall no longer be subject to eminent domain under the Local Redevelopment and Housing Law. If the Borough shall fail or refuse to provide the Certificate of Completion within thirty (30) days after request by the Redeveloper, the Borough shall provide to the Redeveloper a written statement setting forth in detail the respects in which it believes that the Redeveloper has failed to complete the Project in accordance with the provisions of this Agreement or is otherwise in default under this or any other applicable agreement and what reasonable measures or acts will be necessary in order for the Redeveloper to be entitled to a Certificate of Completion.

Section 2.14   Construction Phasing Schedule. The construction of the Project and the obtaining by the Redeveloper of all necessary Governmental Approvals shall be commenced in the manner set forth in the Construction Phasing Schedule provided by Redeveloper (hereinafter called the "Construction Phasing Schedule" attached as "Exhibit C"). Except as otherwise provided in this Agreement, all Improvements shall be commenced or concluded, as the case may be, as set forth in Article IX, subject to Force Majeure.

21

Section 2.15   Dust and Nuisance.   The Redeveloper agrees to use its best efforts to not commit a public or private nuisance by reason of dirt, dust, debris, air pollution, noise pollution, gas, smoke or other unlawful annoyance resulting from construction, trucking or other operations. The means of dust control shall be subject to approval by the Borough Engineer.

Section 2.16   Duty RE: Unsafe Conditions.   The Redeveloper shall correct and make safe any dangerous or unsafe condition created, caused or suffered to exist by the Redeveloper (or by those acting for or on behalf of the Redeveloper) affecting public safety or general welfare, if such condition develops. In the event that such condition exists, notice shall be given by certified mail to the Redeveloper, whereupon Redeveloper shall correct such condition within such reasonable period of time as the Borough in its notice shall specify. In the event such condition is not corrected by the Redeveloper, the Borough Council may order corrective work to be done and the Redeveloper and its surety shall reimburse the Borough for all costs and expenses incurred thereby.

Section 2.17   County and State Requirements. Redeveloper represents that it has heretofore complied and that it will in the future comply with all, if any, requirements and/or regulations of the Bergen County Planning Board, the Bergen County Engineer, Bergen County Road Department and Bergen County Department of Public Works, Bergen County Soil Conservation District, New Jersey Department of Environmental Protection, New Jersey Department of Transportation, Bergen County Sewer Authority and any other Governmental Agency in same are mandated by law, and hereby further represents that before commencing work which requires such approval, it will secure all county, state and federal approvals required for such work.

22

Section 2.18 Settlement of Tax Appeal. The Redeveloper has agreed to fund the tax appeal settlement entered into between the Borough and the former owner of the Redevelopment Area, Lever Bros., which is memorialized in a judgment from the New Jersey Tax Court, a copy of which is attached hereto as "Exhibit E." The settlement amount due to the previous owner is $250,000, plus interest and costs, if any, as set forth in said settlement agreement. Redeveloper shall make payment promptly upon demand from Lever Bros.

Section 2.19 Performance Bond for Municipal Complex. As set forth in the Disposition Agreement:

(a) Developer shall furnish a Performance Bond for the benefit of the Borough, in statutory form, in an amount equal to six million dollars ($6,000,000), such sum representing the Cost of Construction of the Municipal Complex, guaranteeing the performance of all obligations of the Developer with respect to the Subject Site as approved by the Borough Attorney, and set forth in N.J.S.A. 40:55D-53 and N.J.S.A. 5:39-1.1 et seq. No building permits or Certificates of Occupancy shall be issued until the Performance Guaranty shall have been received, provided, however, the same shall not be required to be posted until Developer makes application for the building permits.

(b) The performance guarantees shall be reduced or released by the Borough upon recommendation of the Borough Engineer or Chief Construction Official. In the event of a reduction, the amount of the reduction shall be mutually agreed upon by Developer and the Borough. The Borough hereby agrees, upon issuance of a Certificate of Completion for the Municipal Complex, to release said Performance Bond; provided, however, that in no event shall a final release of the performance guarantees be affected unless the improvements shall have

23

been fully installed in a reasonably workmanlike manner. Borough approval, which shall not be unreasonably withheld, shall be in accordance with the terms of this Agreement.

(c) In the event that the Redeveloper defaults on its obligations under this Agreement and/or the Disposition Agreement such that the Performance Bond is called in for payment to the Borough, upon completion of the Municipal Complex under the terms and conditions of this Agreement and the Disposition Agreement, the Borough shall pay to the bond company the sum of three million, seven hundred thousand and one dollars ($3,700,001), said sum representing the payment due the Redeveloper upon the satisfaction of its responsibilities under the Disposition Agreement. Notwithstanding the foregoing, nothing in this Section shall require the Borough to make any payment whatsoever until such time as the Municipal Complex has been completed in accordance with the terms and conditions of the Disposition Agreement.

## ARTICLE III

### BOROUGH RESPONSIBILITIES

Section 3.01 Intentionally Deleted.

Section 3.02 Professional Services. With respect to any legal work required by the Borough in connection with this Agreement and the Project, the Borough shall be entitled to appoint an attorney or attorneys to act as special counsel to perform such work for the Borough. Costs for professional services incurred by the Borough during the development review process (but excluding any due diligence expenses and legal expenses incurred by the Borough in connection with negotiating the Disposition Agreement and conducting due diligence on the

24

property to be conveyed thereunder) shall be the obligation of Redeveloper pursuant to N.J.S.A. 40:55D-53.2.

Section 3.03 Cooperation. The Borough shall cooperate fully in the preparation and prosecution of any applications for Governmental Approvals required for the Project. The Borough further agrees to actively support any application filed by the Redeveloper with the Borough Planning Board for approval of any site or subdivision plans or maps, provided that such plans conform to the ordinances of the Borough, the Redevelopment Plan and this Agreement, and provided that the Borough has already approved the plans in writing pursuant to this Agreement. The Borough shall cooperate with Redeveloper to insure that all water, stormwater and sanitary services/utilities as may be required by Redeveloper are provided to Redeveloper by the Borough on a timely basis for Redeveloper's Work hereunder. Any costs associated with providing such services shall solely be the obligation of the Redeveloper.

Section 3.04 Borough Not Responsible to Third Parties. Nothing contained in this Agreement shall be construed to give any person or legal entity, not a party to this Agreement, any claims against the Borough or any of its agents or agencies with respect to any matter arising out of this Agreement including, but not limited to, the installation of any improvements, or for any damage arising therefrom.

Section 3.05 Municipal Officials, Etc. Not Liable on Contract. The covenants, undertakings, agreement and other obligations mentioned in this Agreement shall not be construed as representations by the Mayor and Council, the Board or by any Borough officer, agent or employee to have or to assume any contractual or other liability to or with any persons,

25

firms or corporations purchasing any land, buildings, or improvements from the Redeveloper or otherwise using or having any interest in the same, nor shall this Agreement be construed to place any liability on the Borough or Board to these persons.

Section 3.06   Consent of the Borough.      Whenever it is stated herein that something is subject to the Borough's consent, such consent shall not be unreasonably withheld, delayed, or conditioned.   In no event shall this section relieve Redeveloper of the obligation to obtain consent from the Borough where such consent is specifically required by law or this Agreement, nor shall it prohibit the Borough from reasonably withholding, delaying, or conditioning such consent when and where appropriate.

## ARTICLE IV

### PROJECT FINANCING

Section 4.01   Financing and Equity Capital.   The Redeveloper represents that it either has obtained or will obtain financing for the Project, which financing may be a combination of debt financing and an equity contribution of the Redeveloper.

## ARTICLE V

### COVENANTS AND RESTRICTIONS

Section 5.01   Declaration of Covenants and Restrictions.   The Redeveloper agrees to record a Declaration of Covenants and Restrictions (hereinafter referred to as the "Declaration"), with respect to all lands included in the Project Premises, including specifically the Redeveloper's Parcels, imposing upon said lands the agreements, covenants and restrictions

26

required pursuant to Section 5.02 and Article VI of this Agreement. All provisions hereinafter with respect to the insertion in or the application of any covenants, restrictions and agreements shall apply equally to the Declaration and such covenants, restrictions and agreements shall be inserted in and apply to the Declaration, whether or not so stated in such provisions.

Section 5.02   Description of Covenants.   The covenants to be imposed upon the Redeveloper, its successors and assigns, and recorded in the Declaration, shall set forth:

(a)   Redeveloper and its successors and assigns shall devote the Project Premises to the uses specified in the Redevelopment Plan, as may be amended, and shall not devote the Project Premises to any other use(s);

(b)   Redeveloper shall not have power to sell, lease or otherwise transfer the Redevelopment Area, Project Premises or any part thereof, without the written consent of the Borough, obtained in accordance with N.J.S.A. 40A:12A-9, which consent shall not be unreasonably withheld; and

(c)   Upon completion of the required Improvements and the subsequent issuance of a Certificate of Completion for the Project, the conditions determined to exist at the time the area was determined to be in need of Redevelopment shall be deemed to no longer exist and the land and improvements thereon shall no longer be subject to eminent domain as a result of those prior determinations.

Section 5.03   Effect and Term of Covenants.   It is intended and agreed, and the Declaration shall so expressly provide, that the agreements and covenants set forth in Section 5.02 shall be covenants running with the land and that they shall, in any event, and without

27

regard to technical classification or designation, legal or otherwise, and except only as otherwise specifically provided in this Agreement, be binding, to the fullest extent permitted by law and equity, for the benefit and in favor of, and enforceable by, the Borough, its successors and assigns, and any successor in interest to the Project Premises, or any part thereof, against the Redeveloper, its successors and assigns and every successor in interest therein, and any party in possession or occupancy of the Project Premises or any part thereof. It is further intended and agreed that the agreements and covenants set forth in Section 5.02(a) shall remain in effect until the expiration of the Redevelopment Plan (at which time such agreements and covenants shall cease and terminate) and that the agreements and the covenants provided in Sections 5.02(b) and (c) shall remain in effect without limitation as to time; provided that such agreements and covenants shall be binding on the Redeveloper itself, each successor in interest to the Project, the Project Premises, or any part thereof, and each party in possession or occupancy, respectively, only for such period as Redeveloper or such successor or party shall have title to, or an interest in, or possession or occupancy of the Project Premises, the buildings and structures thereon or any part thereof.

Section 5.04    Enforcement by the Borough.  In amplification, and not in restriction of the provisions of this Article V, it is intended and agreed that the Borough and its successors and assigns shall be deemed beneficiaries of the agreements and covenants set forth in Section 5.02 both for and in their own right but also for the purposes of protecting the interests of the community and other parties, public or private, in whose favor or for whose benefit such agreements and covenants shall run in favor of the Borough for the entire period during which such agreements and covenants shall be in force and effect, without regard to whether the

28

Borough has at any time been, remains, or is an owner of any land or interest therein to or in favor of which such agreements and covenants relate. The Borough shall have the right, in the event of any breach of any such agreement or covenant, to exercise all the rights and remedies and to maintain any actions or suits at law or in equity or other proper proceedings to enforce the curing of such breach of agreement or covenant, to which they or any other beneficiaries of such agreement or covenant may be entitled. The Borough shall be entitled to reimbursement for all reasonable costs, including attorneys' fees, for the successful enforcement of its rights and remedies in any judicial or administrative forum.

Section 5.05    Permitted Exceptions. The following are not exceptions to title, but rather, permitted title encumbrances (the "Permitted Exceptions") with respect to the Project Parcels:

(a) Covenants, conditions, building and use restrictions specified in the Redevelopment Plan, as they relate to the Subject Site;

(b) Any facts disclosed by the Survey provided the same do not materially or adversely affect the ability of the Borough to operate and use the improvements constructed on the Subject Site as contemplated in this Agreement;

(c) Title exceptions appearing on the final site plan for the Redevelopment Area affecting the Subject Site;

(d) Present and future statutes, laws, ordinances, regulations, restrictions, legal requirements and orders of any federal, state, county or municipal government or other public authority relating to the Subject Site;

(e) Liens for real estate taxes not yet due and payable;

29

(f) Local building and zoning laws and regulations;

(g) Surface conditions observable by a visible inspection of the Subject Site and subsurface conditions not visible by inspection;

(h) The provisions of the LRHL;

(i) Such other title exceptions as may be consented to or approved by the Borough in writing;

(j) The rights of utility companies to maintain pipes, poles, cables and wires over, on and under the street, the parts of the Subject Site next to the street or running to any improvement on the Subject Site; and

(k) Any riparian rights or interest of the State of New Jersey requiring a riparian grant or conveyance of riparian rights to the Subject Site.

## ARTICLE VI

### MUNICIPAL CONSENT FOR ASSIGNMENT OR SALE

Section 6.01   Transfers and Assignments.   Redeveloper shall not have the right to transfer or assign this Agreement to any Transferee of Redeveloper's interest in the Project Premises except as expressly set forth in Section 5.02(b) and this Section.   In the event of any Transfer permitted under this Agreement, all of the obligations of the Redeveloper under this Agreement shall be specifically assumed in writing by the assignees or transferees of the Redeveloper. Notwithstanding the foregoing, no transfer or assignment of either this Agreement or the Redeveloper's interest in the Project Premises shall be valid unless the Borough has approved such assignment or transfer in writing pursuant to N.J.S.A. 40A:12A-9.  In the event

30

the Redeveloper seeks to assign or transfer property and the obligation of this Agreement, the Redeveloper shall provide the Borough with sufficient proof in affidavit form from the Redeveloper which shall affirmatively represent that the obligations and responsibilities set forth in this Agreement and the Disposition Agreement have not been violated by the Developer and shall further specifically represent that the Developer is aware of no uncured notices of violation from the Borough Engineer or any agency having jurisdiction over the Project. Any legal Transfer shall release the Redeveloper from any further obligation with respect to the portion transferred under this Agreement from and after the closing of the Transfer, except as to any liability or obligation of the Redeveloper incurred prior to such Transfer and except as otherwise provided in this Agreement or in the written approval by the Borough. Notwithstanding the foregoing, Redeveloper shall not assign this Agreement (other than to a Mortgagee in connection with financing) if Redeveloper is not in compliance with the Construction Schedule for the Municipal Complex in accordance with Article IX.

Section 6.02   Permitted Transfers.   The following transfers are exceptions to the prohibition set forth in Section 6.01, and shall not require prior approval by the Borough: (a) a mortgage or mortgages and other liens, security interests and encumbrances including, without limitation, pledges by the owners of the ownership interests in the Redeveloper to any Ownership Interest Pledgee, for the purposes of financing costs associated with the acquisition, development, construction and marketing of the Project, subject to Article VII hereof; (b) utility and other development easements; (c) conveyances and/or leases to the ultimate tenants of the individual residential units or commercial space within the Project, (d) any contract or agreement with respect to any of the foregoing exceptions; (e) a transfer of any portion of the Project

31

provided that the transferee has been approved in writing and in accordance with N.J.S.A. 40A:12A-9, by the Borough; and (f) the transfer of all or a portion of the Redevelopment Area or Project to an affiliated entity or controlled group in furtherance of the development and/or financing of the Project.. Notwithstanding anything in this Agreement to the contrary, after completion of that portion of Phase I consisting of the municipal facilities, the Borough's consent to any Transfer which might be subject to its consent shall be limited to consent as set forth in N.J.S.A. 40A:12A-9.

Section 6.03 Prohibition Against Speculative Development. Due to the importance of the redevelopment of the Project Premises to the general welfare of the Borough and the assistance afforded by the Borough to the for the purpose of making such redevelopment possible, the Redeveloper represents and agrees that its acquisition and development of the Project Premises, and its other undertakings pursuant to this Agreement are, and will be used, for the purpose of the redevelopment of the Project Premises as provided herein and in the Disposition Agreement, and not for speculation in land-holding.

## ARTICLE VII

## MORTGAGE FINANCING AND RIGHTS OF MORTGAGEE

Section 7.01 Notice to Borough. Prior to the completion of the Project, as certified by the Borough, neither the Redeveloper nor any successor in interest to the Project Premises or any part thereof shall engage in any financing or any other transaction creating any mortgage or other encumbrance or lien upon the Project Premises, whether by express agreement or operation of law, or suffer any encumbrance or lien to be made on or attach to the Project Premises, except

32

for the purpose of obtaining funds in connection with the Project. The Redeveloper or its successor in interest shall notify the Borough of any financing, secured by mortgage or other lien instrument, which it has entered into with respect to the Project Premises or any part thereof and, in addition, the Redeveloper shall promptly notify the Borough of any encumbrance or lien that has been created on or attached to the Project Premises, whether by voluntary act of the Redeveloper or otherwise, upon obtaining knowledge or notice of same. The provisions of this Section 7.01 shall not be deemed to grant to the Borough the right to approve or review the terms of any such proposed financing.

Section 7.02   Completion of Project.   Notwithstanding any of the provisions of this Agreement, including but not limited to those which are or are intended to be covenants running with the land, the Mortgagee or Ownership Interest Pledgee authorized by this Agreement (including any such holder who obtains title to the Project Premises or title to the ownership interests in the Redeveloper, or any part thereof as a result of foreclosure proceedings, or action in lieu thereof, but not including (a) any other party who thereafter obtains title to the Project Premises or such part from or through such holder or (b) any purchaser at foreclosure sale other than the Mortgagee itself or the Ownership Interest Pledgee, as the case may be) shall in no way be obligated by the provisions of this Agreement to construct or complete the Project or to guarantee such construction or completion; nor shall any covenant or any other provision in the Declaration be construed to so obligate such Mortgagee or Ownership Interest Pledgee. Except as otherwise provided in Section 7.04 herein, nothing in this Article or any other Article or provision of this Agreement shall be deemed or construed to permit or authorize any such Mortgagee or Ownership Interest Pledgee to devote the Project Premises or any part thereof to

33

any uses, or to construct any improvements thereon, other than those uses or improvements provided or permitted under the Redevelopment Plan and this Agreement.

Section 7.03   Notice to Mortgagee or Ownership Interest Pledgee.   Whenever the Borough shall deliver any notice or demand to the Redeveloper with respect to any breach or default by the Redeveloper of its obligations or covenants under this Agreement, the Borough shall at the same time forward a copy of such notice or demand to each Mortgagee or Ownership Interest Pledgee, as the case may be, authorized by this Agreement at the last known address of such holder shown in the records of the Borough. It shall be the obligation of the Redeveloper to provide to the Borough correct addresses for all Mortgagees or Ownership Interest Pledgees in accordance with the notice provisions of Article XI.

Section 7.04   Right to Cure Default and Assume Redeveloper's Obligations.   After any breach or default referred to in Section 7.03 above, each Mortgagee or Ownership Interest Pledgee shall (insofar as the rights of the Borough are concerned) have the right, at its option, within thirty (30) days, to cure or remedy such breach or default and to add the cost thereof to the mortgage, or the pledge as the case may be, provided that, if the breach or default is with respect to construction of the Project, nothing contained in this Article or any other Article of this Agreement shall be deemed to permit or authorize such Mortgagee or Ownership Interest Pledgee, either before or after foreclosure or action in lieu thereof, to undertake or continue the construction or completion of the Project (beyond the extent necessary to conserve or protect the holder's security, including the improvements or construction already begun) without first having expressly assumed the obligation to the Borough, by written agreement satisfactory to the

34

Borough, by written agreement satisfactory to the Borough, to complete, in the manner provided in this Agreement, the Project on the Project Premises or the part thereof to which the lien or title of such holder relates. Any such Mortgagee or Ownership Interest Pledgee who shall properly complete the Project or applicable part thereof shall be entitled, upon written request made to the Borough, to receive the individual Certificates of Occupancy for the individual residential units or commercial structures, the overall Certificate of Occupancy for the entire Project and the Certificate of Completion as hereinabove set forth in this Agreement.

Section 7.05   Mortgagee's Option To Cure Redeveloper Default.  The Borough further agrees that the Borough shall not terminate, or take any action to terminate, this Agreement, unless Mortgagee and Ownership Interest Pledgee has received notice of the event giving rise to the Borough's right to terminate the Agreement and has failed within to cure, or to commence and to diligently prosecute the cure of, Redeveloper's default(s) specified in such notice within sixty (60) days after the cure period given to Redeveloper; provided, however, with respect to defaults that are not readily curable by the Mortgagee or Ownership Interest Pledgee within sixty (60) days (including without limitation defaults as to payments owed the Borough), the Borough shall not terminate, or take any action to terminate, this Agreement if the Mortgagee or Ownership Interest Pledgee, after receipt of the notice provided above and prior to the expiration of the sixty (60) day cure period, (i) institutes proceedings to foreclose the mortgage or pledge (or exercises other appropriate remedies to obtain title and possession of the Project Premises) and diligently prosecutes such proceedings and/or remedies, (ii) moves to lift any automatic or other stay that prohibits or otherwise prevents holder or Ownership Interest Pledgee from commencing and/or prosecuting such proceedings and/or remedies, and (iii) Mortgagee or

35

Ownership Interest Pledgee discharges all other obligations as and when due from the Redeveloper to the Borough under this Agreement to the extent that Mortgagee or Ownership Interest Pledgee can do so given its then current status as lender, and not the owner of the Project Premises.

Section 7.06   Borough's Option To Cure Mortgage Default.   In the event of a default or breach prior to the completion of the Project by the Redeveloper, or any successor in interest, in or of any of its obligations under, and, to the Mortgagee, the Borough may at its option cure such default or breach, in which case the Borough shall be entitled, in addition to and without limitation upon any other rights or remedies to which it shall be entitled by the Agreement, operation of law, or otherwise, to reimbursement from the Redeveloper or successor in interest of all costs and expenses incurred by the Borough in curing such default or breach and to a lien upon the Project Premises (or the part thereof to which the mortgage, encumbrance, or lien relates) for such reimbursement, provided, that any such lien shall be subject always to the lien of (including any lien contemplated, because of advances yet to be made, by) any then existing mortgages on the Project Premises authorized by the Agreement.

## ARTICLE VIII

### DEFAULT / REMEDIES

Section 8.01   Default.        The Borough has the right to declare the Redeveloper in default under this Agreement in any one of the following eventualities:

      (a)   Redeveloper becomes insolvent;

      (b)   Redeveloper makes an assignment for the benefit of creditors;

(c)     A voluntary petition in Bankruptcy is filed by the Redeveloper and not discharged within 30 days;

(d)     An involuntary petition in Bankruptcy is filed against the Redeveloper and the Redeveloper is adjudicated Bankrupt and not discharged within 60 days.

(e)     A receiver or receivers are appointed to take charge of the property of Redeveloper and such receiver or receivers are not discharged within ninety (90) days.

(f)     The Redeveloper abandons the construction of the Project for a period of thirty (30) consecutive days, unless such abandonment is due to Force Majeure.

Section 8.02   Redeveloper Default.

(a)   Upon a default by the Redeveloper under the terms and/or conditions of this Agreement, the Borough shall provide the Redeveloper with thirty (30) days written notice of such default, specifying in detail the nature thereof, within which period of time the Redeveloper shall be required to cure same. Notwithstanding the foregoing sentence, if the default is of a nature that it cannot, with the exercise of reasonable diligence, be cured within the thirty (30) day period, then for so long as Redeveloper is diligently pursuing the cure of such default, the thirty (30) day period shall be extended to a reasonable period of time to enable the Redeveloper to cure the default with the exercise of reasonable diligence. If at the expiration of the cure period, as it may be extended, the Redeveloper has failed to cure any such default, the Borough, without further notice to the Redeveloper, may exercise the remedies set forth in Subsection (b) hereof.

(b)   The cash deposit and performance bond may be utilized by the Borough for the performance and completion of the Improvements described in this Agreement upon default of

37

the Redeveloper, after all notice and cure periods, as they may be extended hereunder, as well as for other cots as set forth in this Agreement. It is understood that the performance guarantee is given pursuant to N.J.S.A. 40:55D-53, and the Borough shall be entitled to all of the rights and remedies provided thereby, together with all rights and remedies provided by the law and/or equity. The Redeveloper agrees that in the event the Redeveloper defaults under the terms of this Agreement, that the Redeveloper shall be responsible for, not only the costs of completing the improvements, but also all reasonable ancillary costs and reasonable counsel fees expended by the Borough to enforce the provisions of this Agreement.

(c) The Redeveloper agrees that any time the Redeveloper shall fail to comply with any of the terms of this Agreement or any part of the specification as herein mentioned, the Borough Engineer, Construction Code Official or the Police Department, as to public safety matters on any issue committed to their discretion, may forthwith stop all further work on said improvement until the work has been corrected or otherwise made to comply with the terms of this Agreement and the said specifications.

(d) Notwithstanding anything to the contrary herein contained, in the event conditions detrimental to health, life, limb or property are created by the Redeveloper, they shall be promptly corrected at the expense of the Redeveloper. If any emergency shall arise, the Borough will immediately notify the Redeveloper on the site or if the emergency permits, in the sole discretion of the Borough Engineer, by notice hand delivered or sent by Certified Mail, Return Receipt to the address provided herein for notices. If no action is promptly taken by the Redeveloper, the Borough is hereby empowered to take such corrective measures as in its sole

38

but reasonable discretion it may deem necessary and charge the reasonable cost of same to the Redeveloper.

Section 8.03   Initial Remedy Upon Default.   Except as otherwise provided in this Agreement, in the event of any default in or breach of this Agreement or any of its terms or conditions by any party hereto or any successor to such party, such party (or successor) shall, within thirty (30) days of receiving written notice from another, proceed to commence to cure or remedy such default or breach. In case such action is not taken or not diligently pursued, or the default or breach shall not be cured or remedied within a reasonable time, the aggrieved party may, in addition to such other rights as specified in this Agreement, institute such proceedings as may be necessary or desirable in its opinion to cure and remedy such default or breach, including, but not limited to, proceedings to compel specific performance by the party in default or breach of its obligations.

Section 8.04   Remedies in the Event of Termination of this Agreement.   In the event that, prior to the issuance of a Certificate of Completion for the Project, in violation of this Agreement, the Redeveloper assigns or attempts to assign this Agreement or any rights in the Project or the Project Premises, contrary to the provisions of this Agreement, or if any default or failure referred to in Sections 8.01 and 8.02 shall not be cured within thirty (30) days after the date of written demand by the Borough or within the period of time granted by the Borough extending beyond thirty (30) days shall not have been cured, ended or remedied in accordance with the provisions of that section, then this Agreement, and any rights of the Redeveloper or its assignee or transferee in this Agreement, or arising therefrom with respect to the Borough or the Project Site, shall, at the option of the Borough, be terminated and there shall be no further rights

39

or obligations of the parties, except as expressly set forth in this Section 8.04. In the event of such termination, the Borough shall terminate the Redeveloper's designation as the redeveloper of the Project.

The Borough may proceed, upon termination of the Redeveloper's rights under this Agreement, including termination of the designation of the Redeveloper as the designated redeveloper for the Project Site and the Redevelopment Area, to proceed to choose and designate a new Redeveloper in accordance with the provisions of the local Redevelopment and Housing Law, and to exercise the power of eminent domain in favor of such newly designated Redeveloper as the Borough may deem necessary or proper in order to complete the Project in accordance with the Redevelopment Plan. Any actions taken by the Borough under this Section 8.04 shall always be subject to and limited by, and shall not defeat, invalidate or limit in any way the lien of any mortgage or ownership interest pledge authorized by this Agreement for the protection of the holders of such mortgage or ownership interest pledge.

Section 8.05    Rights and Remedies Cumulative. The rights and remedies of the parties to this Agreement, whether provided by law or by the Agreement, shall be cumulative, and the exercise by either party of any one or more of such remedies shall not preclude the exercise by it, at the same or different times, of any other such remedies for the same default or breath or of any of its remedies for any other default or breach by the other party. No waiver made by either such party with respect to the performance, or manner or time thereof, or any obligation of the other party or any condition to its own obligation under the Agreement shall be considered a waiver of any rights of the party making the waiver with respect to the particular obligation of the other

40

party or condition to its own obligation beyond those expressly waived in writing and to the extent thereof, or a waiver in any respect in regard to any other rights of the party making the waiver or any other obligations of the other party.

## ARTICLE IX

## ADDITIONAL TERMINATION RIGHTS

Section 9.01   Additional Termination Rights of the Borough.   This Agreement shall terminate upon reasonable notice by the Borough to the Redeveloper of its decision to so terminate, pursuant to the provisions of Section 13.01, provided, however, the dates set forth below shall be extended by the delay incurred due to an occurrence of an event of Force Majeure.   The Redeveloper warrants that it shall proceed with all due diligence to obtain necessary County approvals with the assistance of the Borough.

> (a)   If on a date one (1) month after the issuance of a building permit, the Commencement of Construction of the Municipal Complex has not occurred.
>
> (b)   If on a date twelve (12) months after the Commencement of Construction of the Municipal Complex, a Certificate of Completion has not been issued for the Municipal Complex; provided, however, that such deadline may be extended, upon notice provided by the Redeveloper to the Borough, to a date not later than eighteen (18) months after the date of issuance of a building permit.
>
> (c)   If on a date twelve (12) months after the date of issuance of a building permit, Commencement of Construction of the balance of Phase I of the Project, not including the Municipal Complex, has not occurred; provided, however, that

41

such deadline may be extended, upon notice provided by the Redeveloper to the Borough, to a date not later than twenty-four (24) months after the date of issuance of a building permit, if commercially reasonable financing is not available due to market conditions.

(d)     If on a date twenty-four (24) months after the date of issuance of a building permit, the Commencement of Construction of Phase II of the Project has not occurred; provided, however, that such deadline may be extended to a date thirty-six (36) months after the date of issuance of a building permit, upon notice provided by the Redeveloper to the Borough, if commercially reasonable financing is not available due to market conditions.

## ARTICLE X

### REPRESENTATIONS AND WARRANTIES

Section 10.01 Representations and Warranties by Redeveloper. Redeveloper hereby represents and warrants the following for the purpose of inducing the Borough to enter into this Agreement and to consummate the transactions contemplated hereby, all of which shall be true as of the date hereof:

(a)     Formation.    Redeveloper is duly formed, validly existing and in good standing under the laws of the State of New Jersey and is qualified to do business under the laws of the State of New Jersey, and has all requisite company power and authority to carry on its business as now conducted and as contemplated by this Agreement will be conducted, and to enter into and perform its obligations under this Agreement.

42

(b)     <u>Legal Authority; Power</u>.   Redeveloper has the legal power, right and authority to (i) enter into this Agreement and the instruments and documents referenced herein to which Redeveloper is a party, (ii) consummate the transactions contemplated hereby, (iii) take any steps or actions contemplated hereby, and (iv) perform its obligations hereunder.

(c)     <u>Execution; No Violation</u>.   This Agreement has been duly executed by Redeveloper, and is valid and legally binding upon Redeveloper and enforceable in accordance with its terms on the basis of the laws presently in effect, except as enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws affecting creditor's rights generally and subject to the availability of equitable remedies, and the execution and delivery hereof and will not violate the operating agreement or other formation or operating documents of the Redeveloper or result in a breach or constitute a default under or violate the terms of any indenture, agreement or other material instrument to which Redeveloper is a party or by which the Redeveloper or its material assets may be bound or affected.

(d)     <u>No Pending Litigation</u>. There is no pending litigation, or to the best of Redeveloper's knowledge (after reasonable inquiry) litigation threatened in writing, that would prevent Redeveloper from performing its duties and obligations hereunder or have a material adverse effect on the financial condition or business of the Redeveloper.   There are no outstanding judgments against the Redeveloper that would have a material adverse effect upon the assets or property of the Redeveloper or which would materially impair or limit the ability of the Redeveloper to enter into or carry out the transactions contemplated by this Agreement.

43

(e)    Financial Matters.    Redeveloper has the capability of obtaining the requisite debt and equity financing in an amount sufficient for the construction, development and operation of the Project Premises.

(f)    No Conflict.    This Agreement is not prohibited by and does not conflict with any agreements, instruments, judgments or decrees to which the Redeveloper is a party or is otherwise subject.

(g)    No Violation of Laws.    The Redeveloper has received no notice as of the date of this Agreement asserting any non-compliance in any material respect by the Redeveloper with applicable statutes, rules and regulations of the United State of America, the State of New Jersey, or of any other state, municipality or agency.    The Redeveloper is not in default with respect to any judgment, order, injunction or decree of any court, administrative agency or other governmental authority which is in any respect material to the transaction contemplated hereby.

(h)    Project Documents.    The Redevelopment Agreement as well as all other project documents associated with the Project Premises as set forth on the exhibits and schedules attached hereto and incorporated herein are based upon reasonable assumptions and fairly present to the Borough the subject matter thereof.

Section 10.02 Representations   and   Warranties by Borough.    The Borough hereby represents and warrants the following to Redeveloper for the purpose of inducing Redeveloper to enter into this Agreement and to consummate the transactions contemplated hereby, all of which shall be true as of the date hereof:

44

(a)    Formation.  The Borough is an instrumentality of the State of New Jersey, and has all requisite power and authority to enter into and perform its obligations under this Agreement.

(b)    Legal Authority; Power.  The Borough has the legal power, right and authority to (i) enter into this Agreement and the instruments and documents referenced herein to which the Borough is a party, (ii) consummate the transactions contemplated hereby, (iii) take any steps or actions contemplated hereby, and (iv) perform its obligations hereunder.

(c)    Execution; No Violation or Conflict.  This Agreement has been duly executed by the Borough and is valid and legally binding upon the Borough and enforceable in accordance with its terms on the basis of laws presently in effect, except as enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws affecting creditor's rights generally and subject to the availability of equitable remedies, and the execution and delivery hereof will not violate the constitutional documents of the Borough or other regulations or documents governing the actions of the Borough or results in a material breach or constitute a material default under or violate the terms of, or conflict with, any indenture, agreement or other instrument to which the Borough is a party or by which the Borough or its material assets may be bound or affected.

(d)    No Pending Litigation.  There is no pending litigation, or to the best of the Borough's knowledge (after reasonable inquiry) litigation threatened in writing, that would prevent the Borough from performing its duties and obligations hereunder or have a material adverse effect on the financial condition or activities of the Borough. There are no outstanding

45

judgments against the Borough that would have a material adverse effect upon the Project Premises or which would materially impair or limit the ability of the Borough to enter into or carry out the transactions contemplated by this Agreement.

(e)     No Violation of Laws.  The Borough has received no notice as of the date of this Agreement asserting non-compliance in any material respect by the Borough with applicable statutes, rules or regulations of the United State of America, the State of New Jersey, or of any other state, municipality or agency.  The Borough is not in default with respect to any judgment, order, injunction or decree of any court, administrative agency or other governmental authority which is in any respect material to the transactions contemplated hereby.

### ARTICLE XI

### [RESERVED]

### ARTICLE XII

### PREPARATION AND APPROVAL OF
### PLANS AND SPECIFICATIONS FOR DEVELOPMENT

Section 12.01 Borough Approval of Site Plan.   Redeveloper has obtained Site Plan Approval for Phase I of the Project.   Redeveloper shall at its own cost, within one hundred twenty (120) days after the Effective Date, cause to be prepared by a licensed architect, surveyor and/or engineer of the State of New Jersey a subdivision plan, a preliminary and final site plan for the construction of Phase II of the Project consistent with the Redevelopment Plan and a metes and bounds description of the Redevelopment Area (collectively, the "Phase II Site Plan"). The Borough shall have a period of ninety-five (95) days after receipt thereof to approve such Phase II Site Plan, including the building orientations, architectural style and building materials

46

to be used for the Improvements, and facilities for parking and structured parking, as being in conformity with the Redevelopment Plan and this Agreement, or to furnish to Redeveloper in writing notice of any changes or modifications, and the reasons therefor, required to be made in order to render the same in conformity with the Redevelopment Plan and this Agreement. The Borough shall not unreasonably withhold, delay or condition approval of the Phase II Site Plan provided it is materially consistent with the Redevelopment Plan and, to the extent not inconsistent therewith, the MLUL. If changes or modifications shall be required by the Borough, Redeveloper shall incorporate such changes and modifications and furnish revisions to the Borough for approval within thirty (30) days after receipt of written notice thereof. The Redeveloper shall submit the Phase II Site Plan application as and for both a preliminary and final Site Plan Approval (the "Site Plan Approval").

Section 12.02 Filing of Phase II Site Plan. Redeveloper shall pursue Phase II Site Plan Approval in a reasonable manner and shall prepare and submit all applications and supporting documents to the Planning Board within thirty (30) days of receipt of the Borough's approval of the Phase II Site Plans and shall make a full public presentation of the Phase II Site Plan and proposed Project, at public meetings and upon requisite notice as required under the Municipal Land Use Law. Redeveloper shall, in making its presentation, be obligated to consider public comment made at the presentations, and shall have available at the presentation persons who are knowledgeable of the proposed project and the geographic surroundings of the Redevelopment Area to provide responses to questions that may be posed by members of the public.

47

The Borough hereby acknowledges that simultaneously with its application for Phase II Site Plan Approval, the Redeveloper may apply to the Planning Board for Major Subdivision Approval pursuant to the Multiple Land Use Law, in Redeveloper's sole discretion, and for the purposes of this Agreement such application shall be deemed to be included in the Phase II Site Plan Approval.

Section 12.03 Phase II Site Plan Approval.   The Planning Board shall expeditiously process and hear the application for Phase II Site Plan Approval, tentatively scheduled to be heard on November 20, 2007.  In the event that, within sixty (60) days from the date of submission to the Planning Board of a complete application for Phase II Site Plan Approval, Redeveloper has not received Phase II Site Plan Approval from the Planning Board, then at either party's election, upon written notice to the other, the sixty (60) day period shall be extended to a reasonable period of time as agreed by the Parties.  The Planning Board shall not unreasonably withhold, condition or delay Phase II Site Plan Approval provided that the Phase II Site Plan Application is complete and is materially consistent with the Redevelopment Plan and, to the extent not inconsistent therewith, the MLUL.

The failure to obtain Phase II Site Plan Approval within the time set forth above shall not be construed as a breach of the performance time requirement of this Section 12.03, provided the application then under consideration is consistent with the requirements of the Redevelopment Plan and all other applicable legal requirements, including the MLUL.   Redeveloper's time constraint hereunder for acquiring the applicable Governmental Approvals shall be extended day for day with that agreed to by the Redeveloper, as applicant, and the Planning Board only if the

48

application then under consideration is consistent with the requirements of the Redevelopment Plan and with all applicable legal requirements.

Section 12.04 Approval of Construction Plans.   Within one hundred eighty (180) days after receiving Phase II Site Plan Approval from the Planning Board, Redeveloper shall, at its own cost, cause to be prepared and submitted to the Construction Code Official (the "CCO") the various Construction Plans of the Project required for construction of the Improvements.   The CCO shall have a period of thirty (30) days after receipt thereof to review and approve these Construction Plans as being in conformity with the Redevelopment Plan and this Agreement, and as being appropriate, in the CCO's reasonable exercise of judgment, in terms of building orientations, their placement on the Project Premises and architectural styling and building materials to be used for the Improvements, and facilities for parking and structured parking as well as the locations on the Project Premises, or to furnish to Redeveloper in writing notice of any changes or modifications, and the reasons therefor, required to be made in order to render the same in conformity with the Redevelopment Plan and this Agreement.

The CCO shall, if the final Construction Plans originally submitted conform to the provisions of the Redevelopment Plan and this Agreement, approve in writing such Construction Plans, and no further filing by the Redeveloper or approval by the CCO thereof shall be required except with respect to any change. Such Construction Plans shall, in any event, be deemed approved unless rejection thereof in writing by the CCO, in whole or in part, setting forth in detail the reasons therefore, shall be sent to Redeveloper within thirty (30) days after the date of their receipt by the CCO.  If the CCO so rejects the final Construction Plans in whole or in part as not being in conformity with the Redevelopment Plan or this Agreement, the Redeveloper

49

shall submit new or corrected final Construction Plans which are in conformity with the Redevelopment Plan and this Agreement within sixty (60) days after receipt of written notification to the Redeveloper of the rejection. The provisions of this Section 12.04 relating to approval, rejection, and resubmission of corrected Construction Plans hereinabove provided for with respect to the original Construction Plans shall continue to apply until the Construction Plans have been approved by the CCO; provided, that in any event the Redeveloper shall submit final Construction Plans for the Project which are in conformity with the Redevelopment Plan and this Agreement no later than two hundred seventy (270) days after receiving Preliminary Site Plan Approval from the Planning Board. Failure to provide satisfactory Construction Plans within the above timeframe shall provide the Borough with the option to either i) grant a reasonable extension of time for the Redeveloper to provide the CCO with conforming Construction Plans, or ii) terminate this Agreement.

Section 12.05 Other Plans to be Submitted. The Redeveloper shall, to the extent not shown on the Phase II Site Plan, also submit the following plans to the CCO for his review and acceptance within the time frame provided in Section 12.04 above, and at the same time as it submits the Phase II Site Plans and subdivision plan pursuant to Section 12.01 above:

(a) A plan showing the building, the site and site improvements, parking facility(ies), all elevations of the building(s), the exterior treatment of the building including color, type and texture of material(s) to be used, and a sample of the actual construction materials being used on all facades.

(b) A lighting plan demonstrating that all "on site" walkways, parking areas, and other areas accessible to pedestrians during the hours of darkness will be adequately lighted

50

proposed by Redeveloper, shall be twenty (20) days after the date of the CCO's receipt of notice of such change and a copy of the revised plan or plans.

Section 12.08 Final Site Plan Approval.   A Certificate of Occupancy issued by the Borough Construction Code Official is a prerequisite to the issuance of a Certificate of Completion by the Borough under this Agreement. Redeveloper shall be required to submit Site Plans for the Project as built that are final in nature and which reflect compliance with the Governmental Approvals and the Redeveloper's Site Plan(s). Any material deviations between the Final Site Plan must have been previously submitted by Redeveloper to the CCO and the Borough and received the prior written approval of the CCO and the Borough, as provided in the Redevelopment Plan, as amended, and this Agreement.

Section 12.09 Changes in Improvements to be Constructed.   The Redeveloper shall not be permitted to construct any Improvements on the Project Premises other than those set forth as shown on the Site Plans and Construction Plans, nor shall the Redeveloper be permitted to make any additions, changes, alterations, substitutions or the Improvements to be constructed, without the prior written consent of the Borough after review and approval by the Borough of the revised site and construction plans showing such changes, alterations, substitutions or modifications.

## ARTICLE XIII

### NOTICES AND DEMANDS

Section 13.01 Manner of Notice.   Any notice, request, consent or other communication under this Agreement (a "Notice") shall be in writing and shall be given by personal delivery or by Federal Express or similar overnight national courier, or by telecopier

52

with confirmation (followed by overnight courier), addressed to the parties at the addresses hereinabove set forth. An additional copy of any notice intended for Redeveloper shall be sent to:

Herrick, Feinstein LLP
One Gateway Center
Newark, New Jersey 07102
Attn: Scott Tross, Esq.
Facsimile: (973) 274-2500

and an additional copy of any notice intended for the Borough shall be sent to:

Durkin & Boggia
71 Mount Vernon Street
P.O. Box 378
Ridgefield Park, New Jersey 07660
Attn: Philip N. Boggia, Esq.
Facsimile: (201) 641-6649

Notice shall be deemed to be delivered upon receipt. Any party may, upon ten (10) days' notice to the other, change the address to which notices to such party shall thereafter be given.

## ARTICLE XIV

## MISCELLANEOUS

Section 14.01 Force Majeure. It is agreed that the deadline stated herein for construction may be extended to a date mutually agreed upon by the parties, and it shall be extended if completion of the construction of the Improvements is prevented by an event of Force Majeure, in which case any unexpired deadline shall be extended for the period of the enforced delay, as mutually determined by the parties, provided that the Redeveloper undertaking the improvement who seeks the benefit of this provision on Force Majeure shall, within ten (10) days after the beginning of any such enforced delay, have notified the Borough, and of the cause or causes

53

thereof, and has requested an extension for the period of the enforced delay. Compliance with municipal laws regulating land use and construction, any legal requirements under any applicable environmental laws, as well as known NJDEP clearances, approvals, or permits typical of the development process and referred to in this Agreement, shall not be considered or construed as events of Force Majeure.

Section 14.02 Right of Entry For Utility Service. The Borough reserves for itself and any public utility company, as may be appropriate, upon three days written notice, the unqualified right to enter upon the Project Premises at any reasonable time for the purpose of reconstructing, maintaining, repairing, or servicing the public utilities located within the Project Premises boundary lines.

Section 14.03 Redeveloper Not To Construct Over Utility Easements. The Redeveloper shall not construct any building or other structure or improvement on, over, or within the boundary lines of any easement for public utilities, unless such construction is provided for in such easement or has been approved by the Borough. If approval for such construction is requested by the Redeveloper, the Borough shall use its best efforts to assure that such approval shall not be withheld unreasonably.

Section 14.04 Construction Sign. The Redeveloper shall provide and erect a construction sign at the site before the start of construction, and shall maintain the sign until the completion of the Project, such signage to be consistent with applicable ordinances. The sign shall be at least 8' 0" x 12' 0" in size and shall be separate from any sign erected by the Redeveloper to advertise the Project.

Section 14.05 Maintenance.  The Redeveloper shall be responsible for maintenance and securing the Project Premises, subject to this Agreement, until such time as Redeveloper no longer owns or leases the Project Premises or parts thereof.

Section 14.06 Equal Employment Opportunity.  The Redeveloper agrees that during the construction of Improvements:

(a)  The Redeveloper will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Redeveloper will take affirmative action to insure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer, recruitment or recruitment advertising, layoff or termination; rates of pay or other forms of compensation, and selection for training, including apprenticeship. The Redeveloper agrees to post in conspicuous places, available to employees and applicants for employment, notices setting forth the provisions of this nondiscrimination clause and any such notices provided by the Borough which are consistent therewith.

(b)  The Redeveloper will, in all solicitations or advertisements for employees placed by or on behalf of the Redeveloper, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(c)  Subcontractors and suppliers to the Project Area shall include qualified and certified minority enterprises.

55

(d)    The obligations in this Section shall be binding on all contractors and subcontractors to the extent that any work is done by any contractor or subcontractor, and any contract entered into by the Redeveloper shall so provide.

Section 14.07 Entire Agreement.   This Agreement constitutes the entire Agreement of the parties and supersedes the prior or contemporaneous writings, discussions, or agreements between the parties with respect to the subject matter hereof. This Agreement may not be changed, modified, or amended except by a written agreement specifically referring to this Agreement signed by all the parties hereto. Except as otherwise set forth herein, no amendment, extension, modification or alteration in any of the terms and/or conditions or requirements by the Borough shall operate so as to relieve any surety from its obligations on any performance or maintenance guarantee.

Section 14.08 Titles of Articles and Sections/Headings.   Any titles of the several Parts and Sections of the Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of its provisions. The Section headings contained in this Agreement are inserted for reference purposes only and shall be given no weight in the construction of this Agreement. None of the headings or titles of Articles and Sections are intended to limit or define the contents of the Sections and Articles.

Section 14.09 Counterparts.   This Agreement is executed in several counterparts, each of which shall constitute one and the same instrument.

56

Section 14.10 Severability.  If any provision of this Agreement shall be determined to be invalid or unenforceable by a court of competent jurisdiction, such determination shall not affect the remaining provisions of this Agreement, all of which shall remain in full force and effect.

Section 14.11 Estoppels .  Within ten (10) days following request by Redeveloper, or of any lender, purchaser or other party having an interest in the Project, the Borough shall issue a signed estoppel certificate either stating this Agreement is in full force and effect and that there is no default or breach under this Agreement, or stating the nature of the default or breach, if any.

Section 14.12 Conflicts.  In the event of any conflict or inconsistency between the terms of this Agreement and the Disposition Agreement, the terms of the Disposition Agreement shall control with respect to the portion of the Project and the Improvements that are the subject of the Disposition Agreement.

Section 14.13 I ndemnification. Redeveloper shall be and remain liable for any and all damage or monetary loss (including, but not limited to, attorneys' fees) that may be suffered by the Borough or the Board, or their officers, employees, agents and/or professionals by any neglect, wrongdoing, omission or commission of any act by the Redeveloper or any person, firm or corporation acting for the Redeveloper hereunder arising from the construction or installation of the improvements, the performance of the terms hereof or from or out of this Agreement. The Redeveloper shall also save, indemnify, and hold harmless the Borough, its officers, agents, boards and employees for any and all actions at law or in equity, charges, debts, liens, encumbrances, costs and attorneys' fees which may arise from any such damage or loss, from the making of the improvements, the performance of the terms hereof or from or out of this

57

Agreement, except where the Borough or its agents have been judicially determined to have acted contrary to law or failed to perform acts required by law or by this Agreement or have been guilty of negligence.

When and in the event that by reason of the negligence of the Redeveloper in the construction of the Project, litigation arises and the Borough is made a party Defendant to any lawsuit so instituted and by reason of the necessity of the Borough to defend such suit, escrow funds provided for in Section 14.14 hereof are deemed to be insufficient to pay the continuing reasonable bills for services rendered to the Borough by its attorney and/or engineer, or other expenses or costs incurred in said litigation, the Borough may serve a written notice by Certified Mail, Return Receipt, upon the Redeveloper at the address set forth herein, requiring the Redeveloper to deposit within thirty (30) days thereof, such additional funds that the Borough may deem necessary for the completion of the development and the defense of any such litigation. The Redeveloper shall, within thirty (30) days, deposit such additional funds with the Borough as required. Should the Redeveloper fail to do so within the required time period, the Borough may direct the appropriate officials to place a stop work order on all development and construction of the Project on the Property and as depicted on the Site Plan.

Section 14.14 Borough's Professional Costs. The reasonable engineering, planning, and legal fees or charges for services rendered to the Board and to the Borough in connection with this Agreement and in connection with improvements made hereunder shall be paid by the Redeveloper upon the execution and delivery of this Agreement. A cash deposit in of $25,000 dollars shall be deposited with the Borough for all professional services, it being specifically

58

agreed, that if during the course of the development it appears in the reasonable estimation of the CCO that the amount of deposit made is inadequate to meet such costs, the Borough may require additional sums to be deposited with the Borough as it might determine to be necessary and reasonable, and the Redeveloper shall forthwith deposit same. No building permits or Certificate of Occupancy shall be issued until such deposits have been made.

The Borough shall be and is hereby authorized by the Redeveloper to disburse the said deposit in payment of such services as are rendered upon the submission of property vouchers therefore, duly sworn to by the person or persons rendering the services and the unused portion of any such deposit shall be returned to the Redeveloper by the Borough upon issuance of the final Certificate of Completion for the Improvements.

Section 14.15 Dedication of Site ets.

(a)    The Redeveloper or its successors or assigns, if requested in writing by the Borough, shall dedicate to the public use, if applicable, all streets and areas lying within the bed of each street and the improvements therein as depicted in the Site Plan and such other aforesaid areas by deed or other acceptable method of conveyance as set forth herein, provided, however, that this Agreement shall not constitute an acceptance by the Borough of such streets or improvements there in other areas, until such time as the Borough may formally adopt a Resolution accepting the dedication after the recommendation of, among other things, the Borough Engineer.

Until such time as the Redeveloper has completed all the public improvements, including roadways and driveways, and the Borough has accepted the same by formal Resolution, the

Redeveloper shall be responsible to maintain said roads and driveways and keep same free of all snow and other debris so as to give access to fire, police and other emergency vehicles which may be required to render assistance at the Property. Notwithstanding anything to the contrary, no obligation is imposed on the Borough to accept any street, road or driveway shown on the Subdivision and/or Site Plans and/or other drawings to herein.

(b)     If requested in writing by the Borough, the Redeveloper, and its successors and assigns, agrees to deliver to the Borough a deed, free and clear of all liens, encumbrances, covenants and conditions, and containing a metes and bounds description for all new streets, roads, driveways, easements, rights-of-way, playgrounds, and other areas to be dedicated to the Borough as depicted on the Site Plan, together with a title commitment (using the most recent ALTA form) indicating that the Redeveloper has clear and marketable title thereto. The conveyance by the Redeveloper to the Borough shall be by Deed of Bargain and Sale with Covenants against Grantors Acts in recordable form, described by reference to a filed map, setting forth all roads, easements and rights-of-way together with a proper Affidavit of Title and Title Insurance Policy subject only to the Standard ALTA exceptions, all subject to the approval of the Borough Attorney. Said streets, roads, driveways, easements and rights-of-way are to become part of the Borough road and Borough utility systems, reserving unto the Redeveloper or his successors and assigns the right to drain into drainage easements and discharge sanitary waste in the appropriate systems all subject to and under the supervision and approval of the Borough Engineer and in accordance with all pertinent ordinances and regulations of any agencies of government having jurisdiction. Notwithstanding anything to the contrary, no obligation is imposed on the Borough to accept any new streets, roads, driveways,

60

easements, rights-of-way, playgrounds or other areas shown on the Subdivision Plans, Site Plan and/or other drawings referred to herein.

Section 14.16 Dispute Resolution.    The Borough and Redeveloper agree that in the event of any dispute between the Borough Engineer and the Redeveloper as to the compliance with this Agreement, the Redeveloper reserves the right to a hearing before the Governing Body. In the event that any dispute should arise regarding the payment of professional fees attributed to the site, same shall be resolved in accordance with the Municipal Land Use Law, N.J.S.A. 40:55D-1, et seq and applicable Borough Ordinances. In the event the Borough Engineer and the Redeveloper are unable to resolve any dispute that may arise hereunder, such dispute shall be resolved by arbitration, except in the case that specific performance or other equitable relief is requested by either party, in which case such dispute shall be resolved by litigation.

Section 14.17 Governing Law.    This Agreement shall be governed by and construed in accordance with the substantive and procedural laws of the State of New Jersey. Any litigation arising out of this Agreement shall be brought in the Superior Court of New Jersey, Law Division, Bergen County vicinage, and the parties agree to submit to the jurisdiction of said Court.

Section 14.18 Performance Bond.

(a) Prior to the issuance of a building permit, the Redeveloper shall post a Performance Bond in the amount reasonably determined by the Borough Engineer to insure the payment of the cost of installation of all on-site improvements, in accordance with N.J.S.A. 40:55D-53a(1). The Redeveloper shall provide an endorsement from a bonding company or

61

lending institution showing that the Borough of Edgewater is a secured party in connection with the requirements of this Agreement. The Performance Bond or letter of credit is to guarantee that all of the site work that is undertaken shall be completed in accordance with the Site Plans approved by the Planning Board and also to guarantee that all site work, including but not limited to on-site storm drainage system and sanitary sewer system, landscaping, etc. are constructed on the site as shown in the Site Plans.

(b) Prior to the discharge of the Performance Bond referred to above and prior to the issuance of any Final Certificate of Occupancy, the Developer shall submit to the Borough Engineer a detailed "As-Built" Site Plan prepared and certified by a licensed New Jersey Professional Engineer. The "As-Built" Site Plan shall show the exact location, sizes and elevation of all installed improvements, and shall meet with the reasonable requirements and approval of the Borough Engineer.

Section 14.19 No Third Party Beneficiaries. Nothing contained in this Agreement shall be construed to give any person or legal entity, not a party to this Agreement, any claims against either party to this Agreement or any of their respective agents or agencies with respect to any matter arising out of this Agreement including, but not limited to, the installation of any improvements, or for any damage arising therefrom.

[SIGNATURES ON FOLLOWING PAGE]

62

IN WITNESS WHEREOF, the Borough has caused this Agreement to be duly executed in its name and behalf of the Mayor and Council, and its seal to be hereunto duly affixed and attested by its Secretary, and the Redeveloper has caused this Agreement to be duly executed in its name and behalf, on or as of the day first above written.

ATTEST:                                          BOROUGH OF EDGEWATER

BY: _____                     BY: _____
Name: BARBARA RAE                                Name: WARREN (MRELSE
Title: BOROUGH CLERK OF EDGEWATER                Title: MAYOR OF EDGEWATER

ATTEST:                                          I. PARK EDGEWATER, LLC

BY: _____                     BY: _____
                                                 Name: James Cocker
                                                 Title: Manager

63

STATE OF NEW JERSEY )
                     ) SS: County of
COUNTY OF [____] )

I CERTIFY that on November 5, 2007, [____], personally came before me and this person acknowledged under oath, to my satisfaction, that:

a)  This person signed, sealed and delivered the attached document as an officer of the corporate managing member of the limited liability company named in this document;

b)  The proper corporate seal was affixed; and

c)  This document was signed and made by the corporation as its voluntary act in its capacity as managing member of the limited liability company named in this document and by virtue of a resolution of its board of directors and in accordance with the operating agreement of the limited liability company.

A Notary Public of New Jersey
Commission Expires [____]

MARIA N. MARTINEZ
Notary Public
My Commission Expires Feb. 28, 2008

64

EXHIBIT A

REDEVELOPMENT AREA

ALL that certain tract piece or parcel of land, situate, lying and being in the Borough of Edgewater, County of Bergen, New Jersey:

Beginning at the intersection of the easterly side or line of River Road, as now laid out, and the division line between the counties of Hudson and Bergen and running thence,

1.   North 12°05'49" West, a distance of 41.82 feet, thence;
2.   North 12°05'49" West, a distance of 100.62 feet, thence
3.   North 12°17'58" West, a distance of 16.23 feet, thence;
4.   Westerly along a curve to the left, having an arc distance of 155.99 feet, a radius of 1066.30 feet, a central angle of 8°22'55", and being subtended by a chord bearing North 02°54'29" East, 155.85 feet, thence;
5.   North 01°46'59" West, a distance of 276.21 feet, thence;
6.   Northerly along a curve to the right, having an arc distance of 176.02 feet, a radius of 860.00 feet, a central angle of 11°43'37", and being subtended by a chord bearing North 04°04'45" East, 175.71 feet, thence;
7.   North 09°56'34" East, a distance of 100.95 feet, thence;
8.   Northerly along a curve to the right, having an arc distance of 380.52 feet, a radius of 890.00 feet, a central angle of 24°29'48", and being subtended by a chord bearing North 22°11'28" East, 377.63 feet, thence;
9.   North 34°26'22" East, a distance of 370.67 feet, thence;
10.  Northerly along a curve to the left, having an arc distance of 69.88 feet, a radius of 2010.00 feet, a central angle of 1°59'31", and being subtended by a chord bearing North 33°26'37" East, 69.88 feet to a point of cusp, thence;
11.  South 56°57'31" East a distance of 580.86 feet;
12.  Easterly along a curve to the left, having an arc distance of 73.07 feet, a radius of 680.75 feet, a central angle of 6°09'00", and being subtended by a chord bearing South 60°01'14" East, 73.04 feet, thence;
13.  South 63°05'44" East, a distance of 241.53 feet, thence;
14.  South 62°15'44" East, a distance of 433.87 feet, thence;
15.  South 62°15'44" East, a distance of 100.00 feet; thence;
16.  South 26°35'46" West, a distance of 88.83 feet; thence;
17.  South 63°15'44" East, a distance of 416.66 feet; thence;
18.  South 28°59'09" West, a distance of 106.62 feet; thence;
19.  South 28°59'09" West, a distance of 329.58 feet; thence;
20.  South 28°59'09" West, a distance of 205.08 feet; thence;
21.  North 62°21'04" West, a distance of 620.89 feet; thence;
22.  North 63°21'04" West, a distance of 65.58 feet; thence;
23.  North 63°21'04" West, a distance of 716.23 feet; thence;
24.  South 33°29'29" West, a distance of 52.27 feet; thence;
25.  South 19°14'27" West, a distance of 50.06 feet; thence;
26.  South 11°40'41" West, a distance of 76.34 feet, thence;

27. South 27°51'48" West, a distance of 50.22 feet; thence;
28. South 15°35'36" West, a distance of 50.36 feet; thence;
29. South 30°37'51" West, a distance of 126.29 feet; thence;
30. South 16°20'50" West, a distance of 75.43 feet; thence;
31. South 03°12'12" East, a distance of 27.73 feet; thence;
32. South 29°16'28" East, a distance of 24.21 feet; thence;
33. South 24°20'42" West, a distance of 60.03 feet; thence;
34. South 56°07'39" West, a distance of 18.03 feet; thence;
35. South 31°42'39" East, a distance of 30.14 feet, thence;
36. North 59°05'49" West, a distance of 335.00 feet to the Point of Beginning.

EXHIBIT B

REDEVELOPMENT PLAN



# BURGIS ASSOCIATES, INC.

COMMUNITY PLANNING AND DEVELOPMENT CONSULTANTS

25 Westwood Avenue
Westwood, New Jersey 07675
Phone (201) 666-1811
Fax (201) 666-2599
e-mail: jhb@burgis.com

Community Planning
Land Development and Design
Landscape Architecture

**REDEVELOPMENT PLAN**
**UNILEVER REDEVELOPMENT AREA**

BLOCK 99 LOTS 1, 3, 4 & 5
BOROUGH OF EDGEWATER
BERGEN COUNTY, NEW JERSEY

PREPARED FOR:

BOROUGH OF EDGEWATER PLANNING BOARD
BA# 1626.16

August 9, 2006



# BURGIS ASSOCIATES, INC.

## COMMUNITY PLANNING AND DEVELOPMENT CONSULTANTS

25 Westwood Avenue
Westwood, New Jersey 07675
Phone (201) 666-1811
Fax (201) 666-2599
e-mail: jhb@burgis.com

Community Planning
Land Development and Design
Landscape Architecture

# REDEVELOPMENT PLAN
## UNILEVER REDEVELOPMENT AREA

BLOCK 99 LOTS 1, 3, 4 & 5
BOROUGH OF EDGEWATER
BERGEN COUNTY, NEW JERSEY

PREPARED FOR:

BOROUGH OF EDGEWATER PLANNING BOARD
BA# 1626.16

The original document was appropriately signed and sealed on August 9, 2006 in accordance with Chapter 41 of Title 13 of the State Board of Professional Planners.

Joseph H. Burgis, P.P., AICP
Professional Planner #2450

Sean Moronski, P.P., AICP
Professional Planner #5601

MEMBERS OF THE EDGEWATER PLANNING BOARD

Kevin O'Connor, Chairman
Hon. Nancy Merse, Mayor
Hon. Neda Rose, Councilwoman
John Candelmo
Gerry Balberir
Iris Borman
Michael Kelley
Mark Klein
Howard Levine
Joseph Kerwin, Alternate #1
Linda Farell, Alternate #2

Planning Board Secretary
Annamarie O'Connor

Planning Board Attorney
Philip Boggia, Esq.

Planning Board Engineer
Thomas Solfaro, P.E., Schoor DePalma

Planning Consultants
Joseph Burgis, P.P., AICP
Sean Moronski, P.P., AICP

# TABLE OF CONTENTS

Introduction ........................................................................................... 1
Statutory Criteria ................................................................................... 3
Property Description .............................................................................. 4
Surrounding Development Pattern ........................................................ 6
Master Plan ........................................................................................... 7
Zoning .................................................................................................. 7
Redevelopment Plan .............................................................................. 9
   Purpose ............................................................................................ 9
   Description of SVR Zone ................................................................. 10
   Permitted Uses ................................................................................ 10
   Area and Bulk Regulations .............................................................. 13
   Supplemental Regulations Concerning Specific Uses ...................... 15
   Signage ........................................................................................... 16
   Parking and Loading ........................................................................ 16
   General Design Standards ................................................................ 17
   Façade Treatments ........................................................................... 18
   Materials and Texture ...................................................................... 18
   Lighting .......................................................................................... 18
   Streetscape Design .......................................................................... 19
   Landscaping .................................................................................... 19
   Submittal Requirements .................................................................. 20
   Waivers .......................................................................................... 21
Redevelopment Plan's Relationship to Master Plan ............................... 21
Redevelopment Plan's Relationship to State Development and Redevelopment Plan ... 22
Redevelopment Procedures ................................................................... 23

## LIST OF TABLES

Table 1: Existing Building Information ................................................... 4
Table 2: OR-1 Bulk Requirements ......................................................... 8

## LIST OF MAPS

Map 1: Study Area Map ......................................................................... 2
Map 2: Unilever Site Building Location Map .......................................... 5
Map 3: Conceptual Site Plan (for illustrative purposes only) .......... Appendix

## Introduction

This report presents the redevelopment plan for the tract of land commonly referred to as the Unilever tract located in the Borough of Edgewater, New Jersey. Pursuant to the provisions of the Local Redevelopment and Housing Law (LRHL), the Borough of Edgewater has designated the Unilever property, an area of 48.68 acres including approximately 23.1 acres of uplands and nearly 26 acres of riparian land, as "an area in need of redevelopment." The property, identified as Block 99, Lots 1, 3, 4, & 6 on Borough tax maps, is located on the east side of River Road, south of its intersection with Gorge Road.

The Borough Council, following their adoption of a resolution designating the site an "area in need of redevelopment" pursuant to the Planning Board's recommendation, directed the Planning Board to prepare this redevelopment plan. This plan represents the next step in the redevelopment process. It is designed to affirmatively address the statutory requirements set forth in the LRHL, identifying the plan's relationship to local land use objectives, and enumerating the uses that may be permitted in the area along with regulatory controls governing the proposed intensity and distribution of those uses. The plan incorporates the philosophy and policies of the State's smart growth initiatives, envisioning the creation of a mixed-use commercial and residential community that promotes a pedestrian-friendly environment combining retail uses and residences in an attractive comprehensively integrated format.

The Borough is obligated to proceed in this effort in accordance with the procedures set forth in the Local Redevelopment and Housing Law. This process calls for participation by both the Borough Council and Planning Board, and additionally requires public participation. The accompanying chart summarizes this process.

### The Redevelopment Process





## Statutory Criteria

The Local Redevelopment and Housing Law (LRHL) identifies the required elements that must be incorporated into a redevelopment plan. The statute provides that the redevelopment plan is to include an outline for the planning, development, redevelopment or rehabilitation of the project area sufficient to indicate:

A. The relationship to definite local objectives as to appropriate land uses, density of population, improved traffic and public transportation, public utilities, recreational and community facilities and other improvements;

B. Proposed land uses and building requirements in the project area;

C. Adequate provision for the temporary and permanent relocation, as necessary, of residents in the project area, including an estimate of the extent to where decent, safe and sanitary dwelling units affordable to displaces residents will be available to them in the existing housing market;

D. An identification of any property within the redevelopment area which is proposed to be acquired in accordance with the redevelopment plan;

E. Any significant relationship of the redevelopment plan to the master plans of contiguous municipalities, County Master Plan, and State Development and Redevelopment Plan.

3

PROPERTY DESCRIPTION

The study area is comprised of the Unilever property, identified on Borough tax records as Block #9 Lots 1, 3, 4 and 5. It occupies an area of approximately 49 acres, including approximately 23.1 acres of uplands and approximately 26 acres of riparian land. The property has approximately 1,700 feet of frontage along River Road and an upland depth ranging from 350 feet at the southerly portion of the parcel to approximately 600 feet at the northerly portion of the parcel. The site's total depth, including riparian lands, is approximately 2,000 feet.

The site is currently developed as a research facility that was occupied by Unilever Research, the former owner of the study area. There are nine major buildings (minimally 5,000 square feet in size) and several miscellaneous smaller buildings on site, containing a total of total 315,234 square feet of floor area. This represents a floor area ratio of 0.34 FAR based solely upon the site's upland acreage. These structures, and their use by Unilever, are identified in the accompanying table.

Table 1: Existing Building Information

| Building | Year Built | Floor Area (sf) | Primary Uses |
|---|---|---|---|
| 1 | 1952 (30,000 sf addition in 1964) | 100,917 sf | Laboratory; Office |
| 2 | 1952 (15,000 sf addition in 1985) | 62,904 sf | Pilot Plant |
| 3 | 1966 (7,000 sf addition in 1985) | 19,714 sf | Storage |
| 4 | 1984 | 4,295 sf | Boiler House |
| 5 | 1985 (2,944 sf addition in 1994) | 54,844 sf | Laboratory; Common Space |
| 6 | 1985 | 33,964 sf | Utilities; Laboratory; Office |
| 7 | 1985 | 5,260 sf | Electrical Utility/Chiller Bldg. |
| 9 | 1997 | 15,910 sf | Consumer Testing Bldg. |
| 10 | 1997 | 559 sf | Guardhouse |
| 21 | 1989 | 2,400 sf | Pilot Plant Drum Storage |
| 32 | 1956 | 7,922 sf | Maintenance Shop; Engineering |
| 44 | 1996 | 1,104 sf | Effluent Plant |
| -- | Numerous Misc. Bldgs | 5,450 sf | Utilities & Misc |
| Total | -- | 315,234 sf | -- |

Source: Unilever Research US. See Map 2 for the location of the numbered buildings referenced in this table.



As noted in the above table, there are a number of small miscellaneous structures on the site totaling 5,450 square feet in area. These buildings are used for utilities and miscellaneous storage.

The site's existing parking lots have a total of 668 off-street parking spaces, including 587 spaces for employees and 81 parking spots for visitors. This represents a ratio one parking space for each 471 square feet of floor area.

The redevelopment designation report prepared for the planning board in 2005 provides detailed descriptions of the various buildings on-site. In summary, the review of on-site conditions in the field and review of a Unilever building conditions report indicated that many of the on-site buildings are characterized by nominal dimensions which affect their potential for adaptive re-use, a number lack utility connections while others are all interconnected to a central boiler plant, and many of the buildings interior physical design limits their potential retrofitting for other uses. Additionally, the site's floor spaces suggests that, if the site were to be redeveloped for office and research and development utilizing contemporary parking standards, there is a significant shortfall in the amount of parking spaces serving the site. The limited remaining development area appears insufficient to accommodate the additional parking needed to meet contemporary requirements. These conclusions resulted in the planning board's determination that the area met the statutory criteria for an 'area in need of redevelopment' designation, and the borough council's concurrence with that conclusion. Refer to the borough's 'area in need' study for specific details concerning on-site conditions.

## Surrounding Development Pattern

The study area is located in an area containing a variety of uses. Business, office, retail and residential uses are all located in the immediate and general vicinity of the site. For example, to the north of the study area along the easterly side of River Road is an office building at 115 River Road, followed by a vacant parcel that is designated as a Superfund site by the Environmental Protection Agency (EPA), both of which are zoned OR-1. At the intersection of River Road and Gorge Road is the City Place mixed use residential-commercial complex, zoned MCRD. On the west side of River Road south of Gorge Road are several parcels zoned OR-1, including small-scale offices and older industrial buildings.

To the south of the study area is North Bergen Township. On the westerly side of River Road in North Bergen is a mix of commercial uses and residential uses. The easterly side of River Road in this area contains several residential developments and some vacant parcels.

## Master Plan

The Borough of Edgewater adopted its most recent master plan in 1998 and a reexamination report in 2004. The 2004 Reexamination Report identified a number of land use planning issues that pertain to the Study Area. For example, the document noted "after 50 years, Unilever announced it was vacating its property and relocating its operations. Comprising 23.1 acres of upland property and 26 acres of riparian land, the Unilever Property presents both opportunities for redevelopment and difficulties to address. The primary issues outlined in this reexamination report include whether to continue the current land use designation or review potential alternative uses." The document did not make any recommendation regarding whether or not to pursue a redevelopment designation, although subsequently the Borough requested the Planning Board to pursue a redevelopment study, which was subsequently approved.

The 2004 Reexamination Report noted that the plan's land use recommendations are designed to reinforce the distribution of the residential and commercial waterfront activity as specified in the plan, encourage a development design incorporating a building arrangement which emphasizes property's waterfront location and which enhances waterfront view sheds and physical as well as visual access, and provides suitable buffers to physically separate changes in land use patterns which occur along the waterfront. The plan also seeks to discourage any higher density development (except for those areas specified in the plan).

The plan also seeks to preserve and enhance the amenities of the waterfront area by encouraging additional active and passive recreation features that promote access to the waterfront, and by establishing visual linkages to the Hudson River and New York skyline. The plan calls for a continuous waterfront open space and walkway system along the entire waters edge, with perpendicular pedestrian access from River Road to the walkway system, and recommends that the walkway system be designed in association with significant open space/park features which will serve as a unifying element which also provides visual and physical access to the waterfront.

## Zoning

The redevelopment area is presently in the OR-1 Office Research Zoning District. The zones adjoining the redevelopment area include an OR-1 Zone to the north and west. Zoning to the south, in North Bergen, include a P-1 Riverside Zone and the R-2 Intermediate Density Residential Zone across River Road.

Principal permitted uses in the OR-1 Zone include the following: laboratories and related offices devoted to research, design, experimentation, and/or product testing; business, professional, executive and administrative office purposes; and, child care centers.

The area and bulk requirements within the study area are summarized in the accompanying table.

Table 2: OR-1 Bulk Requirements

| Zoning Criteria | OR-1 Zone Requirements |
|---|---|
| Min. Lot Area (sf) | 40,000 |
| Min. Lot Width (ft) | 150 |
| Min. Lot Depth (ft) | 150 |
| Min. Front Yard (ft) | 40 |
| Min. Side Yard (ft) | 25 |
| Min. Rear Yard (ft) | 35 |
| Max. Building Coverage (%) | 40 |
| Max. Impervious Coverage (%) | 80 |
| Max. Building Height (st/ft) | 3 / 40 |
| Max. Floor Area Ratio | 0.40 |

Source: Edgewater Zoning Ordinance

The code sets forth a variety of parking standards. For industrial uses, including research and development, one space per 400 sf of gross floor area is required. For office uses, the code requires one space per 225 sf of gross floor area up to 50,000 sf. Above 50,000 sf of gross floor area, one space per 250 sf is required.

Per §249-103 of the Borough Zoning Ordinance, a landscaped buffer area is required at least 15 feet wide from an adjacent non-residential use and 25 feet from an adjacent residential use. The applicant must also comply with zoning regulations regarding the development of the Hudson River Waterfront Walkway.

REDEVELOPMENT PLAN

The redevelopment plan is designed to serve as the basis for the redevelopment the area. The plan is designed to enable the redevelopment area to accommodate residential uses, including multi-family and townhouse dwelling units, and non-residential uses such as retail and service-oriented businesses in a comprehensive integrated format. There are provisions for public access to the waterfront, significant outdoor amenity along the waterfront, provision for a ferry landing to serve local residents, and plans for development of municipal facilities.

The redevelopment plan identifies development regulations designed to enhance the use of the site for the above noted activities, provide safe and efficient vehicular and pedestrian circulation, adequate parking, and ensure the provision of a substantive landscape and aesthetic amenity. At the end of this report is an appendix that includes a map for illustrative purposes only. This map includes a conceptual site layout providing prospective distribution of uses and identifies the general location of a municipal building in the westerly section of the tract. Since the map is intended as a conceptual site layout, there may be some variation and deviation from what is indicated on the map in the appendix.

The plan components are detailed below. These regulations shall serve as the redevelopment plan for the area, which shall be referred to as the Southern Waterfront Redevelopment (SWR) Zone.

A. Purpose: The purpose and intent of this district is to allow for a development involving a mixture of compatible residential, commercial, and related activities and public spaces to be accommodated in a group of structures designed to enhance and promote the redevelopment of the southern waterfront of the Borough of Edgewater. In addition to the aforementioned uses, this district is to provide for a new municipal building in the redevelopment area. The planning of this area is designed to encourage an integrated, comprehensive design with respect to the location and relationship of buildings, parking, landscape amenity, architectural elements, public open space areas, environmental features, roads, pedestrian walkways, access to the surrounding road network, utilities and municipal facilities; provide a design that incorporates a 'block neighborhood' arrangement of buildings and related features to facilitate a specified character comprised of a street grid arrangement, buildings close to streets, sidewalks along streets, pedestrian movement, on-street parking, and other aspects of neo-traditional planning; encourage public use along the waters edge through the development of a waterfront walkway and associated adjacent areas wherein substantive outdoor seating areas, outdoor cafes and similar activities are oriented in order to take maximum advantage of the views of the river and New York skyline.

B. Description of the SWR Zone District: The SWR Zone shall constitute the following lands: Block 99 Lots 1, 3, 4 & 5.

9

C. Permitted Uses: In the SWR Zone no buildings or structures shall be erected nor shall any land or building be designed, used or intended to be used for any purpose other than the following:

1. Principal Permitted Uses:

   a. Townhouse and multi-family residential dwelling units.
   b. Retail trade and service establishments, excluding automobile sales and gas station establishments, provided all retail trade and service establishment shall be located within 300 feet of the SWR northern zone line.
   c. Eating and drinking establishments, including outdoor seating.
   d. Business and professional offices
   e. Banks and financial institutions.
   f. Child care centers, subject to §249-99C.
   g. Municipal buildings and facilities.
   h. Parks and playgrounds.
   i. Ferry landing.

2. Conditional Uses: Essential services, subject to §249-101A.

3. Accessory Uses:

   a. Off-street parking and loading facilities.
   b. Parking garages, provided that all above-grade garages must contain either residential uses above the garage or, where the garage is in the portion of the zone that permits retail uses, the portion of the garage abutting any principal internal arterial street shall contain retail uses in that portion of the structure along the arterial street(s).
   c. Signs.
   d. Fences and walls.
   e. Outdoor passive recreation amenities.
   f. Other customary accessory uses and buildings that are clearly incidental to the principal uses and buildings permitted in this zone.

D. Area and Bulk Regulations

1. Tract Development

   a. Block and Street Dimensions

      1) In the northern section of the SWR Zone as outlined on the map in the Appendix, a minimum of one neo-traditional street should be established, consisting of at-grade retail, upper level apartments and/or office space, and on-street parking. This should be comprised of a minimum of three blocks so as to promote efficient vehicular and pedestrian movement, and function as a neo-traditional mixed-use neighborhood.

10

2) Streets shall be classified as arterial streets or local streets, depending upon their function. The redevelopment plan shall incorporate, at a minimum, two arterial streets to facilitate traffic movement and establish defining the principal configuration of the overall design.

3) The following minimum requirements shall be imposed for arterial streets:
   a) Minimum right-of-way width: 50 feet.
   b) Number of travel lanes: two, with a turning lane at intersections if determined necessary based on appropriate traffic studies.
   c) Minimum lane width: 12 feet.
   d) Minimum median width (if provided): 10 feet.
   e) On street parking shall be permitted and encouraged.

4) The following minimum requirements shall be imposed on local streets:
   a) Minimum right of way width: 40 feet.
   b) Number of travel lanes: two.
   c) Minimum lane width: 12 feet.
   d) Minimum median width (if provided): 10 feet.
   e) On street parking shall be permitted and encouraged.

5) All sidewalks shall be constructed to the curb line so as to reinforce the neo-traditional character of the redevelopment. The following minimum requirements shall apply:
   a) River Road: 15 feet.
   b) Streets with retail development: 10 feet.
   c) Streets without retail development: 6 feet.
   d) Sidewalks not bordering a street: 4 feet.

b. Bulk requirements:

| | |
|---|---|
| Min. Tract Area | 20 upland acres |
| Min. Tract Street Frontage | 1,000 feet on a major arterial road as defined in Borough Master Plan |
| Min. Building Setbacks | 50 feet from River Road ROW 25 feet from northerly and southerly property lines |
| Min. Setback Between Bldgs | 40 feet |
| Min. Setback to Internal Roads | See Sec. D.1.a.5 re: sidewalk requirements |
| Max Setback from Internal Roads | 20 feet |
| Min/Max Setback, Garage to Internal Road | 10 feet / 25 feet |
| Max. Building Coverage | 45 Percent |
| Max. Impervious Coverage | 75 Percent |

11

c. Residential Intensity of Use.

1) Market Units. The redevelopment area shall be permitted to be developed with approximately 420 market-rate dwellings.

2) Affordable Housing Obligation. See item E.2 below.

d. Non-Residential Intensities of Use. In no event shall the total floor area of retail and service commercial development, including eating and drinking establishments, business and professional offices, and banks and financial institutions, in the SWR Zone exceed 100,000 square feet of gross floor area, and further provided no individual store shall exceed 25,000 square feet of floor area.

e. Maximum Building Height.

| | |
|---|---|
| Mid-Rise Multi-Family Residential: | 6 stories / 70 feet |
| Townhouse Residential: | 3 stories / 35 feet |
| Commercial without Residential Units Above: | 2 stories / 30 feet |
| Municipal Buildings and Facilities: | 3 stories / 40 feet |

f. Retail and service commercial uses, including any banks, financial institutions and eating and drinking establishments, shall be required to be placed along arterial streets in the development.

g. Multiple Buildings on a Lot. Multiple buildings shall be permitted on lots in the SWR Zone.

h. Ancillary rooftop appurtenances. Ancillary rooftop appurtenances including decorative features may exceed the height limitations set forth herein, provided that in no event shall such appurtenances exceed 12 feet in height, nor cover more than 20 percent of the area of the roof of such building.

i. Landscaped Perimeter. A minimum 25 foot wide landscaped buffer shall be provided along the River Road street frontage, and 15 feet shall be required along all other lot lines except for the area along the Hudson River, where the regulations governing the Hudson River Waterfront Walkway shall apply. The landscaped area along River Road may contain a walkway.

j. Vehicular Considerations:

1) The redevelopment area shall be designed to include a minimum of two arterial roads that shall serve as the principal spine roads forming the development.

2) On River Road, no more than two roadway connections shall be permitted from the SWR Zone, except if additional roadway connections are required by Bergen County.

12

3) To facilitate safe and efficient movement of pedestrians, appropriate traffic calming measures shall be implemented wherever feasible, including such elements as:

   a) The width of curb radii shall be minimized to the extent practical. Wide, sweeping intersections shall be discouraged.

   b) Crosswalks shall be provided at all intersections and, on arterial streets, shall be constructed of a different paving material than on the rest of the street.

   c) On local streets, devices such as speed bumps, speed tables and bump-outs may be utilized to slow traffic, as determined appropriate and necessary.

2. Lot Development. A minimum lot area of 1.0 acres shall be required for individual lots within the SWR Zone. This regulation is designed solely to enable subdivision of the overall tract following approval of a site plan identifying a comprehensive development plan for the entire tract.

E. Supplemental Regulations Concerning Specific Uses

1. Municipal Building.

   a. A minimum of 1.5 acres in the westerly portion of the SWR Zone shall be set aside for use as a municipal building.

   b. Sufficient area around the municipal building shall be provided to accommodate the required parking spaces and other accessory uses for the facility.

2. Inclusionary Development Set Aside.

   a. Pursuant to the Borough's adopted Housing Element and Fair Share Plan, the developer shall provide 60 affordable housing units for the first 300 dwelling units on site. Any units over and above 300 units shall provide one unit for every eight market units over and above 300 units. All units set aside for low- and moderate-income households shall be in accordance with the provisions of this section and subject to the rules of the Council on Affordable Housing and the Borough of Edgewater Housing Element and Fair Share Plan. The required affordable housing set aside should be satisfied within the tract. If it is determined that the borough is entitled to rental bonus credits per the applicable COAH regulations, it may be feasible to reduce the total number of units constructed on site by virtue of the imposition of rental bonus credits.

   b. In addition to the above, all non-residential development in the redevelopment area shall be subject to the payment of development fees in accordance with the provisions of the Borough of Edgewater Housing Element and Fair Share Plan, local ordinances, and regulations of the Council on Affordable Housing.

13

3. Parking Garages.

   a. Maximum height shall not exceed 30 feet above grade.

   b. Parking garages shall provide a minimum of 75 percent of all required parking spaces on site, but in no event shall contain more than 85 percent of all required parking spaces.

4. Hudson River Waterfront Walkway.

   a. The design of the waterfront walkway shall comply with all requirements set forth by §249-96.J of the Borough of Edgewater Zoning Ordinance.

   b. The waterfront walkway design, materials, plantings, lighting, streetscape furniture and any design element should be consistent and integrated with the overall concept for the zone to promote a comprehensive design.

5. Ferry Landing.

   a. A ferry slip service may be provided on-site.

   b. The ferry stop is permitted to operate seven days per week.

   c. No commuter parking to service the ferry landing shall be permitted.

   d. The dock used for access to the ferry platform should be designed in an aesthetically pleasing manner integrated with the overall design for the site. This should include pedestrian-oriented amenities such as lighting bollards, benches, trash receptacles, and paving materials that may include a combination of scored colored concrete and brick pavers.

   e. Decorative lighting bollards, benches and trash receptacles should be provided along both sides of the dock at a uniform spacing unless these are incorporated with mooring bits, cleats and/or other marine mooring bollards to create a unified design for the pier.

   f. Bollards and streetscape furniture design shall be consistent with the waterfront walkway and overall site comprehensive design.

   g. Lifelines and other appropriate life safety equipment shall be installed on the pier and on the ferry docking platform.

14

6. Outdoor Restaurants/Cafes.

    a.  The easternmost portion of the retail buildings, located at the end of the arterial road, that parallels the SWR northern zone line and that face the Hudson River Walkway, shall be developed with outdoor seating. Sufficient area, consisting of a minimum 30 foot by 50 foot in dimension, shall be provided adjacent to the waterfront walkway for this purpose.

    b.  Outdoor restaurants and cafes shall comply with all requirements set forth by §249-100.J of the Borough of Edgewater Zoning Ordinance.

F.  Signage.  In the SWR Zone, signs shall comply with the following requirements.

1.  A maximum of two monument signs, located at the principal entrance points to the site, shall be permitted.  These signs shall identify the development only.

2.  The height of the monument sign shall be limited to six feet in height inclusive of the base of the sign.  The monument sign shall be setback a minimum of ten (10) feet from any property line. The sign shall not exceed thirty-two (32) square feet in area.

3.  A monument sign shall be placed perpendicular to the River Road property line to ensure visibility.

4.  Each commercial use shall be entitled to a wall-mounted sign, but in no event shall the total square footage of all wall signs exceed 10 percent of the square footage of the front façade.

    a.  Wall signs shall not exceed two square feet of signage for every linear foot of the front facade of the portion of the building occupied by the use being advertised. No wall sign shall exceed a vertical dimension (height) of greater than two feet.

    b.  The maximum letter size of any wall-mounted sign shall be two feet.

    c.  Wall signs that are placed parallel to the building wall shall be permitted to project forward no more than six inches from the building nor be attached to a wall at a height of less than eight feet above the sidewalk or ground.

    d.  Canopies, perpendicular signage and awnings shall be permitted to overhang the pedestrian right-of-way, with a minimum vertical clearance of 8.5 feet, a maximum overall height of five feet, and a minimum setback of three feet from the curb line.  Lettering on a canopy or awning shall be limited to the valance area and shall not exceed 75 percent of the linear width of the valance. The valance shall be no more than one foot in height, and lettering on the valance shall be limited to six inches in height.

15

5. Window Signs. In addition to any sign or signs permitted pursuant to this section, window display signs, as well as affixed window signs limited to indicate membership in a retail or professional organization or credit card or credit association, to show manufacturers' or required licenses, or advertisements referable to sales within, shall be permitted to be attached to windows on the interior of the business use provided that the aggregate area employed for such purpose shall not exceed 30 percent of the total window area on which it is located.

6. Signage must comply with all other applicable regulations per §249-106.

## G. Parking and Loading

1. The following parking standards shall apply:

| Land Uses | Required Off Street Parking Spaces |
|---|---|
| Residential | RSIS standards apply |
| Retail Trade and Service Establishments: | 1 per 250 sf GFA |
| Banks and Financial Institutions | 1 per 300 sf GFA |
| Eating and Drinking Establishments | 1 per 3.5 seats |
| Municipal Buildings and Facilities | 1 per 200 sf GFA |
| Public Access to Waterfront Walkway | 1 per tract acre, with minimum of 20 parking spaces. |

2. For other off-street parking requirements, refer to §249-71.

3. For off-street loading requirements, refer to §249-72.

## H. General Design Standards

1. The tract design shall incorporate a minimum of two principal spine roads around which the overall design shall be oriented. Buildings shall be oriented to these spine roads in order to create a corridor with buildings close to these spine roads, and sidewalks along these roads.

2. Building Form and Mass. All buildings should relate harmoniously to the site's natural features and other on-site buildings, as well as other structures in the vicinity that have a visual relationship and orientation to the proposed buildings. Such features should be inco rporated into the design of building form and mass, and assist in the determination of building orientation in order to preserve visual access to natural or man-made community focal points.

16

3. Large horizontal buildings, i.e. buildings with a linear dimension of more than 250 feet, should be broken into segments having vertical orientation. A visual and/or physical break should be provided minimally every 100 feet linear feet. Offsets consisting of a break in the linear plan of the building of a minimum two and one-half feet shall be required. Related architectural elements which preclude a continuous uninterrupted facade building length may also be utilized to achieve a break in the linear dimension of the building walls in place of an offset if determined by the approving authority to achieve the same purpose. All building foundations shall be appropriately landscaped.

4. Buildings with expansive blank walls are prohibited. Appropriate facade treatments should be imposed to ensure that such buildings are integrated with the rest of the development.

5. New buildings are encouraged to incorporate such building elements as entrances, corners, graphic panels, display windows, etc as a means to provide a visually attractive environment.

6. Cornices, awnings, canopies, flag poles, signage and other ornamental features should be encouraged as a means to enhance the visual environment. Such features may be permitted to project over pedestrian sidewalks, with a minimum vertical clearance of 8.5 feet, to within three feet of a curb.

l. Facade Treatments

1. A "human scale" of development should be achieved at grade and along street frontages through the use of such elements as windows, doors, columns, awnings and canopies.

2. Multi-tenant buildings shall provide varied storefronts and such elements as noted above for all ground floor tenants. Upper floors shall be coordinated with ground floors through common materials and colors.

3. Design emphasis should be placed on primary building entrances. These entrances should be vertical in character, particularly when there is the need to provide contrast with a long linear building footprint, and such details as piers, columns, and framing should be utilized to reinforce verticality.

4. Side and rear elevations should receive architectural treatments comparable to front facades when public access or public parking is provided next to the buildings.

5. Rhythms which carry through a block such as store front patterns, window spacing, entrances, canopies or awnings, etc., should be incorporated into facades.

6. The facade elevations of the parking deck shall receive architectural treatment that complements buildings attached to the deck. For example, window cut-outs, framing, and other architectural vernacular detailing should be used to reinforce the complementary appearance of the parking deck, integrating its design into the overall project.

17

J. Material and Texture

1. A variety of materials may be appropriate. Masonry, which works well at the base of a building, can vary in size, color and texture, and enables the provision of a decorative pattern or band. Above 12 feet in height, masonry can be substituted with other suitable materials.

2. The use of fabric or metal canopies is to be encouraged, especially over storefronts, at entrances or over display windows.

3. Where appropriate, integration of large scale graphics into the facade is encouraged.

K. Lighting

1. The use of creative lighting schemes to highlight building facades and related areas of a site shall be encouraged. The use of traditional style lanterns and similar fixtures also shall be encouraged. Exterior neon lights and lighting generating glare and unnecessary night-glow impacts shall be prohibited. Fixtures shall not exceed a height of 15 feet.

2. Whenever possible, light poles should be integrated into landscaped islands.

L. Streetscape Design

1. Retail sales and service establishments shall be required at street level in all buildings fronting on internal arterial streets in the area within 750 feet of the SWR northern zone line. The only exception is where the design provides for a public plaza.

2. The design shall include at least one public plaza with a minimum 5,000 square feet along an internal arterial road, to serve as a separation point between a solely residential building and the retail area of the tract.

3. Street furniture such as benches, tables, trash receptacles, etc., shall be encouraged throughout the development, provided the materials used are consistent with the overall concept of the building design.

4. Sidewalks should have a minimum width of 10 feet along streets where active pedestrian corridors are located and active pedestrian movements are encouraged, and located along building frontages so as to tie the various buildings together. Wider sidewalks may be designed for special places such as plazas or courts.

5. Benches should be provided at a ratio of one bench for every 200 feet of frontage on streets with ground level retail stores and along the waterfront walkway. At least one bicycle rack should also be provided on each block on all streets with retail uses.

18

M. Landscaping

1   A hierarchy of landscape features should be established for the site. The main entrance road should include street trees on each side of the roadway, and such trees should be different from the trees used in parking areas. Spacing between trees shall be a maximum 40 feet unless another vertical element, such as a decorative light fixture or blade sign, is used between the trees, in which case a maximum 60 foot shall be permitted. Trees along primary streets should be in a formal arrangement, while informal planting may be provided along access roads.

2.   Street trees and other plant material should be provided at the ends of parking bays. Landscaped islands should be at least six feet in width. This section does not apply to parking spaces in parking garages.

3.   Trees should be a 2.5 to 3 inch caliper.

4.   Parking rows longer than 20 parking spaces should have a six foot wide landscaped island to break the pavement. This section does not apply to parking spaces in parking garages.

5.   Foundation plantings including trees and shrubs should be planted along the parking deck walls, to break up the extended building wall.

6.   All areas not improved with buildings, structures and other man-made improvements shall be landscaped with trees, shrubs, ground cover, street furniture, sculpture or other design amenities.

N.   Submittal Requirements

1.   An applicant for development in the SWR Zone must submit a site plan indicating the manner in which the entire tract is to be developed. Said plan shall include all the data required for site plan review, and clearly indicate the distribution of use and intensity of use of land within the tract. This zone-wide approach to development in the SWR Zone is mandated to ensure that the zone tract is developed within the framework of a comprehensive, integrated design and not in a piecemeal fashion.

2.   The submittal shall contain, in addition to the site plan submittal provisions, a report detailing the following:

     a.   The total number of dwelling units by bedroom count, the square footage of non-residential floor area and the land area to be devoted to residential and each non-residential use. The density and intensity of use of the entire tract shall be noted.

19

b. A traffic and circulation plan regarding vehicular and pedestrian movements, addressing the goals and policy statements set forth in the Borough Master Plan shall be provided. Such report shall address existing and projected vehicular peak hour movements, turning movements, and the need for improvements to enhance traffic safety and convenience in the area.

c. A socio-economic impact study shall be required pursuant to §249-96.L.

d. A viewshed study shall be required pursuant to §249-96.M.

e. A proposed timing schedule in the case where construction is contemplated over a period of years, including any terms or conditions which are intended to protect the interests of the public and of the residents who occupy any section of the development prior to the completion of the development in its entirety.

O. Waivers. Variation from the requirements set forth in this redevelopment plan may be necessary in certain circumstances or to meet Federal, State or County permit requirements. In such an instance, the Planning Board may waive certain bulk, parking or design requirements if the designated redeveloper demonstrates that such waiver will not substantially impair the intent of the redevelopment plan, and will not present a substantial detriment to the public health, safety and welfare.

20

Relationship to Borough of Edgewater Master Plan

The Borough of Edgewater adopted its most recent master plan in 1998 and a reexamination report in 2004. The 2004 Reexamination Report identified a number of land use planning issues that pertain to the Study Area. For example, the document noted "after 50 years, Unilever announced it was vacating its property and relocating its operations outside the Borough. Comprising 21 acres of upland property and 27 acres of riparian land, the Unilever Property presents both opportunities for redevelopment and difficulties to address. The primary issues outlined in the Reexamination Report include whether to continue the current land use designation or review potential alternative uses." The document did not make any recommendation regarding whether or not to pursue a redevelopment designation, although subsequently the Borough requested the Planning Board to pursue this study, in the context of the applicable statutory criteria, to assess the propriety of designating the area an area in need of redevelopment.

The redevelopment plan promotes a number of the land use goals and objectives on which the master plan is predicated, including the following:

A. Objectives

1. To encourage borough actions to guide the appropriate use or development of all lands in Edgewater, in a manner which will promote the public health, safety, morals, and general welfare.

2. To secure safety from fire, flood, panic and other natural and man-made disasters.

3. To provide adequate light, air and open space.

4. To provide sufficient space in appropriate locations for a variety of uses and open space, both public and private, in a manner compatible with the character of the borough and the environment.

5. To encourage the location and design of transportation routes which will promote the free flow of traffic while discouraging the location of such facilities and routes which would result in congestion blight, or unsafe conditions.

6. To promote a desirable visual environment through creative development techniques and good civic design and arrangements.

B. Goals

1. To maintain and enhance the existing areas of stability in the community; to encourage a proper distribution of land uses by designating areas which have their own uniform development characteristics.

2. To ensure that any prospective development is responsive to the Borough's environmental features, and can be accommodated while preserving those physical characteristics.

21

3. To preserve and enhance the amenities of the waterfront area by maintaining and encouraging additional active and passive recreation features which promote access to the waterfront, and by establishing a design policy which will ensure visual linkages to the Hudson River and New York skyline. A continuous waterfront open space and walkway system should be encouraged along the entire waters edge. Perpendicular pedestrian access from River Road to the walkway system should also be encouraged. The system should be designed in association with significant open space/park features which will serve as a unifying element which also provides visual and physical access to the waterfront.

4. To acknowledge waterfriparian areas as part of an overall parcel of land, while at the same time recognizing the need to limit the intensity of development that results on the upland area.

The proposed redevelopment plan furthers these objectives by establishing regulations that result in a use that is complementary to the redevelopment area's waterfront location. The proposed mix of uses – residential, commercial and public – will revitalize this area that once served as a cornerstone of Edgewater's industrial past. Now the parcel is part of the revitalized Edgewater, one of mixed uses and improved waterfront access.

## Relationship to the State Development and Redevelopment Plan

The proposed redevelopment plan is consistent with the goals and objectives of the SDRP. The plan is predicated upon a number of broad goals and objectives. These include the following:

1. Revitalize the State's cities and towns;
2. Conserve the natural resources and systems;
3. Promote beneficial growth, development and renewal for all residents of New Jersey;
4. Preserve and enhance areas with historic, cultural, scenic, open space and recreational value;
5. Ensure sound and integrated planning and implementation standards.

The proposed redevelopment plan will be implemented in compliance with all applicable New Jersey Department of Environmental Protection (NJDEP) regulations.

## Redevelopment Procedures

A. Relocation. The implementation of the redevelopment plan will not require any relocation of residence or business.

B. Procedural Actions. The redevelopment procedure is outlined below:

1. Planning Board Investigation. The statute provides that no area of a municipality shall be determined a redevelopment area unless the governing body "shall, by resolution, authorize the planning board to undertake a preliminary investigation to determine whether the proposed area is a redevelopment area according to criteria set forth in the applicable laws of the State of New Jersey." The statute also states, "such determination shall be made after public notice and public hearing."

22

The governing body authorized the preparation of the preliminary investigation to determine if the area is in need of redevelopment. The Planning Board conducted a hearing on the investigation and recommended that the tract studied be declared an area in need of redevelopment.

2. Redevelopment Area Designation. Following the recommendation by the Planning Board, the governing body adopted a resolution designating the Property in Question as a redevelopment area.

3. Redevelopment Plan Preparation. The governing body authorized the preparation of a redevelopment plan.

4. Planning Board Review. Prior to adoption of a redevelopment plan, the Planning Board reviews the Redevelopment Plan for consistency with the Master Plan. Following this review, the Planning Board issues recommendations to the governing body regarding the redevelopment plan.

The redevelopment plan is to be consistent with the master plan or designed to effectuate the Master Plan. The governing body can adopt a redevelopment plan that is inconsistent with the Master Plan by an affirmative majority of its full authorized membership. The reasons for such action must be set forth in the redevelopment plan.

5. Adoption of Ordinance to Implement Redevelopment Plan. The governing body adopts, by ordinance, the redevelopment plan after introduction of the ordinance and a public hearing.

The governing body can adopt a redevelopment plan with amendments or revisions, subject to an affirmative vote of the majority of the full authorized membership and shall record in its minutes the reasons for each amendment or revision.

C. Property Acquisition. The borough proposes to acquire 1.5 acres in the westerly section of the tract for a municipal building and accessory parking associated with the use.

23

APPENDIX: CONCEPTUAL SITE PLAN
(Map is for illustrative purposes only)

EXHIBIT C

CONSTRUCTION PHASING SCHEDULE

Redevelopment of the Redevelopment Area by the Redeveloper shall proceed according to the following Construction Phasing Schedule:

| Event | Deadline |
|---|---|
| Submission of all materials necessary for obtaining building permit for Municipal Complex | No later than one (1) month after the Execution Date of the Redevelopment Agreement |
| Commencement of Construction of Municipal Complex | No later than one (1) month after issuance of a building permit for the Municipal Complex |
| Obtaining Certificate of Completion for Municipal Complex | No later than twelve (12) months after Commencement of Construction of the Municipal Complex, subject to extension to eighteen (18) months pursuant to provisions of Article IX. |
| Commencement of Construction of balance of Phase I, not including Municipal Complex | No later than twelve (12) months after issuance of a building permit for the balance of Phase I, subject to extension to twenty-four (24) months pursuant to the provisions of Article IX. |
| Commencement of Construction of Phase II | No later than twenty-four (24) months after issuance of a building permit for Phase II, subject to extension to thirty-six (36) months pursuant to the provisions of Article IX. |

EXHIBIT D

REMEDIATION PLAN



State of New Jersey
DEPARTMENT OF ENVIRONMENTAL PROTECTION

JON S. CORZINE
*Governor*

LISA P. JACKSON
*Commissioner*

Bureau of Industrial Site Remediation
401 East State Street, P.O. Box 432, Trenton, NJ 08625
Fax Number - 609-633-1454

Approval Letter

Joseph Cotter
i.park Edgewater, LLC
485 West Putnam Avenue
Greenwich, CT 06830

Re:   Remediation Agreement in the Matter of the
      Edgewater Site Conopco, Inc. d/b/a Unilever Research and Development
      Conopco, Inc. d/b/a Unilever Research and Development/i.park Edgewater, LLC (i.park)
      45 River Road, Edgewater Borough, Bergen County
      Industrial Site Recovery Act (ISRA) Case #s: E20030062 and E20040267
      Site Remediation Program (SRP) Program Interest (PI) #: 015891
      EA Identification #: SUB070002
      **Documents For The Proposed New Police Station and Borough Hall (PS/BH) Parcel Only:**
      Response to the New Jersey Department of Environmental Protection's (NJDEP's) April 20,
      2007 Notice of Deficiency (NOD)/Remedial Investigation Workplan (RIW) dated May 8,
      2007; Supplemental Perimeter Air Monitoring Workplan (PAMW) dated June 1, 2007;
      Revised Schedule dated June 1, 2007; Response to the NJDEP's June 7, 2007 Email
      Correspondence dated June 14, 2007; Response to the NJDEP's June 22, 2007 Comments on
      the Supplemental PAMW dated June 25, 2007; and Revised Action Level For Dust Email
      dated June 26, 2007

Dear Mr. Cotter:

The NJDEP has completed review of the above-referenced reports for the proposed new PS/BH
Parcel submitted in response to the NJDEP's April 20, 2007 NOD.  The NJDEP has determined
that these reports are in compliance with the Technical Requirements for Site Remediation
(TRSR) at N.J.A.C. 7:26E and other applicable requirements.  The NJDEP hereby approves these
reports, effective the date of this letter.

Pursuant to the schedule applicable to the i.park site, i.park shall submit a Supplemental Remedial
Investigation Report (RIR) and Remedial Action Workplan (RAW) for the proposed new PS/BH
Parcel by September 3, 2007 and September 7, 2007, respectively, and a Supplemental RIR for
the entire i.park site by October 1, 2007.  Please submit these documents by those dates, or
submit a written request for an extension at least 2 weeks prior to the due date.  Please be ad vised

New Jersey Is An Equal Opportunity Employer   ■   Printed on Recycled Paper and Recyclable

that the NJDEP strongly recommends that i.park submit these documents all at the same time for the NJDEP's review. Failure to submit the reports in accordance with the schedule may result in the initiation of enforcement action. For your convenience, the regulations concerning the NJDEP's remediation requirements can be found at http://www.state.nj.us/dep/srp/reg/

Thank you for your cooperation in this matter. If you have any questions regarding this matter please contact the Case Manager, Michael P. Gaudio, at (609)-292-3208.

Sincerely,

Joseph J. Nowak, Supervisor
Bureau of Industrial Site Remediation

c: Irene Kropp, NJDEP/SRWM
Michael P. Gaudio, NJDEP/BISR
Jim Kealy, NJDEP/BEERA
Anne Pavelka, NJDEP/BGWPA
Robert Hayton, NJDEP/BCM
Richard Ho, USEPA
Bergen County Department of Health Services
Nancy Merse, Mayor of Edgewater
David M. Winslow, GZA GeoEnvironmental of New York
John McGee, Scheor DePalma

2



STATE OF NEW JERSEY
DEPARTMENT OF COMMUNITY AFFAIRS
OFFICE OF SMART GROWTH
BROWNFIELDS REDEVELOPMENT TASK FORCE
101 SOUTH BROAD STREET, PO Box 204
TRENTON, NJ 08625-0204
PHONE (609) 292-9034 · FAX (609) 292-3292
EMAIL: BROWNFIELDS@DCA.STATE.NJ.US

JON S. CORZINE
Governor

BENJAMIN L. SPINELLI
Executive Director

CHARLES A. RICHMAN
Acting Commissioner

2007 -2 PM 3: 02

September 28, 2007

Property Administrator
Borough of Edgewater
916 River Road
Edgewater NJ 07020

To whom it may concern:

The Brownfields Task Force is legislatively mandated to maintain an inventory of the state's brownfield sites pursuant to N.J.S.A. 58:10B-23.

This statute defines the term "brownfield" to mean "any former or current commercial or industrial site that is currently vacant or underutilized and on which there has been, or there is suspected to have been, a discharge of a contaminant." The inventory is located on NJSiteMart.com and serves as a marketing and value-adding tool for property owners, a planning aid for private and public purposes, and an indication of properties that may be eligible for a wide range of state incentives.

This letter is intended to advise you that the property located at River Road River Front, Block 53.58, Lot 2.02,2, in Edgewater has been submitted for inclusion in the Task Force inventory as a brownfield site pursuant to N.J.S.A. 58:10B-23. The staff of the Task Force has made inquiries with regard to the submission of the property in question and, based upon these inquiries and review of pertinent information, the Task Force is prepared to include the property as part of the inventory.

The Task Force is forwarding this letter to you to advise you of the Task Force's intention to include the property in the inventory. In the event that you have any questions or concerns with regard to inclusion of the property in the inventory, you may advise the Task Force accordingly in writing, via the enclosed fax submission sheet, faxed to 609-292-3292 or mailed to the above address, attention Donna Rendeiro, by October 31, 2007.

This action is being taken, not only because it is required by law, ("One of the responsibilities of the New Jersey Brownfields Redevelopment Task Force is to compile and maintain an inventory of brownfields properties in the State of New Jersey (N.J.S.A. 58:10B-23)), but because it is in the best interest of the citizens of the State of New Jersey and property owners such as yourself.

Enclosed for your information is a set of Frequently Asked Questions regarding the compilation, maintenance and use of the inventory.

Very truly yours,

Benjamin L. Spinelli
Executive Director

Attachments

*New Jersey Is An Equal Opportunity Employer · Printed on Recycled Paper and Recyclable*

EXHIBIT E

UNILEVER TAX JUDGMENTS

TAX COURT OF NEW JERSEY
COUNTY: Bergen
DOCKET NO.000029-2005

Unilever Research & Dev etc

Plaintiff(s),

v                                    CIVIL ACTION
                                     JUDGMENT

Edgewater Bor

Defendant(s).

The parties having agreed upon a settlement, the assessment
shall be as set forth below:

Block:           99
Lot:             1,3,4,5
Street Address:  45 River Rd
Year:            2005

TAX COURT JUDGMENT

Land:            $8,742,900.00
Improvements:    $9,836,300.00
Total:           $18,579,200.00
--------------------------------

Statutory interest pursuant to N.J.S.A. 54:3-27.2 having been
waived by taxpayer shall not be paid provided the tax refund is
paid within 60 days of the date of entry of the Tax Court
judgment.

The provisions of N.J.S.A. 54:51A-8 (Freeze Act) shall not apply
to this judgment.

Cheryl A. Ryan, Clerk/Administrator
Tax Court of New Jersey

Entered:  3/16/2007

A TRUE COPY

Attorney for Plaintiff: Raymond A Koski Esq
Attorney for Defendant: Philip N Boggia Esq

TAX COURT OF NEW JERSEY
COUNTY: Bergen
DOCKET NO.002506-2004

Unilever Research & Development etc

Plaintiff(s),

v                                    CIVIL ACTION
                                     JUDGMENT

Edgewater Bor

Defendant(s).

The parties having agreed upon a settlement, the assessment
shall be as set forth below.

Block:          99
Lot:            1,3,4,5
Street Address: 45 River Rd
Year:           2004

TAX COURT JUDGMENT

Land:           $8,742,900.00
Improvements:   $9,836,300.00
Total:          $18,579,200.00
-----------------------------

Statutory interest pursuant to N.J.S.A. 54:3-27.2 having been
waived by taxpayer shall not be paid provided the tax refund is
paid within 60 days of the date of entry of the Tax Court
judgment.

The provisions of N.J.S.A. 54:51A-8 (Freeze Act) shall not apply
to this judgment.

                              Cheryl A. Ryan, Clerk/Administrator
                              Tax Court of New Jersey

                              A TRUE COPY
                              CHERYL A. RYAN, Administrator/Clerk
                              Tax Court of New Jersey

Entered: 3/16/2007

Attorney for Plaintiff: Raymond A Koski   Esq
Attorney for Defendant: Philip N Boggia   Esq

UNILEVER SITE

CONCEPTUAL SITE PLAN

RIVER ROAD

HUDSON RIVER

NORTH

# EXHIBIT B

§ 240-154.  General provisions for constructing affordable units.

A.   Affordable housing units being constructed on site shall meet the requirements of Edgewater's Affordable Housing Ordinance and shall be in conformance with COAH's third round rules at N.J.A.C. 5:94-1 et seq., and the Uniform Housing Affordability Controls at N.J.A.C. 5:80-26.1 et seq., including, but not limited to requirements regarding phasing schedule, controls on affordability, low-/moderate-income split, heating source, maximum rent and/or sales price, affordability average, bedroom distribution and affirmative marketing.

B.   To the greatest extent possible, affordable housing units being provided within inclusionary developments shall be disbursed throughout inclusionary developments and shall be located within buildings designed to be architecturally indistinguishable from the market-rate units otherwise being constructed within the development. To that end, the scale, massing, roof pitch and architectural detailing (such as the selection of exterior materials, doors, windows, etc.) of the buildings containing the affordable housing units shall be similar to and compatible with that of the market-rate units.

C.   The priority for providing affordable housing shall be as follows:

(1)   The provision of the required number of affordable units shall be met and required first through on-site construction, and on-site construction shall be treated as the highest and best preference for provision of affordable units. If on-site construction cannot be accomplished, then the obligation shall be met through the creation of affordable units elsewhere within the Borough of Edgewater.

(2)   A payment in lieu of construction to the Borough of Edgewater shall only be allowed for satisfaction of a fractional obligation of less than one unit. With approval by the Borough, a builder or developer may round up a fractional obligation to provide construction in accordance with the above.

D.   Specific regulations for affordable units within a nonresidential development and/ or mixed-use development are as follows:

(1)   Affordable housing units may be constructed within or converted from space above the first floor level in nonresidential mixed-use buildings or may be constructed as new space above the first floor level on the same site as a permitted nonresidential use or development, subject to site plan review by the Board having jurisdiction. This shall only be allowable where residential dwellings situated above the first floor level are permitted pursuant to the district regulations as set forth in this chapter of the Borough.

(2)   All affordable units shall comply with COAH's rules pertaining to the phasing of construction, integration, split between low- and moderate-income units, controls on affordability, bedroom distribution, affirmative marketing, heating

source, and administration of the affordable units, as set forth in N.J.A.C. 5:94 et seq., as amended, and elsewhere in the rules.

E.   Payments in lieu of the construction of affordable housing shall be allowable only to satisfy a fractional obligation of less than one unit. The cost of construction of one affordable unit is deemed to be $200,000 per unit. The payment in lieu of construction for satisfaction of a fractional obligation shall be pro rata in accordance with that cost.

F.   Regulations with respect to prior approvals or agreements are as follows:

(1)   Development that has received preliminary or final approval before the effective date of this article shall not be required to provide affordable housing as set forth herein, unless it was part of the previous approval, or a substantial change in the development is sought. If a substantial change to a prior preliminary or final approval is sought, then the developer shall be required to comply with this article.

(a)   For the purpose of preliminary or final approvals existing before the effective date of this article, a "substantial change" to such an approval is defined as follows:

[1]   Five feet of improvements into any yard setback;

[2]   Seven feet in building height;

[3]   One percent in floor area ratio;

[4]   One percent in impervious coverage;

[5]   Five feet in building spacing or location;

[6]   Three parking spaces;

[7]   Five feet in driveway locations;

[8]   One percent in site disturbances;

[9]   Five feet in lot line locations;

[10] Any change in residential density;

[11] Any change in use that encompasses more than 1% of the approved building floor area; and

[12] Any new variances pursuant to N.J.S.A. 40-55D-7(c) or (d).

(b)   Any such change enumerated above shall not alter the percentage of low- or moderate-income housing in an approved project, if applicable.

:2

    (2)  When a prior approval exists, this article shall be applicable as a condition of approval under the following additional circumstances:

        (a)  In any application that seeks to extend or modify the expiration date of a development approval; and

        (b)  In any application that seeks to extend or modify the statutory period of protection as applicable to the particular classification of approval granted.

    (3)  This article shall not change any existing and approved developer's agreement between a developer and the Borough of Edgewater so long as the agreement contains a negotiated and approved requirement for meeting COAH obligations generated by the development.

G.  Other regulations are as follows:

    (1)  Every development applicant shall be required to submit a proposed Affordable Housing Production Plan (AHPP) at the time the application is made. The AHPP shall be a condition of the completeness determination. Each AHPP shall be the subject of review for consistency with COAH's rules, the Fair Housing Act, this article, and the Borough's Housing Element and Fair Share Plan, as proposed to and/or approved by COAH, and such other rules and regulations as may be applicable. This review shall be conducted by the Borough Planner or by such other person or entity as shall be designated to administer the Borough's COAH matters.

    (2)  The AHPP shall be approved by the board hearing the development application. The board shall consider the impacts of the proposal relative to its consistency with Borough's Housing Element and Fair Share Plan, this article, and the applicable COAH regulations.

    (3)  Compliance with COAH's rules and with the approved AHPP shall be a condition of the board's resolution of approval and may be covered by appropriate performance and maintenance guarantees as with any other required improvement.

    (4)  It shall be the developer's responsibility, at its sole cost and expense, to contract with a COAH-approved and Borough-designated experienced entity for the initial and ongoing administration of the controls on affordability so as to ensure full COAH compliance. The designated administrative entity shall, by February 1 of each year, and as otherwise required by COAH throughout the year, file with the Borough Clerk of the Borough of Edgewater such certifications, reports and/or monitoring forms as may be required by COAH to verify the continuing compliance of each affordable unit with COAH's rules.

§ 240-154

§ 240-154

(5) Developments covered by this article shall be exempt from the payment of development fees pursuant to any development fee ordinance adopted by the Borough.

# EXHIBIT C

Amended and Restated Redevelopment Plan

Unilever Redevelopment Area

Block 99, Lots 1, 1.02, 1.03, 1.04, 1.05, 1.07, 1.08, 1.09, 1.12, 1.14, 3, 4 and 5

Borough of Edgewater, New Jersey

**BOROUGH OF EDGEWATER**
August 2013

## Table of Contents

1    INTRODUCTION ....................................................................................................................... 1

2    STATUTORY CRITERIA ........................................................................................................... 2

3    REDEVELOPMENT AREA DESCRIPTION ............................................................................. 3

4    SURROUNDING DEVELOPMENT PATTERN ......................................................................... 4

5    DEVELOPMENT REGULATIONS ........................................................................................... 5

    A.    INTRODUCTION ................................................................................................................ 5
    B.    PURPOSE ........................................................................................................................ 5
    C.    LAND USES ..................................................................................................................... 5
    D.    SUPPLEMENTAL REGULATIONS CONCERNING SPECIFIC USES .......................................... 6
    E.    AREA AND BULK REGULATIONS ........................................................................................ 7
    F.    SIGNAGE ......................................................................................................................... 9
    G.    PARKING AND LOADING .................................................................................................. 10
    H.    CIRCULATION ................................................................................................................ 11
    I.    GENERAL DESIGN STANDARDS ...................................................................................... 11
    J.    FACADE TREATMENTS ................................................................................................... 12
    K.    LANDSCAPING ............................................................................................................... 13

6    PLAN CONSISTENCY REVIEW ........................................................................................... 14

    A.    RELATIONSHIP TO LAND USE ORDINANCE ...................................................................... 14
    B.    RELATIONSHIP TO BOROUGH OF EDGEWATER MASTER PLAN ........................................... 14
    C.    RELATIONSHIP TO MASTER PLANS OF ADJACENT MUNICIPALITIES .................................... 15
    D.    RELATIONSHIP TO THE BERGEN COUNTY MASTER PLAN ................................................. 15
    E.    RELATIONSHIP TO THE STATE DEVELOPMENT AND REDEVELOPMENT PLAN ....................... 16

7    REDEVELOPMENT PROCEDURES ..................................................................................... 17

    A.    RELOCATION .................................................................................................................. 17
    B.    PROCEDURAL ACTIONS .................................................................................................. 17
    C.    SUBMITTAL REQUIREMENTS ........................................................................................... 17
    D.    VARIATION FROM REDEVELOPMENT PLAN ....................................................................... 18

APPENDIX: CONCEPT PLAN ..................................................................................................... 19

# 1   Introduction

This amended and restated redevelopment plan has been prepared for a property commonly known as the Unilever tract located in the Borough of Edgewater, Bergen County, New Jersey. It amends and supplements the redevelopment plan for this site that was originally adopted in 2005. Pursuant to the provisions of the Local Redevelopment and Housing Law ("LRHL"), the Borough of Edgewater has designated the Unilever tract, an area of 48.68 acres including approximately 23.1 acres of uplands and nearly 26 acres of riparian land, as an "area in need of redevelopment." The property, initially identified as Block 99 Lots 1, 3, 4 and 5 but, pursuant to subsequent subdivisions, is now identified as Block 99 Lots 1, 1.02, 1.03, 1.04, 1.05, 1.07, 1.08, 1.09, 1.12, 1.14, 3, 4 and 5 on Borough tax maps, is located on the east side of River Road south of its intersection with Gorge Road. It is heretofore referred to as the "redevelopment area" and that designation remains unchanged.

The Borough Council, following its adoption of a resolution designating the site a redevelopment area pursuant to the Planning Board's recommendation, directed the Planning Board to prepare a redevelopment plan, which was adopted in 2005. While the site has been partially redeveloped in accordance with the original plan, a number of changes have occurred since the plan's adoption, including the well-recognized financial recession and changing market conditions, to warrant changes to the development regulations for the redevelopment area. This amended and restated plan is designed to affirmatively address the statutory requirements set forth in the LRHL, identifying the plan's relationship to local land use objectives, and enumerating the uses that may be permitted in the area consistent with market conditions, along with regulatory controls governing the proposed intensity and distribution of those uses. The plan incorporates the philosophy and policies of the State's smart growth initiatives, envisioning the creation of a mixed-use commercial and residential community that promotes a pedestrian-friendly environment combining retail uses and residences in an attractive comprehensively integrated format.

# 2   Statutory Criteria

The LRHL identifies the required elements that must be incorporated into a redevelopment plan. The statute provides that the redevelopment plan is to include an outline for the planning, development, redevelopment or rehabilitation of the project area sufficient to indicate:

A. The relationship to definite local objectives as to appropriate land uses, density of population, improved traffic and public transportation, public utilities, recreational and community facilities and other improvements;

B. Proposed land uses and building requirements in the project area;

C. Adequate provision for the temporary and permanent relocation, as necessary, of residents in the project area, including an estimate of the extent to whore decent, safe and sanitary dwelling units affordable to displaces residents will be available to them in the existing housing market;

D. An identification of any property within the redevelopment area which is proposed to be acquired in accordance with the redevelopment plan;

E. Any significant relationship of the redevelopment plan to the master plans of contiguous municipalities, County Master Plan, and State Development and Redevelopment Plan.

# 3 Redevelopment Area Description

The redevelopment area is comprised of parcels designated as Block 99, Lots 1, 1.02, 1.03, 1.04, 1.05, 1.07, 1.08, 1.09, 1.12, 1.14, 3, 4 and 5. The redevelopment area occupies an area of approximately 49 acres, including approximately 23.1 acres of uplands and approximately 26 acres of riparian land. It has approximately 1,700 feet of frontage along River Road and an upland depth ranging from 350 feet at the southern end of the tract to approximately 600 feet at the northern end of the tract. The redevelopment area's total depth, including riparian lands, is approximately 2,000 feet. The redevelopment area was formerly developed as a research facility that was occupied by Unilever Research, the former owner of the redevelopment area. All of the buildings that formerly occupied the site have been removed with the exception of two buildings that have been or will be renovated and reoccupied with new uses.

# 4   Surrounding Development Pattern

The redevelopment area is located in an area containing a variety of uses. Business, office, retail and residential uses are all located in the immediate and general vicinity of the site. For example, to the north of the redevelopment area along the easterly side of River Road is an office building at 115 River Road, followed by a vacant parcel that is designated as a Superfund site by the Environmental Protection Agency (EPA). At the intersection of River Road and Gorge Road is the City Place mixed-use residential-commercial complex. On the west side of River Road south of Gorge Road are several parcels developed with commercial uses. To the south of the redevelopment area is North Bergen Township. On the westerly side of River Road in North Bergen is a mix of commercial uses and residential uses. The easterly side of River Road in this area contains several residential developments and some vacant parcels.

# 5 Development Regulations

## A. INTRODUCTION

This section of the redevelopment plan provides standards for the continued redevelopment of the redevelopment area. The plan is designed to enable the redevelopment area to accommodate residential uses, including multi-family and townhouse dwelling units, and non-residential uses such as retail and service-oriented businesses, in a comprehensive integrated format consistent with the surrounding development patterns. The plan also provides for community amenities including a new municipal building, public access to the waterfront, open spaces, a pier and a potential ferry landing to serve local residents.

The redevelopment plan identifies development regulations designed to enhance the use of the site for the above noted activities, provide safe and efficient vehicular and pedestrian circulation, adequate parking and substantive landscape and aesthetic amenities. At the end of this report is an appendix that includes a map for illustrative purposes only. This map includes a conceptual site layout providing prospective distribution of uses. The plan components are detailed below. These regulations serve as the redevelopment plan for the area, which shall continue to be referred to as the Southern Waterfront Redevelopment (SWR) Zone.

## B. PURPOSE

The purpose and intent of the SWR Zone is to allow for a walkable development involving a mixture of compatible residential, commercial, and related activities and public spaces to be accommodated in a group of structures designed to enhance and promote the redevelopment of the southern waterfront of the Borough of Edgewater. The planning of this area is designed to encourage an integrated, comprehensive design with respect to the location and relationship of buildings, parking, landscaping, architectural elements, public open space areas, environmental features, roads, pedestrian walkways, access to the surrounding road network, utilities and municipal facilities; provide a design that incorporates a pedestrian-friendly arrangement of buildings and related features to facilitate a specified character comprised of a street grid arrangement, buildings close to streets, sidewalks along streets and on-street parking; encourage public use along the water's edge through the development of a waterfront walkway and associated adjacent areas wherein substantive outdoor seating areas, outdoor cafes and similar activities are oriented in order to take maximum advantage of the views of the river and New York skyline.

## C. LAND USES

In the SWR Zone, no building or structures shall be erected nor shall any land or building be designed, used or intended to be used for any purpose other than the following.

1.     **Permitted Principal Uses**

   a.   Multi-family residential dwelling units, including mid-rise and townhouse buildings.

   b.   Retail trade and service establishments, excluding automobile sales and gas station establishments.

   c.   Eating and drinking establishments, including outdoor dining, subject to §240-141 of the Land Use Ordinance of the Borough of Edgewater.

   d.   Banks and financial institutions.

   e.   Offices and professional uses.

   f.   Hotels. Limited to 160 rooms.

   g.   Child care centers, subject to §240-125 of the Land Use Ordinance of the Borough of Edgewater.

   h.   Municipal buildings and facilities. A minimum of 1.5 acres in the west-central portion for of the SWR Zone shall be set aside for municipal use.

   i.   Parks and playgrounds.

   j.   Ferry landing.

2.     **Permitted Conditional Uses**

Essential services, subject to §240-142 of the Land Use Ordinance of the Borough of Edgewater.

3.     **Permitted Accessory Uses and Structures**

   a.   Off-street parking and loading facilities.

   b.   Parking garages.

   c.   Signs.

   d.   Fences and walls.

   e.   Outdoor passive recreation amenities.

   f.   Other customary accessory uses and buildings that are clearly incidental to the principal uses and buildings permitted in this zone.

## D.     SUPPLEMENTAL REGULATIONS CONCERNING SPECIFIC USES

1.     **Multiple Buildings and Uses on a Lot**

Multiple buildings and uses shall be permitted on lots in the SWR Zone.

## 2. Affordable Housing

Pursuant to the Borough's adopted Housing Element and Fair Share Plan, the developer shall provide affordable housing units on site. The number of units shall be based upon the maximum number of units required under the applicable regulations in effect as of the date of the issuance of the last final certificate of occupancy for market rate units, but shall not exceed 75 affordable housing units. All units set aside for low- and moderate-income households shall be in accordance with the provisions of this section and subject to the rules of the Council on Affordable Housing and the Borough of Edgewater Housing Element and Fair Share Plan.

Non-residential development in the redevelopment area shall not be subject to the payment of development fees.

## 3. Hudson River Waterfront Walkway

a. The design of the waterfront walkway shall comply with all requirements set forth by §240-106 of the Land Use Ordinance of the Borough of Edgewater.

b. The waterfront walkway design, materials, plantings, lighting, streetscape furniture and any design element should be consistent and integrated with the overall concept for the zone to promote a comprehensive design.

## 4. Ferry Landing

a. A ferry slip service may be provided on-site.

b. The ferry stop is permitted to operate seven days per week.

c. No commuter parking to service the ferry landing shall be permitted.

d. The dock used for access to the ferry platform should be designed in an aesthetically pleasing manner integrated with the overall design for the site. This should include pedestrian-oriented amenities such as lighting bollards, benches, trash receptacles, and paving materials that may include a combination of scored, colored concrete and brick pavers.

e. Decorative lighting bollards, benches and trash receptacles should be provided along both sides of the dock at a uniform spacing unless these are incorporated with mooring bits, cleats and/or other marina mooring bollards to create a unified design for the pier.

f. Bollards and streetscape furniture design should be consistent with the overall design of the site and the waterfront walkway.

g. Lifelines and other appropriate life safety equipment shall be installed on the pier and on the ferry docking platform.

## E. AREA AND BULK REGULATIONS

1. Minimum Lot Area.

a. Overall Tract Upland Area: 20 acres.

7

      b. Individual Lots: there shall be no minimum area required for individual lots, provided however, all bulk requirements (including setbacks, coverage and the like) shall not be applicable to the specific lots to be created by such subdivisions. This regulation is designed solely to enable subdivision of the overall tract in conjunction with approval of a site plan identifying a comprehensive development plan for the entire tract.

2. Minimum Street Frontage for Overall Tract: 1,000 feet on a major arterial road as defined in Borough Master Plan.

3. Minimum Building Setbacks.

      a. 25 feet from River Road right-of-way.

      b. 20 feet from southerly property line.

      c. 10 feet from northerly property line.

      d. 30 feet to another building unless attached/adjoining or pre-existing.

4. Maximum Building Coverage: 45 percent.

5. Maximum Impervious Coverage: 85 percent.

6. Maximum Residential Units: 595.

7. Maximum Commercial Floor Area: The gross floor area of all retail trade and service establishments, eating and drinking establishments, and banks and financial institutions shall not exceed 85,000 square feet, except that one freestanding bank with a floor area not to exceed 3,500 square feet shall be permitted. The gross floor area of any individual store shall not exceed 25,000 square feet.

8. Maximum Building Height.

| | |
|---|---|
| Mid-Rise Multi-Family Residential | 6 stories/70 feet |
| Townhouse Residential | 3 stories/35 feet |
| Hotel | 6 stories/70 feet |
| Commercial without Residential Units Above | 2 stories/30 feet |
| Municipal Buildings and Facilities | 3 stories/40 feet |
| Parking Garages | 50 feet* |

\* A garage adjoining a residential building may exceed 50 feet in height but shall not exceed the height of the adjoining building

Ancillary rooftop appurtenances including decorative features and parapet walls may exceed the height limitations set forth herein, provided that in no event shall such appurtenances exceed 12 feet in height, nor cover more than 20 percent of the area of the roof of such building.

Case 2:17-cv-12659-JMV-CLW  Document 16-7  Filed 04/09/18  Page 168 of 333 PageID: 1007

## F.    SIGNAGE

### 1.    Monument Signs

A maximum of two monument signs, located at the principal entrance points to the site, shall be permitted to identify the overall development and shall comply with the following requirements:

  a. Maximum height: 20 feet inclusive of the base of the sign.

  b. Maximum area: 200 square feet.

  c. Minimum setback from any property line: three feet.

  d. Individual businesses may be listed on these signs.

### 2.    Building Signs

  a. Multi-tenant buildings.

   i. Maximum number of signs: one wall-mounted sign, except that individual tenants with more than one facade shall be permitted a second wall-mounted sign.

   ii. Maximum sign area: two square feet of signage for every linear foot of the front facade of the portion of the building occupied by the use being advertised.

   iii. Maximum sign height: two feet.

  b. Single-tenant buildings.

   i. Maximum number of signs: one wall-mounted sign for each facade facing a street or parking lot.

   ii. Maximum sign area: two square feet of signage for every linear foot of the façade, but not to exceed 150 square feet.

  c. Wall signs that are placed parallel to the building wall shall be permitted to project forward no more than six inches from the building, and if located above an entrance door, shall not be attached to a wall at a height of less than eight feet above the sidewalk or ground.

  d. Canopies, perpendicular signage and awnings shall be permitted to overhang the pedestrian right-of-way, with a minimum vertical clearance of 8.5 feet, a maximum overall height of five feet, and a minimum setback of three feet from the curb line. Lettering on a canopy or awning shall be limited to the valance area and shall not exceed 75 percent of the linear width of the valance. The valance shall be no more than one foot in height, and lettering on the valance shall be limited to six inches in height.

### 3.    Window Signs

In addition to any sign or signs permitted pursuant to this section, window display signs, as well as affixed window signs limited to indicate membership in a retail or professional organization or credit card or credit association, to show manufacturers or required licenses, or advertisements referable to sales within, shall be permitted to be attached to windows on the interior of the business use provided that the aggregate area employed for such purpose shall not exceed 30 percent of the total window area on which it is located.

9

## 4.    Directional Signs

Internal directional signs shall be permitted to direct visitors to various uses within the SWR Zone. Directional signs shall not exceed four feet in height or 10 square feet in area. Due to the size and complexity of the overall development on the tract, logos or store names shall be permitted on directional signs.

## G.    PARKING AND LOADING

1.    Off-street parking spaces shall be provided in accordance with the following table, and shall be provided with respect to the overall tract irrespective of lot configuration:

| Land Use | Minimum Number of Spaces |
|---|---|
| Residential | 0.8 per studio or one-bedroom unit |
|  | 1.3 per two-bedroom unit |
|  | 1.9 per three-bedroom unit |
| Retail Trade and Service Establishments | 1 per 250 sq. ft. of gross floor area |
| Banks and Financial Institutions | 1 per 300 sq. ft. of gross floor area |
| Eating and Drinking Establishments | 1 per 3.5 seats |
| Hotel | 1 per 2 guest rooms, plus 10 spaces for staff |
| Municipal Buildings and Facilities | 1 per 200 sq. ft. of gross floor area* |
| Public Access to Waterfront Walkway | 1 per tract acre, with minimum of 20 parking spaces |

* Exclusive with complementary parking uses after hours to be determined by the Borough

The above parking requirements are subject to modification based upon a shared parking analysis/utilization study submitted by the Redeveloper as part of any site plan application to the Planning Board.

The residential parking requirements listed above represent alternative standards to those that would typically be required for mid-rise residential development and are permitted by the New Jersey Residential Site Improvement Standards at N.J.A.C. 5:21-4.14(c), which allows such modifications based on local conditions. Among the factors warranting a reduction in required residential parking are the mixed-use nature of the development permitted by the redevelopment plan, availability of mass transit and the tendency of households in mixed-use, transit-served settings to require less parking.

2.    For other off-street parking requirements, refer to §240-166 of the Land Use Ordinance of the Borough of Edgewater. The regulations pertaining to the location of parking spaces in §240-166B and landscaping in parking and loading areas in §240-166E shall not apply to the SWR Zone. Landscaping requirements for parking areas and other locations are included in Section K of this plan.

3.    Off-street loading.

a. A minimum of one off-street loading space shall be provided for any retail or service establishment with a gross floor area of 10,000 square feet or greater, and may be provided for other uses.

b. Shared loading spaces serving more than one building or use may be provided.

c. The minimum dimensions of loading spaces shall be 12 feet in width and 35 feet in length, with a minimum vertical clearance of 12 feet.

## H.    CIRCULATION

1.  The tract design shall incorporate a minimum of two principal spine roads around which the overall design is oriented. Buildings should be oriented to these spine roads in order to create a corridor with buildings close to these spine roads, and sidewalks along these roads.

2.  The primary vehicular connections from the SWR Zone to River Road should be at these spine roads. Additional roadway connections shall be permitted for emergency vehicle access as well as if required by Bergen County.

3.  On-street parking shall be permitted and encouraged within the SWR Zone.

4.  The minimum width of sidewalks shall be six feet. Wider sidewalks are encouraged along River Road and in front of commercial uses.

5.  To facilitate safe and efficient movement of pedestrians, appropriate traffic calming devices such as speed bumps, speed tables and bump-outs may be utilized to slow traffic.

6.  The width of curb radii shall be minimized to the extent practical. Wide, sweeping intersections shall be discouraged.

7.  Crosswalks shall be provided at all intersections.

## I.    GENERAL DESIGN STANDARDS

1.  One east-west street in the northern section of the SWR Zone should be designed as a walkable, mixed-use street. Uses on the easternmost two blocks of this street should include retail sales and service establishments, eating and drinking establishments, and/or banks and financial uses at street level.

2.  All buildings should relate harmoniously to the site's natural features and other on-site buildings, as well as other structures in the vicinity that have a visual relationship and orientation to the proposed buildings. Such features should be incorporated into the design of building form and mass, and assist in the determination of building orientation in order to preserve visual access to natural or man-made community focal points.

3.  New buildings with a linear dimension of more than 250 feet should be broken into segments having vertical orientation. A visual and/or physical break should be provided minimally every 100 feet linear feet. Offsets consisting of a break in the linear plane of the building of a minimum two and one-half feet should be provided. Related architectural el-

ements which preclude a continuous uninterrupted façade building length may also be utilized to achieve a break in the linear dimension of the building walls in place of an offset if determined by the approving authority to achieve the same purpose.

4. New buildings are encouraged to incorporate such building elements as entrances, corners, graphic panels, display windows, etc. as a means to provide a visually attractive environment.

5. Cornices, awnings, canopies, flagpoles, signage and other ornamental features should be encouraged as a means to enhance the visual environment. Such features shall be permitted to project over pedestrian sidewalks, with a minimum vertical clearance of 8.5 feet, to within three feet of a curb.

   6. The first level of parking decks shall either be clad in decorative stone consistent with the design of other buildings in the redevelopment area or have foundation plantings including trees and shrubs planted along the parking deck walls.

7. The use of creative lighting schemes to highlight building façades and related areas of a site shall be encouraged. The use of traditional style lanterns and similar fixtures also shall be encouraged. Exterior neon lights and lighting generating glare and unnecessary night-glow impacts shall be prohibited. Fixtures shall not exceed a height of 20 feet.

8. Street furniture such as benches, tables, trash receptacles, etc., shall be encouraged throughout the development, provided the materials used are consistent with the overall concept of the building design.

9. Benches should be provided at a ratio of one bench for every 200 feet of frontage on streets with ground level retail stores and along the waterfront walkway. At least one bicycle rack should also be provided on each block on all streets with retail uses.

## J.  FACADE TREATMENTS

1. A "human scale" of development should be achieved at grade and along street frontages through the use of such elements as windows, doors, columns, awnings and canopies.

2. Multi-tenant buildings shall provide varied storefronts and such elements as noted above for all ground floor tenants. Upper floors shall be coordinated with ground floors through common materials and colors.

3. Design emphasis should be placed on primary building entrances. These entrances should be vertical in character, particularly when there is the need to provide contrast with a long linear building footprint, and such details as piers, columns, and framing should be utilized to reinforce verticality.

4. Side and rear elevations should receive architectural treatments comparable to front facades when public access or public parking is provided next to the buildings.

5. Rhythms which carry through a block such as store front patterns, window spacing, entrances, canopies or awnings, etc., should be incorporated into facades.

12

6.     Buildings with expansive blank walls are prohibited. Appropriate façade treatments should be imposed to ensure that such buildings are integrated with the rest of the development

7.     The facade elevations of parking decks shall receive architectural treatment that complements buildings attached to the deck. For example, window cut-outs, framing, and other architectural vernacular detailing should be used to reinforce the complementary appearance of the parking deck, integrating its design into the overall project.

8.     A variety of materials may be appropriate. Masonry, which works well at the base of a building, can vary in size, color and texture, and enables the provision of a decorative pattern or band. Above 12 feet in height, masonry can be substituted with other suitable materials.

9.     The use of fabric or metal canopies is encouraged, especially over storefronts, at entrances or over display windows.

10.    Where appropriate, integration of large scale graphics into the facade is encouraged.

## K.   LANDSCAPING

1.     A hierarchy of landscape features should be established for the site. The main entrance road should include street trees on each side of the roadway, and such trees should be different from the trees used in parking areas. Trees along primary streets should be in a formal arrangement, while informal planting may be provided along access roads.

2.     Landscaping shall be provided along the River Road street frontage and other property lines where practical.

3.     Street trees and other plant material shall be provided at the ends of parking bays and within parking rows longer than 25 parking spaces. Landscaped islands should be at least six feet in width. This section does not apply to parking spaces in parking garages.

4.     Trees should be a 2.5 to 3 inch caliper.

5.     Landscaped areas shall be provided in protected areas of parking lots, such as along walkways, in center islands or at the end of parking bays, and shall be distributed , throughout the parking area to mitigate the view of the parked vehicles without interfering with adequate sight distance for vehicles or pedestrians. The landscaping shall consist of hardy, low-maintenance varieties of trees and shrub plantings no higher than three feet subject to the approval of the Board engineer.

6.     All areas not improved with buildings, structures and other man-made improvements shall be landscaped with trees, shrubs, ground cover, street furniture, sculpture or other design amenities.

# 6   Plan Consistency Review

## A.   RELATIONSHIP TO LAND USE ORDINANCE

This redevelopment plan supersedes the Land Use Ordinance set forth in Chapter 240 of the Borough Code, except that the specific provisions of the Land Use Ordinance which are referenced herein by section number, and only those provisions, shall apply in the redevelopment area. Final adoption of this plan by the Borough Council shall be considered an amendment of the Borough of Edgewater Zoning Map.

## B.   RELATIONSHIP TO BOROUGH OF EDGEWATER MASTER PLAN

The Borough of Edgewater adopted its most recent master plan in 1998 and reexamination reports in 2004 and 2010. The reexamination reports identify a number of land use planning issues that pertain to the redevelopment area.

The redevelopment plan promotes a number of the land use goals and objectives on which the master plan is predicated, including the following:

A.    Objectives

1.    To encourage borough actions to guide the appropriate use or development of all lands in Edgewater, in a manner which will promote the public health, safety, morals, and general welfare.

2.    To secure safety from fire, flood, panic and other natural and man-made disasters.

3.    To provide adequate light, air and open space.

4.    To provide sufficient space in appropriate locations for a variety of uses and open space, both public and private, in a manner compatible with the character of the borough and the environment

5.    To encourage the location and design of transportation routes which will promote the free flow of traffic while discouraging the location of such facilities and routes which would result in congestion blight, or unsafe conditions.

6.    To promote a desirable visual environment through creative development techniques and good civic design and arrangements.

B.    Goals

14

1.  To maintain and enhance the existing areas of stability in the community; to encourage a proper distribution of land uses by designating areas which have their own uniform development characteristics.

2.  To ensure that any prospective development is responsive to the Borough's environmental features, and can be accommodated while preserving these physical characteristics.

3.  To preserve and enhance the amenities of the waterfront area by maintaining and encouraging additional active and passive recreation features which promote access to the waterfront, and by establishing a design policy which will ensure visual linkages to the Hudson River and New York skyline. A continuous waterfront open space and walkway system should be encouraged along the entire waters' edge. Perpendicular pedestrian access from River Road to the walkway system should also be encouraged. The system should be designed in association with significant open space/park features which will serve as a unifying element which also provides visual and physical access to the waterfront.

4.  To acknowledge water/riparian areas as part of an overall parcel of land, while at the same time recognizing the need to limit the intensity of development that results on the upland area.

The proposed redevelopment plan furthers these objectives by establishing regulations that result in a use that is complementary to the redevelopment area's waterfront location. The proposed mix of uses — residential, commercial and public — will revitalize this area that once served as a cornerstone of Edgewater's industrial past. Now the parcel is part of the revitalized Edgewater, one of mixed uses and improved waterfront access.

## C.   RELATIONSHIP TO MASTER PLANS OF ADJACENT MUNICIPALITIES

The rehabilitation area is situated along the southern border of the Borough of Edgewater adjacent to the Township of North Bergen. The North Bergen Master Plan provides for the redevelopment of properties along River Road in the vicinity of the Unilever Redevelopment Area with a mix of land uses. Therefore the redevelopment plan would not impact the North Bergen Master Plan.

## D.   RELATIONSHIP TO THE BERGEN COUNTY MASTER PLAN

The Bergen County Master Plan has not been comprehensively updated for over 40 years. Land use conditions in the County as a whole and Edgewater in particular have changed so much during that time that its goals and policies are very much outdated and thus have no relevance for current planning efforts.

## E.   RELATIONSHIP TO THE STATE DEVELOPMENT AND REDEVEL-
OPMENT PLAN

The New Jersey State Development and Redevelopment Plan (SDRP) was originally adopted in 1992. A revised version of the plan was adopted by the State Planning Commission in 2001. While required by the State Planning Act to be revised and re-adopted every three years, the SDRP has only been re-adopted once during the 18 years since its original adoption. A new State Strategic Plan (SSP) has been proposed as the revision to the 2001 SDRP but has not been adopted as of this writing.

This redevelopment plan is consistent with the goals and objectives of the SDRP. The plan is predicated upon a number of broad goals and objectives. These include the following:

1.  Revitalize the State's cities and towns;

2.  Conserve natural resources and systems;

3.  Promote beneficial growth, development and renewal for all residents of New Jersey;

4.  Preserve and enhance areas with historic, cultural, scenic, open space and recreational value;

5.  Ensure sound and integrated planning and implementation standards.

# 7   Redevelopment Procedures

## A.   RELOCATION

The implementation of the redevelopment plan will not require any relocation of residence or business.

## B.   PROCEDURAL ACTIONS

The redevelopment procedure is outlined below:

1.   Planning Board Investigation. The statute provides that no area of a municipality shall be determined a redevelopment area unless the governing body "shall, by resolution, authorize the planning board to undertake a preliminary investigation to determine whether the proposed area is a redevelopment area according to criteria set forth in the applicable laws of the State of New Jersey." The statute also states "such determination shall be made after public notice and public hearing." The Planning Board was previously authorized and previously investigated the Property and made such recommendation,

2.   Redevelopment Area Designation. Following the recommendation by the Planning Board, the Borough Council adopted a resolution designating the Property as a redevelopment area.

3.   Redevelopment Plan Preparation. As set forth above, the Governing Body previously adopted a redevelopment plan and this Amended and Restate Redevelopment Plan is intended to supersede the same.

## C.   SUBMITTAL REQUIREMENTS

1.   An applicant for development in the SWR Zone must submit a site plan indicating the manner in which the entire tract is to be developed. Said plan shall include all the data required for site plan review, and clearly indicate the distribution of use and intensity of use of land within the tract. This zone-wide approach to development in the SWR Zone is mandated to ensure that the zone tract is developed within the framework of a comprehensive, integrated design and not in a piecemeal fashion.

2.   The submittal shall contain, in addition to the site plan submittal provisions, a report detailing the following:

   a.   The total number of dwelling units by bedroom count, the square footage of non-residential floor area and the land area to be devoted to residential and each non-residential use. The density and intensity of use of the entire tract shall be noted.

17

e. A proposed timing schedule in the case where construction is contemplated over a period of years, including any terms or conditions which are intended to protect the interests of the public and of the residents who occupy any section of the development prior to the completion of the development in its entirety.

3. A socioeconomic impact study shall be required pursuant to §249-108 of the Land Use Ordinance of the Borough of Edgewater.

4. A traffic study shall be required pursuant to §249-109 of the Land Use Ordinance of the Borough of Edgewater. The study should address the goals and policy statements set forth in the Borough Master Plan, and shall address existing and projected vehicular peak-hour movements, turning movements, and the need for improvements to enhance traffic safety and convenience in the area.

5. A viewshed study shall be required pursuant to §249-110 of the Land Use Ordinance of the Borough of Edgewater.

## D. VARIATION FROM REDEVELOPMENT PLAN

The Edgewater Planning Board may grant deviations from the regulations contained within this Redevelopment Plan where, by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or by reason of exceptional topographic conditions, pre-existing structures or physical features uniquely affecting a specific piece of property, the strict application of any area, yard, bulk or design objective or regulation adopted pursuant to this Redevelopment Plan, would result in peculiar practical difficulties to, or exceptional and undue hardship upon, the developer of such property. The Edgewater Planning Board may also grant such relief in an application relating to a specific piece of property where the purposes of this Redevelopment Plan would be advanced by a deviation from the strict requirements of this Plan and the benefits of the deviation would outweigh any detriments. No relief may be granted under the terms of this section unless such deviation or relief can be granted without substantial detriment to the public good and without substantial impairment of the intent and purpose of the Redevelopment Plan.

Notwithstanding the above, any changes to the uses permitted in the redevelopment area shall be permitted only by means of an amendment of the Redevelopment Plan by the Borough Council, and only upon a finding that such deviation be would be consistent with and the furtherance of the goals and objectives of this Plan.

# APPENDIX: Concept Plan

# EXHIBIT D

PLANNING BOARD
BOROUGH OF EDGEWATER
EDGEWATER, NEW JERSEY

# THE REGULAR MEETING HELD ON DECEMBER 12 ᵀᴴ 2011

## OPEN PUBLIC MEETINGS ACT READ BY THE CHAIRMAN

PLEDGE

ROLL CALL

MEMBERS PRESENT
Mr. Malakoff
Mr. Philomey
Ms. Borman - acting Chair
Mrs. Farrell
Councilman Vidal
Mayor Delaney

ALSO PRESENT:
Keith Barrack – Attorney
Kathryn Gregory-Planner
(Gregory Associates)

Agenda:
Memorization of Resolution for IPark
Keith Barrack, the Board attorney gave a brief overview of the resolution.

No question from the board or the public at this time.

A motion was made by Pete Philomey to approve the resolution
,and was seconded by Jay Malakoff

The vote was as follows:
Mr. Malakoff                    yes
Mr. Philomey                   yes
Mrs. Farrell                      yes
Mayor Delaney                 yes
Councilman Vidal              Absented (wasn't at the last meeting)
Acting Chairperson Borman  yes

A motion was made to adjourn at 7:12 pm

Respectfully Submitted

Annamarie O'Connor
Secretary

EDGEWATER BOROUGH PLANNING BOARD

RE: i.PARK EDGEWATER, LLC
AMENDED PRELIMINARY AND FINAL SITE PLAN AND
MINOR SUBDIVISION

RESOLUTION NO.

Made By: M R Philomy

Seconded By: MR Malakoff

**WHEREAS,** i.Park Edgewater, LLC ("Applicant") has applied to the Edgewater Borough Planning Board ("Board") for amended preliminary and final site plan and amended subdivision approval, with respect to Phase II of the multi-use redevelopment project on property designated as Block 99, Lots 1, 3, 4 and 5 on the Edgewater Borough Tax Map, also known as 45 River Road ("Property"); and

**WHEREAS,** on September 18, 2006 the Property was delineated as an area in need of redevelopment by the Mayor and Council of the Borough of Edgewater and a Redevelopment Plan for the Property was adopted by the Borough on August 19, 2006; and

**WHEREAS,** the Applicant has received the following approvals from the Board with respect to Phase II of the redevelopment:

- January 28, 2008. Preliminary and Final Site Plan and Major Subdivision Approval for Phase II;
- March 9, 2009. Amended Preliminary and Final Site Plan and Amended Major Subdivision Approval for Phase II;
- March 22, 2011 Minor Subdivision Approval for subdivision of Lot 1, creating new Lot 1.12 for Building K;
- June 28, 2010. Minor Subdivision Approval for further subdivision of Lot 1, annexing subdivided portion of adjacent Block 96, Lot 3.02;
- August 11, 2010. Amended Preliminary and Final Site Plan and Amended Major Subdivision Approval for the creation of Lots 1.03, 1.04, 1.05 and 1.07, along with changes to densities in Building C1 (Lot. 1.05), Building D (Lot 1.03), and Building F (Lot 1.07);
- December 13, 2010 Preliminary and Final Minor Subdivision Approval to permit the subdivision of 36,166 sf parcel located on Lot 1, Block 99 to be annexed to adjacent Block 96, Lot 3.02;
- April 25, 2011 final minor subdivision approval creating new lot 1.14.

(collectively, the "Prior Approvals"); and

WHEREAS, as set forth in the Prior Approvals, the Applicant has received the Board's approval to construct a total of 495 residential units (420 market rate units, 75 affordable units), 98,200 square feet of retail/office space and 8,300 square feet of restaurant space; and

WHEREAS, Phase I of the project, which involves the construction and rehabilitation of the buildings designated E-1, E-2, H and K and includes a new municipal complex for the Borough of Edgewater, was previously approved by the Board on December 19, 2006; and

WHEREAS, the pending subdivision proposes to subdivide Lot 1, thereby creating one 12) new lot and maintaining the remainder of Lot 1 and a separate lot 1.02; and

WHEREAS, the pending amendment to the Site Plan proposes modifications to the previously approved Buildings E1/E2, C1, C2, D and L which are collectively referred to as the "Main Street Area" of the project; and

WHEREAS, the pending amendment would reallocate the approved residential units by increasing the number of units in building C1 to 44 residential units, increasing the number of residential units in building D to 66 residential units and increasing the number of residential units in Buildings E1/E2 to a combined 150 residential units; and

WHEREAS, the pending amendment would permit Garage 2 to be located adjacent to buildings E1/E2; and

WHEREAS, the pending amendment would permit buildings C2 and L to be combined into single 24,000 sf building designated as C2/L; and

WHEREAS, the pending amendment would increase buildings C1 and D height to six stories or 70 feet; and

WHEREAS, the application seeks the following Waivers:

    a.  Minimum set back of 0 feet between buildings E1/E2 and Garage 2 where 40' is required;

    b.  Garage to Internal Road Set back of six feet rather than 10 foot setback required and six foot sidewalk rather 10 foot sidewalk;

    c.  Reduced Landscape buffer of four feet along northern property line;

    d.  No street level retail for Garage 2;

    e.  No residential above Garage 2;

    f.  Garage 2 height of 65.5' which exceeds current maximum parking garage height of 30';

    g.  No landscaping in Temporary lots A and J;

    h.  24' Right of Way between proposed lots 1.02 and 1.04;

    i.   Reduced landscape buffer of minimum of 8' along River Road;

    j.   No retail use along Road A;

    k.  Less than 75% of parking spaces within garages – temporary condition; and

    l.   Parking space dimensions of 9' X 18' rather than 10' X 20' as required.

**WHEREAS**, notice having properly been made, a hearing was held upon the Application September 26, 2011 but not completed; and

**WHEREAS**, the applicant submitted an amended application for a subdivision and amended site plan modification and re-noticed and advertised in advance of the November 9, 2011 special meeting; and

**WHEREAS**, notice having been properly made, a hearing was held on the Amended Application on November 9, 2011; and

**WHEERAS**, the September 26, 2011 hearing record was incorporated by reference into the November 9, 2011 hearing record; and

**WHEREAS**, the following individuals appeared on behalf of the Applicant:   Paul Kaufman, Esq., attorney; Lisa DiGerolamo, P.E., civil engineer; Paul Grygiel, P.P., professional planner; James DeBarbieri, AIA, architect, Alfredo A. Paulo, AIA, Architect, and Mohammed Shama, AIA, Architect, and

**WHEREAS**, all notice requirements have been met; and

**WHEREAS**, the Board having reviewed the plans, application and testimony presented on behalf of the Applicant and having reviewed the reports and opinions of the Board's professionals, makes the following findings of fact and conclusions of law:

    1.    The Board has jurisdiction to hear the Application.

    2.    The following exhibits were marked:

        A-1:   Colored Rendering of combined building C2/L;

        A-2:   Colored Elevation of C2/L submitted with Site Plan displaying corner of building, east and south Elevations;

        A-3:   Building Materials;

        A-4:   Colored Elevation of C2/L submitted with Site Plan displaying North and West Elevation;

        A-5:   Renderings depicting Englewood South project;

        A-6:   Colored Elevation of Home Goods;

A-7:   Colored Rendering of site entrance view from River Road;

A-8:   Colored rendering of site entrance view from River Road with Centro façade visible;

A-9:   Colored rendering of C2/L building;

A-10:  Site Plan Sheet No. C-03 prepared by Paulus Sokolowski & Sartor dated June 14, 2011, sealed on October 31, 2011 consisting of one sheet.

3.     The Board considered the following reports, which are made a part of the record before the Board:

       (a) review letter dated July 28, 2011, prepared by the Board Engineer, Daniel C. Kaufman, P.E., P.P., from Neglia Engineering Associates; and

       (b) review letter dated August 10, 2011, prepared by the Board Engineer, Brian A. Intindola, P.E., P.P., from Neglia Engineering Associates; and

       (c) review letter dated August 19, 2011, prepared by the Board Engineer, Daniel C. Kaufman, P.E., P.P., from Neglia Engineering Associates; and

       (d) review letter dated July 27, 2011 and revised August 8, 2011, prepared by the Board Planner, Kathryn Gregory, P.P., A.I.C.P; and

       (e) review letter dated August 15, 2011and revised September 26, 2011, prepared by the Board Planner, Kathryn Gregory, P.P., A.I.C.P.

4.     The Property is an approximately 45.016 acre lot located in the SWR (Southern Waterfront Redevelopment) Zone District. It lies on the easterly side of River Road in the most southerly part of the Borough of Edgewater.

5.     As set forth above, the Board previously granted the Initial Approval on January 28, 2008, as well as several amended subsequent approvals for modifications to the project.

6.     In addition, the Applicant has received the required approvals from the County of Bergen and the New Jersey Department of Environmental Protection.

7.    Lisa DiGerolamo, P.E., civil engineer, was accepted as an expert in the field of civil engineering and testified on behalf of the Applicant.

8.    Ms. DiGerolamo testified that existing buildings F, D, and C1 had been previously approved by the Board and that the current request seeks to increase the number of residential units in building F from 28 to 40 units.

9.    Ms. DiGerolamo further testified that the applicant sought to amend the site plan to combine buildings C2 and L into a single 24,000 sf retail structure to be identified as C2/L that would have 96 stalls of surface parking and temporary parking now suitable for use by building K.

10.    Ms. DiGerolamo further testified that the amendment, as proposed, was still compliant with the maximum number of residential units and total retail square footage permitted under the Redevelopment Plan.

11.    Ms. DiGerolamo further testified Garage 2 as identified on Exhibit A-10 would be adjacent to buildings E1 and E2, be a six story structure housing 248 parking stalls.

12.    Ms. DiGerolamo further testified that the proposed Garage 2 was designed to service E1/E2 and thus there would no windows facing the garage, it was still lower than the existing E1/2 at its highest point, and thus would have no negative impact on the site.

13.    Ms. DiGerolamo further testified that the sidewalk on the westerly side of the garage was a sufficient width because it was not likely that individuals would be walking along that road as there was no current retail on either side of the road.

14.    Ms. DiGerolamo further testified that the applicant could add landscape islands to the temporary lots, but it would be impractical to do so during this phase because the plantings and construction would be ripped up prior to the next phase of construction.

15.    The applicant, the responded to the Landscape Comments set forth in the Neglia Engineering August 10, 2011 report. The Applicant agreed that any such approval would be conditioned upon compliance with items 1 through 12, provided however, that items 10 through 12 would be held in abeyance for 3 years if site construction is not completed by then, comment 14 was a condition of approval, and approval shall be conditioned upon detailed plans being provided and approved by the Borough engineer regarding items identified in comments 15 and 16..

16.  Applicant further agreed to that any such approval would be conditioned upon compliance with traffic comments 1 through 7 set forth in the Neglia Engineering August 10, 2011 report.

17.  Alfredo Paolo, AIA Architect was accepted as an expert in the field of architecture and testified on behalf of the Applicant.

18.  Mohammed Shama, AIA Architect was accepted as an expert in the field of architecture and testified on behalf of the Applicant.

19.  Mr. Paolo and Mr. Shama testified regarding the design of the proposed C2/L building.

20.  James DeBarbieri, AIA Architect was accepted as an expert in the field of architecture and testified on behalf of the Applicant.

21.  Mr. DeBarbieri testified that the proposed combined C2/L building would have an enclosed loading area for two trucks and one compactor, it would be screened from the public and hidden from view as exemplified by Exhibit A-1.

22.  Mr. DeBarbieri further testified that the building C2/L would be 290 feet from River Road and hidden from view.

23.  Mr. DeBarbieri further testified that the 24,000 sf building would serve as an "anchor store" for the retail component of the Main Street portion of the development and that the on site population would not support street level retail absent such a draw.

24.  Mr. DeBarbieri further testified that the main axis of movement on the site would be east to west and not north to south. Therefore, he opined that the six foot sidewalk adjacent to Garage 2 would be sufficient as there would be limited pedestrian traffic along Road A.

25.  Members of the public questioned Ms. DiGerolamo, Mr. DeBarbieri, Mr. Paolo and Mr. Shama.

26.  Public questions included the type of lighting to be emitted from the Home Goods sign. Counsel and Mr. DeBarbieri represented that the sign would be turned off during non-business hours and would have a soft lighting effect.

27.  Paul Grygiel, P.P., professional planner, was accepted as an expert in the field of community planning and testified on behalf of the Applicant.

{00050039 DOC} 6

2011PB MIN7

28.   Mr. Grygiel testified that the proposed increase in height of buildings C1 and D complied with the existing Redevelopment Plan and do not require a variance or waiver.

29.   Mr. Grygiel further testified that the proposed combination of C2/L complies with the mandatory elements of the Redevelopment Agreement.

30.   Mr. Grygiel further testified that the proposed Garage 2 would not impact the landscape as Garage 2 was lower than buildings E1/E2 and that it would be in furtherance of providing 75% of the spaces on site in structured parking when the project is complete.

31.   Mr. Grygiel further testified that the applicant was seeking a waiver and not a variance with regard to the design standards applicable to Garage 2.

32.   Mr. Grygiel further testified that the minimum set back of zero feet would not impact the light and air issue as the residential units in building E1/E2 faced the water only, the buildings are single loaded with the corridors facing the west and had a closed façade facing west.

33.   Mr. Grygiel further testified that current landscaping surround Garage 2 is similar to prior approvals and is appropriate as no retail is suggested on the ground floor and Road A is not a main road.

34.   Mr. Grygiel further testified that the Redevelopment Plan limits retail to 100,000 sf on the site and the retail is better suited on other portions of the site.

35.   Mr. Grygiel further testified that because the residential is adjacent to Garage 2 it is not necessary to place the residential above or below the garage.

36.   Mr. Grygiel further testified that it would be appropriate to landscape parking areas once final construction is complete to alleviate added expense and destruction of completed work.

37.   Mr. Grygiel further testified that although the temporary parking lots impervious cover on the site would be 77.1%, after completion of the approved project, it would remain below the 75% threshold and thus, no waiver is required .

38.   Mr. Grygiel further testified that the proposed 9 x 18 foot parking stalls are industry standard and are adequate even though 10 x 20 foot stalls are required.

39.   Mr. Grygiel also testified that the proposed subdivision is consistent with

and in furtherance of the Redevelopment Plan adopted by the Borough of Edgewater with respect to the Property, as well as the Initial Approval granted by the Board. The grant of subdivision will enable the project to move forward in accordance and fulfillment of the redevelopment plan over the Property. He further testified that the benefits of the project substantially outweigh any possible detriment and that the waivers can be granted without substantial detriment to the public good or any neighboring properties and without substantial impairment to the intent and purpose of the Borough Zone Plan and Zoning Ordinance.

40.    Members of the public questioned Mr. Grygiel.

41.    In response to the Board's prior request that the Applicant address the affordable housing requirement, Counsel for the applicant referred to Building A as identified on Exhibit A-10, which calls for 37 affordable housing units to be constructed. Counsel stated that while Building A was not presently proposed, it acknowledged that once the applicant has completed 210 market rate residential units certificates of occupancy for additional market rate residential units would not be issued until Building A were completed .

42.    The Board entertained a motion to grant the requested amended preliminary and final site plan approval and amended preliminary and final subdivision approval, along with waivers from the requirements of the Redevelopment Plan with respect to certain bulk requirements and parking space size requirements.

43.    The Board, having considered the testimony and documentation presented as part of the Application, found that the requested amended preliminary and final site plan approval and amended preliminary and final subdivision approval, along with the waivers requested should be granted, in that the amended site plan and subdivision will enable the Applicant to better proceed with the approved redevelopment plans and that the amended site plan and subdivision will not have any negative impact, or changed impact, from the prior approvals, on the neighborhood or the zoning scheme.

44.    The Board further found that the grant of amended site plan approval and amended subdivision approval is not inconsistent with the redevelopment plan and that the benefits of the same outweigh any burdens presented.

NOW, THEREFORE, BE IT RESOLVED, by the Edgewater Borough Planning Board that the approval of the Application of i.Park Edgewater, LLC for amended preliminary and final site plan approval and amended preliminary and final subdivision approval with

{00050839.DOC}8

2011PB MIN9

associated waivers is hereby memorialized, such approvals having been made subject to the Applicant's express adherence to and compliance with the following conditions:

1.      The payment of all real estate taxes relating to the Property.

2.      The payment of all outstanding fees and assessments relating to the Property.

3.      The Applicant must make current all escrow accounts with the Edgewater Borough Planning Board, and ensure that the escrow account continues to contain sufficient funds. The failure of the Applicant to maintain sufficient escrow funds within thirty (30) days of receipt of a deficiency notice shall result in the voiding of this approval.

4.      The Applicant must obtain all necessary approvals from outside agencies, local, county, state and federal.

5.      The Applicant shall comply with the conditions and recommendations set forth in the August 10, 2011 report of the Board Engineer, Daniel C. Kaufman, P.E., P.P., of Neglia Engineering Associates, regarding Lanscaping and Traffic as set forth on the record at the hearing, as well as the representations contained within the October 7, 2011 letter prepared by Paul Kauffman, Esq.

6.      The Applicant shall post performance and maintenance bonds, in such amount determined by the Board Engineer, as the same may be required under the Development Agreement between the Borough and the Applicant.

7.      The Applicant shall provide the Board Engineer with at least twenty-four (24) hours notice prior to the start of any construction.

8.      The terms and conditions as set forth in this Resolution shall be incorporated and any other governmental approvals, including prior Board approvals, as if set forth at length. The Applicant shall transmit a copy of the within Resolution to all other governmental agencies having jurisdiction over this matter and from which Applicant seeks approval.

A copy of this Resolution shall be sent by the Planning Board secretary to the Applicant by Certified Mail No. _____, Return Receipt Requested, to the Edgewater Borough Clerk, to the Edgewater Borough Zoning Officer, and to the Edgewater Borough Building Inspector within ten (10) days of the date hereof.

Kevin O'Connor, Chairman

Anna-Marie O'Connor, Secretary

PLANNING BOARD
BOROUGH OF EDGEWATER
EDGEWATER, NEW JERSEY

THE REGULAR MEETING HELD ON NOVEMBER 9TH 2011

OPEN PUBLIC MEETINGS ACT READ BY THE CHAIRMAN

PLEDGE

ROLL CALL

| MEMBERS PRESENT | ALSO PRESENT: |
|---|---|
| Mr. Candelmo | Keith Barrack – Attorney |
| Mr. Philomey | Kathryn Gregory-Planner |
| Ms. Borman | **(Gregory Associates)** |
| Mrs. Farrell | Dan Kaufman- Engineer |
| Mrs. Kelley | **Neglia Engineering** |
| Mr. Malakoff | |
| Mayor Delaney | |
| Mr. Levine | |
| Chairman O'Connor | |

Agenda Ipark:

Paul Kaufman attorney for the applicant gave the board attorney the green
cards and proof of notice.
The residents of Churchill estates in North Bergen stated that they weren't
noticed of this meeting.
The board attorney stated that the tax office in North Bergen indicates that
only part of Churchill estates is within two hundred feet of the property line.

Alfredo Paolo, AIA Architect was accepted as an expert in the field
of architecture and testified on behalf of the Applicant.

Mohammed Shama, AIA Architect was accepted _as an expert in the
field of architecture and testified on behalf of the Applicant.

Mr. Paolo and Mr. Shama testified regarding the design of the
proposed C2/L building.

James DeBarbieri, AIA Architect was accepted as an expert
in the field of architecture and testified on behalf of the Applicant.

Members of the public questioned, Mr. DeBarbieri, Mr. Paolo and
Mr. Shama.

Paul Grygiel, professional planner, was accepted as an expert in the
field of community planning and testified on behalf of the Applicant.

Mr. Grygiel testified that the proposed increase in height of buildings C1
and D complied with the existing Redevelopment Plan and do not require
a variance or waiver.

Mr. Grygiel further testified that the proposed combination of C2/L
complies with the mandatory elements of the Redevelopment Agreement.

Members of the public questioned Mr. Grygiel.

The Board entertained a motion to grant the requested amended
preliminary and final site plan approval and amended preliminary
and final subdivision approval, along with waivers from the
requirements of the Redevelopment Plan with respect to certain bulk
requirements and parking space size requirements.

A motion was made by Howard Levine to approve the application
and was seconded by Ema Kelley.

The vote was as follows:

| Mr. Candelmo | yes |
| Mr. Philomey | yes |
| Ms. Borman | yes |
| Mrs. Farrell | yes |
| Mrs. Kelley | yes |
| Mr. Malakoff | yes |
| Mayor Delaney | yes |
| Mr. Levine | yes |
| Chairman O'Connor | yes |

A motion was made by Ms. Borman to approve the minutes from the September 26, 2011 meeting, and seconded by Mr. Levine.
The board all voted in favor with Chairman O'Connor abstaining.

Also minutes from December 2010 to August 2011 prepared by Debbie Reilly.

A motion was made to adjourn

Respectfully submitted

Annamarie O'Connor

Secretary
11-9-11

PLANNING BOARD
BOROUGH OF EDGEWATER
EDGEWATER, NEW JERSEY

THE REGULAR MEETING HELD ON SEPTEMBER 26TH 2011

OPEN PUBLIC MEETINGS ACT READ BY THE CHAIRMAN

PLEDGE

ROLL CALL

MEMBERS PRESENT                    ALSO PRESENT:
Mr. Candelmo                       Keith Barrack – Attorney
Mr. Philomey                       Kathryn Gregory-Planner
Ms. Borman                         **(Gregory Associates)**
Mrs. Farrell                       Dan Kaufman- Engineer
Mrs. Kelley                        **(Neglia Engineering)**
Mayor Delaney
Mr. Levine
Councilman Vidal
Chairman O'Connor

The board welcomed back the secretary.

I Park:
The attorney for the applicant is Paul Kaufman.

The board received the notice of publication and green cards.

The applicant is applying for amended preliminary and final site plan, with
amended subdivision and variance approval with respect to Phase II of the
multi-use redevelopment project on prc
3, 4 and 5 on the Edgewater Borough T
45 River Road.

*NO meeting*

*October 2011*

municibid
online government auctions
www.municibid.com | Completely Free for Government to Sell!

2011PB MIN14

A short discussion about a document from the DEP that says if a property owner has the walkway as part of their property they can be held liable if found to be deliberately negligent. Chairman said that the Board will have a full discussion on the issue at a later date.

Mr. Kaufman said that they noticed far beyond what they are required to do by law.

Spoke about the previous application and reviewed the current request. Noted that nobody will be affected by the garage. Identified parking areas.

Lisa DiGerolamo was sworn in and gave expert testimony. Reviewed the proposed changes noting they are simple and straight forward. Reviewed the major change in the C2L building. Spoke about the introduction of garage 2. Answered detailed questions, including questions about the temporary parking areas. Mr. Kaufman spoke about and responded to comments that had been made by the Architect. Answered questions and spoke about affordable housing.

Carl Monheit, Project Manager, iPark Edgewater, was sworn in and responded to questions. Discussion about what the DEP requires.

Mr. Kaufman said that he believes all comments can be addressed.

Discussion about the term Shopping Center. Joseph Cotter from iPark spoke noting that retail, excluding the suggested Shop & Stop, is 60,000 square feet. Residential being built is 600,000.

Chairman O'Connor opened the meeting to the public and the following were heard:

Peggy Wong, 8550 Boulevard East, North Bergen:

- Speaking for the walkway as a member of the Hudson River Waterfront Conservancy.
- Asked about signage and the temporary parking areas.
- Reminded that there is an official logo for the walkway.
- Expressed concern about an elevation change.

- Asked about construction equipment entrance for the temporary work. Spoke about a Bus Stop.
- Concerned about a temporary walkway made of asphalt.
- Ms. Wong was told that the Planning Board does not have the jurisdiction to override the DEP.

No one else wished to be heard and Chairman O'Connor closed the meeting to the public.

The board will continue at the next meeting.

The board attorney stated they wouldn't have to re-notice.

A motion was made to adjourn.

Respectfully submitted

Annamarie O'Connor
Secretary
$9 \cdot 26 - 11$

PLANNING BOARD
BOROUGH OF EDGEWATER
EDGEWATER, NEW JEREY

The Regular meeting held on August 22, 2011

Open Public Meeting Act read by Chairman

Pledge of Allegiance

Roll Call

Members Present                          Also Present
Ms. Borman                               Keith Barrack, Attorney
Mr. Malakoff                             Kathryn Gregory - Planner
Mr. Philomey                             Dan Kaufman - Engineer
Mayor Delaney
Mr. Levine
Mrs. Kelley
Mrs. Farrell
Councilman Vidal
Chairman O'Connor

Paul Kauffman spoke on behalf of I Park, the application was to amend the subdivision
site plan and modify the garage.

A woman objected to the hearing advising some people in North Bergen were not served.
Mr. Kauffman advised the list used for the mailing came from the North Bergen
Assessor's office. The woman advised that Church Hill Road was not notified. Another
woman said she usually received notice and had not received this one.

7:12 there was a 2 minute recess for Mr. Kauffman to speak to his client to decide if they
wanted to move forward.

Mr. Kauffman advised he wanted to get back to North Bergen to see if there was an error.
He requested a special meeting in a couple of weeks and requested they proceed with an
informational consult meeting.

Mr. Kauffman advised he notice the previously served people as well as the new list for
the new hearing.

The Board agreed to move forward with an informational consult meeting for this
evening and not have the hearing as per Mr. Kauffman's request.

The application would consist of temporary parking for retail. They would pick up some

temporary parking behind Main Street. E1 & E2 would have its own parking garage which would be connected directly to building consisting of 248 stalls.

Mr. Cotter described the different parking areas for each building. Explaining the developer would always have temporary parking for each phase.

Lisa Digeromol was asked if there would be assigned spaces for which she advised there would no.

Katheryn Gregory

Council Subcommittee – Councilman Vidal

Joseph Cotter of I Park advised the southern part would include the COAH requirements.

Councilman Vidal said the committee looked at the layout of the building and had some new idea for the parking structure. They were waiting for the architect to complete the design. He had just been advised they were ready.

Mr. Malakoff asked where is the project gong that it seemed to have more retail.

Paul Kauffman spoke of the possibility of Home Goods coming in and being an anchor store. The apartments have changed for today's market.

Ms. Borman commented on the site plan was approved a year ago and that the emphasis now seemed more commercial. That all the hours she and the board spend prior the emphasis was more on residential with certain amount stores and retail to make iPark a destination.

Mr. Kauffman advised the plan had stayed the same. The unit count changed from 104 to 150 units, the building did not change.

Ms. Borman stated CVS, AT&T and now Home Goods. All nationwide retail.

Councilman Vidal advised the Planning Board and residents are looking for ratables.

Joseph Cotter commented that doesn't want COAH if not required.

Already received COAH waiver. Paul Kauffman asked to speak to his client to discuss idea for COAH. There was a break at 7:52 PM.

8:00 PM resumed and roll call taken.

Roll Call

Members Present                          Also Present
Ms. Borman                               Keith Barrack, Attorney

Mr. Malakoff
Mr. Philomey
Mayor Delaney
Mr. Levine
Mrs. Kelley
Mrs. Farrell
Councilman Vidal
Chairman O'Connor

Kathryn Gregory - Planner
Dan Kaufman - Engineer

Paul Kauffman advised there was some confusion. He explained building C&D was
retail on the ground level and residential units on top. The building would be 4 floors.

E2- will be 6 stories

Joseph Cotter – COAH will put on plan to see where it will go. The approved site plan
was done 5 years ago. The new plan would keep the integrity of Main Street. When half
the units are complete they would then do half of the COAH units. The building would
be done in 2 phases.

There is a concern regarding financing. If don't' get financing for COAH after  then do
COAH can't finance the whole thing.

Mr. Philomey suggested the applicant meeting with the group and then come back to the
board and re-present. He suggested the possibility of adding a seconded level to Home
Goods and putting affordable housing there.

Joseph Cotter Own land – for financing

Chairman suggested the Mr. Kauffman and his client talk, they had already been granted
a waiver could do some time, need to have plan.

Paul Kauffman gave John Candelmo a check for $350.00 for the application fee.

The meeting was open to the Public at 8:12 PM

Valory Bardinas, 16 Hudson Terrace, Edgewater, advised she was a firm believer in
COAH and affordable housing does not make for bad neighbors. She suggested spreading
out the units through out and not grouped together. Since 1 Park sold part of the parking
lot to Mr. Hagney of 115 River Road, would there be enough parking left. The applicant
advised there would. Commercial helps tax base and doesn't drain the schools, etc.

Betty Wong, 8550 Boulevard East, North Bergen, spoke on behalf of the Board of
Trustees for the Hudson River Walk. She wanted to know how the walkway was intended
to be completed. Joseph Cotter advised the walkway would be done with each separate

building. She recommended steel sheet metal since it would require less maintenance otherwise the rocks float away.

Mary Hogan, 606 Undercliff Avenue, Edgewater, commented that the law says COAH is to be built along with the development. A certain percentage of the project and then a certain percentage of the COAH is to be done. She asked about the subcommittee, was it a subcommittee of the Planning Board. She was advised it was a Subcommittee of the Mayor and Council, which consists of Mayor Delaney and Council members, Luis Vidal, Maureen Holtje, and Neda Rose. The application was sent back to the Mayor and Council and they never sent it back to the planning board. The Planning Board already approved the site plan.

A motion to adjourn was made by John Candelmo and seconded by Jay Malakoff at 8:37 pm.

Respectfully submitted,

Deborah Reilly
Acting Secretary

$8 \cdot \partial 1 - 11$

PLANNING BOARD
BOROUGH OF EDGEWATER
EDGEWATER, NEW JERSEY

The Regular meeting was held Monday, July 25, 2011.

Open Public Meetings act read by the Chairman

ROLL CALL

MEMBERS PRESENT
Ms. Borman
Mr. Malakoff
Mrs. Kelley
Mrs. Farrell
Councilman Vidal
Mayor Delaney
Mr. Levine
Mr. Candelmo
Chairman O'Connor

Also present:
Kathryn Gregory
Dan Kaufman
Keith Barrick

Chairman announced that there would be an information hearing regarding the new school building on River Road and Palisade Terrace.

i-Park was sending a new application and asked to be redeemed complete. The next meeting date will be August 29, 2011 and the applicant was reminder there was a 15 day requirement for any changes.

Dennis Makeyer was the consultant for the School Board.

The attorney advised that any objections the board might have would be sent to the state.

The site plan submitted was to add a 3rd floor to the already approved two floor project.

The original bid for the 2 floors came in far under budget and adding a 3rd floor now would be a better price.. The 3rd floor would also be used for special needs children and would generate income with tuition paid students from other towns. It would be impossible to do a 3rd floor when the building is active with children. It would be better to do it now while the contractors are there.

Kathryn Gregory was concerned about the parking spaces. According to the plans, there will be 32 classrooms and the Borough Ordinance would require them to have 64 spaces and the site plan only show 48 spaces.

Chrisopher Sanders, architect from Arcari & Iovino advised there was enough on-site parking. Chairman asked if they changed the parking with the 3rd floor being added and the answer was no.

Ms. Gregory asked for the number of teachers and students. Mr. Sanders advised he did not have that information but could supply it.

The student drop off area would be Orchard Street for the parents and the buses would drop off on Undercliff Avenue. The new main entrance is to be level to Undercliff Avenue.

Ms. Borman asked how under budget it the bid come in for the first and second floor. Mr. Rotino, consultant to Board of Ed, advised that the original project estimate was between 21 million and 22 million and the bid came in at 17.5 million. The difference should be enough to put on the 3rd floor totally. The demolition estimate was between $800,000.00 and $900,000.00 and the cost was only $502,000.00. Currently there are 17 special ed. Students that are being sent to other municipalities, 6 or 7 would qualify to come back, and there would be room for approximately 6 or 7 tuition paid additional students, which would generate an income of approximately 50,000 – 60,000.00 per student. There would be 60-80 tuition based pre-school students.

Chairman asked if there were any other questions regarding the design or structure. Ms. Gregory's issue with the parking was the only issue.

Mayor asked what the expected completion date was. They expect to have the entire building enclosed by December 15th. The third floor would take an additional 3 or 4 months, and possible they third floor would be finished at a later date. EVG is projected to reach capacity in 10 years. G.W. is expected to open for the 2012-2013 school year, but will probably be ready December 2012 or January 2013.

Mr. Barrick requirement the board to make a motion to authorize a letter be sent to the state concerning the limited parking with direction if Kathryn Gregory is satisified the object be removed. He feels a resolution is necessary.

Mr. Makeyor felt a resolution was not necessary since there was no application before the board. Mr. Makeyor asked if the board needed to use the word object. His concern was if there was an objection the Department of Education would stop the review and then costs would increase.

Mr. Sanders advised the site design was maximized and gave as much parking as they could fit on site.

Mr. Barrick advised this was strictly advisory to allow state to know the planning board concerns.

Motion was made by Ms. Borman for a Resolution to be sent to the state if after the Chair and Planning Board consulted after the additional information and they still remain unsatisfied a Resolution would be sent to the state stating the concerns of the parking. This motion was seconded by Mr. Malakoff. All members voted in favor.

The meeting was then opened to the public, no one present wishes to speak therefore the Chairman closed the meeting to the public..

Motion to adjourn was made by John Candelmo and seconded by Chairman O'Connor 7:54 PM.

Respectfully,

Deborah Reilly
Acting Planning Board Secretary

7-25-11

PLANNING BOARD
BOROUGH OF EDGEWATER
EDGEWATER, NEW JERSEY

The Regular meeting was held Monday, June 27, 2011.

Open Public Meetings act read by the Chairman

Pledge of Allegiance

Chairman O'Connor announced he received a call at 7:08 PM that the applicant asked to carry over the application because of a miscommunication.

All members were in agreement with this request.

ROLL CALL

MEMBERS PRESENT
Ms. Borman
Mr. Philomey
Mr. Malakoff
Mrs. Farrell
Chairman O'Connor

Chairman O'Connor advised that Mr. Levine was unable to attend and that Mr. Candelmo had a death in his family.

Motion to Adjourn was made by Mr. Malakoff and seconded by Mrs. Kelley.

Respectfully,

Deborah Reilly
Acting Planning Board Secretary

PLANNING BOARD
BOROUGH OF EDGEWATER
EDGEWATER, NEW JERSEY

The Regular meeting was held Monday, April 26, 2011.

Open Public Meetings act read by the Chairman

Pledge

ROLL CALL

MEMBERS PRESENT                          ALSO PRESENT:
Ms. Borman                               Keith Barrack
Mr. Philomey                             for Mark Peck, Attorney
Mr. Malkoff
Councilman Vidal
Mrs. Farrell
Mr. Levine
Chairman O'Connor

Resolution – i.Park Edgewater LLC – Final Minor Subdivision.

All members vote yes.

Meeting was open in to the public, no wished to be heard. Closed meeting to public.

Chairman announced that the board will try to not to hold meetings in July and August.

Motion to Adjourn was made by Howie Levine and seconded by Linda Farrell at 7:05 PM

Respectfully,

Deborah Reilly
Acting Planning Board Secretary

PLANNING BOARD
BOROUGH OF EDGEWATER
EDGEWATER, NEW JERSEY

The Regular meeting was held Monday, March 28, 2011.

Open Public Meetings act read by the Chairman

Pledge of Allegiance

Moment of Silence in memory of Mayor Nancy Merse

ROLL CALL

MEMBERS PRESENT
Mr. Candelmo
Mrs. Kelley
Ms. Borman
Mr. Philomey
Mr. Levine
Acting Mayor Vidal
Mr. Malakoff
Chairman O'Connor

ALSO PRESENT:
Mark Peck - Attorney
Kathryn Gregory - Planner
Dan Kauffman – Engineer

Resolution

AT&T Sign Mobility, granting the amended application allowing the existing sign to remain the same with a second sign on the south façade with a 5x5 glob and 2' lettering.

They did away with one variance but the board did grant 2 variances one for the wall sign depth and the other to allow 2 signed where the ordinance only would have allowed for one. With the conditions being the illuminated signs be set on a timer not to be lit after 10:00 PM

Motion was made by Mrs. Kelley and seconded by Mr. Levine.

Vote

| Ms. Borman | No |
| Mr. Malakoff | No |
| Mrs. Kelley | Yes |
| Mr. Philomey | Yes |
| Mr. Candelmo | Yes |
| Mr. Levine | Yes |
| Chairman O'Connor | Yes |

Public Hearing

i.Park – Minor Subdivision

Final Subdivision – E1 & E2
45 River Road
Block 99 Lot 1
Subdivision is for lot 1.14 Only
Allison Penner of Kauffman & Burns represented the applicant and reviewed the application. Introduced Frances Wecht, Surveyor. Board accepted Mr. Wecht's qualifications.

Mr. Wecht gave testimony and referenced Exhibits A1 and A2.   He had reviewed the March 24. 2011 Neglia report. Error was in original plan and was corrected in Exhibit A2. Exhibit A2 shows that the applicant had accepted Neglia's comments. Ms. Penner noted that any comments relating to Lot 1.09 were not applicable because they had withdrawn that portion of the application.

Mark Peck reminded everyone that that the Board right now was only considering a minor subdivision.

The Chairman opened the meeting to the public at 7:20 P.M. to speak on the application. No one wished to speak therefore the Chairman closed the meeting to the public.

Kathryn Gregory asked about the outline of the exterior of the building and if the bump out was going to be eliminated. Mr. Wecht said that was correct.

There is no variance involved and no revision to the site plan. Applicant is only seeking minor subdivision with no variances or changes.

Motion was made by Mr. Malakoff and seconded by Mr. Philomey.

Vote

| | |
|---|---|
| Ms. Borman | Yes |
| Mr. Philomey | Yes |
| Mr. Malakoff | Yes |
| Mrs. Kelley | Yes |
| Acting Mayor Vidal | Yes |
| Mr. Levine | Yes |
| Mr. Candelmo | Yes |
| Chairman O'Connor | Yes |

Application was approved.

Chairman opened the meeting to the public.  No one wished to be heard.  Chairman closed the meeting to the public.

Motion to Adjourn was made by John Candelmo and seconded by Emma Kelley at 7:23 PM

Respectfully,

Deborah Reilly
Acting Planning Board Secretary

3 28-11

PLANNING BOARD
BOROUGH OF EDGEWATER
EDGEWATER, NEW JERSEY

The Regular meeting was held Monday, February 28, 2011.

Open Public Meetings act read by the Chairman

Pledge of Allegiance

ROLL CALL

MEMBERS PRESENT                    ALSO PRESENT:
Mr. Candelmo                       Mark Peck - Attorney
Mrs. Kelley                        Kathryn Gregory - Planner
Ms. Borman                         Dan Kauffman – Engineer
Mr. Philomey
Mr. Levine
Mr. Malakoff
Chairman O'Connor

Mark Peck, Attorney swore in member Peter Philomey.

Public Hearing AT & T Sign application
Alison Kauffman on behalf of AT&T Mobility
Property at 45 River Road   Bloc 99- Lot 112
Building K

Variance – no new construction

Ms. Olson Testimony – Service Select Signs
Expert in Signs
Works at Service Select Signs for 14 years has testified in past as expert in signage and
has been accepted as expert.

Exhibit A1 – original application

Pg 1 of 4 – sign awning has already been approved and installed.

First sign 15.1 sq. ft. front of building

3 additional awnings are being requested tonight with to have 3' letterset  Bump out that
side of building. Propose orange sign is color scheme of the corporate standard.

Mrs. Olsen said existing sign is facing River Road but cannot be seen at a further distance away.

Applicant is requesting an amended site plan approval and variance relief with respect to signage only in that building. No construction is proposed at this time, there are no new structures.

Chairman said no sign facing River Road. Applicant confirmed no sign facing River Road. Iris Borman said the first sign is approved and John Candelmo said the Existing sign is permitted under code. The new signs are why they are before the board.

Ms. Olson advised they were looking for 3 signs in total.

Applicant advised the signs would be illuminated with LED which could be placed on a timer and if that was a problem they can be turned off at a certain time.

Testimony – Elizabeth Leheny of Phelps Price is a licensed planner.
The board accepts this testimony.

Site is Building K – 100' in front of River road – renovated.

Variances requested:  maximum #1 – permitted
                  Requesting 2 additional signs 1 – West and 1 – South

2' is permitted, proposed signs are 2 ¾ x 2' and 1 is 9' x 2 1/8'
Maximum letter size permitted is 2'. The proposed signs are 2' x 4 ¼ '
Depth permitted is 6' and the signs proposed are to be 8". Applicant wants signs to be recognizable to the public. Building is set back 100' from River Road.

Ms. Gregory advised the difference would be the maximum height it would be a linear sign.

Mr. Candelmo said it is not the amount of signs. The ordinance states one sign per building unless you are on different roadway. They are not on different roads but parking areas which is not really permitted by our ordinance.

Mr. Candelmo AT&T sign is similar in size to the Moe's Grill. AT & T is looking to put them on multiple elevations.

The only sign up right now is on the right of the building.

Proposed signs will be just wall mounted signs. No proposing any free standing signs. They are all wall signs.

The difference between the large sign and exists is 54 sq. ft. and the proposed sign is 57 sq. ft. with a 6' globe.

Chairman asked what other tenants would be in the building besides
Moe's and the applicant advised there would be 2 additional tenants. The board was
concerned how all the signs would infringe on the other tenants. Each tenant would need
to come before board for their own signage. Linda Farrell said the sign of the sign would
set precedent for other stores.

Mr. Philomey suggested making 2 signs and getting rid of the third sign. Is there room to
have the 2 signs a little bit bigger and not have a third. Applicant advised the Globe is
proportion to the area and give good brand recognition. South elevation AT&T is the
only tenant with entrance on that side of building.

Ms. Borman spoke about setting a precedent for the rest of the property this is not what
was approved; and if each application erodes the original intent of that property. If the
signs are approved it will set the precedent for every other tenant.

Mr. Philomey motioned for the small sign not 9' signed. He was concerned about the
large globe. Sign is 6' feet and putting globe on top would then be 9'. Applicant would
consider bringing out to 5', they would prefer to have stacked signs rather than linear.
Mr. Malakoff seconded this motion.

Ms. Borman advised board is trying to stay within the original i park plan and thinks 2
signs is enough.

Applicant said they get rid of the small sign over the door and keep the larger sign on
sign of building with the globe of 5' would bring to less than 2' letter set.

Mr. Philomey according to site plan they don't need huge signs. Only seeing the signs
within the development and 2 signs more than adequate, Mr. Malakoff agreed.

Motion is to permit to add to the existing sign a twin the existing sign is on south façade
and this is on the west façade without permitted and denying the larger globe and at&t
proposed for the south façade.

Vote for Motion is as follows:
Ms. Borman --  Yes
Mr. Philomey --  Yes
Mr. Malakoff -  Yes
Mrs. Kelley    - No
Mrs. Farrell   -  No
Mr. Levine    -  No
Mr. Candelmo -  No
Chairman O'Connor - No.

Motion failed.

They need sign on South and West but they don't need over kill.
Chairman suggests put the globe there, which is their emblem remove sign over door.
The applicant would eliminate the variance if the sign was 5'.

Mr. Levine motioned to approve an addition sign to the south side with the reduction of
the globe logo to be a 5x5 globe with proportionately reduced lettering to be approx. 2' in
height seconded by Mrs. Farrell.

Vote:
Ms. Borman –    No
Mr. Philomey –  Yes
Mr. Malakoff -  No
Mrs. Kelley    - Yes
Mrs. Farrell    Yes
Mr. Levine      Yes
Mr. Candelmo    Yes
Chairman O'Connor -Yes

Amended application approved.

Open to the public and was closed to the public

Chairman announced there was nothing pending yet for the next meeting. Any items to
be deemed complete must be received by March 14, 2011 or it will be scheduled for the
April meeting.

Motion to adjourn was made by Mr. Maloff and seconded by Mrs. Farrell
Resolution

Respectfully,

Deborah Reilly
Acting Planning Board Secretary
$\supset$ - $\supset S$ -( /

PLANNING BOARD
BOROUGH OF EDGEWATER
EDGEWATER, NEW JERSEY

The Regular Re-organization meeting was held Monday, January 24, 2011.

Open Public Meetings act read by the Chairman

Roll Call

Member Present                        Also Present:
Mr. Candelmo                              Mark Peck - Attorney
Mrs. Kelley                               Dan Kaufman – Neglia Engineering
Mrs. Farrell
Ms. Borman
Mr. Levine
Councilman Vidal
Mayor Merse
Mr. Malakoff
Chairman O'Connor

Pledge of Allegiance

### REORGANIZATION

The Board Attorney Mark Peck Esq. swore in the newly appointed members of the board:
John Candelmo – Class II appointment
Councilman Vidal
Mayor Merse

A motion was made by Howard Levine to nominate Kevin O'Connor Chairman.
and seconded by Iris Borman. The board all voted yes to accept with Chairman O'Connor
abstaining.

A motion was made by Kevin O'Connor to nominate Howard Levine for Vice Chairman
and seconded Jay Malakoff. The board all voted yes to accept.  The attorney explained
procedures to appointing professionals.

A motion was made by Howard Levine to nominate Neglia Engineers as the Board
Engineer, and seconded by Iris Borman. The board all voted yes.

A motion was made to nominate Gregory Associates as the Board Planner, by
Councilman Vidal and seconded by Linda Farrell. The board all voted yes.

A motion was made to nominate Mark Peck from the firm of Florio, Perrucci, Steinhardt and Fader the board attorney, by Howard Levine and seconded by Iris Borman. The board all voted yes, with the exception of the Mayor and the Chairman who both abstained.

A motion was made by Howard Levine to nominate Annamarie O'Connor the Board Secretary, and seconded by Jay Malakoff. The board all voted yes with Chairman O'Connor abstaining.

**Meeting dates for 2011 are as follows:**

| February 28 | May 23 | August 22 | November 24 |
|---|---|---|---|
| March 28 | June 27 | September 26 | December 12 |
| April 25 | July 25 | October 24 | January 23, 2012 |

Items for completeness: i Park – the applicant is not ready due to a miscommunication.

Open to the public no one present wished to speak therefore Chairman closed the meeting to the public

A motion was made to adjourn at 7:48

Respectfully Submitted,

Deborah Reilly, for Annamarie O'Connor
Acting Secretary

$1-24-11$

# EXHIBIT E



## BOROUGH OF EDGEWATER
MUNICIPAL BUILDING
55 RIVER ROAD
EDGEWATER, NEW JERSEY 07020
Phone (201) 943-1700
Facsimile (201) 943-9242

July 17, 2013

Ms. Lynn Ward
Mr. Joseph Cotter
i.Park Edgewater LLC
485 West Putnam Avenue
Greenwich, CT 06830

Re:  Proposed Amendments to the Unilever Redevelopment Plan

Dear Lynn and Joe,

The Mayor and Council again had an opportunity to discuss your proposed amendments to the Unilever Redevelopment Plan at their July 15, 2013 Council meeting.

Prior to these amendments being considered further, the Borough would like the following outstanding items addressed:

1.  Proportional contribution to pump station #4 upgrades.  Albeit that you have recognized this obligation as well as establishing a June 14, 2013 date for payment conditional on the start of work, it is getting to the point whereby the agreed upon amount should be finalized and placed in an escrow account so that funds can be used for this purpose.
2.  Borough Hall LEEDS Certification.  It was i.Park who proposed this for the site and your architect, builder, and the Borough's architect spent a considerable amount of time and money to submit a LEEDS application with a hopeful certification.  As of this date, no application has been made and the building is not LEEDS certified.
3.  Affordable Housing.  The Borough wishes to remain proactive with the developments obligation of affordable housing and would like details of how and when this component will be satisfied?
4.  A $350,000 contribution to the emergency communications radio system of the Borough of Edgewater's emergency services.  This payment is to be made no later than June 14, 2014.

Please address these four issues so that we may proceed in a timely manner.

Sincerely,

Gregory S. Franz
Administrator

cc: Mayor and Council
     Philip Boggia, Esq.
     Kathryn Gregory, PP
     Dan Kaufman, PE
     Paul Kaufman, Esq.
     John Candelmo
     Edgewater Planning Board

# EXHIBIT F

# KAUFMAN, SEMERARO & LEIBMAN, L.L.P.

PAUL C. KAUFMAN
MARK J. SEMERARO (NJ & NY BAR)
MARC E. LEIBMAN (NJ & NY BAR)

JAIME R. PLACEK (NJ, NY & NE BAR)
JUSTIN D. SANTAGATA (NJ & NY BAR)
ALLYSON M. KASETTA (NJ & NY BAR)
BRYAN P. REGAN (NJ, NY & CA BAR)
CLAY D. SHORROCK (NJ & NY BAR)

OF COUNSEL
DAVID R. GELBERT

ATTORNEYS AT LAW
FORT LEE EXECUTIVE PARK
TWO EXECUTIVE DRIVE
SUITE 530
FORT LEE, N.J. 07024
TELEPHONE: 201. 947.8855
FACSIMILE: 201. 947.2402

www.NewJerseyFirm.com

WOOLWORTH BUILDING
233 BROADWAY, SUITE 2370
NEW YORK, N.Y. 10279
TELEPHONE: (212) 987-4000

REPLY TO:
NEW JERSEY

July 22, 2013

VIA EMAIL ONLY
Gregory S. Franz, Administrator
Borough of Edgewater
Municipal Building
55 River Road
Edgewater, New Jersey 07020

Re:    i.Park Redevelopment Project
       Block 99 Lot 1 (the "Redevelopment Area")

Dear Mr. Franz:

I reviewed with my client your letter of July 17, 2013.    Please inform the Governing Body of the following:

1.    Our understanding is that i.Park has yet to receive the cost estimate for this project as well as the estimate of its proportionate contributive share.   i.Park will place in escrow the amount as soon as received and agreed.

2.    I am informed that i.Park's architect is in the process of compiling the remaining documentation needed for the LEED Certification and the application will be filed in the near future.

3.    i.Park has entered into a contract with an experienced affordable housing developer.   We are informed that construction of the affordable housing building will commence within six (6) to eight (8) months and that this developer will be in contact with you promptly following site plan approval for the affordable housing building (which will promptly follow adoption of the amended redevelopment Plan).

Gregory S. Franz, Administrator
Borough of Edgewater
July 22, 2013
Page 2


     4.    This payment is not due until June 14, 2014 and will be made in a timely manner.

     I hope the above adequately responds to the Governing Body's questions and concerns.

     Please feel free to contact me if you have any further questions.

Very truly yours,

PAUL KAUFMAN

PK/jr
Enc.
cc:    Mayor and Council
       Philip N. Boggia, Esq.
       Kathryn Gregory, PP
       Daniel Kaufman, PE
       John Candelmo
       Edgewater Planning Board
       i.Park Edgewater LLC

# EXHIBIT G



John S. Hogan
Bergen County Clerk

**Bergen County Clerk**
One Bergen County Plaza
Hackensack, NJ 07601
(201) 336-7000
www.bergencountyclerk.org



INSTRUMENT # 15-011822

V 01866 0895

RECORDED DATE: 02/19/2015 02:22:52 PM

| | |
|---|---|
| **Document Type:** Deed > 350,000 | **Transaction #:** 6822379 |
| | **Document Page Count:** 7 |
| | **Operator Id:** CLERK |

**RETURN TO:**

MAIN STREET TITLE & SETTLEMENT SVCS LLC
190 MAIN ST
SUITE 306
HACKENSACK  NJ
07601

**SUBMITTED BY:**

| PRIMARY NAME | SECONDARY NAME |
|---|---|
| I PARK EDGEWATER LLC | 45 RIVER ROAD ASSOCIATES LLC |

**ASSOCIATED DOCUMENT(S):**

MUNICIPALITY: EDGEWATER
CONSIDERATION AMT:  $400,000.00
LOT:  1.19
BLOCK: 99

FEES / TAXES:

| | |
|---|---|
| Recording Fee: Deed > 350,000 | $40.00 |
| Additional Pages Fee | $60.00 |
| Basic Fee - County | $400.00 |
| Basic Fee - State | $1,000.00 |
| N.J.A.H.T.F Fee | $375.00 |
| P.H.P.F Fee | $200.00 |
| E.A.A. Fee | $520.00 |
| General Purpose Fee | $720.00 |
| Homeless Trust Fund - Bergen County | $3.00 |
| Total: | $3,318.00 |

**INSTRUMENT #:** 15-011822
Recorded Date: 02/19/2015 02:22:52 PM

I hereby CERTIFY that this document is recorded
in the Clerk's Office in Bergen County, New
Jersey.

John S. Hogan
Bergen County Clerk

OFFICIAL RECORDING COVER PAGE

Page 1 of 8

# PLEASE DO NOT DETACH
THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

```
Consideration        : $400,000.00
Realty Transfer Fee  : $3,215.00
State Portion        : $2,240.00
County Portion       : $600.00
Municipality Portion : $375.00
```

Prepared by:

BY: _____

PAUL KAUFMAN, ESQ.

15-011822    Deed > 350,000
V Bk: 01866 Pg: 0895-0902    Rec. Fee $103.00
John S. Hogan, Bergen County Clerk
Recorded 02/19/2015  02:22:52 PM

**DEED**

This Deed is made on February 10, 2015

BETWEEN **i.PARK EDGEWATER, LLC,** a Delaware limited liability company, by i.Park Edgewater Holdings LLC (Managing Member) by i.Park Edgewater Investments Inc. (Managing Member) having an address at c/o National Re/Sources, 485 West Putnam Avenue, Greenwich, Connecticut 06830, referred to as the Grantor,

AND       **45 RIVER ROAD ASSOCIATES, LLC,** having an address at 1000 Portside Drive, Edgewater, New Jersey 07020, referred to as the Grantee.

The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

**Transfer of Ownership**. The Grantor grants and conveys (transfers ownership of) the property described below to the Grantee. This transfer is made for the sum of FOUR HUNDRED THOUSAND AND ONE and 00/100THS ($400,000.00) DOLLARS. The Grantor acknowledges receipt of this money.

**Tax Map Reference**. (N.J.S.A. 46:15-2.1) Municipality of Edgewater, Block No. 99, Lot 1.19

[ ]    No property tax identification number is available on the date of this deed. (Check box if applicable)

**Property**. The property consists of the land and all the buildings and structures on the land in the BOROUGH of EDGEWATER, COUNTY of BERGEN and the STATE of NEW JERSEY.

### See Schedule A attached hereto.

Being a portion of the property conveyed to the Grantor herein by Deed from Conopco, Inc., d/b/a Unilever Research and Development-Edgewater, a New York Corporation, dated August 30, 2004, recorded October 20, 2004 in Deed Book 8736, Page 290 and subdivided from the remainder of the parcel by Subdivision Map 9582 recorded in the Office of the Bergen County Clerk on August 21, 2014.

The conveyance is subject to the following:

I.   Riparian Grants

    1.    From the State of New Jersey to Colby And Company Incorporated dated
February 27, 1902 and recorded April 13, 1904 in Deed Book 580, Page 104 as
amended by grant dated June 30, 1904 and recorded July 22, 1904 in Deed
Book 586, Page 118.

    2.    From the State of New Jersey to The New York Transit Company, dated
June 27, 1901 and recorded May 17, 1937 in Deed Book 2062, Page 598 also
recorded in Liber O page 21.

    3.    From the State of New Jersey to Lever Brothers Company recorded
January 30, 1985 in Deed Book 6896, Page 777 also recorded as Liber X-6 page
102.

    4.    From the State of New Jersey to Lever Brothers Company recorded
March 8, 1985 in Deed Book 6905, page 36 also recorded as Liber X-6 page
186.

    5.    From the State of New Jersey to Waterfront Improvement Co. dated April
14, 1904 and recorded in Liber P of the State Grants as Page 75.

    6.    From the State of New Jersey to Martin and Lynes, dated March 30, 199
and recorded in Liber M of State Grants at page 556.

II.   Agreement between James Pyle and Sons and the Borough of Edgewater dated
     June 14, 196 and recorded in Deed Book 940, Page 24 and the oil line right of
     way as shown on tax map of the Borough of Edgewater.

III.   The easements shown on Filed Maps # 9154, #9512, #9540, #9542 and #9582.

IV.   All Easements and Restrictions set forth on the attached scheduled.

V.   Right of Way Utility Grants as set forth in Deed Book V1097, Page 483 and Deed
    Book 6848, Page 648.

VI.   Declaration of Covenants and Restrictions as set forth in Deed Book V1725,
     Page 1962 as the same may be now or hereafter lawfully amended from time to
     time.

VII.   Restrictions/Easements as set forth in Deed Book V1725, Page 1911 and Deed
      Book 4133, Page 206.

VIII.   Deed Notices:

1. Deed Notice Remedial Action Area #2 dated October 2, 2012 by i.Park Edgewater LLC and Edgewater Lofts, LLC recorded in Deed Book V1562, Page 1368.

2. Deed Notice Remedial Action Area #2 dated October 9, 2012 by i.Park Edgewater LLC and Edgewater Lofts, LLC recorded in Deed Book V1211, Page 1996.

3. Deed Notice Remedial Action Area #2 dated October 9, 2012 by i.Park Edgewater LLC and Edgewater Lofts, LLC recorded in Deed Book V1211, Page 2010.

4. Deed Notice Remedial Action Area #1 dated October 2, 2012 by i.Park Edgewater LLC, One Main Street Edgewater LLC, Two Main Street Edgewater LLC, Three Main Street Edgewater LLC, Four Main Street Edgewater LLC and Edgewater Lofts, LLC recorded in Deed Book V1211, Page 2054.

IX.   The Amended and Restated Redevelopment Plan for the Unilever Redevelopment Area dated August 2013 adopted by the Borough of Edgewater by Ordinance 1503-2014 on April 21, 2014 (the "Amended Redevelopment Plan").   Grantee shall not use the Property for any purpose other than the construction and development of 75 affordable housing units consistent with the Amended Redevelopment Plan, without the express written consent of Grantor so long as Grantor, or any entity affiliated with Grantor owns any portion of the Unilever Redevelopment Area.   For such purposes, an affiliated entity shall mean any entity related to Grantor as parent, subsidiary or with similar principals such that the entity shall be a controlled group as determined under Section 1563 of the Internal Revenue Code, as amended, and the regulations promulgated thereunder.

**Promises by Grantor**.  The Grantor promises that the Grantor has done no act to encumber the property except as otherwise set forth in this Deed.  This promise is called a "covenant as to grantor's acts" (N.J.S.A. 46:4-6).  This promise means that the Grantor has not allowed anyone else to obtain any legal rights which affect the property (such as by making a mortgage or allowing a judgment to be entered against the Grantor).

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK

**Signatures.**   This Deed is signed and attested to by the Grantor's proper corporate officers as of the date at the top of the first page. Its corporate seal is affixed.

WITNESS:

I.PARK EDGEWATER, LLC
By: i.Park Edgewater Holdings LLC,
Managing Member
By: i.Park Edgewater Investments,
Inc., Managing Member

By:
Name: JOSEPH COTTER
Title: Managing Member

### ACKNOWLEDGEMENT

STATE OF ~~CONNECTICUT~~ *New York*            :
COUNTY OF ~~FAIRFIELD~~ *Westchester*    :ss.
            :

I certify that on February *10*, 2015, JOSEPH COTTER personally came before me and this person acknowledged under oath, to my satisfaction, that (i) this person is the Manager of i.Park Edgewater LLC, the limited liability company named in the within document; (ii) that this document was signed and delivered by the limited liability company as its voluntary act and deed; and (ii) (c) made this Deed for: $400,00.00 as the full and actual consideration paid or to be paid for the transfer of title. (Such consideration is defined in N.J.S.A. 46:15-5.)

DANIEL SCHUYLER
Notary Public, State of New York
No. 01SC5084025
Qualified in Orange County
Commission Expires Aug. 25, *2017*

**RECORD & RETURN TO:**

MAIN STREET TITLE & SETTLEMENT SERVICES, LLC
190 MAIN STREET
SUITE-305
HACKENSACK, NEW JERSEY 07601
 A++N: NATOR

All that certain lot, parcel or tract of land, situate and lying in the Borough of Edgewater, County of Bergen and State of New Jersey being more particularly described as follows:

BEING known and designated as Lot 1.19, Block 99 as shown on map entitled "I.Park Edgewater, LLC, Proposed Lot 1.14 Subdivision Block 99, Lots 1.04, 1.11, 1.13 & 1.15 to 1.19, Borough of Edgewater, Bergen County, New Jersey filed on August 21, 2014 as Map No. 9582.

BEGINNING at the northeasterly corner of Proposed Lot 1.19, said point being the following two (2) courses from the northwesterly corner of Lot 1.14, Block 99 as shown on a map entitled "Proposed Lot 1.14 Subdivision Block 99, Lot 1, Borough of Edgewater, Bergen County, New Jersey" filed in the Bergen County Clerk's Office on October 6, 2010, Filed Map No. 9540.

a)    South 30 degrees 00 minutes 57 seconds West a distance of 262.91 feet to a point; thence

b)    North 59 degrees 59 minutes 03 seconds West a distance of 35.00 feet to the point of beginning, and running thence

1)    South 30 degrees 00 minutes 57 seconds West a distance of 173.04 feet to a point; thence

2)    North 59 degrees 59 minutes 03 seconds West a distance of 75.48 feet to a point; thence

3)    North 30 degrees 00 minutes 57 seconds East a distance of 173.04 feet to a point; thence

4)    South 59 degrees 59 minutes 03 seconds East a distance of 75.48 feet to the point of BEGINNING.

**The above description is drawn in accordance with a survey made by Paulus, Sokolowski and Sartor, LLC, dated January 23, 2015.**

FOR INFORMATIONAL PURPOSES ONLY: Also known as Parts of Lots 1, 3, 4 & 5 (Lot 1.19 not a matter of record) in Block 99 on the Borough of Edgewater Tax Map.

FOR INFORMATIONAL PURPOSES ONLY: BEING COMMONLY KNOWN AS 45 River Road, Edgewater, NJ 07020



GIT/REP-3
(5-12)

State of New Jersey
## SELLER'S RESIDENCY CERTIFICATION/EXEMPTION
(C.55, P.L. 2004)

(Please Print or Type)

**SELLER(S) INFORMATION (See Instructions, Page 2)**

Names(s)
I.PARK EDGEWATER LLC

Current Resident Address:
Street: 485 West Putnam Avenue

| City, Town, Post Office | State | Zip Code |
|---|---|---|
| Greenwich | CT | 06830 |

**PROPERTY INFORMATION (Brief Property Description)**

| Block(s) | Lot(s) | Qualifier |
|---|---|---|
| 99 | 1.16 | |

Street Address:
45 River Road

| City, Town, Post Office | State | Zip Code |
|---|---|---|
| Edgewater | NJ | 07020 |

| Seller's Percentage of Ownership | Consideration | Closing Date |
|---|---|---|
| 100% | 900000.00 ¬ 400 000 00 | 2/10/2015 |

**SELLER ASSURANCES (Check the Appropriate Box)  (Boxes 2 through 10 apply to Residents and Non-residents)**

1. ☐ I am a resident taxpayer (individual, estate, or trust) of the State of New Jersey pursuant to N.J.S.A. 54A:1-1 et seq. and will file a resident gross income tax return and pay any applicable taxes on any gain or income from the disposition of this property.

2. ☐ The real property being sold or transferred is used exclusively as my principal residence within the meaning of section 121 of the federal Internal Revenue Code of 1986, 26 U.S.C. s. 121.

3. ☐ I am a mortgagor conveying the mortgaged property to a mortgagee in foreclosure or in a transfer in lieu of foreclosure with no additional consideration.

4. ☐ Seller, transferor or transferee is an agency or authority of the United States of America, an agency or authority of the State of New Jersey, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Government National Mortgage Association, or a private mortgage insurance company.

5. ☒ Seller is not an individual, estate or trust and as such not required to make an estimated payment pursuant to N.J.S.A.54A:1-1 et seq.

6. ☐ The total consideration for the property is $1,000 or less and as such, the seller is not required to make an estimated payment pursuant to N.J.S.A. 54A:5-1-1 et seq.

7. ☐ The gain from the sale will not be recognized for Federal income tax purposes under I.R.C. Section 721, 1031, 1033 or is a cemetery plot. (CIRCLE THE APPLICABLE SECTION). If such section does not ultimately apply to this transaction, the seller acknowledges the obligation to file a New Jersey income tax return for the year of the sale (see instructions).

    ☐ No non-like kind property received.

8. ☐ Transfer by an executor or administrator of a decedent to a devisee or heir to effect distribution of the decedent's estate in accordance with the provisions of the decedent's will or the intestate laws of this state.

9. ☐ The property being sold is subject to a short sale instituted by the mortgagee, whereby the seller has agreed not to receive any proceeds from the sale and the mortgagee will receive all proceeds paying off an agreed amount of the mortgage.

10. ☐ The deed being recorded is a deed dated prior to the effective date of P.L. 2004, c. 55 (August 1, 2004), and was previously unrecorded.

**SELLER(S) DECLARATION**

The undersigned understands that this declaration and its contents may be disclosed or provided to the New Jersey Division of Taxation and that any false statement contained herein could be punished by fine, imprisonment, or both. I furthermore declare that I have examined this declaration and, to the best of my knowledge and belief, it is true, correct and complete. By checking this box ☐ I certify that the Power of Attorney to represent the seller(s) has been previously recorded or is being recorded simultaneously with the deed to which this form is attached.

| | |
|---|---|
| 2/10/2015    2/10/2015 | |
| Date | Signature |
| | (Seller) Please indicate if Power of Attorney or Attorney in Fact |
| | |
| Date | Signature |
| | (Seller) Please indicate if Power of Attorney or Attorney in Fact |

RTF-1 (Rev. 7/14/10)
MUST SUBMIT IN DUPLICATE

STATE OF NEW JERSEY
AFFIDAVIT OF CONSIDERATION FOR USE BY SELLER
(Chapter 49, P.L.1968, as amended through Chapter 33, P.L. 2006) (N.J.S.A. 46:15-5 et seq.)
BEFORE COMPLETING THIS AFFIDAVIT, PLEASE READ THE INSTRUCTIONS ON THE REVERSE SIDE OF THIS FORM.

| STATE OF NEW JERSEY | | FOR RECORDER'S USE ONLY |
|---|---|---|
| | SS. County Municipal Code | Consideration $ 400,000.00 |
| COUNTY | 0213 | RTF paid by seller $ |
| | | Date 2-19-15 By |

MUNICIPALITY OF PROPERTY LOCATION  EDGEWATER      *Use symbol "C" to indicate that fee is exclusively for county use.

(1) PARTY OR LEGAL REPRESENTATIVE *(Instructions #3 and #4 on reverse side)*

Deponent,   JOSEPH COTTER                being   duly   sworn   according   to   law   upon   his/her   oath,
            (Name)
deposes and says that he/she is the  CORP OFFICER                in a deed dated                           transferring
(Grantor, Legal Representative, Corporate Officer, Officer of Title Company, Lending Institution, etc.)

real property identified as Block number 89                Lot number  1.19                        located at

45 RIVER ROAD, EDGEWATER, NEW JERSEY                                    and      annexed      thereto.
            (Street Address, Town)

(2) CONSIDERATION $    400,000.00 *(Instructions #1 and #5 on reverse side)* ☐ no prior mortgage to which property is subject.

(3) Property transferred is Class 4A    4B    4C (circle one). If property transferred is Class 4A, calculation in Section 3A below is required.

(3A) REQUIRED CALCULATION OF EQUALIZED VALUATION FOR ALL CLASS 4A (COMMERCIAL) PROPERTY TRANSACTIONS:
*(Instructions #5A and #7 on reverse side)*
Total Assessed Valuation ÷ Director's Ratio = Equalized Assessed Valuation

$         ÷        89.46% = $
If Director's Ratio is less than 100%, the equalized valuation will be an amount greater than the assessed value. If Director's Ratio is equal to or in
excess of 100%, the assessed value will be equal to the equalized valuation.

(4) FULL EXEMPTION FROM FEE *(Instruction #8 on reverse side)*
Deponent states that this deed transaction is fully exempt from the Realty Transfer Fee imposed by C. 49, P.L. 1968, as amended through
C. 66, P.L. 2004, for the following reason(s). Mere reference to exemption symbol is insufficient. Explain in detail.


(5) PARTIAL EXEMPTION FROM FEE *(Instruction #9 on reverse side)*
NOTE: All boxes below apply to grantor(s) only. ALL BOXES IN APPROPRIATE CATEGORY MUST BE CHECKED. Failure to do so will
void claim for partial exemption. Deponent claims that this deed transaction is exempt from State portions of the Basic, Supplemental, and
General Purpose Fees, as applicable, imposed by C. 176, P.L. 1975, C. 113, P.L. 2004, and C. 66, P.L. 2004 for the following reason(s):

A.    SENIOR CITIZEN    Grantor(s) ☐ 62 years of age or over.*(Instruction #9 on reverse side for A or B)
B.  ⌠ BLIND PERSON    Grantor(s) ☐ legally blind or; *
    ⌡ DISABLED PERSON Grantor(s) ☐ permanently and totally disabled ☐ receiving disability payments ☐ not gainfully employed*

    Senior citizens, blind persons, or disabled persons must also meet all of the following criteria:
    ☐ Owned and occupied by grantor(s) at time of sale.        ☐ Resident of State of New Jersey.
    ☐ One or two-family residential premises.                  ☐ Owners as joint tenants must all qualify.

    *IN CASE OF HUSBAND AND WIFE, PARTNERS IN A CIVIL UNION COUPLE, ONLY ONE GRANTOR NEED QUALIFY IF TENANTS BY THE ENTIRETY.

C.    LOW AND MODERATE INCOME HOUSING *(Instruction #9 on reverse side)*
    ☐ Affordable according to H.U.D. standards.        ☐ Reserved for occupancy.
    ☐ Meets income requirements of region.             ☐ Subject to resale controls.

(6) NEW CONSTRUCTION *(Instructions #2, #10, #12 on reverse side)*

    ☐ Entirely new improvement.                ☐ Not previously occupied.
    ☐ Not previously used for any purpose.     ☐ "NEW CONSTRUCTION" printed clearly at top of first page of the deed.

(7) RELATED LEGAL ENTITIES TO LEGAL ENTITIES *(Instructions #5, #12, #14 on reverse side)*

    ☐ No prior mortgage assumed or to which property is subject at time of sale.
    ☐ No contributions to capital by either grantor or grantee legal entity.
    ☐ No stock or money exchanged by or between grantor or grantee legal entities.

(8) Deponent makes this Affidavit to induce county clerk or register of deeds to record the deed and accept the fee submitted herewith in
accordance with the provisions of Chapter 49, P.L. 1968, as amended through Chapter 33, P.L. 2006.

Subscribed and sworn to before me
this 10th day of February, 2015          Signature of Deponent

                                         485 West Putnam Avenue
                                         Deponent Address

                                         xxx-xxx- 6   1   7
                                         Last three digits in Grantor's Social Security Number

| | I.PARK EDGEWATER LLC |
|---|---|
| | Grantor Name |
| | Greenwich, CT 06830 |
| | Grantor Address at Time of Sale |
| | Name/Company of Settlement Officer |

DANIEL SCHUYLER
Notary Public, State of New York
No. 01SC6024025
Qualified in Orange County
Commission Expires Aug. 25, 2012
County recording officers shall forward one copy of each RTF-1 form when Section 3A is completed to:

| FOR OFFICIAL USE ONLY | |
|---|---|
| Instrument Number | County |
| Deed Number | Book        Page |
| Deed Dated | Date Recorded |

STATE OF NEW JERSEY
PO BOX 251
TRENTON, NJ 08695-0251
ATTENTION: REALTY TRANSFER FEE UNIT

The Director of the Division of Taxation in the Department of the Treasury has prescribed this form as required by law, and it may not be altered or
amended without prior approval of the Director. For information on the Realty Transfer Fee or to print a copy of this Affidavit, visit the Division's website at:
www.state.nj.us/treasury/taxation/ipt/localtax.shtml.

# EXHIBIT H

Site Plan of the iPark
Redevelopment dated
August 20, 2014

Available upon Request

# EXHIBIT I



Block 99, Lots depicted above

# EXHIBIT J



# EXHIBIT K





INSTRUMENT # 17-030710

V 02587 1018

RECORDED DATE: 04/13/2017 08:33:49 AM

John S. Hogan
Bergen County Clerk

Bergen County Clerk
One Bergen County Plaza
Hackensack, NJ 07601
(201) 336-7000
www.bergencountyclerk.org

| | |
|---|---|
| **Document Type:**   Deed > 1,000,000 | Transaction #: 7432708 |
| | Document Page Count: 7 |
| | Operator Id: CLERK |

| RETURN TO: | SUBMITTED BY: |
|---|---|
| MAIN STREET TITLE & SETTLEMENT SVCS LLC<br>190 MAIN ST<br>SUITE 306<br>HACKENSACK NJ 07601 | |

| PRIMARY NAME | SECONDARY NAME |
|---|---|
| EDGEWATER LOFTS LLC | JULIA  CHIANG |

**ASSOCIATED DOCUMENT(S):**

MUNICIPALITY: EDGEWATER
CONSIDERATION AMT:  $1,600,000.00
LOT:  1.14
BLOCK:  99

FEES / TAXES:

| Realty Transfer Fee: | $16,835.00 |
|---|---|
| State Portion: | $12,260.00 |
| County Portion: | $2,400.00 |
| Municipality Portion: | $2,175.00 |
| 1% Grantee Fee: | $16,000.00 |
| Recording: | $103.00 |

Total:                $32,938.00

INSTRUMENT #: 17-030710
Recorded Date: 04/13/2017 08:33:49 AM

I hereby CERTIFY that this document is recorded
in the Clerk's Office in Bergen County, New
Jersey.



John S. Hogan
Bergen County Clerk

## OFFICIAL RECORDING COVER PAGE

Page 1 of 8

# PLEASE DO NOT DETACH
THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

NOTE: If document data differs from cover sheet, document data always supersedes.
*COVER PAGE DOES NOT INCLUDE ALL DATA, PLEASE SEE INDEX AND DOCUMENT FOR ANY ADDITIONAL INFORMATION.

|||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||

17-030710    Deed > 1,000,000
V Bk: 02587 Pg: 1018-1025    Rec. Fee $103.00
John S. Hogan, Bergen County Clerk
Recorded 04/13/2017  08:33:49 AM

Prepared by:

PAUL KAUFMAN

Consideration          : $1,600,000.00
Realty Transfer Fee   : $16,835.00
State Portion          : $12,260.00
County Portion         : $2,400.00
Municipality Portion  : $2,175.00
1% Grantee Fee         : $16,000.00

## UNIT DEED

THIS DEED is made this 4th day of April 2017 between **Edgewater Lofts LLC**, a Delaware limited liability company, having an office at 485 West Putnam Avenue, Greenwich, Connecticut 06830, referred to in this document as "Grantor", and **JULIA CHIANG and DAVID CHIANG, H/W**, about to reside at 9 Somerset Lane, **Unit 320**, Edgewater, New Jersey 07020 referred to in this document as "Grantee". (The words "Grantor" and "Grantee" include all Grantors and all Grantees under this Deed.)

In return for the payment to the Grantor by the Grantee of **ONE MILLION, SIX HUNDRED THOUSAND AND 00/100THS ($1,600,000.00)** Dollars, the Grantor grants and conveys to the Grantee a certain unit, located in the Borough of Edgewater, County of Bergen and State of New Jersey, specifically described as follows:

**Unit 320** situated in Edgewater Pearl Condominium, together with an undivided **0.7258** percentage interest in the Common Elements of the Condominium (the "Unit"), as same may be adjusted in the future as allowed by the Master Deed for Edgewater Pearl Condominium. The conveyance evidenced by this Deed is made under the provisions of and is subject to the New Jersey Condominium Act (N.J.S.A. 46:8B-I *et seq.*) and the Planned Real Estate Development Full Disclosure Act (N.J.S.A. 45:22A-21 *et seq.*), as amended, and any applicable regulations adopted under either law. The conveyance evidenced by this Deed is also made in accordance with the terms, limitations, conditions, covenants, restrictions, easements, agreements and other provisions set forth in the Master Deed for Edgewater Pearl Condominium, dated July 2, 2014 and recorded on July 3, 2014, in the Office of the Bergen County Clerk in Deed Book V Bk 1700, at Page 1892, as amended in Deed Book V-1960, Page 68; Deed Book V-2046, Page 800; Deed Book V-2060, Page 206 and Deed Book V-2156, Page 1828 as same may now or hereafter be lawfully amended, and all its exhibits, including all easements, terms, conditions, reservations, rights-of-way, air rights, covenants of record, governmental statutes, ordinances and regulations, possible added assessments for the year of sale as set or levied under N.J.S.A. 54:4-63.1 *et seq.* and all facts that an accurate survey may disclose.

The Unit is now designated as Lot 1.14 CB220, Block 99 on the municipal tax map of the Borough of Edgewater.

This Deed entitles the Grantee to have and to hold for its proper use and benefit forever the premises and all it is subject to as described in this document.

The Grantor covenants that the Grantor has done nothing which encumbers or adversely affects title to the Unit or the Common Elements of the Condominium.

By the acceptance of this Deed, the Grantee consents to any future amendments, supplements and/or revisions (from now on collectively called "amendments") of the Master Deed for Edgewater Pearl Condominium, the Certificate of Incorporation of

Edgewater Pearl Condominium Association, Inc., the By-laws of Edgewater Pearl Condominium Association, Inc. and/or the Rules and Regulations of Edgewater Pearl Condominium Association, Inc. (from now on collectively called the "Condominium Governing Documents"), which are required: (a) in order to incorporate any future phases into the Edgewater Pearl Condominium (from now on called the "Condominium"); (b) which are (a) required by applicable statutes, regulations, ordinances, resolutions, or orders of any governmental or quasi-governmental agency having jurisdiction over the Condominium; (b) required by any title insurance company selected by the Grantor to insuring or proposing to insure title to any Unit(s) within the Condominium, lands that are proposed for incorporation or are incorporated as part of the Condominium; or (c) required by any Institutional Lender owning, holding, servicing, insuring, guaranteeing or proposing to provide, own, hold, service, insure, guarantee or acquire a first mortgage loan, the lien of which will encumber (a) Unit(s) within the Condominium.

If an amendment is required for any one of the reasons- described above, then the Grantee expressly agrees that the Grantor is authorized, on behalf of the Grantee, to sign and record any document necessary to make the amendment, supplement or revision effective. This authority is called a power of attorney and the Grantor, in exercising this authority, is referred to as the Grantee's attorney-in-fact. By signing this Deed, the Grantee designates the Grantor as having this authority. This power of attorney will be binding upon anyone who claims an interest in the Unit by or through the Grantee, such as a mortgagee, other lienholders, a purchaser, a tenant or someone with an interest acquired through a will or by operation of law. If an amendment is required for one of the reasons expressed, only the signature of the attorney-in-fact is required in order for the amendment to be effective. The Grantor may not, however, exercise its authority as attorney-in-fact without a separate written consent of the Grantee if the amendment adversely affects the value or substantially alters the floor plan of any Unit, or changes the percentage of the undivided interest in the Common Elements appurtenant to any Unit, or substantially increases the nature of the financial obligations of an Owner, or reserves any additional or special privileges for the Sponsor not previously reserved.

The Grantee declares and acknowledges that this power of attorney is coupled with an interest in the subject matter. The Grantee understands that the Grantor has caused the Condominium's governing documents to be adopted and recorded and that same are binding on the owners of all Units in the Condominium for the mutual benefit of the owners of all Units including the Grantor. The Grantor, as the Sponsor of the Condominium, the initial seller of all Units and the present owner of Units has an interest in the Condominium and in the amendment of the Condominium's governing documents under the circumstances described. For this reason, this power of attorney may not be revoked by the Grantee.

The power of attorney will be effective for a period of ten (10) years from the date the first Unit is conveyed to an individual purchaser or until the Grantor conveys title to the last Unit to an individual purchaser, whichever is the first to occur. This power of attorney shall not be affected by the death or disability of any principal.

The Grantor has received the full payment from the Grantee.
This Deed is signed by the Grantor and the Grantee on the date first mentioned above.

WITNESS:

GRANTOR:
EDGEWATER LOFTS LLC
By: i.Park Edgewater LLC
By: i.Park Edgewater Holdings LLC,
    Managing Member
By: i.Park Edgewater Investments, Inc.,
    Managing Member

BY: _____
    JOSEPH COTTER, President

WITNESS

GRANTEE:

_____
                                David Chiang
_____
    JULIA CHIANG

CERTIFICATE OF ACKNOWLEDGMENT BY INDIVIDUAL

STATE OF CONNECTICUT )
                     ) SS.:
COUNTY OF FAIRFIELD  )

I am a _Notary Public_, an officer authorized to take acknowledgments and proofs in this State. I sign this acknowledgment below to certify that it was made before me.

I certify that on March _29_, 2017, JOSEPH COTTER personally came before me and they acknowledged under oath, to my satisfaction, that (i) he is the President of i.Park Edgewater Investments, Inc., a Delaware Corporation, the managing member of i.Park Edgewater Holdings, LLC, a Delaware limited liability company, the managing member of I.Park Edgewater, LLC, the managing member of Edgewater Lofts, LLC, (the "Limited Liability Company") (ii) that this document was signed and delivered by the limited liability company as its voluntary act and deed; and (iii) made this Deed for: $1,600,000.00 as the full and actual consideration paid or to be paid for the transfer of title. (Such consideration is defined in N.J.S.A. 46:15-5.)

ROSEMARIE HUGHES
Notary Public, State of Connecticut
My Commission Expires July 31, 2020

CERTIFICATE OF ACKNOWLEDGMENT BY INDIVIDUAL

STATE OF NEW JERSEY )
                     ) SS.:
COUNTY OF BERGEN     )

I am a _*attorney*_ , an officer authorized to take acknowledgments and proofs in this State. I sign this acknowledgment below to certify that it was made before me.

On April 4, 2017, JULIA CHIANG AND DAVID CHIANG, appeared before me in person. (If more than one person appears, the words "this person" shall include all persons named who appeared before the officer and made this acknowledgment.) I am satisfied that this person is the person named in and who signed this Deed as Grantee. This person acknowledged signing, sealing and delivering this Deed as this person's act and deed for the uses and purposes expressed in this Deed.

*RECORD & RETURN TO:*
Lauren B. DeCarlo, Esq.
Nazor, Cengarle & DeCarlo, LLC
190 Main Street, Suite 307
Hackensack, NJ 07601

LAUREN B. DECARLO
ATTORNEY AT LAW
STATE OF NEW JERSEY

RECORD & RETURN TO:
MAIN STREET TITLE & SETTLEMENT SERVICES, LLC
190 MAIN STREET
HACKENSACK, NEW JERSEY 07601

MS-92757

All that certain lot, parcel or tract of land, situate and lying in the Borough of Edgewater, County of Bergen and State of New Jersey being more particularly described as follows:

KNOWN AND DESIGNATED AS Unit 320 situated in Edgewater Pearl Condominium, A Condominium, together with an undivided 0.7258 percentage interest in the Common Elements appurtenant thereto, in accordance with and subject to the terms, limitations, conditions, covenants, restrictions and other provisions of the Master Deed of Edgewater Pearl Condominium dated July 2, 2014 and recorded on July 3, 2014 in the Bergen County Clerk's/Register's Office, in Deed Book V1700 Page 1892; First Amendment dated April 29, 2015 and recorded June 9, 2015 in Deed Book V1960 Page 69; Second Amendment dated August 20, 2015 and recorded September 10, 2015 in Deed Book V2046 Page 800; Third Amendment dated August 20, 2015 and recorded September 25, 2015 in Deed Book V2060 Page 206 and Fourth Amendment dated December 4, 2015 and recorded January 13, 2016 in Deed Book V2156 Page 1828 and following, and any amendments or supplements subsequent thereto.

FOR INFORMATIONAL PURPOSES ONLY: Also known as Lot 1.14 CB320 in Block 99 on the Borough of Edgewater Tax Map.

FOR INFORMATIONAL PURPOSES ONLY: BEING COMMONLY KNOWN AS 9 Somerset Lane, Unit 320, Edgewater, NJ 07020

State of New Jersey
**SELLER'S RESIDENCY CERTIFICATION/EXEMPTION**

GIT/REP-3
(9-2015)

(Please Print or Type)

**SELLER'S INFORMATION**

Name(s)

EDGEWATER LOFTS LLC

Current Street Address

485 W PUTNAM AVE

| City, Town, Post Office Box | State | Zip Code |
|---|---|---|
| GREENWICH | CT | 06830 |

**PROPERTY INFORMATION**

| Block(s) | Lot(s) | Qualifier |
|---|---|---|
| 99 | 1.14 | CB320 |

Street Address
9 SOMERSET LANE, UNIT 320

| City, Town, Post Office Box | State | Zip Code |
|---|---|---|
| EDGEWATER | NJ | 07020 |

| Seller's Percentage of Ownership | Total Consideration | Owner's Share of Consideration | Closing Date |
|---|---|---|---|
| 100% | 1,600,000.00 | 100% | ~~3/30/2017~~ 4-41 2017 |

**SELLER'S ASSURANCES (Check the Appropriate Box) (Boxes 2 through 14 apply to Residents and Nonresidents)**

1. ☐ Seller is a resident taxpayer (individual, estate, or trust) of the State of New Jersey pursuant to the New Jersey Gross Income Tax Act, will file a resident gross income tax return, and will pay any applicable taxes on any gain or income from the disposition of this property.

2. ☐ The real property sold or transferred is used exclusively as a principal residence as defined in 26 U.S. Code section 121.

3. ☐ Seller is a mortgagor conveying the mortgaged property to a mortgagee in foreclosure or in a transfer in lieu of foreclosure with no additional consideration.

4. ☐ Seller, transferor, or transferee is an agency or authority of the United States of America, an agency or authority of the State of New Jersey, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Government National Mortgage Association, or a private mortgage insurance company.

5. ☒ Seller is not an individual, estate, or trust and is not required to make an estimated gross income tax payment.

6. ☐ The total consideration for the property is $1,000 or less so the seller is not required to make an estimated income tax payment.

7. ☐ The gain from the sale is not recognized for federal income tax purposes under 26 U.S. Code section 721, 1031, or 1033 (CIRCLE THE APPLICABLE SECTION). If the indicated section does not ultimately apply to this transaction, the seller acknowledges the obligation to file a New Jersey income tax return for the year of the sale and report the recognized gain.
☐ Seller did not receive non-like kind property.

8. ☐ The real property is being transferred by an executor or administrator of a decedent to a devisee or heir to effect distribution of the decedent's estate in accordance with the provisions of the decedent's will or the intestate laws of this State.

9. ☐ The real property being sold is subject to a short sale instituted by the mortgagee, whereby the seller agreed not to receive any proceeds from the sale and the mortgagee will receive all proceeds paying off an agreed amount of the mortgage.

10. ☐ The deed is dated prior to August 1, 2004, and was not previously recorded.

11. ☐ The real property is being transferred under a relocation company transaction where a trustee of the relocation company buys the property from the seller and then sells the house to a third party buyer for the same price.

12. ☐ The real property is being transferred between spouses or incident to a divorce decree or property settlement agreement under 26 U.S. Code section 1041.

13. ☐ The property transferred is a cemetery plot.

14. ☐ The seller is not receiving net proceeds from the sale. Net proceeds from the sale means the net amount due to the seller on the settlement sheet.

**SELLER'S DECLARATION**

The undersigned understands that this declaration and its contents may be disclosed or provided to the New Jersey Division of Taxation and that any false statement contained herein may be punished by fine, imprisonment, or both. I furthermore declare that I have examined this declaration and, to the best of my knowledge and belief, it is true, correct and complete. By checking this box ☐ I certify that a Power of Attorney to represent the seller(s) has been previously recorded or is being recorded simultaneously with the deed to which this form is attached

3-29-17
_____
Date

_____
Signature
(Seller) Please indicate if Power of Attorney or Attorney in Fact

_____
Date

_____
Signature
(Seller) Please indicate if Power of Attorney or Attorney in Fact

RTF-1EE (Rev. 12/09)
MUST SUBMIT IN DUPLICATE

STATE OF NEW JERSEY

**AFFIDAVIT OF CONSIDERATION FOR USE BY BUYER**
(Chapter 49, P.L.1968, as amended through Chapter 33, P.L. 2006) (N.J.S.A. 46:15-5 et seq.)
PLEASE READ THE INSTRUCTIONS ON THE REVERSE SIDE OF THIS FORM BEFORE COMPLETING THIS AFFIDAVIT

STATE OF NEW JERSEY

|  |  |
|---|---|
| COUNTY  Bergen | SS. County Municipal Code 0213 |

FOR RECORDER'S USE ONLY

Consideration $ _____
RTF paid by buyer $ _____
Date _____ By : _____

MUNICIPALITY OF PROPERTY LOCATION   Edgewater

(1) <u>PARTY OR LEGAL REPRESENTATIVE</u> *(See Instructions #3 and #4 on reverse side)*

X X X - X X - X 753
Last three digits in grantee's Social Security Number

Deponent,   Julia Chiang   being   duly   sworn   according   to   law   upon   his/her   oath,
(Name)

deposes and says that he/she is the Grantee in a deed dated 4-4-17 transferring
(Grantee, Legal Representative, Corporate Officer, Officer of Title Company, Lending Institution, etc.)

real property identified as Block number 99.   Lot number 1.14 Qual CB320   located at

9 Somerset Lane, Unit 320, Edgewater   and   annexed   thereto.
(Street Address, Town)

(2) <u>CONSIDERATION</u>  $ 1,800,000.00   *(See Instructions #1, #5, and #11 on reverse side)*

Entire consideration is in excess of $1,000,000:

PROPERTY CLASSIFICATION CHECKED OR CIRCLED BELOW IS TAKEN FROM OFFICIAL ASSESSMENT LIST (A PUBLIC RECORD) OF MUNICIPALITY WHERE THE REAL PROPERTY IS LOCATED IN THE YEAR OF TRANSFER. REFER TO N.J.A.C. 18:12-2.2 ET SEQ.
(A) Grantee required to remit the 1% fee, complete (A) by checking off appropriate box or boxes below.

☑ Class 2 - Residential     ☐ Class 4A - Commercial properties
☐ Class 3A - Farm property (Regular) and any other real            (if checked, calculation in (E) required below)
property transferred to same grantee in conjunction     ☐ Cooperative unit (four families or less) (See C. 46:8D-3.)
with transfer of Class 3A property                                 Cooperative units are Class 4C.

(B) Grantee is <u>not</u> required to remit 1% fee (one or more of following classes being conveyed), complete (B) by checking off appropriate box or boxes below.

☐ Property class. Circle applicable class or classes:       1       3B       4B       4C       15
Property classes: 1-Vacant Land; 3B- Farm property (Qualified); 4B- Industrial properties; 4C- Apartments; 15- Public Property, etc. (N.J.A.C. 18:12-2.2 et seq.)
☐ Exempt organization determined by federal Internal Revenue Service/Internal Revenue Code of 1986, 26 U.S.C. s. 501.
☐ Incidental to corporate merger or acquisition; equalized assessed valuation less than 20% of total value of all assets
exchanged in merger or acquisition. If checked, calculation in (E) required and MUST ATTACH COMPLETED RTF-4.

(C) When grantee transfers properties involving block(s) and lot(s) of two or more classes in one deed, one or more subject to the 1% fee (A), with one or more than one not subject to the 1% fee (B), pursuant to N.J.S.A. 46:15-7.2, complete (C) by checking off appropriate box or boxes and (D).

☐ Property class. Circle applicable class or classes:   1   2   3B   4A   4B   4C   15

(D) EQUALIZED VALUE CALCULATION FOR ALL PROPERTIES CONVEYED, WHETHER THE 1% FEE APPLIES OR DOES NOT APPLY
Total Assessed Valuation ÷ Director's Ratio = Equalized Valuation

Property Class _____   $ _____ ÷ _____ % = $ _____

Property Class _____   $ _____ ÷ _____ % = $ _____

Property Class _____   $ _____ ÷ _____ % = $ _____

Property Class _____   $ _____ ÷ _____ % = $ _____

(E) REQUIRED EQUALIZED VALUE CALCULATION FOR ALL CLASS 4A (COMMERCIAL) PROPERTY TRANSACTIONS: (See Instructions #6 and #7 on reverse side)

Total Assessed Valuation ÷ Director's Ratio =       Equalized Value

$ _____ ÷ _____ % = $ _____

If Director's Ratio is less than 100%, the equalized valuation will be an amount greater than the assessed valuation. If Director's Ratio is equal to or exceeds 100%, the assessed valuation will be equal to the equalized value.

(3) <u>TOTAL EXEMPTION FROM FEE</u> *(See Instruction #8 on reverse side)*
Deponent states that this deed transaction is fully exempt from the Realty Transfer Fee imposed by C. 49, P.L. 1968, as amended through Chapter 33, P.L. 2006, for the following reason(s). Mere reference to exemption symbol is insufficient. Explain in detail.

(4) Deponent makes **Affidavit of Consideration for Use** by Buyer to induce county clerk or register of deeds to record the deed and accept the fee submitted herewith pursuant to the provisions of Chapter 49, P.L. 1968, as amended through Chapter 33, P.L. 2006.

Subscribed and sworn to before me
this 4th day of April , 2017 .

Signature of Deponent
100 Winston Dr, Apt VP5
Cliffside Park NJ 07010
Deponent Address

LAUREN B. DECARLO
ATTORNEY AT LAW
STATE OF NEW JERSEY

Julia Chiang
Grantee Name
100 Winston Dr, Apt VP5
Cliffside Park NJ 07010
Grantee Address at Time of Sale
Main Street Title &
Settlement Services, LLC
Name/Company of Settlement Officer

County recording officers: forward one copy of each RTF-1EE to:

STATE OF NJ - DIVISION OF TAXATION
PO BOX 251
TRENTON, NJ 08695-0251
ATTENTION: REALTY TRANSFER FEE UNIT

FOR OFFICIAL USE ONLY
Instrument Number _____ County _____
Deed Number _____ Book _____ Page _____
Deed Dated _____ Date Recorded _____

The Director, Division of Taxation, Department of the Treasury has prescribed this form, as required by law. It may not be altered or amended without prior approval of the Director. For further information on the Realty Transfer Fee or to print a copy of this Affidavit or any other relevant forms, visit: www.state.nj.us/treasury/taxation/lpt/localtax.shtml.

# EXHIBIT L

Trautner, Thomas J.

| | |
|---|---|
| ɔm: | Linda Robinson <adminjrm@mariniellolaw.com> |
| ‐ent: | Thursday, November 19, 2015 1:09 PM |
| To: | Trautner, Thomas J. |
| Subject: | COAH - Edgewater |
| Attachments: | Vacant Land Inventory and Analysis Report.pdf; Inclusionary Redevelopment Summary of Built Projects - Edgewater COAH.pdf; Edgewater Fair Share Compliance Plan Summary.pdf; Summary of Plan for Total Fair Share Obligation-Edgewater.pdf; Project Narrative-Winterburn - Edgewater.pdf; Project Narrative -38 COAH Assoc. - Edgewater.pdf |

Dear Mr. Trautner: Enclosed please find the documents which were submitted by our Planner to the Master, Frank Banisch, pursuant to the Order of the Court.

Joseph R. Mariniello
(via Linda Robinson)

1

Edgewater

SUMMARY OF PLAN
FOR
TOTAL FAIR SHARE OBLIGATION

MUNICIPALITY: _____

COUNTY: Bergen

| | EST. OBLIG. | COMPLETED UNITS | PROPOSED UNITS | LOW | MOD | VERY LOW | TOTAL UNITS |
|---|---|---|---|---|---|---|---|
| Rehabilitation Share *(per 2010 Census)* | 0 | | | | | | |
| *Rehabilitation Credits* | | | | | | | |
| Rehab Program(s) | | | | | | | |
| *Remaining Rehabilitation Share* | 0 | | | | | | |
| | | | | | | | |
| 1987-1999 Prior Round Obligation *(1)* | 21 | | | | | | |
| *Vacant Land Adjustment (if applicable)* | | | | | | | |
| *Unmet Need* | 0 | | | | | | |
| *RDP* | 21 | | | | | | |
| *Mechanisms (2)* | | | | | | | |
| Prior Cycle Credits (4/1/80-12/31/86) | | | | | | | |
| Credits without Controls | | | | | | | |
| Inclusionary Zoning | | 5 | | 2 | 2 | 1 | 5 |
| 100% Affordable | | | | | | | |
| Accessory Apartments | | | | | | | |
| Write Down-Buy Down/Market-to-fordable | | | | | | | |
| Alternative Living/Supportive & Special Needs | | | | | | | |
| Assisted Living | | 5 | | 3 | | 2 | 5 |
| RCA Units (previously approved) | | | | | | | |
| Compliance Bonus | | 4 | | | | | 4 |
| Rental Bonuses | | 7 | | | | | 7 |
| *Total Prior Round Credits* | | 21 | | | | | 21 |
| *Units Addressing 1987-1999 Prior Round* | 21 | 21 | | | | | 21 |
| | | | | | | | |
| 1999-2015 GAP Period Estimate *(1)* | 225 | | | | | | |
| *Mechanisms (2)* | | | | | | | |
| *Vacant Land Adjustment (if applicable)* | | | | | | | |
| *Unmet Need* | | | | | | | |
| *RDP* | 225 | | | | | | |
| Inclusionary Zoning | | 76 | | 73 | 3 | | 76 |
| Redevelopment | | | 16 | TBD | TBD | TBD | 16 |
| 100% Affordable | | 39 | | 5 | 30 | 4 | 39 |
| Accessory Apartments | | | | | | | |
| Market-to-Affordable | | 12 | 6 | 6 | 6 | | 18 |
| Supportive & Special Needs/ Alternative ring | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Assisted Living | | 11 | | 11 | | | 11 |
| Extended Affordability Controls | | | | | | | |
| Other (describe on a separate sheet) | | | | | | | |
| Smart Growth Bonuses | | | | | | | |
| Redevelopment Bonuses | | | 5 | | | | 5 |
| Rental Bonuses | | 60 | | | | | 60 |
| *Total Third Round Credits* | 225 | 198 | 27 | | | | 225 |
| *Units Addressing 1999-2015 GAP period* | 225 | 198 | 27 | | | | 225 |
| 2015-2025 Third Round Obligation *(1)* | 71 | | | | | | |
| *Mechanisms* (2) | | | | | | | |
| *Vacant Land Adjustment (if applicable)* | 38 | | | | | | |
| *Unmet Need* | | | | | | | |
| *RDP* | 38 | | | | | | |
| Inclusionary Zoning | | 5 | | 5 | | | 5 |
| Redevelopment | | | 59 | TBD | TBD | TBD | 59 |
| 100% Affordable | | | 21 | TBD | TBD | TBD | 21 |
| Accessory Apartments | | | | | | | |
| Market-to-Affordable | | | | | | | |
| Supportive & Special Needs/ Alternative Living | | | | | | | |
| Assisted Living | | 17 | | 17 | | | 17 |
| Extended Affordability Controls | | | | | | | |
| Other (describe on a separate sheet) | | | | | | | |
| Smart Growth Bonuses | | | | | | | |
| Redevelopment Bonuses | | | 19 | | | | 19 |
| Rental Bonuses | | 6 | 18 | | | | 18 |
| *Total Third Round Credits* | 145 | 23 | 117 | | | | 145 |
| *Units Addressing 2015-2025 Fair Share* | 145 | 23 | 117 | | | | 145 |

*(1) Identify the basis for asserting this number as the municipal obligation.*

*(2) Provide a description for each mechanism.*

| TOTALS | # | % OF TOTAL OBLIGATION |
|---|---|---|
| *LOW/MOD UNITS* | 163 | 51.42 |
| *VERY LOW INCOME* | 7 | 2.2 |
| *BONUS CREDITS* | 77 | 24.29 |
| *AGE-RESTRICTED* | 33 | 10.41 |
| *NOT AGE-RESTRICTED* | 137 | 43.22 |

Form #1 - October 6, 2015

Edgewater Fair Share Compliance Plan Summary
Narrative Section
November 2015

27 Dempsey Avenue
*Block 45, Lot 5.01*
*.4431 acres*
*Surrounding land uses:  Primarily various types of residential; some commercial/office/retail along River Road*
*Street Access:  Dempsey Avenue*
*Water capacity:*          *adequate*
*Sewer capacity:*          *adequate*
*Current Zoning:*          *SRH Senior Housing District*

Dempsey Avenue is a 100% affordable age-restricted multi-family development of 31 units.  This site is operated by the Edgewater Housing Authority.

38 COAH
*Block 74, Lot 1.02*
*1.36 acres*
*Surrounding land uses:  Hess tanks across Vreeland Road; open space (park dedicated by 38 COAH); strip mall across River Road; multi-family to northwest*
*Street Access:  Vreeland Road and River Road*
*Water capacity:*          *adequate*
*Sewer capacity:*          *adequate*
*Current Zoning:*          *R-4 Multi-Family Residential*

38 COAH is a 100% affordable 39-unit multi-family development consisting of 100% rental family units. These units are fully built and occupied.

Waterford Towers
*Block 91.01, Lot 1.01; Block 92, Lot 1.01*
*3.09 acres; 3.13 acres (total of 6.22 acres)*
*Surrounding land uses:  a mix of commercial, multi-family, and mixed uses*
*Street Access:*          *Old River Road and River Road*
*Water capacity:*          *adequate*
*Sewer capacity:*          *adequate*
*Current Zoning:*          *R-5 High-_Rise Residential District*

Waterford Towers is an inclusionary development located on River Road.  The development is built and occupied and contains 75 family affordable units.  These are built and fully occupied with COAH income-eligible households.

iPark/ Unilever
*Block 99, Lots 1, 2, 4, and 5*
*48.68 acres (23.1 acres of uplands; 26 acres of Riparian land)*

*Surrounding land uses: Offices uses to the north; retail, office, and residential across River Road*
*Street Access: River Road*
| | |
|---|---|
| *Water capacity:* | *adequate* |
| *Sewer capacity:* | *adequate* |
| *Current Zoning:* | *Redevelopment Plan* |

iPark is a mixed-use development that was subject to a Redevelopment Plan prepared by the Borough. The development was approved in early 2008. The development residential component consists of 495 total units, of which 75 are affordable to low- and moderate-income persons. All the units in the development are family units. All of the units will be rental units. The COAH units are part of an overall Redevelopment Plan for the area. The plan is scheduled to be implemented in phases. It is projected that the COAH units will be built within the next 3 years.

341 Undercliff Avenue
*Block 61, Lot 20*
*.0849 acres*
*Surrounding land uses: Single-, two-, and multi-family residential*
*Street Access: Undercliff*
| | |
|---|---|
| *Water capacity:* | *adequate* |
| *Sewer capacity:* | *adequate* |
| *Current Zoning:* | *R-2 Single- and Two-Family Residential* |

341 Undercliff contains 4 affordable housing units which have been affirmatively marketed and occupied by COAH income-eligible households. These units were purchased by the St. Moritz to provide for their affordable housing obligation.

Avalon Bay
*Block 74, Lot 1.01*
*700 River Road*
*7.64 acres*
*Surrounding land uses: Retail strip mall across River Road; post office across Russell Ave.; residential across Undercliff Ave.*
*Street Access: River Road; Russell Ave.*
| | |
|---|---|
| *Water capacity:* | *adequate* |
| *Sewer capacity:* | *adequate* |
| *Current Zoning:* | *R-4 Multi-Family Residential* |

Avalon Bay is a multi-family development consisting of 404 total units. 4 affordable rental family units were built on site and are fully occupied with income-qualified households.

AHome
*Block 50, Lot 4; Block 50, Lot 6*
*435 Undercliff Ave.; 437/439 Undercliff Ave.*
*.1074 acres; .0954 acres*
*Surrounding land uses: Single-, two-, and multi-family residential*
*Street Access: Undercliff Ave.*
| | |
|---|---|
| *Water capacity:* | *adequate* |
| *Sewer capacity:* | *adequate* |

*Current Zoning:*          *R-2 Single- and Two-Family Residential*

AHome is an 18 unit complex that is being converted to affordable housing units. Since 2008, 12 units have been renovated and sold to COAH income-eligible purchasers. Six (6) units remain to be renovated. It is expected these 6 units will be converted and sold to COAH income-eligible purchasers within the next 3 years.

15 Valley Place
*Block 35, Lot 21*
*.0717 acres*
*Surrounding land uses:  Residential*
*Street Access:  Valley Place*
*Water capacity:*          *adequate*
*Sewer capacity:*          *adequate*
*Current Zoning:*          *R-2 Single- and Two-Family Residential*

Valley Place is a 3-unit multi-family home that was purchased by Dan-Ro to meet its affordable housing obligation. This home has been rehabbed and provides 3 rental family units.

Winterburn Gardens
*Block 71, Lot 2.02 & portion of lot 27*
*acres*
*Surrounding land uses:  Hess tanks across Vreeland Road; open space (park dedicated by 38 COAH); strip mall across River Road; multi-family to northwest*
*Street Access:  Vreeland Road and River Road*
*Water capacity:*          *adequate*
*Sewer capacity:*          *adequate*
*Current Zoning:*          *R-4 Multi-Family Residential*

38 COAH is a 100% affordable 39-unit multi-family development consisting of 100% rental family units. These units are fully built and occupied.

300 Undercliff Avenue
*Block 63.01, Lot 1.02*
*.6524 acres*
*Surrounding land uses:  Single-, two-, and multi-family residential*
*Street Access:  Undercliff*
*Water capacity:*          *adequate*
*Sewer capacity:*          *adequate*
*Current Zoning:*          *R-2 Single- and Two-Family Residential*

300 Undercliff is a 100% affordable senior building that contains 22 units, of which 2 handicapped units have been credited and approved in the Round 2 Housing Plan. These units are all very-low income units.

Winterburn Gardens
*Block 71, Lot 2.02, portion of 27*
*acres*
*Surrounding land uses:  Post office; school; single-, two-and multi-family residential*

*Street Access:   Witnterburn Place*
*Water capacity:          adequate*
*Sewer capacity:          adequate*
*Current Zoning:          R-3 Multi-Family Residential*

Winterburn Gardens is a 100% affordable 21-unit multi-family development consisting of 100% rental family units. These units are currently under construction with an expected completion date of spring 2016.

# 100% Affordable Housing Project

*Summary of Project Status*

Project Name: Winterburn Gardens

MUNICIPALITY: Edgewater      Address: 15 Winterburn Avenue      COUNTY: Bergen

Block(s): 71      Lot(s): 2.02/ portion of lot 27      Current Zoning: R-3

Rezoning Needed: No      (Yes or No)

| Affordable Units | | | | | | Rental Bonuses | | Approvable (Status of local and State approvals) | Available (clear title?) | Number of Proposed Units by Project Site Suitability Criteria [3] | | | | Project Completion Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Low | | Moderate | | Very Low | Total Units | Age-Restricted | Not Age-Restricted | | | Developable | | | Suitable | # Built Units |
| AR[1] | NAR[2] | AR[1] | NAR[2] | | | | | | | Sewer | Water | Consistent w/WQMP | | |
| 9 | | | 9 | 3 | 21 | | 21 | Approved | yes | yes | yes | yes | yes | 21 |

Project Narrative:

Winterburn Gardens is a 100% affordable development consisting of 21 units in 4 stories, at a density of 43.75 du/ac. This project was approved in 2010 and is currently under construction.

(1)  Age-Restricted
(2)  Not Age-Restricted
(3)  Site suitability criteria are as follows:

"Approvable site" means a site that may be developed for low and moderate income housing in a manner consistent with the rules or regulations of all agencies with jurisdiction over the site. A site may be approvable although not currently zoned for low and moderate income housing. "Available site" means a site with clear title, free of encumbrances which preclude development for low and moderate income housing. "Developable site" means a site that has access to appropriate water and sewer infrastructure, and is consistent with the applicable areawide water quality management plan (including the wastewater management plan) or is included in an amendment to the areawide water quality management plan submitted to and under review by DEP. "Suitable site" means a site that is adjacent to compatible land uses, has access to appropriate streets and is consistent with the environmental policies delineated in N.J.A.C. 5:93-4.

Form #4 - October 6, 2015

# 100% Affordable Housing Project

## Summary of Project Status

Project Name: __38 COAH__

MUNICIPALITY: __Edgewater__    COUNTY: __Bergen__

Address: __1 Vreeland Terrace__    Block(s): __74__    Lot(s): __1.02__    Current Zoning: __R-4__

Rezoning Needed: __No__
(Yes or No)

| | Affordable Units | | | | | Rental Bonuses | | | Approvable (Status of local and State approvals) | Number of Proposed Units by Project Site Suitability Criteria [3] | | | | | | # Built Units |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Available (clear title?) | Developable | | | | Suitable | |
| | Low | | Moderate | | Very Low | Total Units | Age-Restricted | Not Age-Restricted | | | | Sewer | Water | Consistent w/WQMP | | |
| | AR[1] | NAR[2] | AR[1] | NAR[2] | | | | | | | | | | | | |
| | 4 | | 30 | | 4 | 39 | | 39 | Approved | yes | yes | yes | yes | yes | yes | 39 |

Project Narrative:

38 COAH is a 100% affordable development consisting of 39 units in 3 stories, at a density of 104 du/ac. This project was approved in 2008 and is currently fully occupied.

(1)  Age-Restricted
(2)  Not Age-Restricted
(3)  Site suitability criteria are as follows:

"Approvable site" means a site that may be developed for low and moderate income housing in a manner consistent with the rules or regulations of all agencies with jurisdiction over the site. A site may be approvable although not currently zoned for low and moderate income housing. "Available site" means a site with clear title, free of encumbrances which preclude development for low and moderate income housing. "Developable site" means a site that has access to appropriate water and sewer infrastructure, and is consistent with the applicable areawide water quality management plan (including the wastewater management plan) or is included in an amendment to the areawide water quality management plan submitted to and under review by DEP. "Suitable site" means a site that is adjacent to compatible land uses, has access to appropriate streets and is consistent with the environmental policies delineated in N.J.A.C. 5:93-4.

Form #4 - October 6, 2015

Inclusionary/Redevelopment
Summary of Built Projects

MUNICIPAL: Edgewater

COUNTY: Bergen

Total Affordable Units: 57

Total Affordable Credits: 28

(Provide a narrative description on a separate sheet and specify the number of completed units by affordability on the form below)

| Project or Site Name (1) | Block/ Lot(s) | Affordable Units Constructed | | | | | | Tenure (R-Rental or S-Sale) | Rental Bonuses | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Low (#/%) | | Moderate (#/%) | | Very Low (#/%) | | | | |
| | | AR (2) | NAR (3) | AR (2) | NAR (3) | AR (2) | NAR (3) | | AR (2) | NAR (3) |
| 27 Dempsey Avenue | 45/5.01 | 31 | | | | | | R | 5 | |
| 300 Undercliff | 63.01/1.02 | | | | | 2 | | R | 1 | |
| 341 Undercliff | 61/20 | | 2 | | 2 | | | R | | 4 |
| Avalon Bay | 74/1.01 | | 2 | | 2 | | 1 | R | | 1 |
| 15 Valley Place | 35/21 | | 1 | | 1 | | | R | 17 | |
| Waterford Towers | 92.01/1.01 & 92/1.01 | | 75 | | 6 | | | S | | |
| A-Home | 50/4 & 6 | | 6 | | | | | N/A | | |
| TOTALS | | 31 | 86 | 0 | 11 | 2 | 1 | N/A | 23 | 5 |

(1) Attach narrative description for each site.
(2) Age-Restricted
(3) Not Age-Restricted

Form #2 - October 6, 201

# Vacant Land Inventory and Analysis Report

Prepared for:



Edgewater Borough
Bergen County, New Jersey

October 28, 2015

Prepared By:



1460 Route 9 South
Howell, New Jersey 07731 (732)
462-7400

---

Jennifer Beahm, PP, AICP

License No. 5625

G:\Edgewater\2015 Vacant Land Analysis\Edgewater_Vacant Land Analysis\Report_28Oct2015.docx

I.   INTRODUCTION

As noted in N.J.A.C. 5:93, "there may be instances where a municipality can exhaust an entire resource (land, water or sewer) and still not be able to provide a realistic opportunity for addressing the need for low and moderate income housing." In recognition of the need to provide for the opportunity to adjust municipal affordable housing obligations, N.J.A.C. 5:93 outlines standards and procedures to demonstrate that a municipal response to its housing obligation is limited by lack of land, water or sewer. This report outlines the vacant land analysis methodology and summarizes the results of the vacant land analysis prepared on behalf of the Borough of Edgewater by CME Associates.

The Borough of Edgewater is an urban community located in Bergen County along the Hudson River. The Borough is near full build-out, and the majority of the Borough's development takes place via infill development and redevelopment opportunities. The Borough's Third Round Growth Share Housing Plan Element and Fair Share Plan, adopted in 2008, recognized the lack of sufficient vacant land in the Borough, and included a request for downward adjustment based on the Borough's land capacity.

Given the Borough's relative lack of vacant and developable land, the Borough's ability to satisfy its Court-determined affordable housing obligation is limited. To demonstrate the lack of vacant developable land in the Borough, the CME Associates has identified all vacant parcels through analysis of tax records and has listed each parcel on the vacant land inventory table in accordance with N.J.A.C. 5:93-4.2(b)(see Attachment A). A Vacant Land Map depicting vacant properties within the Borough is included as Attachment B. An existing land use map for the Borough has also been appended to this report as Attachment C in accordance with N.J.A.C. 5:93-4.2(a). This analysis reveals the Borough of Edgewater lacks the vacant and developable to accommodate its Prior Round and Third Round new construction obligations. There are a limited number of vacant parcels within the Borough that exhibit sufficient acreage to accommodate inclusionary development. Many of these parcels are constrained by steep slopes; while the Borough's largest vacant parcel is an EPA Superfund site that is undergoing extensive remediation. The remaining vacant parcels of adequate size have been entitled through prior development approvals or are developed properties that are listed vacant on the Borough's tax rolls.

After following the procedures for undertaking a vacant land analysis outlined in N.J.A.C. 5:93, the Borough's RDP for the prior round new construction obligation is zero (0) affordable units.

II.   PERMITTED EXCLUSIONS

N.J.A.C. 5:93 establishes criteria by which sites, or portions thereof, in a municipal land inventory may be excluded from a municipality's RDP. Environmentally sensitive areas, including flood hazard areas, areas within Environmentally Sensitive Planning Areas according to the State Plan Policy Map, areas outside of the Sanitary Sewer Service

Vacant Land

*Inventory and Analysis Report*
*Borough of Edgewater*

1

Area (SSA), wetlands, and areas characterized by steep slopes of greater than 15 percent that render a site unsuitable for affordable housing may be excluded from consideration. In addition, small, isolated lots lacking sufficient acreage to generate an affordable housing set-aside as part of an inclusionary development may also be excluded. Vacant lots under development or properties for which site plan approval has been granted may also be excluded. Finally, landlocked parcels or sites with limited or no access may also be excluded from the calculation of the Borough's RDP.

The vacant land inventory table in Attachment A provides a parcel-by-parcel description of exclusions that have been made pursuant to N.J.A.C. 5:93.

It should be noted that the Borough is permitted to reserve up to three percent of its total developed and developable acreage, less existing active municipal recreation areas, for active municipal recreation and exclude this acreage from consideration as potential sites for low and moderate income housing pursuant to N.J.A.C. 5:93-4.2(e)4. Any such site designated for active recreation in accordance with this section must be purchased and limited to active recreational purposes within one year of substantive certification. Although this calculation has not been completed as part of this analysis, the Borough reserves the right to revise this analysis to complete this calculation.

### III. Summary and Conclusion

Based on the procedures for municipal adjustments provided in N.J.A.C. 5:93, the Borough of Edgewater's Realistic Development Potential has been determined to be zero (0) affordable units. The Borough is almost fully developed and contains less than twenty (20) vacant properties of sufficient acreage to accommodate the development of affordable housing. Each of these properties may be excluded from the Borough's Realistic Development Potential due to the presence of steep slopes, environmental contamination, or prior development approvals as outlined in Attachment A contained herein.

2

## ATTACHMENT A: VACANT LAND INVENTORY
## TABLE

1

Vacant
Land

*Inventory and Analysis Report*
*Borough of Edgewater*

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 0211_17_1 | 17 | 2 | RIVER RD | VON DOHLN ENTERPRISES INC | RIVER RD | EDGEWATER, NJ | 0.2132 | Steep Slope Area/Less than 0.5 Acres |
| 0211_17_1.01 | 17 | 1.01 | RIVER ROAD | VON DOHLN ENTERPRISES INC | RIVER ROAD | EDGEWATER, NJ | 0.2597 | Steep Slope Area/Less than 0.5 Acres |
| 0211_2_4 | 2 | 4 | RIVER ROAD | CARDOSO, JOSE & GIAMPIETRO D | SHORE ROAD | EDGEWATER, NJ | 0.0513 | Less than 0.5 Acres |
| 0211_1_6 | 1 | 6 | RIVER ROAD | SCULLION, BRUCE V & JANET A | W 33RD AVE OAK [illegible] | OWASSO, OK | 0.3071 | Less than 0.5 Acres |
| 0211_21_1 | 21 | 1 | RIVER ROAD | RIVER RD ASSOC LLC | RIVER RD [illegible] | EDGEWATER, NJ | 0.2408 | Steep Slope Area/Less than 0.5 Acres |
| 0211_22_1 | 22 | 1 | RIVER ROAD | RIVER RD ASSOC LLC | RIVER RD [illegible] | EDGEWATER, NJ | 1.4234 | Steep Slope Area |
| 0211_23_5.01 | 23 | 5.01 | RIVER RD | RIVER LOOKOUT ASSOC LLC | RIVER RD [illegible] | EDGEWATER, NJ | 0.0433 | Less than 0.5 Acres |
| 0211_24.01_3.01 | 24.01 | 3.01 | UNDERCLIFF AVENUE | [illegible] | SHORE RD | EDGEWATER, NJ | 0.2512 | Steep Slope Area/Less than 0.5 Acres |
| 0211_24.02_3.03 | 24.02 | 3.03 | UNDERCLIFF AVENUE | KOK-MOSHE, JACOB (ETALS) | SHORE RD | EDGEWATER, NJ | 0.1317 | Steep Slope Area/Less than 0.5 Acres |
| 0211_25_1 | 25 | 1 | UNDERCLIFF AVE | UNDERCLIFF AVE LLC | C/O 328 CEDAR LN | TEANECK, NJ | 0.4363 | Steep Slope Area/Less than 0.5 Acres |
| 0211_3_1.01 | 3 | 1.01 | LEARY LANE | GONZALEZ, ROBERT J | DRAGON FLY DR | STROUDSBURG, PA | 0.2901 | Steep Slope Area/Less than 0.5 Acres |
| 0211_3_1.02 | 3 | 1.02 | LEARY LANE | GONZALEZ, ROBERT J | DRAGON FLY DR | STROUDSBURG, PA | 0.3211 | Steep Slope Area/Less than 0.5 Acres |
| 0211_33_1.01 | 33 | 1.01 | RIVER ROAD | S.O.S. DEVELOPMENT LLC | LILAC LN | PARAMUS, NJ | 0.1054 | Steep Slope Area/Less than 0.5 Acres |
| 0211_33_1.02 | 33 | 1.02 | STATE HIGHWAY | S.O.S. DEVELOPMENT LLC | LILAC LN | PARAMUS, NJ | 0.1756 | Steep Slope Area/Less than 0.5 Acres |
| 0211_34_26 | 34 | 26 | 1023-34 RIVER RD | MACIAS, PAMELA | HARRISON AVE | GARFIELD, NJ | 2.0168 | Steep Slope Area/Less than 0.5 Acres |
| 0211_34_41 | 34 | 41 | STATE HIGHWAY 5 | JACOBSON [illegible] | 1166-[illegible] RIVER ROAD | EDGEWATER, NJ | 0.0637 | Steep Slope Area/Less than 0.5 Acres |
| 0211_34_44 | 34 | 44 | STATE HIGHWAY | [illegible], GEORGE (ETALS) | BLUFF ROAD | FORT LEE, NJ | 0.035 | Steep Slope Area/Less than 0.5 Acres |
| 0211_34_47 | 34 | 47 | STATE HIGHWAY | [illegible] | PO BOX 421 | PALISADES PARK, NJ | 0.0461 | Steep Slope Area/Less than 0.5 Acres |
| 0211_34_31 | 34 | 31 | UNDERCLIFF AVE | SOUREK, DANIEL | UNDERCLIFF AVE | EDGEWATER, NJ | 0.0705 | Steep Slope Area/Less than 0.5 Acres |
| 0211_44_11 | 44 | 11 | HUDSON AVENUE | MATSUDA, [illegible] | HUDSON AVE | EDGEWATER, NJ | 0.0172 | Less than 0.5 Acres |
| 0211_45_5.01 | 45 | 5.01 | DEMPSEY AVENUE | EDGEWATER HOUSING ASSOC URBAN RENEW | UNDERCLIFF AVE | EDGEWATER, NJ | 0.4177 | Less than 0.5 Acres |
| 0211_46_3.04 | 46 | 3.04 | RIVER ROAD | WINDSOR AT MARINER'S TOWER, LLC | DEPT 337 PO BOX 4900 | SCOTTSDALE, AZ | 0.0745 | Less than 0.5 Acres |
| 0211_51_37 | 51 | 37 | DEMPSEY AVENUE | CSA REALTY INC C/O LILY [illegible] | PO BOX 316 | TENAFLY, NJ | 0.0644 | Less than 0.5 Acres |
| 0211_4_1 | 4 | 1 | RIVER ROAD | OPEN HOMES LLC | AVE @ PORT IMPERIAL BLVD | WEST NEW YORK, NJ | 0.0571 | Less than 0.5 Acres |
| 0211_5_1 | 5 | 1 | RIVER ROAD | OPEN HOMES LLC | AVE @ PORT IMPERIAL [illegible] | WEST NEW YORK, NJ | 0.0431 | Less than 0.5 Acres |
| 0211_50_41 | 50 | 41 | 374-378 RIVER RD | ESI MGMT | PO BOX 34 | EDGEWATER, NJ | 0.1121 | Less than 0.5 Acres |
| 0211_61_25 | 61 | 25 | OLDWOOD ROAD | [illegible], ULLRICH & SUSAN MURPHY | PO BOX 311 [illegible] | UNION DALE, PA | 4.074 | Steep Slope Area/Less than 0.5 Acres |
| 0211_7_2.01 | 7 | 2.01 | RIVER ROAD | DLE LLC | 15TH ST | FORT LEE, NJ | 0.1715 | Steep Slope Area/Less than 0.5 Acres |
| 0211_7_34 | 7 | 34 | [illegible] PALISADE | DOCETOR, [illegible] | PO BOX 372 | FORT LEE, NJ | 0.4406 | Steep Slope Area/Less than 0.5 Acres |
| 0211_7_6 | 7 | 6 | UNKNOWN | [illegible] COUNTY ESTATE | UNKNOWN | UNKNOWN | 0.3011 | Steep Slope Area |
| 0211_70_4.01 | 70 | 4.01 | RIPARIAN LAND | [illegible] TRUSTEE [illegible] | PO BOX 1414 | BINGHAMTON, NY | 0.0074 | Less than 0.5 Acres |
| 0211_71_2.03 | 71 | 2.03 | RIVER ROAD | RIVER RD ASSOC LLC | [illegible] DR | EDGEWATER, NJ | 0.4913 | Used Vacant but Developed with Residential Use |
| 0211_73_2 | 73 | 2 | GARDEN TERRACE | [illegible] | GARDEN TERR | EDGEWATER, NJ | 0.0154 | Steep Slope Area/Less than 0.5 Acres |
| 0211_75_1.01 | 75 | 1.01 | RIVER ROAD | MARKET PL @ EDGE LLC C/O CAPSTONE | RTE 17 STE 900 | PARAMUS, NJ | 3.5061 | Used Vacant but Developed with Commercial Use |
| 0211_75_2.01 | 75 | 2.01 | RIVER ROAD | MARKET PL AT EDGE LLC C/O CAPSTONE | RTE 17 STE 900 | PARAMUS, NJ | 5.0153 | Used Vacant but Developed with Commercial Use |
| 0211_77_1 | 77 | 1 | RIVER ROAD | JF 444 LLC | PO BOX 234 | [illegible]WOOD, NJ | 1.0914 | Prior Development Approval |
| 0211_78_11 | 78 | 11 | [illegible] | CARDONA, [illegible] | [illegible] | CLIFFSIDE PARK, NJ | 0.2509 | Steep Slope Area/Less than 0.5 Acres |
| 0211_78_1 | 78 | 1 | UNDERCLIFF AVE | [illegible] | PO BOX 1 | EDGEWATER, NJ | 0.3643 | Steep Slope Area/Less than 0.5 Acres |
| 0211_79_1 | 79 | 1 | EDGEWATER ROAD | 1000-1100 RIVER RD ASSOC LLC | [illegible] | EDGEWATER, NJ | 1.0992 | Steep Slope Area |
| 0211_79_2.01 | 79 | 2.01 | EDGEWATER ROAD | BAGHDADCHIAN, [illegible] & SILVA-[illegible] | [illegible] AVE | LEONIA, NJ | 3.0901 | Steep Slope Area/Less than 0.5 Acres |
| 0211_79_2.02 | 79 | 2.02 | EDGEWATER ROAD | [illegible] | HILLTOP TERRACE | CLIFFSIDE PARK, NJ | 0.1129 | Steep Slope Area/Less than 0.5 Acres |
| 0211_79_2.03 | 79 | 2.03 | EDGEWATER ROAD | COLLIGAZZO, GLORIA | FOX TER | CLIFFSIDE PARK, NJ | 0.3552 | Steep Slope Area/Less than 0.5 Acres |
| 0211_79_2.04 | 79 | 2.04 | EDGEWATER ROAD | [illegible] | E MAIN ST #155 | [illegible], NJ | 2.5139 | Steep Slope Area |
| 0211_79_3 | 79 | 3 | EDGEWATER ROAD | 07, USA | EDGEWATER RD | CLIFFSIDE PARK, NJ | 3.750 | Steep Slope Area |
| 0211_79_4 | 79 | 4 | EDGEWATER ROAD | [illegible] & LISA | EDGEWATER ROAD | CLIFFSIDE PARK, NJ | 2.4921 | Steep Slope Area |
| 0211_79_5 | 79 | 5 | EDGEWATER ROAD | [illegible] (ETAL) | EDGEWATER RD | CLIFFSIDE PARK, NJ | 3.3376 | Steep Slope Area/Less than 0.5 Acres |
| 0211_8_9 | 8 | 9 | [illegible] PALISADE TERRACE | [illegible] REALTY CORP | [illegible] BLVD | FORT LEE, NJ | 0.4512 | Steep Slope Area/Less than 0.5 Acres |
| 0211_85.01_1.01 | 85.01 | 1.01 | SOUTH RIVER ROAD | INDEPENDENCE HARBOR CONDO ASSOC | VALLEY RD SUITE 3 | MT ARLINGTON, NJ | 0.2354 | Riparian Grant/Less than 0.5 Acres |
| 0211_85.02_1.01 | 85.02 | 1.01 | RIVER ROAD | EDGEWATER ASSOCIATES | PO BOX 707 [illegible] | EDGEWATER, NJ | 0.8533 | Less than 0.5 Acres |
| 0211_85.03_4 | 85.03 | 4 | RIVER ROAD | NORTH STAR PARTNERS ASSOC LLC | ROADSIDE DR | EDGEWATER, NJ | 1.4175 | Prior Development Approval |
| 0211_85.02_5.01 | 85.02 | 5.01 | RIVER ROAD | NORTH STAR PTNRS ASSOC LLC | ROADSIDE DR | EDGEWATER, NJ | 2.643 | Prior Development Approval |
| 0211_86_28.01 | 86 | 28.01 | MOUNTAINSIDE OLD [illegible] | NYS [illegible] | [illegible] DEPT [illegible] AVE | COOPERSTOWN, NY | 0.3116 | Steep Slope Area/Less than 0.5 Acres |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 0213_M_20.03 | | 14 | 15.03 | MOUNTAIN SIDE OLD RR TURN | AURORA DEVELOPMENT PARTNERS LLC | NORTH RTE 303 STE 201 | CONGERS, NY | 0.3319 | Steep Slope Area/Less than 0.5 Acres | |
| 0213_M_20.01 | | 14 | 18.01 | MOUNTAIN SIDE OLD RR TURN | N Y S & W RR, ATTN: P FITCOLLR | A C DEPT 1 RAILROAD AVE | COOPERSTOWN, NY | 0.33 | Steep Slope Area/Less than 0.5 Acres | |
| 0213_M_20.06 | | 14 | 18.06 | OLD RIVER ROAD | SHERMAN, [illegible] | OLD RIVER RD | EDGEWATER, NJ | 2.0710 | Steep Slope Area/Less than 0.5 Acres | |
| 0213_M_21.31 | | 14 | 21.31 | OLD RIVER ROAD | ONOROZIAN, GEORGE | ELLWY ROAD | FORT LEE, NJ | 3.1144 | Steep Slope Area/Less than 0.5 Acres | |
| 0213_M_22.03 | | 14 | 22.03 | OLD RIVER ROAD | ONOROZIAN, GEORGE | [illegible] ROAD | FORT LEE, NJ | 3.2416 | Steep Slope Area/Less than 0.5 Acres | |
| 0213_M_3 | | 14 | 1 | OLD RIVER ROAD | CCA [illegible] HOLDING CO | PALISADE AVE [illegible] | FORT LEE, NJ | 1.7100 | Steep Slope Area | |
| 0213_M_13 | | 14 | 14 | OLD RIVER ROAD | [illegible] IMPROVEMENTS 1 LLC | [illegible] RD | FORT LEE, NJ | 0.3331 | Steep Slope Area/Less than 0.5 Acres | |
| 0213_M_22 | | 14 | 12 | OLD RIVER ROAD | FASCIANO, MAURICE | ROUTE 47 | [illegible]VILLE, NJ | 0.3124 | Steep Slope Area/Less than 0.5 Acres | |
| 0213_M_4.01 | | 14 | 4.01 | OLD RIVER ROAD | [illegible], LAURA A & LAWRENCE M | ESPLANADE PL | CLIFFSIDE PARK, NJ | 1.0914 | Steep Slope Area | |
| 0213_M_4.03 | | 14 | 4.03 | OLD RIVER RD HILLSIDE SO | THE ESPLANADE LLC | ESPLANADE PLACE | CLIFFSIDE PARK, NJ | 0.3602 | Steep Slope Area | |
| 0213_M_5.01 | | 14 | 5.01 | OLD RIVER RD HILLSIDE SO | CALABRESE, GERALD A & MARION | ESPLANADE PLACE | CLIFFSIDE PARK, NJ | 0.6131 | Steep Slope Area/Less than 0.5 Acres | |
| 0213_M_6 | | 14 | 6 | OLD RIVER ROAD | THOROZIAN, BRIAN & [illegible] | PALISADE AVE | FORT LEE, NJ | 0.099 | Steep Slope Area/Less than 0.5 Acres | |
| 0213_M_1.01 | | 19 | 1.01 | GORGE RD | GORGE RD ASSOC [illegible] PC | C/O [illegible] ROUTE 17 N | HASBROUCK HEIGHTS, NJ | 1.1171 | Steep Slope Area | |
| 0213_M_1.02 | | 19 | 1.02 | GORGE RD | PUBLIC SERVICE GAS & ELEC | PARK PL TAX 4B | NEWARK, NJ | 0.141 | Steep Slope Area/Less than 0.5 Acres | |
| 0213_M_1 | | 10 | 1 | GORGE ROAD | [illegible], MICHAEL & SYLVIA | PO BOX [illegible] | EDGEWATER, NJ | 0.5011 | Steep Slope Area | |
| 0213_M_11 | | 7 | 11 | OLD RIVER ROAD | OLD RIVER LLC | GORGE RD | EDGEWATER, NJ | 2.0661 | Steep Slope Area/Less than 0.5 Acres | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [illegible]_90_20 | 90 | 17 | OLD RIVER ROAD | HACKENSACK WATER CO(UNCT LOT TAX) | N TATUM BLVD | PHOENIX, AZ | 0.0743 | Steep Slope Area/Less than 0.5 Acres |
| [illegible]_90_21 | 90 | 14 | OLD RIVER ROAD | RIVER RD REALTY CO | PO BOX 18 | EDGEWATER, NJ | 0.0538 | Steep Slope Area/Less than 0.5 Acres |
| [illegible]_90_28 | 90 | 28 | GORGE ROAD | RIVER RD REALTY CO | PO BOX 18 | EDGEWATER, NJ | 0.0668 | Steep Slope Area/Less than 0.5 Acres |
| [illegible]_90_31 | 90 | 31 | GORGE RD | GORGE RD, LLC | GORGE RD | EDGEWATER, NJ | 0.2964 | Steep Slope Area/Less than 0.5 Acres |
| [illegible]_90_41.01 | 90 | 41.01 | GORGE RD | GORGE RD, LLC | GORGE RD | EDGEWATER, NJ | 0.2784 | Steep Slope Area/Less than 0.5 Acres |
| [illegible]_92.01_1.01 | 92.01 | 1.01 | GORGE RD | FAOLA FAMILY ASSOCIATES, LP | EDGEWATER AVE | RIDGEFIELD, NJ | 0.0141 | Less than 0.5 Acres |
| [illegible]_92.01_1.02 | 92.01 | 1.02 | GORGE RD | FAOLA FAMILY ASSOCIATES, LP | EDGEWATER AVE | RIDGEFIELD, NJ | 0.0662 | Less than 0.5 Acres |
| [illegible]_92.01_1 | 92.01 | 1 | GORGE RD | NYS&W RAILROAD ATTN N. STECKLER | [illegible] RAILROAD AVE | COOPERSTOWN, NY | 0.0431 | Less than 0.5 Acres |
| [illegible]_93_1 | 93 | 1 | OLD RIVER RD HILLSIDE RD | THE LEY LLC | RIVER RD SUITE 201 | EDGEWATER, NJ | 0.4134 | Less than 0.5 Acres |
| [illegible]_93_1 | 93 | 1 | RIVER ROAD | KING AVENUE LLC N THOMAS KIAGNEY | RIVER ROAD, STE 201 | EDGEWATER, NJ | 0.1173 | Less than 0.5 Acres |
| [illegible]_93_1.04 | 93 | 1.04 | RIVER ROAD | METROPOLITAN CONSOM LLC | PORTSIDE DR | EDGEWATER, NJ | 0.1462 | Less than 0.5 Acres |
| [illegible]_95_1 | 95 | 1 | RIVER ROAD | HUDSON RIVER ASSOC LLC | PORTSIDE DR | EDGEWATER, NJ | 1.2787 | [illegible] |

ATTACHMENT B: VACANT LAND MAPPING



ATTACHMENT C: EXISTING LAND USE MAP



Existing Land Use Map, 2015
Borough of Edgewater
Bergen County, New Jersey

# EXHIBIT M



Michael J. McPartland
Mayor

**BOROUGH OF EDGEWATER**
*Office of the Mayor*
55 RIVER ROAD
EDGEWATER, NEW JERSEY 07020

Phone (201) 943-1700 ~ Facsimile (201) 943-9242
Email: mayormcpartland@edgewaternj.org

January 9, 2017

Joseph Cotter, President
National Resources
485 West Putnam Avenue
Greenwich, CT 06830

Dear Mr. Cotter:

I am the Mayor of the Borough of Edgewater. During the course of our review of the Borough's Affordable Housing obligations, it came to our attention that construction on the Affordable Housing component of your development has yet to begin. This project has been moving forward for several years and yet the 75 units to be developed remain unconstructed.

I understand from discussions with the Borough Attorney that this failure is in contradiction to the statutes and regulations concerning the development of Affordable Housing in New Jersey and cannot continue. The Borough needs immediate updates and a schedule for construction on the affordable units. This would include specific dates for the start of construction and the anticipated completion of same.

Until such time as we are provided with this schedule and are comfortable with it, no further Certificates of Occupancy will be issued by the Borough. I am advising our Land Use Administrator, by copy of this letter, to hold all current and future applications for C.O.'s until they are further directed by the Mayor and Council. Please contact the undersigned at your earliest convenience to discuss this further.

Very truly yours,

Mayor Michael J. McPartland

cc:   Daibes Enterprises
      Gregory Franz, Borough Administrator
      John Condelmo, Land Use Administrator/Construction Code Official
      Joseph R. Mariniello, Esq.

# EXHIBIT N



D A I B E S    E N T E R P R I S E S

January 10, 2017

Borough of Edgewater
Office of the Mayor
55 River Road
Edgewater, N.J. 07020

Dear Mayor McPartland:

We are in receipt of a copy or your correspondence directed to Joseph Cotter
regarding the status of the Affordable Housing component of the iPark
Development and attendant approvals.
As you may be aware, the affordable housing component of the project has been
purchased by a Daibes Entity who has assumed the obligations attendant thereto
and will be developing the project.
Presently, as a result and the needs of the other remaining construction relative
to the project, the subject 'area' is needed for construction staging. We are in
process of preparing required plans for the project and anticipate making
application for Building Permits when completed.
If you require any additional information or documentation, please advise
accordingly.

Thank you.

Respectfully,

Berek Don

cc: Gregory Franz; John Condelmo; Joseph R. Mariniello Esq.
    Joseph Cotter

# EXHIBIT O

LAW OFFICES

# MARINIELLO & MARINIELLO, P.C.

COUNSELORS AT LAW
265 Columbia Avenue
Fort Lee, New Jersey  07024

JOSEPH R. MARINIELLO
jrmariniello@mariniellolaw.com

(201) 947-6600
Fax (201) 947-6605

JOSEPH R. MARINIELLO, JR.
jmariniello@mariniellolaw.com

January 13, 2017

**VIA OVERNIGHT COURIER**
Mr. Frank Banisch
Banisch Associates, Inc.
111 Main Street
Flemington, New Jersey 08822

Re:    In the Matter of Edgewater
        Dkt. No. BER L 6364-15

Dear Mr. Banisch:

Enclosed please find the discovery which the Borough of Edgewater agreed to provide
regarding its current COAH housing at the prior Case Management Conference.  I am
forwarding this as well to all of the parties in the lawsuit.  The documents include back up
documents as well as the spreadsheet illustrating what is enclosed.  There will be probably
some trailing documentation forwarded after today's date, however the bulk of materials
are forwarded herein.

Very truly yours,

Joseph R. Mariniello, Jr.

JRM/lc
Enclosures
cc:    Josh Bauers, Esq., Fair Share Housing (w/attachments) (via overnight courier)
        Thomas J, Trautner, Esq. (w/attachments) (via overnight courier)
        Ms. Beatrice Robbio (w/attachments) (via overnight courier)
        Northeast New Jersey Legal Services (w/attachments) (via overnight courier)
        Edward Boccher, Esq.(w/attachments) (via overnight courier)
        Henry L. Kent Smith, Esq. (w/attachments) (via overnight courier)
        Kathryn Gregory (w/o attachments) (via e-mail)
        Mayor Michael McPartland (w/o attachments) (via e-mail)
        Gregory Franz, Administrator (w/o attachments) (via e-mail)



GREGORY ASSOCIATES LLC
*Specializing in Planning & Development Consulting*

January 13, 2017

Mr. Frank Banisch
Banisch Associates, Inc.
111 Main Street
Flemington, New Jersey 08822

Dear Mr. Banisch:

Please find enclosed a CD ROM of the collected documentation in support of Edgewater's affordable housing units. In our attempt to obtain all the required documentation, we were unable at this time to retrieve some of the required documents, as Edgewater is not directly responsible for the administration of the affordable housing units. Edgewater is committed to providing these documents at a later date when they are received by outside parties.

We have enclosed a matrix outlining all of Edgewater's affordable housing projects and which documents have been retrieved (indicated with an "X"). A designation of "N/A" means not applicable. A designation of "O" means the documentation will be forthcoming, we anticipate in advance of the next Court case management on January 27, 2017.

Regarding the "N/A" designations:

27 Dempsey
- Developer's Agreement – no developer's agreement was ever crafted, as the Edgewater Housing Authority was the "developer" and the Borough did not deem it necessary.

300 Undercliff
- Resolutions – no resolution exists, as the Edgewater Housing Authority was the "developer" and the Borough did not deem it necessary.
- Developer's Agreement – no developer's agreement was ever crafted, as the Edgewater Housing Authority was the "developer" and the Borough did not deem it necessary.

341 Undercliff
- Developer's Agreement – was not necessary, as this was an existing building where units were converted to affordable housing units.
- * additional note: a deed restriction is included for 4 of the 7 units at 341 Edgewater. The remaining 3 units are being purchased by Kray Plaza to meet their affordable housing obligation and correct bedroom mix. At that time, a deed restriction will be recorded for the remaining 3 units.

Winterburn Gardens
- Developer's Agreement – one was never crafted as the Borough did not deem it necessary. This project is fully built and occupied at the current time so a developer's agreement is no longer necessary.

iPark

- COs – the building has yet to be constructed, so COs are obviously not available.
- Deed Restrictions - the building has yet to be constructed, so the deed restrictions are obviously not available.
- Affirmative Marketing - the building has yet to be constructed, so the affirmative marketing documents are obviously not available.
- We have provided 2 letters for the Court; the first letter, dated January 9, 2017, is from the Mayor of Edgewater to the developer of iPark, indicating that no further COs will be issued until affordable housing units are constricted within the development. The second letter, dated January 10, 2017, is from Daibes Enterprises, with an explanation of why the units have not been constructed yet, and intent to construct.

Kray Plaza/1000 Portside Drive

- COs – the building has yet to be constructed, so COs are obviously not available.
- Deed Restrictions - the building has yet to be constructed, so the deed restrictions are obviously not available.
- Affirmative Marketing - the building has yet to be constructed, so the affirmative marketing documents are obviously not available.

345 Undercliff

- Developer's Agreement – was not necessary, as this was an existing building where units are being converted to affordable housing units.
- Deed Restrictions - 6 units are being purchased by Kray Plaza to meet their affordable housing obligation and correct bedroom mix. At that time, a deed restriction will be recorded.
- Affirmative Marketing – the units are being converted to affordable units, so when purchased by Kray Plaza, the units will be affirmatively marketed and documentation will be provided.

Other Affordable Housing Projects

We would also ask the Court to approve the units at 75, 79, 85 Edgewater Place and 377 Undercliff Avenue. These units are comprised of 26 family units, including studios, 1-, 2-, and 3-bedroom units, subject to low income affordability restrictions through the US Department of Housing and Urban Development (HUD), for a term of the mortgage plus 5 years. This project has been approved by HUD in Edgewater Housing Authority's Affirmative Marketing efforts. We have enclosed the deed restriction, contracts, and approval of affirmative marketing for your review.

Please do not hesitate to contact me with any questions.

Very Truly Yours,

Kathryn M. Gregory, PP, AICP

Edgewater Affordable Housing Supporting Documents

| | Type of Unit | # of Affordable Units | Administrative Agent | Resolution | Developer Agreement | COAH | Deed Restriction | Affirmative Marketing |
|---|---|---|---|---|---|---|---|---|
| 1 | 27 Dempsey | Age-restricted | 31 | EHA | X | N/A | X | X | X |
| 2 | 300 Undercliff Avenue | Senior | 30 | EHA | N/A | N/A | X | O | X |
| 3 | Avalon Bay (North River Mews) | Family | 4 | Avalon Bay (?) | X | X | X | X | X |
| 4 | 341 Undercliff Avenue | Family | 7 | Dalbes Enterprises | X | N/A | O | X | O |
| 5 | 15 Valley Place | Family | 3 | BCHA | X | X | X | X | X |
| 6 | 38 COAH | 100% Affordable/ Family | 39 | Dalbes Enterprises | X | X | X | X | X |
| 7 | Waterford Towers | Family | 75 | Dalbes Enterprises | X | X | X | X | O |
| 8 | Winterburn Gardens | 100% Affordable/ Family | 21 | Dalbes Enterprises | X | N/A | X | X | X |
| 9 | IPark | Family | 75 | Dalbes Enterprises | X | X | N/A | N/A | N/A |
| 10 | A-Home | Family | 18 | EHA | X | X | O | X | X |
| 11 | 1000 Portside Drive (Kray Plaza) | Family | 2 | Dalbes Enterprises | X | X | N/A | N/A | N/A |
| 12 | 345 Undercliff Avenue | Family | 6 | Dalbes Enterprises | O | N/A | O | N/A | N/A |
| | | | 311 | | | | | | |
| 13 | 75,79,85 Edgewater Place/ 377 Undercliff | Family | 26 | EHA | X | X (grant agreement) | O | X | X |
| | | Total units | 337 | | | | | | |

January 2017

# EXHIBIT P

Borough of Edgewater
55 River Road
Edgewater, NJ 07020
201-9431700

Date Issued:  02/22/2017
Control #:  12189
Permit #:  20150318

# CERTIFICATE
## IDENTIFICATION

Block:  99          Lot: 1.15          Qual:  1114

Work Site Location:  3  Somerset Lane/ Unit 1114
                     Edgewater

Owner in Fee:  Four Main Street Edgewater, LLC

Address:  485  West Putnam Avenue
          Greenwich  CT  06830

Telephone:  203 661-0055

Agent/Contractor:  1 Park Edgewater, LLC

Address:  485 W. Putnam Ave
          Greenwich CT 06830

Telephone:  203 661-0055

Lic. No.: Bldrs. Reg.No.:

Sucint Security No.:

Federal Emp. No.: 5-5086816

Home Warranty No:  N/A
Type of Warranty Plan:  [ ] State [ ] Private
Use Group:  R-2
Maximum Live Load:
Construction Classification:
Maximum Occupancy Load:
Certificate Exp Date:  04/23/2017
Description of Work/Use:
New Residential Building, Footing and Foundation, Only, Building A.  Temporary
Certificate of Occupancy for Unit 1114

Update Desc. of Wk/Use:
Construction of new Residential Building with 107 Units Building A, Sprinkler Heads, standpipes, Floor Control Valve

## [ ]          CERTIFICATE OF OCCUPANCY

This serves notice that said building or structure has been constructed in accordance with the New Jersey Uniform Construction Code and is approved for occupancy.

## [ ]          CERTIFICATE OF APPROVAL

This serves notice that the work completed has been constructed or installed in accordance with the New Jersey Uniform Construction Code and is approved.  If the permit was issued for minor work, this certificate was based upon what was visible at the time of inspection.

## [ X ]     TEMPORARY CERTIFICATE OF OCCUPANCY/COMPLIANCE

If this is a temporary Certificate of Occupancy or Compliance, the following conditions must be met no later than  04/23/2017  or will be subject to fine or order to vacate:

COMPLETION OF ENTIRE BUILDING

## [ ]     CERTIFICATE OF CLEARANCE-LEAD ABATEMENT 5:17

This serves notice that based on written certification, lead abatement was performed as per NJAC 5:17, to the following extent:

[ ] Total removal of lead-based paint hazards in scope of work

[ ] Partial or limited time period( ____ years); see file

## [ ]          CERTIFICATE OF CONTINUED OCCUPANCY

This serves notice that based on a general inspection of the visible parts of the building there are no imminent hazards and the building is approved for continued occupancy.

## [ ]          CERTIFICATE OF COMPLIANCE

This serves notice that said potentially hazardous equipment has been installed and/or maintained in accordance with the New Jersey Uniform Construction Code and is approved for use until



John Candelmo  Construction Official

U.C.C 260 (rev. 5/03)

1 - APPLICANT     2 - OFFICE     3 - TAX ASSESSOR

Fees:  $ 0.00

Paid[ X ]Check No.:  5646

Collected by:  PVD

Borough of Edgewater
55 River Road
Edgewater, NJ 07020
201-9431700

# CERTIFICATE
## IDENTIFICATION

Date Issued: 02/22/2017
Control #: 12189
Permit #: 20150318

Block: 99    Lot: 1.15    Qual: 1115

Work Site Location: 3 Somerset Lane/ Unit 1115

Edgewater

Owner in Fee: Four Main Street Edgewater, LLC

Address: 485 West Putnam Avenue

Greenwich, CT 06830

Telephone: 203 661-0055

Agent/Contractor: 1 Park Edgewater, LLC

Address: 485 W. Putnam Ave

Greenwich CT 06830

Telephone: 203 661-0055

I.ic. No.: Bldrs. Reg.No.: _____ Federal Emp. No.: 5-5086816

Social Security No.: _____

Home Warranty No: N/A
Type of Warranty Plan: [ ] State [ ] Private
Use Group: R-2
Maximum Live Load: _____
Construction Classification: _____
Maximum Occupancy Load: _____
Certificate Exp Date: 04/23/2017
Description of Work/Use:
New Residential Building, Footing and Foundation, Only, Building A. Temporary
Certificate of Occupancy for Unit 1115

Update Desc. of Wk/Use:
Construction of new Residential Building with 107 Units Building A, Sprinkler Heads, standpipes, Floor Control Valve

[ X ] CERTIFICATE OF OCCUPANCY

This serves notice that said building or structure has been constructed in accordance with the New Jersey Uniform Construction Code and is approved for occupancy.

[ ] CERTIFICATE OF APPROVAL

This serves notice that the work completed has been constructed or installed in accordance with the New Jersey Uniform Construction Code and is approved. If the permit was issued for minor work, this certificate was based upon what was visible at the time of inspection.

[ X ] TEMPORARY CERTIFICATE OF OCCUPANCY/COMPLIANCE
If this is a temporary Certificate of Occupancy or Compliance, the following conditions must be met no later than 04/23/2017 or will be subject to fine or order to vacate:

COMPLETION OF ENTIRE BUILDING

[ ] CERTIFICATE OF CLEARANCE-LEAD ABATEMENT 5:17

This serves notice that based on written certification, lead abatement was performed as per NJAC 5:17, to the following extent:

[ ] Total removal of lead-based paint hazards in scope of work

[ ] Partial or limited time period( _____ years); see file

[ ] CERTIFICATE OF CONTINUED OCCUPANCY

This serves notice that based on a general inspection of the visible parts of the building there are no imminent hazards and the building is approved for continued occupancy.

[ ] CERTIFICATE OF COMPLIANCE

This serves notice that said potentially hazardous equipment has been installed and/or maintained in accordance with the New Jersey Uniform Construction Code and is approved for use until



John Candelmo   Construction Official

U.C.C 260 (rev. 5/03)    1 - APPLICANT   2 - OFFICE   3 - TAX ASSESSOR

Fees: $ 0.00

Paid[ X ]Check No.: 5646
Collected by: PVD

# EXHIBIT Q

FOX ROTHSCHILD LLP
*Formed in the Commonwealth of Pennsylvania*
By:    Henry L. Kent-Smith, Esq. (Atty. ID #034211988)
        Irina B. Elgart, Esq. (Atty. ID #027311999)
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648-2311
(609) 896-3600
*Attorneys for Defendant, 615 River Road Partners, LLC*



FILED
MAY 12 2017
BONNIE J. MIZDOL, A.J.S.C.

|  |  |  |
|---|---|---|
| 615 RIVER ROAD PARTNERS, LLC, | : | SUPERIOR COURT OF NEW JERSEY |
|  | : | LAW DIVISION: BERGEN COUNTY |
| Plaintiff, | : |  |
|  | : | Docket No. BER-L- |
| v. | : |  |
|  | : |  |
| BOROUGH OF EDGEWATER & | : | **CIVIL ACTION** |
| ANNAMARIE O'CONNER, in her official | : |  |
| capacity as the Borough of Edgewater OPRA | : |  |
| Custodian, | : | **ORDER TO SHOW CAUSE** |
|  | : |  |
| Defendants. | : |  |

**THIS MATTER** being brought before the Court by FOX ROTHSCHILD, LLP, attorneys for Plaintiff, 615 River Road Partners, LLC, seeking relief by way of summary action pursuant to N.J. R. Ct. 4:67, and N.J.S.A. 47:1A-6, based upon the facts set forth in the Verified Complaint filed herewith and for good cause shown.

IT IS on this _12th_ day of _May_, 2017,

**ORDERED** that Defendants, Borough of Edgewater and Annamarie O'Conner, appear and show cause on the _23rd_ day of _June_, 2017 before the Superior Court at the Bergen County Courthouse, Bergen County Justice Center, 10 Main Street, Hackensack, New Jersey 07601 at _10_ o'clock in the _fore_ noon, or as soon thereafter as counsel can be heard, why an Order should not be entered:

(1)     Declaring and Adjudging unlawful Defendants' actions in withholding access to government records sought in Plaintiff's March 17, 2017 Open Public Records Act, N.J.S.A. 47:1A-1 et seq., ("OPRA") Request (Exhibits A and B to Verified Complaint);

(2)     Ordering Defendants to turn over government records within its possession that are responsive to the March 17, 2017 OPRA Request;

(3)     Conducting an *in camera* review of the government records to the extent Defendant asserts any legal basis for refusing disclosure of all or a portion of same;

(4)     Declaring that Defendant, Annamarie O'Conner knowingly and willfully violated the Act, unreasonably denied access under the totality of the circumstances, and imposing civil penalties as permitted by law under N.J.S.A. 47:1A-11;

(5)     Awarding Plaintiff its reasonable attorneys' fees and costs incurred in connection with this action; and

(6)     Granting such other and further relief as the Court deems equitable and just.

AND IT IS FURTHER **ORDERED** that:

1.     A copy of this Order and a copy of the Verified Complaint and supporting documents shall be served upon the Defendants within __5__ days from the day hereof, said service being authorized by the attorneys for Plaintiff or their agents upon the Defendants and/or their legal representatives by electronic mail (e-mail), facsimile and/or overnight courier, this Order serving as a substitute for a summons.

2.     If any of the Defendants do not oppose this Order to Show Cause, relief may be granted by default against the non-responsive Defendant, provided that Plaintiff file a proof of service and a proposed form of Order at least one (1) day prior to the return date hereof.

2

3.     Defendants shall file and serve a written answer, brief and/or answering affidavit to this Order to Show Cause and the relief requested in the Verified Complaint and proof of service by *May 26*, 2017. The answer, brief and/or answering affidavit as the case may be, must be filed with the Clerk of the Bergen County Superior Court, 10 Main Street, Hackensack, New Jersey 07601, and a copy of the papers must be sent directly to the chambers of the undersigned Judge. You must also send a copy of your opposition papers to Fox Rothschild, LLP, Attn: Irina B. Elgart, Esquire, 997 Lenox Drive, Building 3, Lawrenceville, New Jersey 08648-2311, counsel for the Plaintiff. A telephone call will not protect your rights; you must file your opposition and pay the required fee of $135.00 and serve your opposition on your adversary, if you want the Court to hear your opposition to the relief plaintiff is seeking.

4.     Plaintiff must file and serve any written reply to defendant's Order to Show Cause opposition by *June 9*, 2017. The reply papers must be filed with the Clerk of the Bergen County Superior Court and a copy of the reply papers must be sent directly to the chambers of the undersigned Judge.

5.     The Court will entertain argument, but not testimony, on the return date of the Order to Show Cause, unless the court and parties are advised to the contrary no later than *3* days before the return date.

6.     Defendants, Borough of Edgewater and Annamarie O'Connor, take notice that the plaintiff has filed a lawsuit against you in the Superior Court of New Jersey. The Verified Complaint attached to this Order to Show Cause states the basis of the lawsuit. If you dispute the Complaint, you, or your attorney, must file a written answer, brief and/or answering affidavit and proof of service before the return date of the Order to Show Cause.

3

7.    If you cannot afford an attorney, you may call the Legal Services office in the county in which you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529).    If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A list of these numbers is also provided.

J.S.C.

BONNIE J. MIZDOL, A.J.S.C.

4

**ATLANTIC COUNTY:**
Deputy Clerk of the
Superior Court
Civil Division, Direct
Filing
1201 Bacharach Blvd., First
Fl.
Atlantic City, NJ 08401
LAWYER REFERRAL
(609) 345-3444
LEGAL SERVICES
(609) 348-4200

**BERGEN COUNTY:**
Deputy Clerk of the
Superior Court
Case Processing Section
Room 119
Justice Center, 10 Main St.
Hackensack, NJ 07601-
0769
LAWYER REFERRAL
(201) 488-0044
LEGAL SERVICES
(201) 487-2166

**BURLINGTON
COUNTY:**
Deputy Clerk of the
Superior Court
Central Processing Office
Attn: Judicial Intake
First Fl., Courts Facility
49 Rancocas Rd.
Mt. Holly, NJ 08060
LAWYER REFERRAL
(609) 261-4862
LEGAL SERVICES
(609) 261-1088

**CAMDEN COUNTY:**
Deputy Clerk of the
Superior Court
Civil Processing Office
1st Fl., Hall of Records
101 S. Fifth St.
Camden, NJ 08103-4001
LAWYER REFERRAL
(609) 964-4520
LEGAL SERVICES
(609) 964-2010

**CAPE MAY COUNTY:**
Deputy Clerk of the
Superior Court
Central Processing Office
9 N. Main St.
Box DN-209
Cape May Court House, NJ
08210
LAWYER REFERRAL
(609) 463-0313
LEGAL SERVICES
(609) 465-3001

**CUMBERLAND
COUNTY:**
Deputy Clerk of the
Superior Court
Civil Case Management
Office

Broad & Fayette Sts. P.O.
Box 615
Bridgeton, NJ 08302
LAWYER REFERRAL
(609) 692-6207
LEGAL SERVICES
(609) 451-0003

**ESSEX COUNTY:**
Deputy Clerk of the
Superior Court
237 Hall of Records
465 Dr. Martin Luther
King, Jr. Blvd.
Newark, NJ 07102
LAWYER REFERRAL
(201) 622-6207
LEGAL SERVICES
(201) 624-4500

**GLOUCESTER
COUNTY:**
Deputy Clerk of the
Superior Court
Civil Case Management
Office
Attn: Intake
Court House
1 North Broad Street, P.O.
Box 129
Woodbury, NJ 08096 .
LAWYER REFERRAL
(609) 848-4589
LEGAL SERVICES
(609) 848-5360

**HUDSON COUNTY:**
Deputy Clerk of the
Superior Court
Superior Court, Civil
Records Dept.
Brennan Court House – 1st
Floor
583 Newark Ave.
Jersey City, NJ 07306
LAWYER REFERRAL
(201) 798-2727
LEGAL SERVICES
(201) 798-6363

**HUNTERDON
COUNTY:**
Deputy Clerk of the
Superior Court
Civil Division
65 Park Avenue
Flemington, NJ 08822
LAWYER REFERRAL
(908) 735-2611
LEGAL SERVICES
(908) 782-7979

**MERCER COUNTY:**
Deputy Clerk of the
Superior Court
Local Filing Office,
Courthouse
175 S. Broad Street, P.O.
Box 8068
Trenton, NJ 08650
LAWYER REFERRAL
(609) 585-6200

LEGAL SERVICES
(609) 695-6249

**MIDDLESEX COUNTY:**
Deputy Clerk of the
Superior Court
Administration Building
Third Floor
1 Kennedy Square, P.O.
Box 2633
New Brunswick, NJ
08903-2633
LAWYER REFERRAL
(908) 828-0053
LEGAL SERVICES
(908) 249-7600

**MONMOUTH COUNTY:**
Deputy Clerk of the
Superior Court
71 Monument Park
P.O. Box 1262
Court House, West Wing
Freehold, NJ 07728-1262
LAWYER REFERRAL
(908) 431-5544
LEGAL SERVICES
(908) 866-0020

**MORRIS COUNTY:**
Deputy Clerk of the
Superior Court
Civil Division – Hall of
Records
P.O. Box 910
Morristown, NJ 07930-
0910
LAWYER REFERRAL
(201) 267-5882
LEGAL SERVICES
(201) 285-6911

**OCEAN COUNTY:**
Deputy Clerk of the
Superior Court
Court House, Room 119
118 Washington Street
Toms River, NJ 08754
LAWYER REFERRAL
(732) 240-3666
LEGAL SERVICES
(732) 341-2727

**PASSAIC COUNTY:**
Deputy Clerk of the
Superior Court
Civil Division
Court House
77 Hamilton St.
Paterson, NJ 07505
LAWYER REFERRAL
(973) 278-9223
LEGAL SERVICES
(973) 345-7171

**SALEM COUNTY:**
Deputy Clerk of the
Superior Court
92 Market St., P.O. Box 18
Salem, NJ 08079
LAWYER REFERRAL

(856) 935-5629
LEGAL SERVICES
(856) 964-2010

**SOMERSET COUNTY:**
Deputy Clerk of the
Superior Court
Civil Division Office
New Court House, 3rd Fl.
P.O. Box 3000
Somerville, NJ 08876
LAWYER REFERRAL
(908) 685-2323
LEGAL SERVICES
(908) 231-0840

**SUSSEX COUNTY:**
Deputy Clerk of the
Superior Court
Sussex County Judicial
Center
43-37 High Street
Newton, NJ 07860
LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 383-7400

**UNION COUNTY:**
Deputy Clerk of the
Superior Court
1st Fl., Court House
2 Broad Street
Elizabeth, NJ 07207-6073
LAWYER REFERRAL
(908) 353-4715
LEGAL SERVICES
(908) 354-4340

**WARREN COUNTY:**
Deputy Clerk of the
Superior Court
Civil Division Office
Court House
413 Second Street
Belvidere, NJ 07823-1500
LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(908) 475-2010

**FOX ROTHSCHILD LLP**
*Formed in the Commonwealth of Pennsylvania*
By:     Henry L. Kent-Smith, Esq. (Atty. ID #034211988)
        Irina B. Elgart, Esq. (Atty. ID #027311999)
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648-2311
(609) 896-3600
*Attorneys for Defendant, 615 River Road Partners, LLC*

| | | |
|---|---|---|
| 615 RIVER ROAD PARTNERS, LLC, | : | SUPERIOR COURT OF NEW JERSEY |
| | : | LAW DIVISION: BERGEN COUNTY |
| Plaintiff, | : | |
| | : | Docket No. BER-L- |
| v. | : | |
| | : | |
| BOROUGH OF EDGEWATER & | : | **CIVIL ACTION** |
| ANNAMARIE O'CONNER, in her official | : | |
| capacity as the Borough of Edgewater OPRA | : | |
| Custodian, | : | **VERIFIED COMPLAINT** |
| | : | |
| Defendants. | : | |

Plaintiff, 615 River Road Partners, LLC ("Plaintiff"), through its counsel, FOX ROTHSCHILD, LLP, by way of Verified Complaint against Defendants, Borough of Edgewater ("Borough") and Annamarie O'Conner ("OPRA Custodian" and collectively with the Borough "Defendants"), says:

1.    This is an action pursuant to N.J.S.A. 47:1A-6 of the Open Public Records Act, N.J.S.A. 47:1A-1 et seq. ("OPRA" or the "Act"), and the common law Right to Know Doctrine.

### THE PARTIES

2.    Plaintiff, 615 River Road Partners, LLC ("Plaintiff") is a New Jersey limited liability company with offices at c/o The Maxal Group, Inc., 825 Third Avenue, 31st Floor, New York, New York 10022, and the fee simple owner of the property known as 615 River Road in the

Borough of Edgewater consisting of approximately 18.73 acres of vacant land along the Hudson River ("Property").

3.      Defendant, Borough of Edgewater, ("Borough") is a political subdivision, as defined by N.J.S.A. 47:1A-1.1, located in Bergen County, with offices located at Edgewater Municipal Building, 55 River Road, Edgewater, New Jersey 07020, and is charged with the duty to provide public access to government records in its possession consistent with the requirements of OPRA.

4.      Defendant, Annamarie O'Conner, ("OPRA Custodian") is the Borough of Edgewater Clerk and the individual designated as the OPRA Custodian who is charged with carrying out the provisions of the OPRA.

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction of this action pursuant to N.J.S.A. 47:1A-6 and the common law.

6.      Venue is proper in this Court pursuant to R. 4:3-2(a)(2) because all of the relevant events occurred in Bergen County.

## ALLEGED FACTS

7.      Plaintiff desires and has sought approval to develop the Property as a multi-family housing with a set aside for low and moderate income households in compliance with the Fair Housing Act, Council on Affordable Housing ("COAH") regulations, and the Mount Laurel Doctrine.

8.      The Borough adopted a Master Plan Housing Element in December 2008 which sets forth the Borough's plan for the provision of affordable housing in compliance with the Mount Laurel Doctrine, including the location of proposed sites for affordable housing developments.

9. The Borough's Housing Element and Fair Share Plan ("2008 HEFSP") was submitted to COAH on January 5, 2009 for review by COAH in conjunction with the Borough's petition for substantive certification that the Borough's plan provided a realistic opportunity for affordable housing in the Borough.

10. The 2008 HEFSP was based upon COAH regulations (N.J.A.C. 5:97-1 et seq., (eff. June 2, 2008) (the "2008 COAH Regulations"), which authorized the imposition of a "growth share" obligation.

11. Ultimately, the 2008 COAH Regulations were found to be invalid by both the Appellate Division and the Supreme Court, particularly as to the calculation of municipal affordable housing regulations based upon "growth share". In re Adoption of N.J.A.C. 5:96 & 5:97, 416 N.J. Super. 462 (App. Div. 2010) (citing N.J.S.A. 52:27D–311(h); N.J.A.C. 5:97–6.4), aff'd as modified sub nom. In re Adoption of N.J.A.C. 5:96, 215 N.J. 578 (2013).

12. The Borough's 2008 HEFSP was never certified by COAH, nor has the Borough secured a judgment of compliance from the Court to render its HEFSP and zoning ordinances constitutionally compliant.

13. The invalidation of the 2008 COAH Regulations and concepts of "growth share" rendered the Borough's 2008 HEFSP no longer valid.

14. On or about July 7, 2015, the Borough filed its Complaint for Declaratory Judgment seeking a judgment of compliance from the court to determine the Borough's affordable housing obligation and to render a revised Housing Element and Fair Share Plan constitutionally compliant. In the Matter of the Application of the Borough of Edgewater, Docket No. BER-L-6364-15 ("Declaratory Judgment Action").

15.     The Borough filed the Declaratory Judgment Action in accordance with the procedures set forth in In re Adoption of N.J.A.C. 5:96, 221 N.J. 1 (2015). However, the court has not issued a judgment of compliance in that matter.

16.     The Borough has relied on a multi-family housing development located at 45 River Road in the Borough, commonly referred to as iPark, which was slated to provide over four hundred ("400") market rate housing units, some retail and commercial space, and an affordable housing site providing seventy-five (75) units of low and moderate income affordable housing in satisfaction of the Borough's constitutional obligation under the Mount Laurel Doctrine as set forth in both its 2008 HEFSP, and in the Declaratory Judgement Action.

17.     Pursuant to COAH regulations, the development of market rate units **shall** be phased in with the affordable housing units pursuant to a set construction schedule. This regulation ensures that developers do not merely build market rate units and abandon the project before the affordable housing units are constructed.

18.     Upon information and belief, the developers of iPark have failed to build the affordable housing units in accordance with COAH's construction schedule.

19.     On March 17, 2017, Plaintiff filed an OPRA request with the Borough of Edgewater seeking the following documents:

>       (1)     All communications, maintained in any form including electronic, regarding the iPark project from September 1, 2016 to the present between the Borough (and/or its representatives), and any third-party (and/or its representatives), including any developer(s) of any portion of iPark;

(2)     All non-privileged communications, maintained in any form including electronic, regarding the iPark project from September 1, 2016 to the present between and/or among any officials and/or representatives of the Borough;

(3)     All building permits issued since December 1, 2016 until the present;

(4)     All certificates of occupancy issued since December 1, 2016 until the present;

(5)     Any documents related to the affordable housing units in the iPark project;

(6)     Any site plans related to the affordable housing units in the iPark project;

(7)     Any agreement(s) related to the affordable housing units in the iPark project; and

(8)     Any architectural drawings related to affordable housing units in the iPark project.

Plaintiff has a strong public interest and legitimate private interest in obtaining the requested documents.

20.     On March 28, 2017, the OPRA Custodian responded to the OPRA Request by letter. A true and correct copy of the Borough's email and letter dated March 28, 2017 (the "OPRA Response"), together with Plaintiff's March 17, 2017 OPRA request (the "OPRA Request") and the three (3) pages produced by the Borough are attached hereto as **Exhibit A**).

21.     Pursuant to the OPRA Response, Defendants produced the following documents:

(4)     All certificates of occupancy issued since December 1, 2016 until the present; and

(8)     Any architectural drawings of the iPark project. (Id.).

22. Namely, the Borough provided two Temporary Certificates of Occupancy in response to OPRA Request No. (4) and one Site Plan in response to OPRA Request No. (8). See **Exhibit A**. Upon information and belief, the Borough has additional documents that are responsive to these requests.

23. The OPRA Response further stated that "Please be advised that the following documents are not being provided" – listing OPRA Requests (1), (2), (3), (5), and (6). See **Exhibit A**.

24. Contrary to the law, the OPRA Response did not state the basis for Defendants' refusal to produce the government records requested in the OPRA Request.

25. Plaintiff has a legitimate public and private interest in the disclosure of the government records sought in the OPRA Request as they relate to the Borough's constitutional obligation to provide its fair share of affordable housing.

26. Plaintiff attempted in good faith to resolve this dispute by writing the Borough on May 7, 2017 to determine whether any further records were forthcoming. A copy of the written request is attached hereto as **Exhibit B**.

27. The Borough has not responded as of the filing of this Complaint and application.

## COUNT I: VIOLATION OF OPRA

28. Plaintiff repeats and incorporates by reference each and every preceding allegation contained in Plaintiff's Verified Complaint as though fully set forth at length herein.

29. The records sought in the OPRA Request are public records subject to disclosure under OPRA.

30. Defendants withheld access to the public records responsive to the OPRA Request without providing a statutory exception under OPRA or other legal basis for refusing access.

31.     Defendants failed to redact the public records responsive to the OPRA Request so
as to provide access to all portions of the public records that are not exempt from disclosure.

32.     Defendants' actions constitute a violation of the Open Public Records Act.

WHEREFORE, Plaintiff demands judgment against Defendant for the following relief:

   a.  Declaring and Adjudging unlawful Defendant's actions in withholding access to
       government records sought in Plaintiff's March 17, 2017 OPRA Request;

   b.  Ordering Defendant to turn over government records within its possession that are
       responsive to the March 17, 2017 OPRA Request;

   c.  To the extent Defendant asserts any statutory exception to disclosure of any portion
       of, or all of the government records, conducting an in camera review of the
       government records;

   d.  Declaring that Defendant, Annamarie O'Conner knowingly and willfully violated
       the Act, unreasonably denied access under the totality of the circumstances, and
       imposing civil penalties as permitted by law;

   e.  Awarding Plaintiff its reasonable attorneys' fees and costs incurred in connection
       with this action; and

   f.  Granting such other and further relief as the Court deems equitable and just.

### COUNT II: VIOLATION OF COMMON LAW RIGHT OF ACCESS

33.     Plaintiff repeats and incorporates by reference each and every preceding allegation
of Plaintiff's Verified Complaint as though fully set forth at length herein.

34.     Plaintiff has a common law right of access to receive copies of the documents
requested in the March 17, 2017 OPRA Request.

35.    Plaintiff has a legitimate private interest and wholesome public interest in the requested records as they relate to the Borough's efforts to comply with its constitutional obligation to provide affordable housing.

36.    Defendant has no legitimate interest in maintaining the secrecy of these documents. Therefore, Defendant has violated Plaintiff's common law right of access to the government records.

**WHEREFORE**, Plaintiff demands judgment against Defendant for the following relief:

a.   Declaring and Adjudging unlawful Defendant's actions in withholding access to government records sought in Plaintiff's March 17, 2017 OPRA Request;

b.   Ordering Defendant to turn over government records within its possession that are responsive to the March 17, 2017 OPRA Request;

c.   To the extent Defendant asserts any statutory exception to disclosure of any portion of, or all of the government records, conducting an in camera review of the government records;

d.   Awarding Plaintiff its reasonable attorneys' fees and costs incurred in connection with this action; and

e.   Granting such other and further relief as the Court deems equitable and just.

**FOX ROTHSCHILD LLP**
*Attorneys for Plaintiff, 615 River Road Partners, LLC*

By: _Irina B. Elgart_
    Irina B. Elgart, Esq.

Dated:  May 11, 2017

ACTIVE\45335193.v1-5/11/17

## VERIFICATION

I, Irina B. Elgart, being of full age and duly sworn according to law upon my oath, depose and say:

1.      Fox Rothschild, LLP is counsel for 615 River Road Partners, LLC, the Plaintiff in the above matter.

2.      I have read the foregoing Verified Complaint and the information contained therein is true and accurate based upon my personal knowledge and information.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: May 11, 2017                              _____
                                                IRINA B. ELGART

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Henry L. Kent-Smith, Esq. and Irina B. Elgart, Esq., are hereby designated as trial counsel in this matter.

> **FOX ROTHSCHILD LLP**
> Attorneys for Plaintiff
>
> By: _____
> Irina B. Elgart, Esq.

Dated: May 11, 2017

## CERTIFICATION PURSUANT TO RULE 4:5-1

I hereby certify that the matter in controversy is not the subject of any other action pending in any Court and is, likewise, not the subject of any pending arbitration proceeding. I further certify there is no action or arbitration proceeding which is contemplated regarding the subject of this action and that I am not aware of any other parties who should be joined in this action.

The following matters involve the same or similar parties relative to the Defendant, Borough of Edgewater's affordable housing obligation pursuant to the Mount Laurel Doctrine: (a) In the Matter of the Application of the Borough of Edgewater, Docket No. BER-L-6364-15; (b) 615 River Road Partners, LLC v. Edgewater Zoning Board of Adjustment, et al., Docket No. BER-L-2040-16; (c) FSHC v. Kray Plaza, LLC, et al., Docket No. BER-L-6431-16; (d) FSHC v. MB Edgewater, LLC, Docket No. BER-L-7687 -16; and (e) 615 River Road Partners, LLC v. Borough of Edgewater, et al. Docket No. BER-L-0090-17.

_____
Irina B. Elgart, Esq.

Dated: May 11, 2017

14

# EXHIBIT A

**Elgart, Irina B.**

| | |
|---|---|
| **From:** | Kristen DeNorchia <kdenorchia@EDGEWATERNJ.ORG> |
| **Sent:** | Wednesday, March 29, 2017 9:02 AM |
| **To:** | Elgart, Irina B. |
| **Subject:** | FW: Online Form Submittal: OPEN PUBLIC RECORDS ACT REQUEST FORM |
| **Attachments:** | DOC310.pdf; DOC309.pdf |

Please accept this email and attachment as my formal response to your OPRA request below.

Kristen DeNorchia

**From:** noreply@civicplus.com [mailto:noreply@civicplus.com]
**Sent:** Friday, March 17, 2017 1:53 PM
**To:** ANNAMARIE; Kristen DeNorchia; Patricia Caruso
**Subject:** Online Form Submittal: OPEN PUBLIC RECORDS ACT REQUEST FORM

## OPEN PUBLIC RECORDS ACT REQUEST FORM

*BOROUGH OF EDGEWATER*
*55 River Road*
*Edgewater, New Jersey 07020*
*Phone 201-943-1700 Fax201-943-9242*

| | |
|---|---|
| First Name | Irina |
| Last Name | Elgart |
| Email Address | ielgart@foxrothschild.com |
| Address | 997 Lennox Drive, Building 3 |
| City | Lawrenceville |
| State | NJ |
| Zip | 08648 |
| Telephone | 6098956632 |
| Fax | *Field not completed.* |
| Prefered Delivery: | Email |
| If you are requesting records containing personal information, please check of one: Under penalty of N.J.S.A. 2C:28-3 I certify that I | HAVE NOT |

1

been convicted of any indictable offense under the laws of New Jersey, any other state, or the United States.

Signature:                                                        Irina Elgart

Date: _____

Record Request Information:                    (1) All communications,
maintained in any form including
electronic, regarding the iPark
project from September 1, 2016
to the present between the
Borough (and/or its
representatives), and any third-
party (and/or its
representatives), including any
developer(s) of any portion of
iPark. (2) All non-privileged
communications, maintained in
any form including electronic,
regarding the iPark project from
September 1, 2016 to the
present between and/or among
any officials and/or
representatives of the Borough.
(3) All building permits issued
since December 1, 2016 until
the present. (4) All certificates of
occupancy issued since
December 1, 2016 until the
present. (5) Any documents
related to the affordable housing
units in the iPark project. (6)
Any site plans related to the
affordable housing units in the
iPark project. (7) Any
agreement(s) related to the
affordable housing units in the
iPark project. (8) Any
architectural drawings related to
affordable housing units in the
iPark project.

Payment Information                              Check

Email not displaying correctly? View it in your browser.

2

Kristen DeNorchia



Borough of Edgewater - "On the Hudson"
Bergen County, New Jersey
55 River Road, Edgewater NJ 07020
201-943-1700

kdenorchia@EDGEWATERNJ.ORG
http://www.edgewaternj.org

3



**BOROUGH OF EDGEWATER**

Municipal Building
55 River Road
Edgewater, NJ 07020
201-943-1700
Fax 201-943-9242

Annamarie O'Connor, RMC
BOROUGH CLERK

March 28, 2017

Irina Elgart
ielgart@foxrothschild.com
2017-55

Dear Ms. Elgart,

The Borough of Edgewater received your Open Public Records Act (OPRA) request on March 17, 2017. As such, the seven (7) business day deadline to respond to your request is March 28, 2017. This response is being provided to you on the 7th business day after the custodian's receipt of said request.

Your OPRA request of March 21, 2017 sought access to the following:

"1) All communications, maintained in any form including electronic, regarding the iPark project from September 1, 2016 to the present between the Borough (and/or its representatives), and any third-party (and/or its representatives), including any developer(s) of any portion of iPark. (2) All non-privileged communications, maintained in any form including electronic, regarding the iPark project from September 1, 2016 to the present between and/or among any officials and/or representatives of the Borough. (3) All building permits issued since December 1, 2016 until the present. (4) All certificates of occupancy issued since December 1, 2016 until the present. (5) Any documents related to the affordable housing units in the iPark project. (6) Any site plans related to the affordable housing units in the iPark project. (7) Any agreement(s) related to the affordable housing units in the iPark project. (8) Any architectural drawings related to affordable housing units in the iPark project."

**"Please be advised that the following documents (s) are being provided:**

All certificates of occupancy issued since December 1, 2016 until the present.
Any architectural drawings the iPark project.

**Please be advised that the following documents (s) are not being provided:**

-All communications, maintained in any form including electronic, regarding the iPark project from September 1, 2016 to the present between the Borough (and/or its representatives), and any third-party (and/or its representatives), including any developer(s) of any portion of iPark.

-All non-privileged communications, maintained in any form including electronic, regarding the iPark project from September 1, 2016 to the present between and/or among any officials and/or representatives of the Borough.

-All building permits issued since December 1, 2016 until the present.

-Any documents related to the affordable housing units in the iPark project.

-Any site plans related to the affordable housing units in the iPark project.

-Any agreement(s) related to the affordable housing units in the iPark project.

-Any architectural drawings related to affordable housing units in the iPark project.



**BOROUGH OF EDGEWATER**
**Municipal Building**
**55 River Road**
**Edgewater, NJ 07020**
201-943-1700
Fax 201-943-9242

**Annamarie O'Connor, RMC**
**BOROUGH CLERK**

If your request for access to a government record has been denied or unfilled within the seven (7) business days required by law, you have a right to challenge the decision by Borough of Edgewater to deny access. At your option, you may either institute a proceeding in the Superior Court of New Jersey or file a complaint with the Government Records Council (GRC) by completing the denial of Access Complaint Form. You may contact the GRC by toll-free telephone at 866-850-0511, by mail at P.O. Box 819, Trenton, NJ, 08625, by e-mail at grc@dca.state.nj.us, or at their web site at www.state.nj.us/grc. The GRC can also answer questions about the law. All questions regarding complaints filed in Superior Court should be directed to the Court Clerk in your County.

Sincerely,

Annamarie O'Connor, R.M.C
Borough Clerk

ACKNOWLEDGMENT

Kindly sign, date and return the below acknowledgment.

I hereby acknowledge that I have received the documents requested except for the documents specifically listed above on which a determination has been made that the documents will not be provided. If any documents have not been provided, I have received information on the procedures for any appeal of the determination.

Date: _____     Applicant: _____



Borough of Edgewater
55 River Road
Edgewater, NJ 07020
201-943-1700

Date Issued: 02/22/2017
Control #: 12189
Permit #: 20150318

## CERTIFICATE
### IDENTIFICATION

Block: 99          Lot: 1.15          Qual: 1114

Work Site Location: 3 Somerset Lane/ Unit 1114

Edgewater

Owner in Fee: Four Main Street Edgewater, LLC

Address: 485 West Putnam Avenue

Greenwich, CT 06830

Telephone: 203 661-0055

Agent/Contractor: 1 Park Edgewater, LLC

Address: 485 W. Putnam Ave

Greenwich CT 06830

Telephone: 203 661-0055

Lic. No./ Bldrs. Reg.No.:                    Federal Emp. No.: S-5086816

Social Security No.:

Home Warranty No: N/A
Type of Warranty Plan: [ ] State [ ] Private
Use Group: R-2
Maximum Live Load:
Construction Classification:
Maximum Occupancy Load:
Certificate Exp Date: 04/23/2017
Description of Work/Use:
New Residential Building, Footing and Foundation, Only, Building A. Temporary
Certificate of Occupancy for Unit 1114

Update Desc. of Wk/Use:
Construction of new Residential Building with 107 Units Building A, Sprinkler Heads,
standpipes, Floor Control Valve

[ ] CERTIFICATE OF OCCUPANCY

This serves notice that said building or structure has been constructed in accordance with the
New Jersey Uniform Construction Code and is approved for occupancy.

[ ] CERTIFICATE OF APPROVAL

This serves notice that the work completed has been constructed or installed in accordance with
the New Jersey Uniform Construction Code and is approved. If the permit was issued for minor
work, this certificate was based upon what was visible at the time of inspection.

[ X ] TEMPORARY CERTIFICATE OF OCCUPANCY/COMPLIANCE
If this is a temporary Certificate of Occupancy or Compliance, the following conditions must be
met no later than 04/23/2017 or will be subject to fine or order to vacate:

COMPLETION OF ENTIRE BUILDING

[ ] CERTIFICATE OF CLEARANCE-LEAD ABATEMENT 5:17

This serves notice that based on written certification, lead abatement was performed as per
NJAC 5:17, to the following extent:

[ ] Total removal of lead-based paint hazards in scope of work

[ ] Partial or limited time period(          years); see file

[ ] CERTIFICATE OF CONTINUED OCCUPANCY

This serves notice that based on a general inspection of the visible parts of the building there
are no imminent hazards and the building is approved for continued occupancy.

[ ] CERTIFICATE OF COMPLIANCE

This serves notice that said potentially hazardous equipment has been installed and/or
maintained in accordance with the New Jersey Uniform Construction Code and is approved for
use until

Fees: $ 0.00

Paid X ]Check No.: 5646

Collected by: PVD



John Candcimo Construction Official

U.C.C 261 (rev. 5/03)          1 - APPLICANT   2 - OFFICE   3 - TAX ASSESSOR

Borough of Edgewater
55 River Road
Edgewater, NJ 07020
201-9431700

Date Issued:    02/22/2017
Control #:      12189
Permit #:       20150318

# CERTIFICATE
## IDENTIFICATION

Block:    99          Lot: 1.15          Qual:   1115

Work Site Location:   3 Somerset Lane/ Unit 1115

Edgewater

Owner in Fee:   Four Main Street Edgewater, LLC

Address:    485 West Putnam Avenue

Greenwich  CT 06830

Telephone:   203 661-0055

Agent/Contractor:   I Park Edgewater, LLC

Address:   485 W. Putnam Ave

Greenwich CT 06830

Telephone:   203 661-0055

Lic. No./ Bldrs. Reg.No.:

Social Security No.:

Federal Emp. No.: 5-5086816

Home Warranty No:        N/A
Type of Warranty Plan:   [ ] State  [ ] Private
Use Group:               R-2
Maximum Live Load:
Construction Classification:
Maximum Occupancy Load:
Certificate Exp Date:    04/23/2017
Description of Work/Use:
New Residential Building, Footing and Foundation, Only, Building A. Temporary
Certificate of Occupancy for Unit 1115

Update Desc. of Wk/Use:
Construction of new Residential Building with 107 Units Building A. Sprinkler Heads.
standpipes, Floor Control Valve

[ ]   CERTIFICATE OF CLEARANCE-LEAD ABATEMENT 5:17

This serves notice that based on written certification, lead abatement was performed as per
NJAC 5:17, to the following extent:

[ ] Total removal of lead-based paint hazards in scope of work

[ ] Partial or limited time period(_____ years); see file

[ ]   CERTIFICATE OF CONTINUED OCCUPANCY

This serves notice that based on a general inspection of the visible parts of the building there
are no imminent hazards and the building is approved for continued occupancy.

[ ]   CERTIFICATE OF COMPLIANCE

This serves notice that said potentially hazardous equipment has been installed and/or
maintained in accordance with the New Jersey Uniform Construction Code and is approved for
use until

[ ]   CERTIFICATE OF OCCUPANCY

This serves notice that said building or structure has been constructed in accordance with the
New Jersey Uniform Construction Code and is approved for occupancy.

[ ]   CERTIFICATE OF APPROVAL

This serves notice that the work completed has been constructed or installed in accordance with
the New Jersey Uniform Construction Code and is approved.   If the permit was issued for minor
work, this certificate was based upon what was visible at the time of inspection.

[ X ]   TEMPORARY CERTIFICATE OF OCCUPANCY/COMPLIANCE
If this is a temporary Certificate of Occupancy or Compliance, the following conditions must be
met no later than  04/23/2017  or will be subject to fine or order to vacate:

COMPLETION OF ENTIRE BUILDING



John Candelmo   Construction Official

U.C.C 260 (rev. 5/03)

Fees:   $ 0.00

Paid[ X ]Check No.:   5646
Collected by:   PVD

1 - APPLICANT   2 - OFFICE   3 - TAX ASSESSOR

# EXHIBIT B

**Elgart, Irina B.**

| | |
|---|---|
| **From:** | Elgart, Irina B. |
| **Sent:** | Sunday, May 07, 2017 6:45 PM |
| **To:** | 'Kristen DeNorchia' |
| **Subject:** | RE: Online Form Submittal: OPEN PUBLIC RECORDS ACT REQUEST FORM |

Hi Kristen –I received responses to only two of the OPRA requests below that consisted of 3 pages: 2 CO's and a site plan.   Please advise whether you deem the response to the OPRA request below complete.

Best regards,

Irina B. Elgart, Esq.
Partner
Fox Rothschild LLP
Princeton Pike Corporate Center
997 Lenox Drive, Building 3, Lawrenceville, NJ 08648-2311
Direct: (609) 895-6632 | Fax: (609) 896-1469 | Main: (609) 896-3600
ielgart@foxrothschild.com
www.foxrothschild.com

**From:** Kristen DeNorchia [mailto:kdenorchia@EDGEWATERNJ.ORG]
**Sent:** Wednesday, March 29, 2017 9:02 AM
**To:** Elgart, Irina B. <IElgart@foxrothschild.com>
**Subject:** FW: Online Form Submittal: OPEN PUBLIC RECORDS ACT REQUEST FORM

Please accept this email and attachment as my formal response to your OPRA request below.

Kristen DeNorchia

**From:** noreply@civicplus.com [mailto:noreply@civicplus.com]
**Sent:** Friday, March 17, 2017 1:53 PM
**To:** ANNAMARIE; Kristen DeNorchia; Patricia Caruso
**Subject:** Online Form Submittal: OPEN PUBLIC RECORDS ACT REQUEST FORM

# OPEN PUBLIC RECORDS ACT REQUEST FORM

*BOROUGH OF EDGEWATER*
*55 River Road*
*Edgewater, New Jersey 07020*
*Phone 201-943-1700 Fax201-943-9242*

First Name                                          Irina

Last Name                                          Elgart

1

| | |
|---|---|
| Email Address | ielgart@foxrothschild.com |
| Address | 997 Lennox Drive, Building 3 |
| City | Lawrenceville |
| State | NJ |
| Zip | 08648 |
| Telephone | 6098956632 |
| Fax | *Field not completed.* |
| Prefered Delivery: | Email |

If you are requesting records containing personal information, please check of one: Under penalty of N.J.S.A. 2C:28-3 I certify that I

HAVE NOT

been convicted of any indictable offense under the laws of New Jersey, any other state, or the United States.

Signature:                                            Irina Elgart

Date: _____

Record Request Information:                 (1) All communications, maintained in any form including electronic, regarding the iPark project from September 1, 2016 to the present between the Borough (and/or its representatives), and any third-party (and/or its representatives), including any developer(s) of any portion of iPark. (2) All non-privileged communications, maintained in any form including electronic, regarding the iPark project from September 1, 2016 to the present between and/or among any officials and/or representatives of the Borough. (3) All building permits issued since December 1, 2016 until the present. (4) All certificates of occupancy issued since December 1, 2016 until the

present. (5) Any documents related to the affordable housing units in the iPark project. (6) Any site plans related to the affordable housing units in the iPark project. (7) Any agreement(s) related to the affordable housing units in the iPark project. (8) Any architectural drawings related to affordable housing units in the iPark project.

Payment Information                          Check

Email not displaying correctly? View it in your browser.

Kristen DeNorchia



Borough of Edgewater - "On the Hudson"
Bergen County, New Jersey
55 River Road, Edgewater NJ 07020
201-943-1700

kdenorchia@EDGEWATERNJ.ORG
http://www.edgewaternj.org

| | |
|---|---|
| 615 RIVER ROAD PARTNERS, LLC, | SUPERIOR COURT OF NEW JERSEY |
| | LAW DIVISION: BERGEN COUNTY |
| Plaintiffs, | |
| | DOCKET NO.: BER-L- 3638-17 |
| v. | |
| | CIVIL ACTION |
| BOROUGH OF EDGEWATER, iPARK | |
| EDGEWATER, LLC; iPARK EDGEWATER | |
| HOLDINGS, LLC; iPARK EDGEWATER | |
| INVESTMENTS, INC.; NATIONAL | |
| RESOURCES ACQUISITIONS, LLC; | |
| NORTH BUILDING EDGEWATER, LLC; | |
| ONE MAIN STREET EDGEWATER, LLC; | |
| FOUR MAIN STREET EDGEWATER, | |
| LLC; EDGEWATER LOFTS, LLC; | |
| EDGEWATER GLASS HOUSE, LLC; | |
| DAIBES ENTERPRISES, LLC; DAIBES | |
| BROTHERS, INC.; DDD & ASSOCIATES, | |
| LLC; 2 PEMBROKE WAY ASSOCIATES, | |
| LLC; 4 PEMBROKE WAY ASSOCIATES, | |
| LLC; 45 RIVER ROAD ASSOCIATES, | |
| LLC; and XYZ CORPORATIONS 1-10, | |
| | |
| Defendants. | |

## PLAINTIFF'S BRIEF IN SUPPORT OF APPLICATION FOR INJUNCTIVE RELIEF

**FOX ROTHSCHILD LLP**
**Formed in the Commonwealth of Pennsylvania**
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648-2311
(609) 896-3600

Of Counsel And On The Brief:
Henry L. Kent-Smith
Irina B. Elgart

## PRELIMINARY STATEMENT[1]

This extraordinary relief is necessary because the Developer Defendants are pocketing subsidies earmarked to develop 75 affordable residences, which was a condition of approval of the iPark Project. However, while completing 477 market-rate units, the Developers Defendants have failed to build a single affordable unit in violation of the mandated construction-phasing schedule of the Council on Affordable Housing ("COAH"). The Borough aware of these violations for years has failed to issue stop work orders, and instead, continues to issue certificates of occupancy for the market-rate units.

The iPark Project is an inclusionary mixed-use redevelopment project on the Hudson Gold Coast. From its inception, the iPark Project approvals and redevelopment agreement required the iPark redeveloper to include a substantial amount of affordable housing as part of the residential component of the Project. However, as a result of the collective actions of the Borough and the Redeveloper Defendants, the iPark Project has morphed into a multi-million dollar luxury mixed-use project with 584 luxury residences of which 477 (82%) are complete, without a single affordable unit. See iPark's illustration of the Project, which is attached to Cmplt as **Exhibit I**.

What has been lost in this transformation are the 75 affordable housing units that were a condition of the approvals and required to be constructed in accordance with COAH's construction schedule. See Cmplt, **Exhibit A,** 2007 Redevelopment Agreement, § 2.08; **Exhibit B**, Ordinance 240-154D(2). COAH's regulations provide that municipalities zoning for inclusionary development **shall** require low and moderate-income housing units to be constructed in accordance with the following schedule:

---

[1]     In support of this application, Plaintiff relies upon the Verified Complaint ("Cmplt.") and exhibits attached thereto, which is being filed simultaneously herewith. Capitalized terms used herein are defined in the Cmplt.

| Percentage of Market-rate Units Completed | Minimum Percentage of Low and Moderate Income Units Completed |
|---|---|
| 25 | 0 |
| 25 + 1 unit | 10 |
| 50 | 50 |
| 75 | 75 |
| 90 | 100 |

N.J.A.C. 5:93-5.6(d); N.J.A.C. 5:94-4.4(f). The policy behind this phasing schedule are complex but essentially necessary to ensure that developers do not abandon inclusionary projects after completing all of the market rate units. With 82% of the market-rate units complete and the last residential structure being pre-sold and under construction by the Developer Defendants, it is imperative to protect the subsidies generated by the market-rate units by issuing temporary restraints and injunctive relief.

The Borough and the Defendants cannot dispute the relevant material facts that can be simply be stated as follows:

- Since 2007, iPark Redevelopment Group was required to build 75 affordable housing units consistent with COAH's construction schedule at N.J.A.C. 5:93-5.6, as required by the 2007 Redeveloper Agreement and Ordinance 240-154(D)(2). See Cmplt, **Exhibit A, § 2.08, and Exhibit B**. See also **Exhibit C**, 2013 Plan; **Exhibit G**, 2015 Deed Restriction.

- iPark Redeveloper Group has never been released from the obligation to and remains jointly responsible for building the affordable housing together with the Daibes Redevelopment Group, who claims to have "assumed" the obligation.

- iPark Redeveloper Group and Daibes Redevelopment Group failed to build a single affordable unit while unjustly profiting from the creation of at least 477 market-rate units (i.e., 82% of 584 market-rate units), which are currently being leased at the Oyster and the View, sold at the Pearl, and are being pre-sold in the Glass House (which will produce 107 units and is under construction).

- While completing about 82% of iPark, iPark Redevelopment Group and its purported assignee, Daibes Redevelopment Group, have steadfastly **refused to design, plan, and build** the affordable housing.

The Borough continues to issue CO's for the market-rate units, and refuses to issue stop work orders to force the creation of the 75 affordable housing units in accordance with COAH's construction schedule as required by the Section 2.08 of the 2007 Redevelopment Agreement and Ordinance 240-154(D)(2).

Despite the 2007 Redevelopment Agreement, Ordinance 240-154D(2), 2013 Amended Plan, and the 2015 Deed Restriction (Cmplt, **Exhibits A, B, C, G, respectively**), iPark Redevelopment Group, the original redeveloper, has attempted to skirt the conditions of its approval by "assigning" its affordable housing obligation to another developer, Daibes Redevelopment Group. However, both Developer Defendants remain responsible since neither has been released from this obligation – not by the Borough or otherwise. At the same time, the Borough has failed to enforce the 2007 Redevelopment Agreement, 2013 Amended Plan, 2015 Deed Restriction, Ordinance 240-154D(2), which collectively mandate the construction of 75 affordable units in accordance with COAH's construction schedule.

Consequently, 615 River Road Partners, LLC, ("615" or "Plaintiff")[2] brings this application and Verified Complaint for temporary restraints and emergent injunctive relief to compel the Borough to enforce the affordable housing construction phase-in schedule as mandated in its own Ordinance 240-154D(2) and Section 2.08 of the 2007 Redevelopment Agreement

---

[2]     Last year, 615 completed the environmental remediation of the former Hess site, and sought approval from the Borough to develop its property as an inclusionary development with a substantial set-aside for low and moderate income households. However, despite filing its variance application, the Borough denied 615 any hearings. Due to Borough's inaction, Plaintiff was forced to file an action seeking a statutory approval, which is currently pending and captioned 615 River Road Partners, LLC v. Edgewater Zoning Board of Adjustment, et al., Docket No. BER- L-2040-16.

4

against the iPark Redevelopment Group and against the Daibes Redevelopment Group, as assignee. Specifically, Plaintiff seeks the following temporary and preliminary relief:

(1)     a writ of mandamus for the Borough to issue a stop work order until the affordable housing units are constructed pursuant to N.J.A.C. 5:23-2.30 and 2.31;

(2)     an injunction against the Borough to preclude it from issuing any further certificates of occupancy for the market-rate units pursuant to N.J.A.C. 5:23-2.30 and 2.31;

(3)     an injunction against iPark Redevelopment Group and Daibes Redevelopment Group precluding any further construction on the iPark Project until the required affordable units are complete; and

(4)     the imposition of an equitable lien due to the unjust enrichment of iPark Redevelopment Group and Daibes Redevelopment Group of future proceeds from sales and/or leases from the iPark Project, to be paid into court to subsidize the construction of the affordable units.

The relief sought herein is necessary to curtail the immediate and irreparable harm to the protected class of low and moderate-income households that are in desperate need of safe and decent affordable housing particularly on the Hudson Gold Coast – where market-rate residential, commercial and retail buildings appear practically overnight. It is clear that simultaneous with the construction of the last market-rate residential building (i.e., the Glass House), it is also being marketed and pre-sold. With the completion of the last market-rate building, iPark Redevelopment Group and Daibes Redevelopment Group have no incentive to complete the affordable units.

COAH's and Ordinance 240-154D(2)'s construction phase-in requirements are mandatory and cannot be unilaterally modified by the Borough and/or any defendant. The construction schedule is a non-waivable condition of approval for an inclusionary development. The reason for the schedule is that in inclusionary developments, the market-rate units subsidize the construction of the affordable units. To ensure that developers do not abandon the project once the market-rate units are complete, such is what is occurring with the iPark Project, COAH's construction schedule is specific by allowing 25% of the market-rate units to be constructed ahead of the affordable

5

housing units in order to provide seed-money to start the affordable units. Then, the construction of the affordable housing units progressively accelerates to ensure that 100% of affordable units are complete by the time that only 90% of the market-rate units are complete. While completing about 82% of iPark (i.e., 477 market-rate units), and starting construction and sales of units in the Glass House (which will produce 107 market-rate units), iPark Redevelopment Group and its purported assignee, Daibes Redevelopment Group, have steadfastly *refused to design, plan, and build* the affordable housing.

In light of the violation of a condition of approval, the issuance of a stop work order is a non-discretionary ministerial task pursuant to N.J.A.C. 5:23-2.30 and 2.31. Therefore, the Borough is not charged with any discretion but to enforce the mandated affordable housing construction schedule. The Court's imposition of injunctive relief is the only avenue to ensure that the affordable housing will be constructed and not irreparably lost or delayed. Consequently, temporary restraints and injunctive relief are necessary to foreclose any further deprivation of affordable housing opportunities to the protected class for the reasons set forth in greater detail below.

6

## STATEMENT OF FACTS

The facts set forth in the Verified Complaint are incorporated herein by reference.

## LEGAL ARGUMENT

### POINT I

### PLAINTIFF IS ENTITLED TO INJUNCTIVE RELIEF

This Court should grant injunctive relief because Plaintiff satisfies all criteria for such relief. Injunctive relief is appropriate when the applicant demonstrates that: (i) the plaintiff has demonstrated a reasonable probability of ultimate success on the merits; (ii) the relief is necessary to prevent irreparable harm; (iii) the movant will suffer comparatively greater hardship if the application is denied than the opposing party will suffer if the application is granted; and (iv) the application is not contrary to the public interest. See Crowe v. DeGioia, 90 N.J. 126, 131-34 (1986); Dolan v. Decapua, 16 N.J. 599, 614 (1954); Subcarrier Comm., Inc. v. Day, 299 N.J. Super. 634, 638 (App. Div. 1997). A review of the circumstances presented here leads inexorably to the conclusion that, in light of the Crowe criteria, this Court should grant Plaintiff's request for relief in the form of a writ of mandamus, an injunction, and the imposition of a constructive trust and/or equitable lien.

Since the mid-2000's, the iPark Redevelopment Group has been obligated to build 75 affordable housing units in accordance with a specific construction phase-in schedule promulgated by the Council on Affordable Housing ("COAH"). See Cmplt, **Exhibit A**, 2007 Redevelopment Agreement, § 2.08 and Exhibit B, Redevelopment Plan, E(2)(a); **Exhibit B**, Ordinance 240-154D(2). The Borough's 2013 Amended Plan and the 2015 Deed Restriction required that iPark Redevelopment Group and Daibes Redevelopment Group build 75 affordable units. See Cmplt, **Exhibit C**, at § D(2); **Exhibit G,** § IX. The COAH's construction schedule mandates that the

7

affordable housing units in an inclusionary development **shall** be constructed in sequence with the market rate housing. N.J.A.C. 5:93-5.6(d); Ordinance 240-154D(2).

For years, the Borough directed iPark Redevelopment Group to phase-in the affordable units and warned that if a violation occurs, it would stop issuing CO's. See Cmplt, **Exhibit D**, 2011 Planning Board Meeting Minutes; **Exhibit E**, July 17, 2013 Letter from Borough Administrator to iPark Redevelopment Group; **Exhibit F**, July 22, 2013 Letter from iPark Redevelopment Group's counsel to Borough Administrator. Despite the warnings, it is crystal clear that the Borough has turned a blind-eye to defendants' repudiation of the conditions of its approval.

In a staged letter writing exchange between the Defendants in January 2017, Defendants, collectively, admit to the violation of this condition of approval. This orchestrated letter exchange was initiated by the Borough with a letter dated January 9, 2017 from the Mayor to iPark Redevelopment Group. Rather than, iPark Redevelopment Group responding to the letter, Daibes Redevelopment Group on "Daibes Enterprises" letterhead wrote back within one (1) day, on January 10, 2017. See Cmplt, ¶¶ 81-86, **Exhibit M**. The Daibes Redevelopment Group admitted to its failure to timely produce affordable housing, and ignored the Borough's request for assurances and a construction schedule for the affordable housing. See Cmplt, **Exhibit N**. Daibes Redevelopment Group's "excuse" for its admitted non-compliance was that the affordable housing could not be built since the area (Lot 1.19) was being used for staging vehicles and equipment for the other market-rate housing and commercial/retail construction! Cmplt, **Exhibits M and N.** A January 13, 2017 letter followed from the Borough's Professional Planner, Kathryn Gregory, to Frank Banish, the Special Master, which states that: (1) "the [iPark] building has yet to be constructed" so certificates of occupancy and 30 year deed restrictions are "obviously not

8

available;" and (2) "no further COs will be issued until affordable housing units are constricted(sic) within the development." Cmplt, **Exhibit O.**

The representation to the Court's Special Master in Ms. Gregory's letter proved to be false. The Borough fraudulently issued two Temporary Certificates of Occupancy to iPark Redevelopment Group on February 22, 2017 for the construction of the Glass House – the last residential building under construction, despite iPark Redevelopment Group's and Daibes Redevelopment Group's admission that the 75 affordable units have never been constructed pursuant to COAH's construction schedule. See Cmplt, ¶¶ 88-89, **Exhibit P**, Temporary CO's dated February 22, 2017 for Lot 1.15 (the Glass House). Moreover, iPark Redevelopment Group and Daibes Redevelopment Group continue to sell units at the Pearl, the other for-sale building. See Cmplt, **Exhibit K**, Deed dated April 2017 selling a unit at the Pearl for $1.6 million. The Borough continues to sanction and endorse the Developer Defendant's violation of its affordable housing construction obligation. Even worse is that the Borough has blocked access to public records in response to 615's OPRA requests of March 2017 regarding the iPark Project – providing no reason for the denial of access. See Cmplt, **Exhibit Q**, Order to Show Cause and Complaint.

As required by Crowe v. De Gioia, Plaintiff can demonstrate that it has a likelihood of success on the merits, that the legal right underlying the claim is settled, and that the Defendants cannot dispute the material facts, which are all derived from documents generated by the Defendants, and are either publically available or were submitted to the court. Between the burden on Defendants to construct the affordable housing they are required to, and the hardship imposed on low and moderate-income households in need of affordable housing, the relative hardship between the parties clearly militates in favor of granting temporary restraints pending a hearing on

9

further injunctive relief. Therefore, Plaintiff respectfully requests that this Court grant this application for a writ of mandamus, and injunctive relief, together with temporary restraints.

## A.    Likelihood Of Success On The Merits.

Plaintiff is able to demonstrate a likelihood of success on the merits for each and every claim asserted in the Verified Complaint for the issuance of a Writ of Mandamus, injunctive relief, and the imposition of an equitable lien upon the proceeds from the continued sale and/or lease of the market-rate units to ensure that the affordable housing will be adequately subsidized and constructed. Under Crowe, the movant is required to establish that: (i) that their legal right to relief is well settled; and (ii) the facts are not converted. 90 N.J. at 131-34. Courts typically refer to these two criteria collectively as requiring the movant to establish a reasonable likelihood of success on the merits. A reasonable probability of success on the merits means that "[m]ere doubt as to the validity of the claim" is not an adequate basis for denial of the relief. Id. at 133.

The Borough and the Defendants cannot dispute the relevant material facts that can be simply be stated as follows:

> •    Since 2007, iPark Redevelopment Group was required to build 75 affordable housing units consistent with COAH's construction schedule at N.J.A.C. 5:93-5.6, as required by the 2007 Redeveloper Agreement and Ordinance 240-154(D)(2). See Cmplt, **Exhibit A, § 2.08, and Exhibit B**. See also **Exhibit C**, 2013 Plan; **Exhibit G**, 2015 Deed Restriction.

> •    iPark Redeveloper Group has never been released from the obligation to and remains jointly responsible for building the affordable housing together with the Daibes Redevelopment Group, who claims to have "assumed" the obligation.

> •    iPark Redeveloper Group and Daibes Redevelopment Group failed to build a single affordable unit while unjustly profiting from the creation of at least 477 market-rate units (i.e., 82% of 584 market-rate units), which are currently being leased at the Oyster and the View, sold at the Pearl, and are being pre-sold in the Glass House (which will produce 107 units and is under construction).

10

• While completing about 82% of iPark, iPark Redevelopment Group and its purported assignee, Daibes Redevelopment Group, have steadfastly *refused to design, plan, and build* the affordable housing.

The Borough and the Defendants cannot dispute Plaintiff's legal right to the relief sought herein. The Borough's Ordinance 240-154D(2) mandates that "[a]ll affordable units shall comply with COAH's rules pertaining to the phasing of construction, . . ., as set forth in N.J.A.C. 5:94 et seq., as amended, and elsewhere in the rules." Cmplt, **Exhibit B**, Ordinance § 240-154D(2). Similarly, Section 2.08 of the 2007 Redevelopment Agreement mandates that "[t]he [iPark] Redeveloper [Group] shall provide a minimum of seventy-five (75) affordable housing units, . . .[and that the] construction phase-in . . . shall be consistent with the rules of the New Jersey Council on Affordable Housing ("COAH")." See Cmplt, **Exhibit A**, 2007 Redevelopment Agreement, § 2.08. To date, iPark Redevelopment Group, and its assignee of the affordable units, Daibes Redevelopment Group, have failed to produce a single affordable unit or comply with COAH's phasing schedule. Likewise, the Borough has failed to undertake any action to enforce its own Ordinance and Agreement with the iPark Redevelopment Group and the Daibes Redevelopment Group to produce the required affordable housing. These facts are indisputable.

Beyond the scope of Ordiance 240-154(d)(2) and 2007 Redevelopment Agreement, the Borough is also subject to a constitutional obligation to provide a realistic opportunity for affordable housing within the Borough. Inherent within this obligation is the duty to enforce its own ordinances, agreements and conditions of approvals with respect to affordable housing to ensure to the extent possible the affordable housing is built. The relief sought by Plaintiff in this action is formerly cognizable as a prerogative writ of mandamus.

"Prior to the adoption of the New Jersey Constitution of 1947, persons aggrieved by action or inaction of state or local administrative agencies could seek review by applying for one of the

11

prerogative writs." Vas v. Roberts, 418 N.J. Super. 509, 515 (App. Div. 2011) (internal quotation marks and citation omitted). Since the adoption of the 1947 Constitution, the prerogative writs of certiorari, quo warranto, prohibition, and mandamus have been consolidated into a single action, commonly known as an "Action in Lieu of Prerogative Writs." Id. at 521. In New Jersey particularly, the prerogative writ is used as "a comprehensive safeguard against official wrong." Garrou v. Teaneck Tryon Co., 11 N.J. 294, 302 (1953).

The prerogative writ of mandamus is used to remedy official inaction. Joseph v. Passaic Hospital, 26 N.J. 557 (1958) (discussing use of writ of mandamus). More specifically, "[a] writ of mandamus is an order given by a court to a government official 'that commands the performance of a specific ministerial act or duty, or compels the exercise of a discretionary function, but does not seek to interfere with or control the mode and manner of its exercise or to influence or direct a particular result.'" In re Resolution of State Comm'n of Investigation, 108 N.J. 35, 45 n. 7 (1987) (quoting Switz v. Twp. of Middletown, 23 N.J. 580 (1957)). A ministerial duty is one that "'is absolutely certain and imperative, involving merely the execution of a set task, and when the law which imposes it prescribes and defines the time, mode and occasion of its performance with such certainty that nothing remains for judgment or discretion.'" Vas, supra, 418 N.J. Super. at 522 (quoting Ivy Hill Park Apartments v. N.J. Prop. Liabl. Ins. Guar. Ass'n, 221 N.J. Super. 131, 140 (App. Div. 1987)).

Mandamus is appropriate where there is no ordinary cause of action that would provide an equally adequate and complete remedy. However, even if an alternative remedy is available, that other remedy must be both realistically adequate and available. For example, and relevant to this matter, the availability of criminal indictment of public officials for failing to enforce zoning

ordinance would not provide adequate remedy to aggrieved neighbor. Garrou, supra, 11 N.J. at

304. The logic of the inadequacy is apparent:

> But the answer is that indictment would not furnish a complete
> remedy, for, while it might be the means of punishing the delinquent
> members, it would leave the public duty still unperformed. To
> justify refusal of the writ on this ground the other remedy must be
> specific and adequate.

Lay v. Hoboken, 75 N.J.L. 315 (Sup. Ct. 1907). The same rings true under the circumstances of

this case.

The Department of Community Affairs regulations dealing with notice of violations and

stop work orders indicate that the role of construction officials is to perform ministerial tasks when

a violation of a regulation or permit exists, and to issue notices of violation ("NOVs") and stop

work orders. N.J.A.C. 5:23-2.30 does not cloak construction officials with discretion over whether

to issue a notice of violation ("NOV") where a violation exists. Instead, "[an] official **shall issue**

a notice of violation and orders to terminate directing the discontinuance of the illegal action or

condition and the correction of the violation" where there is a "violation of the provisions of the

regulations or where there exists a violation of a permit or certificate issued under the regulations."

N.J.A.C. 5:23-2.30(a). The NOV is required to provide, among other thing, an order to terminate

violations within a specific time, a penalty if any, and notice "that if a penalty is imposed, the

enforcing agency will not issue a certificate of occupancy until such penalty has been paid."

N.J.A.C. 5:23-2.30(b)(1).

Where a party does not comply with the NOV, a municipal official must utilize a remedy

that will likely bring about compliance, including the institution of a "proceeding at law or in

equity to restrain, correct, or abate such violation." N.J.A.C. 5:23-2.31(a). Likewise, stop

construction orders may be issued where the construction is being undertaken in violation of any

laws or ordinances. N.J.A.C. 5:23-2.31(d). "Any person or corporation, including an officer, director or employee of a corporation," will be subjected to a penalty if the person violates a condition of a building permit, fails to comply with an order, or makes a false statement or material omission in an application. N.J.A.C. 5:23-2.31(b)(1).

Despite admissions as late as January 2017 by Defendants and the Borough that Defendants are in violation of the construction phasing schedule, the Borough has failed to enforce the provisions of the 2007 Redevelopment Agreement, 2013 Plan, 2015 Deed Restriction, and its own Ordinance § 240-154D(2) relating to COAH's construction schedule by: (1) continuing to issue certificates of occupancy for the market-rate units; (2) refusing to issue stop work orders to the developers; and (3) failing to mandate the development of the affordable units.

The plain language of the COAH regulations are mandatory and clear with regard to the construction-phasing schedule for inclusionary developments. COAH's regulations provide that municipalities zoning for inclusionary development **shall** require low and moderate-income housing units to be constructed in accordance with the following schedule:

| Percentage of Market-rate Units Completed | Minimum Percentage of Low and Moderate Income Units Completed |
|---|---|
| 25 | 0 |
| 25 + 1 unit | 10 |
| 50 | 50 |
| 75 | 75 |
| 90 | 100 |

N.J.A.C. 5:93-5.6(d); N.J.A.C. 5:94-4.4(f). COAH regulations further provide that "[a] newly constructed unit is considered complete when the certificate of occupancy is issued." N.J.A.C. 5:93-5.6(e). The phase-in schedule is mandatory and cannot be modified unilaterally by the Borough or any developer.

14

COAH's schedule to phase-in the affordable housing allows 25% of the market-rate units to be constructed ahead of the affordable housing units in order to provide a funding source for the affordable units. Then, the schedule of the affordable housing units accelerates to ensure that the affordable units are complete ahead of the market-rate units. Prior COAH proposals of N.J.A.C. 5:93-5.6 originally allowed 75% of the affordable units to be delivered at the same time as 100% of the market-rate units. COAH recognized that:

> 154 Comment: The proposed phasing schedule is too generous to developers. As proposed, a developer can finish 99% of the market units and walk away from the last 25% of the low and moderate income units. As an incentive to completion of the low and moderate income units, the phasing schedule should provide that 100% of the low and moderate income units must be completed before 90% of the market rate units are completed. RESPONSE: The Council agrees and has re-proposed the rule in N.J.A.C. 5:93 – 5.6, as described in the summary, which follows. . . .

25 N.J.R. 5774. This policy ensures that developers do not abandon the creation of the affordable units once the market-rate units are complete.

By the end of 2014, the Defendants had completed over 146 market-rate units (i.e., 25% of 584 units). In this situation, not only did iPark Redevelopment Group not follow through with its obligation to phase-in the construction of the affordable units, it claims to have "assigned" its obligation to the Daibes Redevelopment Group. The original redeveloper cannot be relieved of an affordable obligation in connection with an inclusionary development because the obligation is a condition of approval. Therefore, the assignment of an affordable housing obligation is a farce, which renders the "assignment" a legal nullity.

In its December 2008 Housing Element and Fair Share Plan, the Borough relied on the iPark Project to provide 75 affordable housing units. At a Planning Board meeting regarding the iPark subdivision application in 2011, Mr. Cotter, the CEO of National Resources, testified to his

preference that he NOT build affordable housing. Moreover, in 2016, Kathryn Gregory, the Borough Planner, took the position that the affordable housing units would not be produced for at least another three (3) years notwithstanding that construction was continuing on market rate residential units. Not only has the Borough allowed the developers to violate COAH Regulations, the Borough has actively supported iPark's violations.

Despite the fact that the majority of the market-rate units have been built, no affordable units have been constructed. Defendants have violated COAH construction phasing regulations by completing 477 of the 584 market-rate units without producing a single affordable housing unit. Defendants have started to construct the Glass House, which is the last residential building that will consist of 107 market-rate units. Before construction of these units is allowed to continue, the Borough must ensure that the affordable units are built.

In January 2017, the Borough's and Defendants not so artfully and discretely orchestrated a letter exchange definitively demonstrating and memorializing violations of the construction schedule. Without any assurances that the affordable housing will be created and without any construction schedule, the Daibes Redevelopment Group's letter stated that the affordable housing cannot be built because the area is being used for staging of construction equipment for the market rate residential projects! The Borough's inaction was underscored by the Borough Planner's letter dated January 13, 2017 making a nonchalant statement that the affordable housing units will not be built for at least three more years. Despite the representations of the Mayor in his January 10, 2017 letter, and Ms. Gregory in her January 13, 2017 letter, the Borough's inaction is further underscored by the fact that it continues to issue Temporary Certificates of Occupancy for market rate units. These representations are in direct circumvention of the 2007 Developer Agreement and Ordinance §240-154D(2), with no authority to allow for these deviations. The irreparable harm to

16

low income families waiting for safe, decent affordable housing cannot be ignored while iPark constructs market-rate units in knowing violation of COAH regulations and the 2007 and 2013 Redevelopment Agreement. The Borough was required to enforce COAH regulations against the Defendants, and not the Court, must incentivize the Defendants to finish the affordable housing units, rather than to abandon construction once all of the market-rate units are complete.

Pursuant to a restrictive covenant in the 2015 Deed (which incorporates the terms of the 2013 Amended Redevelopment Agreement that the Borough was required to produce, but never did, in the DJ Action), the exclusive use of Lot 1.19 was the development of 75 affordable units. In relevant part, Section IX of the 2015 Deed provides as follows:

> IX. The Amended and Restated Redevelopment Plan for the Unilever Redevelopment Area dated August 2013 adopted by the Borough of Edgewater by Ordinance 1503-2014 on April 21, 2014 (the "Amended Redevelopment Plan"). **Grantee shall not use the Property for any purpose other than the construction and development of 75 affordable housing units consistent with the Amended Redevelopment Plan, without the express written consent of Grantor so long as Grantor, or any entity affiliated with Grantor owns any portion of the Unilever Redevelopment Area.** . . . (emphasis provided).

Therefore, pursuant to a restrictive covenant in the 2015 Deed, the exclusive use of Lot 1.19 was the development of 75 affordable units, and by the property as a storage and staging area for the construction of the non-affordable portions of the project.

In addition, iPark also has a non-residential component, which includes a the Borough Hall, CVS, HomeGoods, retail in the River Road Retail Mall, retail on the first floor of the View and the Marriott Courtyard hotel, all of which have been completed and are operating. See **Exhibit I**, Illustration of iPark with hand-written lot numbers. Pursuant to the 2007 Redevelopment Agreement and 2006 Plan, the non-residential components of iPark were obligated to contribute towards the Borough's affordable housing trust fund pursuant to the then existing contribution

17

ordinances. See Cmplt, **Exhibit A**, 2007 Redevelopment Agreement, Exhibit B - Redevelopment Plan, § E(2)(a). However, the 2013 Amended Plan changed this requirement by exempting nonresidential development in the iPark edevelopment area from the payment of development fees. See Cmplt, **Exhibit C**, at 7. In 2009, the Legislature adopted the Non Residential Development Fee Act, N.J.S.A. 40:55D-8.1 et seq. ("NRDFA") The NRDFA invalidates all municipal affordable housing fee ordinances associated with nonresidential development. N.J.S.A. 40:55D-8.7. The 2013 Amended Plan illegally and improperly exempts the nonresidential component of the iPark Project from payment of the State mandated NRDFA.

The Borough has relied on the iPark Project to provide at least seventy-five (75) units of low and moderate income affordable housing in satisfaction of the Borough's constitutional obligation under the Mount Laurel Doctrine as set forth in the Declaratory Judgement Action the Borough filed in 2015, captioned In the Matter of the Application of the Borough of Edgewater, Docket No. BER-L-6364-15 ("Declaratory Judgment Action"). The Borough filed its Complaint for Declaratory Judgment seeking a judgment of compliance its revised Housing Element and Fair Share Plan is constitutionally compliant. In connection with the procedures set forth in In re Adoption of N.J.A.C. 5:96, 221 N.J. 1 (2015) ("Mount Laurel IV"), a judgment of compliance would have the effect of immunizing the Borough from builder's remedy lawsuits. However, the court has not issued a judgment of compliance in that matter.

For all the reasons set forth above, there is no doubt that the legal obligation to create the affordable units in conjunction with the COAH scheduled is well-established. It is equally uncontroverted that the Borough Daibes and iPark have thumbed their noses at this clear legal requirement.

18

**B.     Irreparable Harm.**

Pursuant to Crowe, 99 N.J. at 130, the irreparable harm criterion is established if the movant establishes that it cannot obtain adequate relief through the award of monetary damages. Since 1975, the constitutional prohibition against exclusionary zoning recognized that municipalities may not allow zoning for the rich, while excluding housing opportunities for lower income households. See Southern Burlington County NAACP, et al. v. Twp. of Mt. Laurel, 67 N.J. 151, 179 (1975) ("Mount Laurel I") ("It is plain beyond dispute that proper provision for adequate housing of all categories of people is certainly an absolute essential in promotion of the general welfare required in all local land use regulation.").

By its very nature, this constitutional obligation cannot be compensated by monetary payment of any amount. Rather, the Mount Laurel requirement is for the provision of a realistic opportunity for the creation of housing opportunities for all citizens of New Jersey, not just those that can afford to live here. As expounded upon by the Court in Mount Laurel II, it is imperative that municipalities are proactive in carrying out their governmental functions and duties to achieve this purpose:

> It would be useful to remind ourselves that the doctrine does not arise from some theoretical analysis of our Constitution, but rather from underlying concepts of fundamental fairness in the exercise of governmental power. The basis for the constitutional obligation is simple: the State controls the use of land, all of the land. **In exercising that control it cannot favor rich over poor.** It cannot legislatively set aside dilapidated housing in urban ghettos for the poor and decent housing elsewhere for everyone else. The government that controls this land represents everyone. While the State may not have the ability to eliminate poverty, **it cannot use that condition as the basis for imposing further disadvantages. And the same applies to the municipality, to which this control over land has been constitutionally delegated.**

19

Southern Burlington County NAACP, et al. v. Twp. of Mt. Laurel, 92 N.J. 58, 209 (1983) ("Mount Laurel II").

It is for this reason and under this authority that the obligation to provide affordable housing at the iPark development was born. In the exercise of its land use powers the Borough required the iPark developer to meet COAH phase in standards when building the market rate residential housing. See **Exhibit A**, 2007 Redevelopment Agreement, § 2.08. This obligation was further bolstered by Ordinance 240-154D(2), which codified the requirement to create housing opportunities for low and moderate income families while building expensive high-end housing for the rich, in a manner that ensured the obligation to provide the affordable units would not fall by the way-side. It is incumbent that these provisions are enforced.

What is more, the importance and function of laws, and the enforcement thereof, is entirely distinct from the purpose of compensating injuries that result from contract or tort actions. As illustrated by the Court in Mount Laurel II, the function and purpose of laws such as zoning laws is to ensure the promotion of the general welfare and to maintain an orderly and just society. The injuries to the social fabric of a society that result from a municipality's failure to enforce its own ordinances cannot be remedied by money. The only cure is judicial intervention to ensure that laws are enforced, especially laws that are in place to safeguard such a critical subject as the provision of affordable housing for people of all income levels.

## C. The Equities Favor Injunctive Relief for Plaintiff

Finally, a plaintiff seeking injunctive relief must establish that the applicable equities weigh in favor of the requested relief. Crowe, supra, 90 N.J. at 132-33. The prong requires the court to consider "the relative hardships to the parties in granting or denying relief." 90 N.J. at 134. The Court must balance the equities involved and, if the potential harm to the public as a result of the

issuance of restraints outweighs any potential damage to defendant, then the restraints should be granted.

In this instance, the balance of the equities could not be more clear or compelling. The Borough and the Developer Defendants have raked in millions of dollars in profits related to the sale of commercial and market rate residential units. This profit is designed to subsidize the creation of the 75 affordable housing units. As a legal obligation to create the affordable housing units has been an agreed-upon legal obligation since 2007, there is simply no basis to claim any hardship for the knowing, willful and contemptuous disregard of both the Redevelopers Agreement and Borough ordinances.

In stark contrast, lower income households have been deprived of safe, decent and affordable housing for years as a result of the callous disregard of the Developer Defendants and the Borough to the housing needs of those least able to advocate for their need. While the iPark developer is raking in profit, and the Borough is enjoying enormous ratables, lower income households are left without housing. Equity cannot sanction such egregious conduct, which is the very essence of "unclean hands".

## CONCLUSION

As a result of the foregoing, Plaintiff's application satisfies the criteria of Crowe v. DiGioia. Therefore, Plaintiff respectfully requests that the Court to grant the following relief:

a. For the issuance of an Order declaring iPark Redevelopment Group and Daibes Redevelopment Group in violation of COAH regulations, N.J.A.C. 5:93-5.6(d) and N.J.A.C. 5:94-4.4(f), Ordinance 240-154D(2), the 2007 Agreement, the 2013 Amended Plan, and the 2015 Deed Restriction;

b. For the issuance of an Order of Mandamus compelling the Borough of Edgewater to enforce Ordinance 240-154D(2), the 2007 Agreement, and the 2013 Amended Plan by requiring Defendants to comply with COAH regulations N.J.A.C. 5:93-5.6(d) and N.J.A.C. 5:94-4.4(f) to construct (75) units of affordable housing prior to the issuance of any certificate of occupancy, either temporary, conditional or permanent, for any market rate residential unit on the iPark Property;

c. For the issuance of an Order enjoining the Borough of Edgewater from issuing any permits or approvals; including zoning permits, building/construction permits, and certificates of occupancy, either temporary, conditional or permanent; for any construction on the iPark Property until such time the Borough issues permanent certificates of occupancy for at least (75) affordable housing units;

d. For the issuance of an Order of Mandamus compelling the Borough to issue a notice of violation and stop work order to the Defendants to abate the violation to its approvals;

e. For the issuance of an order directing Defendants to immediately file for building permits to authorize the construction of seventy five (75) affordable housing units;

f. For the issuance of an equitable lien over sales and lease proceeds against the iPark Property and Defendants until the Borough issues permanent certificates of occupancy for seventy five (75) affordable housing units;

g. For an Order invalidating and striking the following language from the 2015 Deed Restriction: "**without the express written consent of Grantor so long as Grantor, or any entity affiliated with Grantor owns any portion of the Unilever Redevelopment Area**";

h. For the issuance of an Order revoking the Borough's immunity from builder's remedy litigation for failure to provide a realistic opportunity for affordable housing; and

      i.      For such other relief as may be deemed equitable and just, together with costs and counsel fees.

                      **FOX ROTHSCHILD LLP**
                      *Attorneys for Plaintiff, 615 River Road*
                      *Partners, LLC*

                      By: _____
                            Henry L. Kent-Smith
                            Irina B. Elgart

DATED:      May 26, 2017

45687615

**Appendix XII-B1**

<table>
<tr><td colspan="2">


## CIVIL CASE INFORMATION STATEMENT
### (CIS)

Use for initial Law Division
Civil Part pleadings (not motions) under *Rule* 4:5-1
**Pleading will be rejected for filing, under *Rule* 1:5-6(c),
if information above the black bar is not completed
or attorney's signature is not affixed**
</td><td>
**FOR USE BY CLERK'S OFFICE ONLY**
PAYMENT TYPE: ☐CK ☐CG ☐CA
CHG/CK NO.
AMOUNT:
OVERPAYMENT:
BATCH NUMBER:
</td></tr>
</table>

| ATTORNEY / PRO SE NAME<br>Henry L. Kent-Smith | TELEPHONE NUMBER<br>(609) 896-4584 | COUNTY OF VENUE<br>Bergen |
|---|---|---|
| FIRM NAME (if applicable)<br>Fox Rothschild LLP | | DOCKET NUMBER (when available)<br>TBA |
| OFFICE ADDRESS<br>997 Lenox Drive, Bldg. 3<br>Lawrenceville, NJ 08638 | | DOCUMENT TYPE<br>PW Complaint/Order to Show Caus |
| | | JURY DEMAND   ☐ YES   ■ No |

| NAME OF PARTY (e.g., John Doe, Plaintiff)<br>615 River Road Partners, LLC,<br>Plaintiff | CAPTION<br>615 River Road Partners, LLC v. Borough of Edgewater , et al |
|---|---|

| CASE TYPE NUMBER<br>(See reverse side for listing)<br>701 | HURRICANE SANDY<br>RELATED?<br>☐ YES   ■ NO | IS THIS A PROFESSIONAL MALPRACTICE CASE?   ☐ YES   ■ NO<br>IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A -27 AND APPLICABLE CASE LAW<br>REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |
|---|---|---|
| RELATED CASES PENDING?<br>■ Yes   ☐ No | | IF YES, LIST DOCKET NUMBERS<br>BER-L-6364-15 |
| DO YOU ANTICIPATE ADDING ANY PARTIES<br>(arising out of same transaction or occurrence)?<br>☐ Yes   ☐ No | | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known)   ☐ NONE<br>☐ UNKNOWN |

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT, PAST OR<br>RECURRENT RELATIONSHIP?<br>☐ Yes   ■ No | IF YES, IS THAT RELATIONSHIP:<br>☐ EMPLOYER/EMPLOYEE      ☐ FRIEND/NEIGHBOR     ☐ OTHER (explain)<br>☐ FAMILIAL      ☐ BUSINESS |
|---|---|

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?   ☐ Yes   ■ No |
|---|

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR
ACCELERATED DISPOSITION

| DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS?<br>☐ Yes   ■ No | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
|---|---|
| WILL AN INTERPRETER BE NEEDED?<br>☐ Yes   ■ No | IF YES, FOR WHAT LANGUAGE? |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be
redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

ATTORNEY SIGNATURE:



**Side 2**

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
Use for initial pleadings (not motions) under *Rule* 4:5-1

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I - 150 days' discovery**
151   NAME CHANGE
175   FORFEITURE
302   TENANCY
399   REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction)
502   BOOK ACCOUNT (debt collection matters only)
505   OTHER INSURANCE CLAIM (including declaratory judgment actions)
506   PIP COVERAGE
510   UM or UIM CLAIM (coverage issues only)
511   ACTION ON NEGOTIABLE INSTRUMENT
512   LEMON LAW
801   SUMMARY ACTION
802   OPEN PUBLIC RECORDS ACT (summary action)
999   OTHER (briefly describe nature of action)

**Track II - 300 days' discovery**
305   CONSTRUCTION
509   EMPLOYMENT (other than CEPA or LAD)
599   CONTRACT/COMMERCIAL TRANSACTION
603N  AUTO NEGLIGENCE – PERSONAL INJURY (non-verbal threshold)
603Y  AUTO NEGLIGENCE – PERSONAL INJURY (verbal threshold)
605   PERSONAL INJURY
610   AUTO NEGLIGENCE – PROPERTY DAMAGE
621   UM or UIM CLAIM (includes bodily injury)
699   TORT – OTHER

**Track III – 450 days' discovery**
005   CIVIL RIGHTS
301   CONDEMNATION
602   ASSAULT AND BATTERY
604   MEDICAL MALPRACTICE
606   PRODUCT LIABILITY
607   PROFESSIONAL MALPRACTICE
608   TOXIC TORT
609   DEFAMATION
616   WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES
617   INVERSE CONDEMNATION
618   LAW AGAINST DISCRIMINATION (LAD) CASES

**Track IV - Active Case Management by Individual Judge / 450 days' discovery**
156   ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION
303   MT. LAUREL
508   COMPLEX COMMERCIAL
513   COMPLEX CONSTRUCTION
514   INSURANCE FRAUD
620   FALSE CLAIMS ACT
701   ACTIONS IN LIEU OF PREROGATIVE WRITS

**Multicounty Litigation (Track IV)**

| | |
|---|---|
| 271   ACCUTANE/ISOTRETINOIN | 292   PELVIC MESH/BARD |
| 274   RISPERDAL/SEROQUEL/ZYPREXA | 293   DEPUY ASR HIP IMPLANT LITIGATION |
| 281   BRISTOL-MYERS SQUIBB ENVIRONMENTAL | 295   ALLODERM REGENERATIVE TISSUE MATRIX |
| 282   FOSAMAX | 296   STRYKER REJUVENATE/ABG II MODULAR HIP STEM COMPONENTS |
| 285   STRYKER TRIDENT HIP IMPLANTS | 297   MIRENA CONTRACEPTIVE DEVICE |
| 286   LEVAQUIN | 299   OLMESARTAN MEDOXOMIL MEDICATIONS/BENICAR |
| 287   YAZ/YASMIN/OCELLA | 300   TALC-BASED BODY POWDERS |
| 289   REGLAN | 601   ASBESTOS |
| 290   POMPTON LAKES ENVIRONMENTAL LITIGATION | 623   PROPECIA |
| 291   PELVIC MESH/GYNECARE | |

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1,
in the space under "Case Characteristics.

Please check off each applicable category     ☐  Putative Class Action          ☐  Title 59

**FOX ROTHSCHILD LLP**
*Formed in the Commonwealth of Pennsylvania*
BY:    Henry L. Kent-Smith, Esq.  (Atty. ID #034211988)
        Irina B. Elgart, Esq.  (Atty. ID #027311999)
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648-2311
(609) 896-3600
*Attorneys for Plaintiff, 615 River Road Partners, LLC*

---

| | |
|---|---|
| 615 RIVER ROAD PARTNERS, LLC,<br><br>       Plaintiff,<br><br>v.<br><br>BOROUGH OF EDGEWATER, iPARK EDGEWATER, LLC; iPARK EDGEWATER HOLDINGS, LLC; iPARK EDGEWATER INVESTMENTS, INC.; NATIONAL RESOURCES ACQUISITIONS, LLC; NORTH BUILDING EDGEWATER, LLC; ONE MAIN STREET EDGEWATER, LLC; FOUR MAIN STREET EDGEWATER, LLC; EDGEWATER LOFTS, LLC; EDGEWATER GLASS HOUSE, LLC; DAIBES ENTERPRISES, LLC; DAIBES BROTHERS, INC.; DDD & ASSOCIATES, LLC; 2 PEMBROKE WAY ASSOCIATES, LLC; 4 PEMBROKE WAY ASSOCIATES, LLC; 45 RIVER ROAD ASSOCIATES, LLC; and XYZ CORPORATIONS 1-10;<br><br>      Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION:  BERGEN COUNTY<br><br>DOCKET NO.: BER-L-<br><br>CIVIL ACTION<br><br>**CERTIFICATION OF SERVICE** |

HENRY KENT-SMITH, of full age, by way of certification, states as follows:

1.    I am an Attorney-at-Law of the State of New Jersey and a Partner in the law firm of Fox Rothschild LLP, attorneys for Plaintiff, 615 River Road Partners, LLC in the above-captioned matter.

2.     An original and copy of the foregoing Complaint, Order to Show Cause, and

Supporting Brief were forwarded for filing on this date, *via* Hand Delivery, as follows:

> Clerk, Law Division/Civil Part
> Bergen County Justice Center
> 10 Main Street
> Hackensack, New Jersey 07601

3.     Copies of the foregoing documents were served on this date via email to all

interested parties appearing on the Service List, which is attached hereto.

I certify that the foregoing statements by me are true. I am aware that if any of the

foregoing statements made by me are willfully false, I may be subject to punishment.


Henry Kent Smith

Dated:  May 26, 2017

## SERVICE LIST

| | |
|---|---|
| Joshua D. Bauers Esquire<br>Fair Share Housing Center<br>510 Park Boulevard<br>Cherry Hill, NJ 08002<br>(856) 665-5444 x 8<br>joshuabauers@fairsharehousing.org | Borough Attorney:<br>Joseph R. Mariniello, Esquire<br>Mariniello & Mariniello, PC<br>265 Columbia Avenue<br>Fort Lee, NJ 07024<br>(201) 947-6600<br>Fax 201-947-6605<br>jrmariniello@mariniellolaw.com |
| 615 River Rd Partners, LLC<br>Thomas J. Trautner Jr. Esquire<br>Chiesa Shahinian & Giantomasi PC<br>One Boland Drive<br>West Orange, NJ 07052<br>(973) 325-1500<br>ttrautner@csglaw.com | Co-Counsel for Defendant-Intervenor:<br>615 River Rd Partners, LLC<br>Henry Kent-Smith, Esq.<br>Fox Rothschild LLP<br>997 Lenox Drive, Bldg. 3<br>Lawrenceville, NJ 08648<br>609-896-4584<br>Fax 609-896-1469<br>Hkent-smith@foxrothschild.com |
| Attorney Magadelina Torres, Objector<br><br>Northeast New Jersey Legal Services<br>574 Summit Avenue<br>Jersey City, NJ 07306-2797 | Attorneys for Edgewater Board of Adjustment<br>Ronald Gordon, Esq.<br>DeCotiis, Fitzpatrick & Cole, LLP<br>Glenpointe Centre West<br>500 Frank W. Burr Blvd.<br>Teaneck, NJ 07666<br>(201) 928-1100<br>eboccher@decotiislaw.com |
| Frank J. Banisch, III, PP, Special Master<br>Banisch Associates, Inc.<br>111 Main Street<br>Flemington, NJ 08822<br>908-782-7636<br>frankbanisch@banisch.com | IPark Edgewater, LLC<br>c/o Paul Kaufman<br>Kaufman Semeraro & Leibman LLP<br>Fort Lee Executive Park<br>2 Executive Drive, Suite 530<br>Fort Lee, NJ 07024 |
| Philip N. Boggia, Esq.<br>Boggia & Boggia, LLC<br>71 Mt. Vernon Street<br>Ridgefield Park, New Jersey 07660<br>philip@boggialaw.com | |